UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| THE AMERICAN HOSPITAL ASSOCIATION, THE MAINE HOSPITAL ASSOCIATION, EASTERN MAINE MEDICAL CENTER, NATHAN LITTAUER HOSPITAL & NURSING HOME, UNITY MEDICAL CENTER, and DALLAS COUNTY MEDICAL CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., Secretary of the U.S. Department of Health and Human Services, ET AL.,<br><br>Defendants. | DECLARATION OF JEFFREY AUSTIN IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER |

I, Jeffrey Austin, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am the President of the Maine Hospital Association ("MHA"), a non-profit representing 32 community-governed hospitals in Maine. I submit this declaration in support of Plaintiffs' motion for a temporary restraining order. The facts in this declaration are based on my personal knowledge and experience, my review of MHA's business records and of publicly reported State data, and information provided to me by 340B personnel at MHA's member hospitals with direct knowledge of those matters.

2. I joined MHA in 2010 and served as Vice President, Government Affairs and Communications, until I became President of MHA in March 2026. As President, I am responsible for the Association's operations and for its advocacy at the state and federal levels, and in my prior role I was responsible for all of the Association's communications. Before joining MHA, I was a government affairs professional for the Maine Municipal Association.

3. I earned my undergraduate degree from the University of Notre Dame and my law degree from Boston College.

4. I am familiar with Defendants' plan to replace the 340B program's current discount model with a rebate program starting on January 1, 2027, for twenty-five popular drugs. On April 16, 2026, MHA submitted a comment letter to Defendant Engels in response to the Health Resources and Services Administration's (HRSA) Request for Information ("RFI") regarding a 340B rebate model, setting out the costs such a program would impose on our member hospitals and urging HRSA to abandon it.[1] HRSA nonetheless announced the program in a notice published on August 3, 2026 (the "Notice"),[2] and on October 1, 2026 it published the rebate plans it had approved for ten manufacturers covering eighteen drugs (the "Approved Plans").[3] I have reviewed the Notice and the relevant plans. I also know the harm that this rebate program will cause MHA's members if it goes into effect.

**<u>MHA's Members Are the Safety Net in a Rural State</u>**

5. Founded in 1937, MHA is the primary advocate for Maine hospitals in the Maine State Legislature, the U.S. Congress, and state and federal regulatory bodies. Our mission is to support our members in improving the health of their patients and the communities they serve. Twenty-five of our thirty-two member hospitals currently participate in the 340B program.

6. Our members provide essential, around-the-clock medical care across the State of Maine. Half of them are critical access hospitals—small acute care facilities with limited services and no more than twenty-five inpatient beds.

---

[1] Letter from Me. Hospital Ass'n to Thomas J. Engels, Adm'r, Health Res. & Servs. Admin. (Apr. 16, 2026), HRSA-2026-0001-1530.

[2] 91 Fed. Reg. 48,883 (Aug. 3, 2026).

[3] The Approved Plans are posted on HRSA's website. *See* Health Res. & Servs. Admin., *340B Rebate Model Pilot Program*, https://www.hrsa.gov/opa/340b-model-pilot-program (last visited Oct. 5, 2026).

7. Maine has been losing hospital capacity for a decade. Four hospitals have closed, and others have shut down individual service lines. The loss of obstetric care has been especially severe. Maine hospitals have closed ten labor and delivery units within the past decade.

8. The Maine Health Data Organization ("MHDO") is the state agency that maintains Maine's all-payer claims database and collects hospital financial and 340B data. MHDO's most recent hospital financial report shows that the median operating margin for Maine hospitals was <u>0.35</u> percent and the median number of days of cash on hand was <u>9.3</u>. A hospital operating on nine days of cash cannot absorb additional demands on its liquidity simply so that HRSA can run an experiment.

**<u>The 340B Program Sustains Maine's Hospitals</u>**

9. Twenty-seven Maine hospitals participated in the 340B program during fiscal year 2024—the most recent year for which the State has published data—and those hospitals realized more than $300 million in total savings.[4] I understand that the participation rate of Maine hospitals in the 340B program in 2026 is similar to what MHDO reported for 2024.

10. Our members put those savings back into their communities through, among other things, financial assistance to patients who cannot afford care; community-based health clinics at schools, nursing homes, and other easy-to-access locations; outbreak preparedness programs; and life-saving opioid intervention services, including the provision of naloxone, suboxone, and methadone.

[4] Me. Health Data Org., *340B Drug Program Transparency Report* 3 (2026).

**Maine's Hospitals Built Their Operations on the Upfront Discount Model**

11. Our member hospitals designed their pharmacy operations, wholesaler arrangements, third-party administrator contracts, and annual budgets around an upfront discount, because that is the only model HRSA has ever used. They build those savings into the budgets that fund service lines, staffing, and charity care. They also budget a year in advance.

12. A shift to a rebate mechanism would not simply delay a payment. It would require our members to fund, out of cash they do not have, the same discount they have been receiving at the point of purchase for three decades. Our members did not build their operations around an upfront discount out of preference. They did so because that is the only way the program has ever worked, and because HRSA gave them no reason to plan for anything else.

**Maine's Hospitals Will be Forced to Float the Wholesale Acquisition Cost of These Drugs**

13. In preparing this declaration, I solicited information from the 340B professionals in MHA's member systems about what Defendants' rebate program would require of them.

