UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

THE AMERICAN HOSPITAL ASSOCIATION, THE MAINE HOSPITAL ASSOCIATION, EASTERN MAINE MEDICAL CENTER, NATHAN LITTAUER HOSPITAL & NURSING HOME, UNITY MEDICAL CENTER, and DALLAS COUNTY MEDICAL CENTER,

Plaintiffs,

v.

ROBERT F. KENNEDY, JR., Secretary of the U.S. Department of Health and Human Services, ET AL.,

Defendants.

DECLARATION OF MARK BERTILRUD IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

I, Mark Bertilrud, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am the Chief Executive Officer of Unity Medical Center ("Unity") in Grafton, North Dakota. I have been the CEO at Unity since January 2026 and am ultimately responsible for Unity's operations and finances. I submit this declaration in support of Plaintiffs' motion for a temporary restraining order. The facts in this declaration are based on my personal knowledge and experience, my review of Unity's business records, and information provided to me by Unity personnel with direct knowledge of those matters.

2. I have worked in healthcare administration for over forty years. I began my career in 1986 with the Lutheran Hospitals & Homes Society in various administrative roles until 1993. At that time, I moved to Michigan and spent several years working with the American Retirement Corporation at their locations in Holland, MI, and East Lansing, MI, as their Executive Director until 2002. I joined the physician office practice of ProCare Systems that year and served as an Executive Director for several of their medical practices until 2009. After four

years in a private business startup, I returned to an Executive Director role at Eventide Senior Living Communities in Moorhead, Minnesota, in 2013 and served in that role until 2016. From 2016 through 2024, I was the Executive Director of Warroad Senior Living Center in Warroad, Minnesota. In 2024, I became the Chief Operating Officer at Unity and assumed the Chief Executive Officer role in January 2026.

3. I earned an undergraduate degree in Business Administration with a concentration in healthcare management from Concordia College in Moorhead, MN.

4. I am familiar with Defendants' plan to replace the 340B program's current discount model with a rebate program starting on January 1, 2027, for twenty-five popular drugs. On April 17, 2026, Unity submitted a comment letter to Defendant Health Resources and Services Administration ("HRSA") in response to its Request for Information regarding a 340B rebate model pilot program.[1] HRSA nonetheless announced the program in a notice published on August 3, 2026 (the "Notice"),[2] and on October 1, 2026, it published the rebate plans it had approved for ten manufacturers covering eighteen drugs (the "Approved Plans").[3] I have reviewed the Notice and the relevant plans. I also know the harm that this rebate program will cause Unity if it goes into effect.

**Unity Provides Critical Care to an Underserved Population**

5. For more than 110 years, a Grafton, North Dakota-based hospital has served Walsh County and the surrounding region. Today, we provide access to healthcare for over

[1] Letter from Unity Med. Ctr. to Health Res. & Servs. Admin. (Apr. 17, 2026), HRSA-2026-0001-1690.
[2] 91 Fed. Reg. 48,883 (Aug. 3, 2026).
[3] The Approved Plans are posted on HRSA's website. *See* Health Res. & Servs. Admin., *340B Rebate Model Pilot Program*, https://www.hrsa.gov/opa/340b-model-pilot-program (last visited Oct. 5, 2026).

10,000 patients. We operate a fourteen-bed Critical Access Hospital and two primary care Rural Health Clinics.

6. Our patient population is largely elderly and rural; more than twenty percent of Grafton citizens are aged sixty-five or older. Walsh County has been designated by Defendant HRSA as a medically underserved area.[4] U.S. Census Bureau data shows that the median income in Grafton is approximately twenty percent below the median income in the state of North Dakota, and just under seventeen percent of Grafton residents hold a bachelor's degree or higher.[5] Grafton's employment participation rate is approximately sixty percent, and eighteen percent of our citizens have a disability.[6] The primary industries in the area are agriculture and manufacturing.

