UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

THE AMERICAN HOSPITAL ASSOCIATION, THE MAINE HOSPITAL ASSOCIATION, EASTERN MAINE MEDICAL CENTER, NATHAN LITTAUER HOSPITAL & NURSING HOME, UNITY MEDICAL CENTER, and DALLAS COUNTY MEDICAL CENTER,

Plaintiffs,

v.

ROBERT F. KENNEDY, JR., Secretary of the U.S. Department of Health and Human Services, ET AL.,

Defendants.

DECLARATION OF TRAPPER DENTON IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

I, Trapper Denton, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am the Chief Executive Officer of Dallas County Medical Center ("DCMC") in Fordyce, Arkansas. I have served as Chief Executive Officer since May 2026 and am responsible for DCMC's strategy, operations, and finances. I submit this declaration in support of Plaintiffs' motion for a temporary restraining order. The facts in this declaration are based on my personal knowledge and experience, my review of DCMC's business records, and information provided to me by DCMC personnel and consultants with direct knowledge of those matters, including matters predating my tenure as Chief Executive Officer.

2. I have worked in healthcare since 2009. I began my career as a physical therapist assistant with Lifepoint Health, where I worked from October 2009 to May 2016, and then served as Rehab Director from May 2016 to December 2022. I joined DCMC in December 2022 as Financial Controller, became Chief Financial Officer in April 2025, and was appointed Chief Executive Officer in May 2026.

3. I earned a Bachelor of Applied Science from the University of Arkansas at Monticello in 2020 and a Master of Science in Healthcare Administration from the University of Arkansas – Fort Smith in 2022. I am a Certified Healthcare Financial Professional through the Healthcare Financial Management Association and was previously a Certified Specialist Accounting and Finance.

4. I am familiar with Defendants' plan to replace the 340B program's current discount model with a rebate program starting on January 1, 2027, for twenty-five popular drugs. On April 20, 2026, DCMC submitted a comment letter to Defendant Engels in response to Defendant Health Resources and Services Administration's ("HRSA") Request for Information regarding a 340B rebate model, urging HRSA to abandon the rebate model and pursue deduplication through alternative mechanisms.[1] HRSA nonetheless announced the program in a notice published on August 3, 2026 (the "Notice"),[2] and on October 1, 2026, it published the rebate plans it had approved for ten manufacturers covering eighteen drugs (the "Approved Plans").[3] I have reviewed the Notice and the relevant plans. I also know the harm that this rebate program will cause DCMC if it goes into effect.

**DCMC Provides Vital Services to a Vulnerable Population**

5. DCMC opened to the public on May 4, 1958. We operate a twenty-five bed Critical Access Hospital in Fordyce, Arkansas, the seat of Dallas County, a town of just under 3,400 people. We commonly treat patients from Princeton, Tulip, Dalark, Sparkman, Carthage,

---

[1] Letter from Dallas Cnty. Med. Ctr. to Thomas J. Engels, Adm'r, Health Res. & Servs. Admin. (Apr. 20, 2026), HRSA-2026-0001-2261.

[2] 91 Fed. Reg. 48,883 (Aug. 3, 2026).

[3] The Approved Plans are posted on HRSA's website. *See* Health Res. & Servs. Admin., *340B Rebate Model Pilot Program*, https://www.hrsa.gov/opa/340b-model-pilot-program (last visited Oct. 5, 2026).

Farindale, Thornton, Bearden, Hampton, New Edinburg, Tinsman, Rison, and Kingsland. DCMC remains the largest employer in the county, which is known for its timber, farming, and railroad industries.

6. DCMC serves an elderly, low-income, rural population. Dallas County has been designated a medically underserved area by Defendant HRSA.[4] The median income in Fordyce is nearly forty percent below the Arkansas state median.[5] Just eleven percent of Fordyce residents hold a bachelor's degree or higher, more than fifty percent are not in the labor force, and over thirty percent have a disability.[6] Approximately twenty-seven percent of DCMC's patient care is paid for by Medicare or Medicaid.

7. DCMC operates a Level IV Trauma Center and a twenty-four-hour emergency room. We are stroke-certified and have been recognized for our wound care services. We also offer an intensive outpatient psychiatric program, infusion services, radiology, outpatient therapy, and laboratory services, and we operate two rural health clinics.

