UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| THE AMERICAN HOSPITAL ASSOCIATION, THE MAINE HOSPITAL ASSOCIATION, EASTERN MAINE MEDICAL CENTER, NATHAN LITTAUER HOSPITAL & NURSING HOME, UNITY MEDICAL CENTER, and DALLAS COUNTY MEDICAL CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., Secretary of the U.S. Department of Health and Human Services, ET AL.,<br><br>Defendants. | DECLARATION OF SEAN M. FADALE IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER |

I, Sean M. Fadale, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am the President and Chief Executive Officer of Nathan Littauer Hospital and Nursing Home ("NLH") and have served in this role since October 2020. I am responsible for the strategic and operational direction of NLH's hospital, ambulatory clinics, and nursing home, and for the financial well-being of the institution. I submit this declaration in support of Plaintiffs' motion for a temporary restraining order. The facts in this declaration are based on my personal knowledge and experience, my review of NLH's business records, and information provided to me by NLH personnel with direct knowledge of those matters.

2. I began my career in healthcare as a physical therapist. After eleven years as a clinician, I moved to the administrative side and served in leadership roles at hospitals in New York, Illinois, and Pennsylvania. Immediately before joining NLH, I served for eight years as Chief Executive Officer of Community Memorial Hospital in Hamilton, New York.

3. I have spent the majority of my career working in rural healthcare and was formerly a member of the American Hospital Association's Rural Health Council. I am also a Fellow in the American College of Healthcare Executives and a Board Member of the Iroquois Healthcare Association of New York and of the Hospital Association of New York State.

4. I earned my bachelor's degree in sports medicine from Mercyhurst University and my master's degrees in physical therapy and business administration from Gannon University.

5. I am familiar with Defendants' plan to replace the 340B program's current discount model with a rebate program starting on January 1, 2027, for twenty-five popular drugs. On April 17, 2026, I submitted a comment letter to Defendant Engels on NLH's behalf in response to HRSA's Request for Information regarding a 340B rebate model, explaining why any rebate mechanism would impose costs on NLH far outweighing any benefit.[1] HRSA nonetheless announced the program in a notice published on August 3, 2026 (the "Notice"),[2] and on October 1, 2026, it published the rebate plans it had approved for ten manufacturers covering eighteen drugs (the "Approved Plans").[3] I have reviewed the Notice and the relevant plans. I also know the harm that this rebate program will cause NLH if it goes into effect.

**<u>NLH Provides Crucial Care to a Rural and Underserved Community</u>**

6. NLH is the principal provider of acute and primary care for rural Fulton and Hamilton Counties, New York, and we operate the only remaining non-profit nursing home in our area. The next hospital is two hours away.

---

[1] Letter from Nathan Littauer Hosp. to Thomas J. Engels, Adm'r, Health Res. & Servs. Admin. (Apr. 17, 2026), HRSA-2026-0001-1623.
[2] 91 Fed. Reg. 48,883 (Aug. 3, 2026).
[3] The Approved Plans are posted on HRSA's website. *See* Health Res. & Servs. Admin., *340B Rebate Model Pilot Program*, https://www.hrsa.gov/opa/340b-model-pilot-program (last visited Oct. 5, 2026).

7. Our 74-bed acute care hospital provides emergency services, general surgery, general inpatient services, and specialty services including cardiology, neurology, gastroenterology, obstetrics and gynecology, pediatrics, orthopedics, ophthalmology, and urology. Our 84-bed nursing home provides around-the-clock skilled nursing care to short- and long-term residents, along with medical care, specialty care, and physical, occupational, and speech therapy.

8. NLH also operates 11 outpatient clinics in Amsterdam, Broadalbin, Caroga Lake, Fonda, Gloversville, Johnstown, Kingsboro, Mayfield, Perth, and Speculator, New York. These clinics provide primary care and, in some cases, specialist, laboratory, and pharmacy services. Two of them (in Gloversville and Speculator) additionally serve as urgent care clinics with walk-in availability.

9. NLH also offers a Rural Nurse Residency Program to help train the next generation of nurses to serve rural communities.

10. Our patient population is primarily low-income and elderly. A significant number of our patients are retired from factory work in the leather tanning and needle trade industries. Diabetes and chronic obstructive pulmonary disease are prominent drivers of poor health in our community.

11. Approximately sixty-nine percent of all NLH patient care that is paid for has historically been paid for by Medicare or Medicaid. NLH is designated as a disproportionate share hospital because it treats a significant number of low-income patients, and as a Medicare Dependent Hospital given the high number of Medicare patients in our service area.