14. Collectively, our members distribute all eighteen drugs included in Defendants' rebate program.

15. Our members' wholesaler payment terms cannot accommodate a rebate. Among our member systems, payment terms vary from seven to fifteen days. Due to the practical realities of claims submission, however, our members will be forced to float the wholesale acquisition cost of the drugs included in Defendants' rebate program, regardless of their wholesaler payment term.

16. Defendants' ten-day rebate payment clock does not begin when a drug is dispensed. It begins when a manufacturer receives a complete claim, and our members report that building a claim takes days to weeks. Claims are pulled and submitted on reporting cycles

rather than one at a time, so a claim is already days old before it can be sent. Overall, our members estimate that the full period from dispense to rebate ranges from roughly eleven days at the fastest, for drugs administered in the hospital, to as long as a month for contract pharmacy prescriptions. And our members describe even those figures as a best-case scenario they are unlikely to achieve in practice. Thus, our members will be forced to float the wholesale acquisition cost of these drugs while awaiting a rebate, notwithstanding a ten-day payment window. Some hospitals have informed me that doing so will result in a high likelihood that a rebate mechanism would put them at risk of violating their bond covenants.

**HRSA Has Underestimated the Administrative Burden**

17. MHA quantified this burden for HRSA in April. Including the twenty-five drugs HRSA referenced in its RFI, we estimated that Maine's 340B hospitals would incur approximately $55 million in annual incremental administrative and operational costs, driven by added and diverted staff, information technology systems, third-party vendors, compliance activities, and building a process for challenging denials. We estimate that implementation would require our member hospitals to hire roughly thirty-five additional full-time employees collectively, or else to pull clinical staff off patient care to perform administrative work. We told HRSA that its calculations of these costs were extraordinarily inaccurate and understated, and that its estimate of five hours per week was a gross underestimate. HRSA's Approved Plans for eighteen drugs have not meaningfully changed that assessment. And, if anything, our members' experience with the MFP Program indicates that these estimates remain low. It even appears that HRSA has never attempted to measure the time required for backend reconciliation of claims, including challenging claim denials, but our members anticipate this backend work will be the most time-consuming part of Defendants' entire rebate mechanism.

18. HRSA has also assumed that the data its program requires is already collected in the ordinary course. It is not. During the prior iteration of the Rebate Program, both HRSA and the drug companies insisted that hospitals already provide the required information through 340B ESP. That is incorrect. One of our member systems reports that this data is not currently collected from any platform in the fashion a rebate model requires, and that compliance would mean writing new reports and pulling data from seven separate systems spanning its electronic health records, its third-party administrators, and its contract pharmacy platforms. Another member reports that the required fields are not tracked in a single source output, that extracts would have to be modified and pulled from multiple sites of care, and that those fields are not among the data its third-party administrators request today.

19. Our members also cannot prepare for a dispute process that does not exist. Defendants do not intend to publish an ADR process until approximately thirty days after the program takes effect, but we understand that our members will be required to challenge rebate denials with both Beacon and the drug companies themselves. A process that forces hospitals operating on nine days of cash to pursue denied rebates against drug companies, with no assurance that Defendants will ever take action when payments are late or denied improperly, will be so burdensome that it will be functionally unavailable to our members.

**A Less Burdensome Alternative Exists, and Defendants Have Not Explained Why It Will Not Work**

20. MHA does not dispute that preventing duplicate discounts between the 340B program and the Medicare Drug Price Negotiation Program is a legitimate—albeit subsidiary and non-statutory—objective. But this rebate mechanism is not the least burdensome way to achieve it. Drug companies have other available options, and we urged HRSA to adopt a neutral third-party clearinghouse instead. At a minimum, we asked HRSA to explain why a clearinghouse is

neither viable nor less costly than a rebate mechanism. It has not done so. Absent any quantification of issues with the upfront discount model, and given the costs I have described, there is no reason to impose a rebate mechanism on Maine's hospitals.

**Maine's Hospitals Will Have to Cut Clinical Services and Delay Capital Projects if the Rebate Mechanism Goes Into Effect**

21. We also asked our members what they would have to cut if the rebate mechanism took effect. Some hospitals said they would no longer be able to subsidize physician practices or to provide behavioral health, substance use treatment, or labor and delivery services. Many would delay or cancel capital projects already planned—emergency department renovations, electronic medical record installations, and expanded emergency transportation among them.

22. Maine's hospitals are already operating on razor-thin margins and nine days of cash. Defendants' rebate program threatens to put further financial stress on our state's healthcare system, which we cannot absorb without adverse consequences for the communities our members serve.

23. In my comment letter, I explained that "HRSA's desire to test a rebate model is seemingly based on the incorrect premise that it must balance the interests of 340B hospitals and drug companies when choosing a discount mechanism. In reality, HRSA must give primacy to the needs of covered entities ....... "[5] HRSA never responded to this comment and instead stuck with its balancing approach. In so doing, HRSA chose a payment mechanism that was not the most effective and most efficient from the standpoint of Maine's 340B hospitals. The costs and burdens discussed above conclusively prove that.

[5] Letter from Me. Hospital Ass'n to Thomas J. Engels, HRSA-2026-0001-1530, at 1.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 6th day of October, 2026 at Augusta, Maine.

*/s/ Jeffrey Austin*
Jeffrey Austin