7. Unity Medical Center offers a range of critical service lines, including inpatient and swing-bed care, emergency services, oncology, infusion services, surgery, cardiac and pulmonary rehabilitation, chronic disease treatment, mental health counseling, radiology, laboratory, respiratory care, maternity care, foot care, nutritional counseling, and diabetes management. We have primary care clinic locations including walk-in same-day access and physical, occupational, and speech therapy in Grafton and in Park River, ND. Additionally, we provide telemedicine programs and specialty provider access through our clinic space. We have won numerous awards and recognition for our care, quality, and culture, including recognition as a top 100 Critical Access Hospital. Unity also provides education for students at all levels of interest in health careers from middle school through college, including medical students

---

[4] Health Res. & Servs. Admin., *MUA Find*, https://data.hrsa.gov/topics/health-workforce/shortage-areas/mua-find (last visited Oct. 5, 2026).
[5] U.S. Census Bureau, *Grafton, ND*, https://data.census.gov/profile/Grafton_city,_North_Dakota?g=160XX00US3831820 (last visited Oct. 5, 2026).
[6] *Id.*

interested in serving a rural population in conjunction with the University of North Dakota's Medical School.

8. Approximately fifty percent of our patient visit revenue comes from Medicare beneficiaries. Access to transportation for medical care and prescriptions is a serious challenge in our area, which we have addressed in some way by purchasing vans to transport patients when other options are not available to them to access their healthcare needs.

9. As a 501(c)(3) non-profit healthcare system, our goal is the same as that of the 340B program: to stretch our resources as far as possible to provide care to our community.

**The 340B Program Built the Services Unity Provides Today**

10. Unity has participated in the 340B program since 2016. And in 2026 our facility saved $1.6 million through the program's discounted pricing model. Unity's operating margin is less than three percent at $2.2 million, and we have a limited amount of cash on hand. Our annual 340B savings accounted for approximately seventy-three percent of Unity's 2026 net margin. An earlier declaration unintentionally understated the 2025 impact, which was approximately $716,000 rather than $550,000, and the significant increase since that time has been driven by the addition of retail pharmacy outlets to the program.

11. The 340B program is the heartbeat of our operations, and our 340B savings are incorporated into our overall operating budget, which has allowed us to expand service lines, improve our facilities, and administer a financial assistance program for eligible patients. The facilities, skilled teams, and services we offer would not be possible without the substantial impact of 340B savings.

12. For example, we have recently added and expanded cardiac and pulmonary rehabilitation services and hired employees to staff each of them. In addition, we have started

chronic care management and health coaching to support our patients in monitoring and seeking care to best manage their ongoing health concerns. In 2021, we opened a thirty-six-thousand-square-foot, three-story addition to modernize our 68-year-old hospital. The savings from the 340B program were incorporated into the financial feasibility study we submitted in applying for loans through the USDA and the Bank of North Dakota; those savings were an integral part of the financial ratios that allowed us to be approved for the financing. We are still servicing approximately $19.6 million of principal balance on these outstanding loans. As part of the new addition, we built surgical suites, hired and contracted with surgeons, and acquired surgical equipment we otherwise could not have afforded. We are anticipating the opening of a new primary clinic in our Park River location in November of 2026. Once again, the funds created through our 340B savings have been a significant part of our confidence in making these investments in our delivery system.

13. We also built an enhanced hospital-based pharmacy and have now hired pharmaceutical staff, including the addition of a second registered pharmacist. We renovated our thirty-six-year-old clinic using 340B savings, and we have purchased two vans to improve patient access to care. Losing any of these services would leave a significant healthcare void in our community.

14. We have planned additional projects that depend on 340B savings as well. Our current inpatient pharmacy, part of the original 1958 hospital, is in serious need of modernization and expansion. We have been planning that expansion for years and have held fundraising activities through our UMC foundation over the past couple of years. We have entered the design phase of that project, and we are currently working on final space layout and pricing. We have submitted requests for related equipment funding through the Rural Health Transformation

Program as well. If Defendants' rebate program takes effect, it would likely remove this project from our anticipated capital improvements moving forward, and modernization of the space would not be possible. Cash flow impacts and additional expenditures related to the program would give us significant pause in moving forward. In addition, all system-wide anticipated expenditures for capital would need to be heavily scrutinized and reduced or eliminated as cash flows and profit margins would make such investments increasingly difficult or impossible to fund.