8. Access to care remains a substantial challenge in Dallas County, despite our efforts. There is no mental health counseling available anywhere else in the entire county. The closest oncologist is an hour's drive each way. The nearest grocery store, outside of the small one here in town, is thirty miles away. Many of our patients do not have reliable private transportation, which makes traveling to obtain healthcare services a real barrier. Given the vital and irreplaceable services we provide, DCMC has been designated by Defendant Department of

---

[4] Health Res. & Servs. Admin., *MUA Find*, https://data.hrsa.gov/topics/health-workforce/shortage-areas/mua-find (last visited Oct. 5, 2026).

[5] U.S. Census Bureau, *Fordyce, AR*, https://data.census.gov/profile/Fordyce_city,_Arkansas?g=160XX00US0524220 (last visited Oct. 5, 2026).

[6] *Id.*

Health and Human Services as an "Essential Community Provider" serving primarily low-income and medically underserved populations.[7]

9. DCMC is a county entity. Our goal is not to make a profit, but we must maintain operating capital to stay open and prevent patients from losing access to care. Our purpose is the same as that of the 340B program, to stretch scarce resources as far as possible so that we can reach more patients and provide more comprehensive services.

**DCMC's Financial Condition Leaves No Margin for New Costs**

10. DCMC is in a delicate financial position. Our margin for 2026 is approximately 4.4 percent of our overall revenue, and we have approximately 111 days of cash on hand. Post-pandemic staffing shortages, increased supply costs, and diminished reimbursement from insurers, including Medicaid and Medicare Advantage, drive these decreasing margins. We operate on margins typical of the rural hospital sector.

11. Delayed payments to vendors have in some cases increased our interest costs and caused us to forgo early-payment discounts.

**340B Savings Fund DCMC's Service Lines, Facilities, and Staffing**

12. DCMC has participated in the 340B program since August 2010. For the fifteen years since, the savings that program generates have been an indispensable component of our ability to operate as a Critical Access Hospital serving this community. In 2025, we filled 4,316 prescriptions through the program and realized net savings of $1,790,587. Based on actual claims for January through June 2026, annualized, we expect to fill 3,954 prescriptions this year and realize net savings of approximately $1,016,792.

---

[7] Ctrs. for Medicare & Medicaid Servs., *HHS Rolling Draft Essential Community Provider (ECP) List for the Federally-facilitated Marketplace*, https://data.healthcare.gov/rolling-draft-list (last visited Oct. 5, 2026).

13. Our 340B savings are incorporated into our overall operating budget and have enabled us to expand service lines. We recently opened a telehealth clinic for oncology patients, created an intensive outpatient psychiatric program for seniors, expanded provider staffing in both of our primary care outpatient clinics, provided staff training for our electronic medical record, and began developing an infusion program. Before the telehealth oncology clinic, cancer patients in Dallas County had to drive over two hours round trip to see their physician.

14. DCMC policy is to provide healthcare services regardless of a patient's ability to pay, and the 340B program funds the dedicated financial assistance program through which we implement that policy.

15. The 340B program has also allowed DCMC to complete critical maintenance and to recruit and retain staff. For example, the roof on our nearly seventy-year-old building had fallen into such disrepair that staff had to place buckets and cookware around the hospital to catch leaks when it rained; using 340B savings, we replaced the roof without taking on debt in 2024. We used 340B savings to complete a substantial maintenance project on our outpatient therapy building, and those savings also allow us to pay our nurses a state-average salary despite Dallas County's rural, low-income designation. Without the 340B program, it would be impossible to maintain our facility, equipment, and staffing levels.

## **The Maximum Fair Price Is Already Eliminating These Savings**

16. Defendants propose a rebate mechanism at a time when DCMC's 340B savings are already declining sharply. In the first quarter of 2026 alone, approximately 33.5 percent of DCMC's would-be 340B savings on the selected drugs were eliminated by the Maximum Fair Price program. That is the principal reason our annual 340B savings are on course to fall by forty-three percent this year.

**DCMC Built Its Operations in Reliance on the Upfront Discount Model**

17. DCMC designed its pharmacy operations, its wholesaler arrangements, its third-party contractual relationships, and its long-term financial planning in reliance on the upfront discount model that has governed the 340B program since its inception. Those reliance interests are real and material, and a fundamental shift to a rebate mechanism would disrupt them in ways the proposed pilot has not accounted for. The mere existence of statutory authority to permit rebates does not make this change reasonable, particularly where Defendants have not quantified any purported problems with the upfront discount model.

**DCMC Cannot Float the Wholesale Acquisition Cost of the Rebate Program Drugs**

18. DCMC dispenses ten of the eighteen drugs included in Defendants' rebate program.[8] Those ten drugs generate the majority of our 340B savings. In 2025, they accounted for approximately 64 percent of DCMC's total 340B savings. Defendants' rebate mechanism therefore reaches the majority of our 340B program.