**NLH Does Not Have the Financial Margin to Absorb New Costs**

12. NLH has incurred double-digit negative margins for more than five years, resulting in a decrease of fifty-eight percent to its days of cash on hand. We presently have approximately 110 days of cash on hand and expect a margin of negative ten percent this year.

13. That decline in cash resources has already impaired our ability to meet primary operating costs and to pay necessary vendors on time. Our accounts payable have grown by approximately ninety percent over the past four years. Delayed payments have in some cases increased our interest costs and caused us to forgo early-payment discounts, compounding the underlying problem.

14. A rebate mechanism, which converts an upfront saving into a delayed and uncertain repayment, would make each of these problems worse.

**NLH Cannot Float the Wholesale Acquisition Cost of the Rebate Program Drugs**

15. NLH has participated in the 340B program since 2012 and currently saves approximately $1.4 million per year through the program.

16. We used our accumulated prior savings from the 340B program to open our primary care health center in Broadalbin in 2019 and our center in Caroga Lake in 2021. These two small health centers are now able to address previously unmet needs in their respective communities. By cutting into our savings from the 340B discount program, the rebate mechanism will force us to slow or stop the expansion of access to care in the Fulton and Hamilton County communities and restrict our ability to update our facilities and equipment.

17. We also use our 340B program savings to support our general patient care operations, including financial assistance for uninsured patients who are unable to pay for their

care, patient navigation services, and additional programs to help address patient social determinants of health challenges.

18. NLH administers seventeen of the twenty-five drugs referenced in Defendants' rebate program and nine of the eighteen drugs covered by the Approved Plans.[4] Our current outlay for all twenty-five drugs is approximately $320,400 annually, and our 340B savings attributable to them are approximately $694,300. If NLH had to buy all seventeen at wholesale acquisition cost, it would have to front up to approximately $1,014,700 in 2027.[5]

19. A rebate mechanism would force NLH to provide drug companies an interest-free loan while we await discounts we are owed by statute. Given the state of our cash resources, I project that the change would have significant cash flow impacts that would leave NLH further unable to meet financial obligations across many areas of its operations. That burden could put at risk the organization's ability to obtain credit, to continue operating without significant cuts to services, and to serve this community.

**<u>NLH's Experience with the Medicare Transaction Facilitator Shows the Ten-Day Promise Is Illusory</u>**

20. The Notice provides that the rebate payment period is ten days. NLH already participates in a rebate program that provides a meaningful benchmark for what that promise is worth. Under the current payment process for Medicare Transaction Facilitator claims, it has been our experience that claims are paid in approximately thirty to ninety days, depending on the manufacturer and the drug, even though the payment period is supposed to be fourteen days. That payment delay has already proven burdensome to our organization. I have no reason to

[4] Those drugs: Trelegy Ellipta, Januvia, Breo Ellipta, Farxiga, Linzess, Jardiance, Otezla, Enbrel, and Eliquis.
[5] It is not possible for NLH to calculate the prospective 2027 purchase data for only the nine drugs covered by the Approved Plans.

believe the drug companies would perform materially better under Defendants' rebate program, and there are no mandatory consequences if they do not.

21. Because Defendants' decision whether to take any action against drug companies that pay rebates late or inappropriately deny them is entirely discretionary, I have great concern that the rebate program would put our liquidity further at risk. Given that NLH is a small hospital, I expect we would be unevenly matched against drug companies in any dispute and would have little practical recourse.

**NLH Does Not Have the Staff or the Systems to Comply**

22. NLH cannot provide exact figures for the increased cost of a rebate model. But based on preliminary discussions with our third-party administrator and our third-party compliance vendor, I anticipate significant start-up and maintenance charges. We estimate, for example, $45,000 in additional costs annually for only our third-party administrator and third-party compliance vendor. On top of that, we estimate third-party consultation fees at $18,000 annually.

23. NLH's pharmacy staff currently coordinates our participation in the 340B program. That staff does not have the capacity to administer a rebate program on top of its existing work, and I anticipate increases in labor far in excess of HRSA's estimate of five hours per week. We estimate that we would need to add at a minimum one additional full-time employee ("FTE") to cover internal compliance, data submission, reconciliation, audit support, and, where applicable, challenges to denials. The cost of this FTE would be approximately $55,000 annually including salary and benefits.