**Unity Cannot Float the Wholesale Acquisition Cost of the Rebate Program Drugs**

15. Unity administers fifteen of the twenty-five drugs HRSA included in its Request for Information and ten of the eighteen drugs in the Approved Plans.[7] Our current outlay for all twenty-five drugs is a little over $500,000 annually. A transition to purchasing at average wholesale price acquisition costs would require Unity to front an additional $274,000. A critical access hospital of our size with restricted liquidity cannot provide effectively interest-free financing to manufacturers while awaiting rebates. That capital investment opportunity is diverted from frontline patient care and our mission of keeping care local.

16. Because Defendants' ability to take action against drug companies when they fail to timely pay rebates or inappropriately deny them is purely discretionary, I have great concern that the rebate program will put our liquidity at risk. Drug companies could face no penalty for missing their payment timing obligations or improperly denying or delaying a rebate. Without specific and mandatory enforcement parameters, I both fear and expect they will not pay on time or will refuse to pay at all. The anticipated rebate model, even if functioning well, would be filled with added cost, delays in payment, and almost assuredly a reduction in the total dollars

[7] Those drugs are: Eliquis, Farxiga, Januvia, Breo Ellipta, Janumet, Linzess, Tradjenta, Trelegy Ellipta, Vraylar, and Xtandi.

returned to the organization. An inefficient system, and the resulting administrative burden in tracking, submitting, monitoring, and resolving claims is overwhelming to consider.

**The Dispute Process Is Functionally Unavailable to Unity**

17. Defendants do not intend to publish an actual dispute resolution process until approximately thirty days after the rebate program goes into effect, but Defendants' public statements indicate that covered entities will be required to challenge rebate denials with Beacon and the drug companies themselves. The administrative dispute resolution process will therefore be functionally inaccessible to a facility of Unity's size and resources.

18. Filing a complete claim requires a forensic level of data reconciliation. For each disputed national drug code ("NDC"), Unity must provide evidence of the 340B ceiling price, the actual price paid, and proof of patient eligibility. Preparing a single ADR petition could take specialized staff up to 40 to 60 hours. At our internal labor rates, the cost of preparing a claim would often exceed the value of the rebate being claimed. Our ability to withstand payment delays and/or pay for the cost of recovery actions will be prohibitively significant in staff and legal costs.

19. In addition, the ten-day rebate repayment window resets every time a manufacturer identifies an issue with a claim. Manufacturers are thus incentivized to cycle through repeated ten-day requests for information, exhausting our administrative resources before the dispute process even begins. Waiting indeterminate periods of time for rebates that might never be paid—while fronting a huge portion of our available cash to drug companies—could and will likely lead to a liquidity crisis for Unity.

20. The disparity of resources between drug companies and covered entities like ours allows manufacturers to use technical denials as an attrition strategy, knowing a critical access hospital cannot afford to contest them.

**Unity Does Not Have the Staff or the Systems to Comply**

21. Unity designed its technological systems and operational infrastructure in reliance on an upfront discount model. We simply do not have the staff needed to comply with a rebate program. At a facility of our size, each staff member necessarily wears multiple hats; very few roles are dedicated to a single job. Unity estimates a requirement of the equivalent of one to two specialized full-time employees to manage the burden of complying with the rebate program, including submitting claims and reconciling payments and denials. These hours would accumulate from staff throughout our operations to identify, track, and gather data, prepare submissions, track progress, and ultimately resolve disputes and discrepancies. Staff from clerical, technical, and professional levels would need to be involved.

22. Should we need to employ additional expertise, 340B-trained professionals command total compensation packages upward of $160,000. For Unity, that expense could consume a large part of the entire benefit of the program. These professionals are also not in great supply, particularly in rural regions, and I would expect a search to be difficult and lengthy. Taking into account the time required to recruit, hire, and train such personnel, and the additional time required to prepare our data systems, I do not believe Unity could practically be prepared to implement Defendants' rebate program by January 1, 2027.