19. Applying our 2025 claims data to these ten drugs, the acquisition cost to DCMC under an upfront discount model would be approximately $163,000 in 2027. Under Defendants' rebate model, however, the WAC cost on those same drugs is a tenfold increase—approximately $1.66 million. The cumulative working capital DCMC would be required to float throughout 2027 to drug manufacturers is therefore approximately $1.5 million.

20. For a Critical Access Hospital of our size, $1.5 million diverted to manufacturers for rebate processing is simply not possible without borrowing, with the associated interest expense and debt service, or through offsetting reductions in services. Adding a rebate

[8] Those drugs are: Eliquis, Farxiga, Januvia, Jardiance, Linzess, Vraylar, Trelegy Ellipta, Janumet, Tradjenta, and Breo Ellipta.

mechanism therefore would tie up operating capital we need for patient care and add staffing and vendor costs, even as our 340B savings keep shrinking.

21. A rebate mechanism would effectively require DCMC to provide drug manufacturers with interest-free financing while we await the statutory discount to which we are entitled. Even a ten-day manufacturer payment window does not eliminate that exposure because certain of our wholesalers require daily payment.

**The Ten-Day Rebate Window Does Not Prevent the Float, and Manufacturers Face No Mandatory Consequences When They Fail to Timely Pay Rebates**

22. There is another problem that compounds my cash flow concerns. Our wholesaler arrangements are configured for 340B acquisition pricing, not wholesale acquisition cost. Moving the selected drugs to wholesale acquisition cost materially increases our monthly invoice exposure, which puts us in danger of exceeding our credit limits and preventing us from providing those drugs to patients at all.

23. Ahead of the 2026 pilot, our wholesalers were not prepared to extend the credit limits DCMC needed on its 340B accounts to operationalize even the partial rebate program. When credit limits are exceeded, wholesalers stop fulfilling drug orders. That does not halt the 340B program only for the drugs in the pilot. It halts the 340B program for every 340B product DCMC purchases.

24. Defendants' program would also put the decision whether DCMC receives its statutory discount under the control of the drug companies themselves. Our contract pharmacies dispense all ten of the rebate program drugs that DCMC dispenses. For the past six years, manufacturers have pursued unilateral policies restricting 340B pricing at contract pharmacies, and those restrictions remain the subject of ongoing litigation and regulatory dispute. Defendants' rebate model would put those same manufacturers in charge of adjudicating rebate

claims on the very dispenses they have spent six years attempting to exclude from the 340B program. I do not believe the companies that have worked that long to deny us the discounts on these prescriptions can be relied upon to police our claims to them.

25. Moreover, Defendants do not intend to publish an actual dispute resolution process until approximately thirty days after the rebate program takes effect, and I understand that covered entities will be required to challenge rebate denials with Beacon and the drug companies themselves. Because Defendants' ability to take action against drug companies that fail to pay timely rebates or inappropriately deny rebates is purely discretionary, I fear drug companies will face no penalty for missing the ten-day window or improperly denying a rebate. And DCMC lacks the resources to meaningfully participate in a dispute resolution process that requires us to contest delayed and denied rebates against sophisticated drug companies.

**DCMC Does Not Have the Staff or Systems to Comply**

26. DCMC administers the current 340B program with a single employee. HRSA estimates that its rebate program will require merely five hours of work per covered entity per week and that additional staffing will in many cases be unnecessary.[9] In our comment letter, we estimated that Defendants' rebate mechanism will require approximately ten hours per week, twice HRSA's figure, and the Approved Plans have only added to that work.[10] For a Critical Access Hospital with our staffing profile, that means we will likely need to divert a former pharmacy technician from her core responsibilities of community education and outreach. In a county where DCMC staff attends festivals and local events because that is how many residents

[9] 91 Fed. Reg. 35,989, 35,990 (June 15, 2026).

[10] Letter from Dallas Cnty. Med. Ctr. to Thomas J. Engels, HRSA-2026-0001-2261, at 4.

learn what care is available to them, absorbing the work with a current employee does not make it free. It simply makes the loss hard to find on a balance sheet.

27. Administration of this rebate mechanism divides into two parts, neither of which can be automated the way HRSA assumes. The first is data submission. The fields for our contract pharmacy claims are already collected in the ordinary course of business, but they reside in two different third-party administrator systems. The fields required for medical claims are not as readily available, and assembling them across our electronic medical record and our billing systems is substantially more complicated and will require manual compilation.