24. For the fourteen years NLH has participated in the 340B program, we have built our pharmacy operations, our third-party administrator and compliance vendor arrangements,

and our financial planning around the upfront discount model that has governed the program since its inception. The data this rebate mechanism requires is not data our systems easily produce today. NLH engages a third-party compliance vendor to assist with the collection, submission, retention, validation, and maintenance of our manufacturer restriction compliance activities; that vendor must access each third-party administrator's system to download, validate, and submit the data. To supply the data the rebate model would require, our third-party administrator, our compliance vendor, and NLH personnel would all have to coordinate to ensure accurate submissions. It is unlikely that our third-party administrator would be able to extract the required medical claims data from our electronic health record at all, which would require an entirely new manual process to be designed and implemented. These changes would impose a burden far in excess of what HRSA has estimated.

25. And that does not even include the labor hours required for backend reconciliation, which I expect to be the most burdensome part of the entire rebate mechanism. This work stream, which does not exist under the upfront discount model, would require new staff or draw on staff from across our organization to identify and track rebate claims, gather supporting data, follow up on late or unpaid rebates, and dispute denials.

26. The Approved Plans would make that reconciliation work even more difficult, because the drug companies have not agreed to treat the same kind of claim the same way. The clearest example involves drugs that also carry a Medicare maximum fair price ("MFP"). The Notice allows a manufacturer to deny a 340B rebate as duplicative of the MFP only if it supplies "rationale and specific documentation" for the denial.[6] But the ten manufacturers whose plans HRSA approved have taken different positions on how they will handle those claims. Some have

[6] 91 Fed. Reg. at 48,903.

reserved the right to deny the 340B rebate outright when the drug is also subject to an MFP. Others have said they will pay the 340B rebate and instead reduce the MFP refund to the pharmacy or provider through the Medicare Transaction Facilitator. As a result, NLH could submit two essentially identical claims and have one paid and the other denied, depending only on which company made the drug, and each company has kept the ability to change its approach once the program is underway. For a pharmacy staff as small as ours, learning ten different sets of rules, monitoring for changes to each of them, and reconciling every denial against a different standard and across multiple reimbursement schemes is not a marginal addition to the workload. It is a new job entirely.

27. The Notice's 45-day submission deadline adds still more work. Under the Notice, a claim submitted more than 45 days after the drug is dispensed will be denied unless NLH can show "extenuating circumstances."[7] Claims with extenuating circumstances will then be evaluated "on a case-by-case basis." Given the manual data extraction I describe above, I expect that some of our claims will miss that window. Each time that happens, a member of our staff will have to write up the circumstances, submit a request for an exception, and then follow up on it. Nothing in the Notice tells us what circumstances will qualify, how long a decision will take, or whether the clock stops while a request is pending. We would be asking for exceptions without even knowing the standard.

28. Taking into account the time required to recruit, hire, and train new personnel, to design a manual data extraction process that does not exist today, to coordinate that process across two outside vendors, and to implement a backend reconciliation workflow that also does

---

[7] *Id.* at 48,902.

not exist today, I do not believe NLH can be prepared to implement Defendants' rebate program by January 1, 2027.

**The Rebate Program Has Already Changed What NLH Can Plan For**

29. The prospect of this program has forced NLH to make major adjustments to its strategic plan. Where we had been planning five years out, we have scaled back to two years.

30. We have also paused projects that would expand access to care. Although we have received donated property for a new primary care clinic and have donors lined up, we have not been able to move forward with it. Our retail pharmacy build-out also remains on hold. We first paused these projects last year in response to Defendants' rebate program, but within weeks of that program being set aside, Defendants signaled that a larger one was coming. So, the projects remain on hold.

31. If the rebate program takes effect, we would also have to scale back investments in necessary medical equipment and could be forced to forgo critical services for this community. We have even written into our third-party administrator contract renewal the option to reconsider whether NLH will remain in the 340B program at all if a rebate program does not make us financially whole. We have never had to do that before.

**Defendants Have Identified No Problem at NLH That a Rebate Program Would Solve**

32. To date, no manufacturer has approached NLH regarding a 340B or Medicare Drug Price Negotiation Program duplicate discount issue. Manufacturer-initiated audits of 340B covered entities are already extremely rare, with the most recent data available indicating that HRSA received only two final audit reports from manufacturers between November 2022 and September 2024. In my view, the existing administrative dispute resolution process therefore

sufficiently addresses any manufacturer concerns about duplicate discounts without imposing a rebate model on hospitals like ours.

33. NLH is the only hospital in a poor, rural, and aging community, and the 340B program is a substantial part of what allows us to remain one. Defendants' rebate program would take resources we use for patient care and spend them recovering discounts we are already owed.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this _8th__ day of October___________, 2026 at Galway, Ireland___________.

/s/Sean Fadale____________________
Sean M. Fadale