23. Administering the rebate program would involve two distinct tasks, neither of which can be automated in the way Defendants assume. The first is data submission. The data fields required for our contract pharmacy claims are already collected in the ordinary course of

business, but they reside in different third-party administrator systems. The fields required for medical claims are not as readily available, and assembling them from our electronic health record and our billing systems is substantially more complicated and will require manual compilation.

24. The second task, reconciliation, I expect to be even more costly and burdensome. Because the 340B program has always operated through an upfront discount, Unity has never had to reconcile incoming rebates. Unlike an upfront discount, a rebate would require Unity to match payments received weeks or months later to individual drug purchases and claims; identify claims for which rebates are missing, delayed, denied, or underpaid; investigate discrepancies between our records and manufacturers' determinations; correct or resubmit claims where appropriate; and pursue unresolved amounts with manufacturers or their vendors. Once a payment arrives, we cannot simply treat it as undifferentiated revenue. We must determine which underlying 340B transactions the payment covers, match those transactions to our own purchasing and claims records, and then allocate the payment to the appropriate internal accounts, departments, pharmacies, and cost centers. These are not mere bookkeeping formalities. At a facility of our size, this work would fall on the same small group of pharmacy, finance, billing, and information-technology staff who already wear multiple hats, and in many cases, it would require manual investigation that no technology available to Unity can perform for us.

25. The Approved Plans make that reconciliation work harder still, because the same claim will be treated differently depending on which drug it applies to. Claims for drugs that also carry a Medicare maximum fair price ("MFP") illustrate the problem. The Notice permits a manufacturer to deny a rebate for duplication with the MFP only if it provides "rationale and

specific documentation" for the denial.[8] The Approved Plans do not follow one approach. Some manufacturers reserve the right to reject a 340B rebate claim when the drug is also subject to the MFP. Others will pay the 340B rebate in full and instead reduce the maximum fair price refund paid to the dispensing pharmacy or provider through the Medicare Transaction Facilitator. For the same kind of claim, then, Unity could receive a rebate from one manufacturer and a denial from another, and the drug companies have reserved the leeway to change approach after the program begins. Our staff would have to know each manufacturer's rules, monitor for changes, and reconcile every denial against a different standard across multiple reimbursement schemes. For a facility where no one is dedicated to 340B full time, that is not realistic.

26. Claims submitted after the 45-day deadline add yet another layer of work. A claim submitted more than 45 days after dispense will be denied, and the Notice only contemplates exceptions for "extenuating circumstances."[9] For every claim Unity submits beyond the 45-day window, we will be forced to manually describe the extenuating circumstances and submit a request for consideration "on a case-by-case basis." But it is unclear what circumstances qualify, how long a request will take, or whether the 45-day clock pauses while a request is pending. Given the data-collection problems described above, Unity expects that some claims will inevitably miss the window through no fault of our own.

**The Rebate Program Threatens to Turn Unity's 340B Benefit into a Liability**

27. Taken together, Defendants' rebate program would impose on Unity upwards of $200,000 in additional annual labor costs and, based on Unity's experience, an estimated

[8] 91 Fed. Reg. at 48,903.
[9] *Id*. at 48, 902.

$125,000 each year in rebates denied on technical grounds and never recovered. Those recurring costs alone consume roughly one quarter of the benefit of our 340B program.

28. But the more fundamental concern is liquidity. The program would require Unity to advance up to approximately $2.5 million in wholesale acquisition costs each year and await repayment from manufacturers. That number would almost certainly grow over time as the initial program is expanded to additional drugs in the future. Unity simply does not have the unrestricted cash available to lend to manufacturers, particularly when there is no guarantee of either timely repayment or repayment at all.

29. If the previous numbers are even remotely accurate, Unity will no longer be able to use and distribute our 340B savings as we have. Our service lines will be reduced, and our community will be forced to seek more distant options for care currently delivered here, or those services may simply be unavailable.

30. Defendants' rebate program threatens to undermine the express purpose of the 340B program itself, which is to allow us to stretch our resources and serve an underserved population in a very remote area of North Dakota. It would transform a vital safety-net program into a profit-retention tool for manufacturers.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 6th day of October, 2026 at Grafton, North Dakota.

/s/Mark Bertilrud
Mark Bertilrud