28. The second part, reconciliation, I expect to be more costly and burdensome. Because the 340B program has always operated under an upfront discount mechanism, we have never had to reconcile incoming rebates. Unlike an upfront discount, a rebate requires DCMC to match payments received weeks or months later to individual drug purchases and claims; identify claims for which rebates are missing, delayed, denied, or underpaid; investigate discrepancies between our records and manufacturers' determinations; correct or resubmit claims where appropriate; and pursue unresolved amounts with manufacturers or their vendors. Once a payment arrives, we cannot simply treat it as undifferentiated revenue. We must determine which underlying 340B transactions the payment covers, match those transactions to our own purchasing and claims records, and then allocate the payment to the appropriate internal accounts, facilities, departments, pharmacies, and cost centers. These are not merely bookkeeping formalities. They require coordination among pharmacy, finance, accounting, revenue-cycle, and information-technology personnel and, in many cases, manual investigation that no technology available to DCMC can perform for us.

29. The Approved Plans compound that reconciliation burden, because there is no single set of rules to reconcile against. For example, under the Notice, a manufacturer may refuse a rebate on the ground that it duplicates the maximum fair price only if it supplies "rationale and specific documentation" for doing so.[11] The Approved Plans, however, take inconsistent positions on how that overlap is handled. Certain manufacturers have reserved the right to deny the 340B rebate outright whenever the drug also carries a maximum fair price. Other manufacturers have committed to pay the 340B rebate in full and to recover the overlap by reducing the maximum fair price refund processed through the Medicare Transaction Facilitator. Thus, two identical claims may yield a payment from one company and a denial from another—and the manufacturers allow themselves room to switch approaches after the program is underway. The one DCMC employee who administers our 340B program would have to track each manufacturer's policy, watch for revisions, and evaluate every denial under whichever standard happened to apply.

30. The 45-day submission deadline creates even more work. Any claim DCMC files more than 45 days after the drug is dispensed will be rejected, and the Notice requires a showing of "extenuating circumstances" to receive an extension.[12] Each time a claim falls outside the 45-day window, we would have to write up the circumstances by hand and ask that an exception be granted "on a case-by-case basis." The Notice does not say what counts as extenuating, how quickly a request will be decided, or whether the deadline is tolled while the request is under review. Because DCMC must compile its medical claims data manually from our electronic

[11] 91 Fed. Reg. at 48,903.

[12] *Id.* at 48,902.

medical record and billing systems, a hard 45-day cutoff means a genuine risk that we will forfeit discounts the statute entitles us to receive.

31. Separate from those recurring costs, we would incur one-time startup costs of approximately $8,000 to build the claims submission and reconciliation infrastructure a rebate model requires. Those startup costs are sunk regardless of whether Defendants' so-called pilot succeeds.

32. We are preparing for January 1, 2027, as best we can, and so are our vendors. But taking into account the time required to build claims submission and reconciliation processes that do not exist today, and how much about the Notice and the Approved Plans remains unclear, I do not believe DCMC can be prepared to implement Defendants' rebate program by January 1, 2027.

**The Rebate Program Has Harmed DCMC**

33. If Defendants' rebate mechanism goes into effect, we would be at risk of cutting unprofitable service lines, such as our telehealth oncology clinic, which would return Dallas County cancer patients to a two-hour round trip for every appointment. Another at-risk program is our intensive outpatient psychiatric program for seniors, and there is no mental health counseling anywhere else in this county.

34. Because of the uncertainty surrounding the future of our 340B savings, DCMC has also placed all non-revenue-generating projects on temporary hold. Those include the maintenance and access projects we had planned before the first rebate program was announced: at least $35,000 in needed boiler room maintenance, a wheelchair-accessible shower the hospital still lacks, an employee daycare in a repurposed nursing home that would help us recruit working

mothers, and a telehealth clinic in a local school to reach children who lack access to care. All of them have remained on hold since last year due to the possibility of Defendants' rebate program.

35. Ultimately, the financial pressure from Defendants' rebate mechanism could force DCMC to leave the 340B program altogether.

36. DCMC exists because there is no other hospital in Dallas County. Every dollar Defendants' rebate mechanism would divert from patient care—to float drug companies, to chase rebates we are already owed, to staff an administrative apparatus that treats no one—is a dollar taken from a community that has no alternative.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this _8th__ day of October__________, 2026 at Fordyce, Arkansas.

/s/Trapper Denton
Trapper Denton