UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| THE AMERICAN HOSPITAL ASSOCIATION, THE MAINE HOSPITAL ASSOCIATION, EASTERN MAINE MEDICAL CENTER, NATHAN LITTAUER HOSPITAL & NURSING HOME, UNITY MEDICAL CENTER, and DALLAS COUNTY MEDICAL CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., Secretary of the U.S. Department of Health and Human Services, ET AL.,<br><br>Defendants. | DECLARATION OF CHAD GOLDER IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER |

I, Chad Golder, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am the General Counsel and Secretary of the American Hospital Association ("AHA"). Founded in 1898, the AHA leads, represents, and serves nearly 5,000 member hospitals, health systems, and other healthcare organizations, as well as 43,000 individual members, with the mission of advancing the health of all individuals and communities. Through its representation and advocacy, the AHA ensures that its members' perspectives and needs are heard in national health policy development and in legislative and regulatory debates. I submit this declaration in support of Plaintiffs' motion for a temporary restraining order. The facts in this declaration are based on my personal knowledge and experience, my review of the administrative record, information provided to me by our members, and my review of the AHA's business records.

2. I became General Counsel and Secretary of the AHA on January 1, 2024, after previously serving as the Association's Deputy General Counsel.

3. Before joining the AHA, I was a Partner and founding member of Munger, Tolles & Olson LLP's Washington, D.C. office. I also have spent a significant portion of my career in government service, as a Deputy Associate Attorney General, an Assistant U.S. Attorney in the Eastern District of Virginia, counsel to the Deputy Attorney General, and a law clerk to Justice John Paul Stevens of the U.S. Supreme Court and Judge Merrick Garland of the U.S. Court of Appeals for the District of Columbia Circuit. I earned my undergraduate and law degrees from Yale University.

4. More than 2,000 of the AHA's member hospitals and health systems participate in the 340B drug pricing program. These members include disproportionate share hospitals that serve a high number of low-income patients. Many of these members operate on very thin—or negative—margins and have limited cash-on-hand.

5. I am familiar with the 340B program's longstanding upfront discount mechanism, with Defendants' first attempt to replace that mechanism with a rebate program in 2025, and with Defendants' current plan to replace it with an expanded rebate program beginning January 1, 2027. I submitted comments in opposition to both plans on the AHA's behalf, and I submitted a declaration in support of Plaintiffs' motion for a temporary restraining order in *American Hospital Association v. Kennedy*, 820 F. Supp. 3d 30 (D. Me. 2025). I know the harm that this second rebate program will cause the AHA's members and mission if it is not enjoined before January 1, 2027.

**<u>This Court Enjoined Defendants' First Rebate Program, and Defendants Returned With an Expanded One</u>**

6. On August 1, 2025, Defendant Health Resources and Services Administration ("HRSA") published a "340B Rebate Model Pilot Program" covering ten drugs and scheduled to begin January 1, 2026. Plaintiffs challenged that program on December 1, 2025. On December

29, 2025, this Court preliminarily enjoined the program, holding that Defendants "failed to follow the APA's basic blueprint," showed "casual indifference to localized impacts," left the record "silent on the cost of floating the full price of covered drugs," and did not consider covered entities' reliance interests.[1] The First Circuit denied a stay pending appeal on January 7, 2026, describing the administrative record as "threadbare."[2] Defendants then dismissed their own appeal, and on February 10, 2026, this Court vacated the program and remanded to HHS.

7. Seven days after that vacatur, HRSA published a Request for Information asking covered entities to provide the incremental cost data the agency had failed to evaluate the first time—one-time startup costs, ongoing administrative costs, whether a rebate program would require additional full-time employees, what new or modified information technology systems would be needed and at what cost, impacts on cash flow and liquidity, what prompt-pay discounts covered entities would forfeit, and what reductions in services and impacts on patient access would follow.[3] HRSA also published two Information Collection Request notices seeking comment on the paperwork burden its program would impose.[4]

8. On August 3, 2026, HRSA published a notice (the "Notice") announcing a second rebate program (the "Rebate Program" or "Program"), effective immediately, with manufacturer plan approvals due September 24, 2026, and a start date of January 1, 2027.[5]

---

[1] *Am. Hosp. Ass'n v. Kennedy*, 820 F. Supp. 3d 30, 44–47 & n.5 (D. Me. 2025).
[2] *Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 34 (1st Cir. 2026).
[3] Request for Information: 340B Rebate Model Pilot Program, 91 Fed. Reg. 7,287, 7,290–91 (Feb. 17, 2026) (the "RFI") (asking about, *inter alia*, "administrative, operational, financial, and medication access concerns in connection with rebate models"; "reliance interests"; "potential cash-flow impacts"; "proposed alternatives and scope-limiting measures to inform a rebate pilot design, including safeguards to promote the integrity of the 340B Program, and avoid duplicate discounts").
[4] 91 Fed. Reg. 9,632 (Feb. 26, 2026); 91 Fed. Reg. 35,989 (June 15, 2026).
[5] 91 Fed. Reg. 48,883, 48,884, 48,902 (Aug. 3, 2026).

9. One day later, on August 4, 2026, HRSA submitted its cost estimate to the Office of Management and Budget.[6] The following day, August 5, 2026, OMB approved that cost estimate "without change."[7]

10. On October 1, 2026, HRSA published the rebate plans it had approved for ten manufacturers covering eighteen drugs (the "Approved Plans").[8]

11. The new Rebate Program is larger than the one this Court enjoined. At this time, it includes eighteen drugs rather than ten. Like before, moreover, the Program reaches all 15,000-plus covered entities, regardless of size, location, or services offered. And it remains a "pilot" only in name: participation is compulsory for covered entities but remains voluntary for drug companies.[9]

**<u>The AHA's Comments on Defendants' Rebate Program</u>**

12. The AHA participated at every stage of the administrative process. I submitted three comment letters to HRSA in 2026 on behalf of the AHA and its more than 2,000 member hospitals and health systems that participate in the 340B program. I adopt and incorporate each of those letters into this declaration.

13. On April 20, 2026, the AHA submitted a fifty-three page comment responding to HRSA's Request for Information. HRSA-2026-0001-1846 (the "AHA Letter"). That letter explained why a rebate mechanism of any kind is flawed in both conception and design. It urged

---

[6] HRSA, Supporting Statement A, 340B Rebate Model Pilot Program Application, Implementation, and Evaluation, OMB Control No. 0906-NEW (Aug. 4, 2026) (the "Supporting Statement"), https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202606-0906-001.

[7] Off. of Info. & Regul. Affs., Off. of Mgmt. & Budget, *OMB Control Number History*, OMB Control No. 0906-0117, https://www.reginfo.gov/public/do/PRAOMBHistory?ombControlNumber=0906-0117 (last visited Sept. 25, 2026).

[8] HRSA, *340B Rebate Model Pilot Program*, https://www.hrsa.gov/opa/340b-model-pilot-program (last visited Oct. 6, 2026).

[9] 91 Fed. Reg. at 48,900 n.32.

HRSA to abandon the idea altogether, while also proposing alternatives for the agency to consider. It also incorporated each of the AHA's prior comment letters on the 2025 rebate program.[10]

14. On April 27, 2026, the AHA submitted a comment responding to HRSA's February 26 Information Collection Request (the "AHA April ICR Comment").[11] That letter reiterated that HRSA's estimated burden was "wildly off-the-mark"; that significant amounts of manual labor would be required because automated tools cannot eliminate the administrative burdens; and that the costs extend well beyond labor hours to include payments to outside vendors, the cost of floating millions of dollars to drug companies as zero-interest loans, and non-economic costs to patients and communities. Ex. 1 to the Complaint at 31.

15. On July 15, 2026, the AHA submitted a comment responding to HRSA's June 15 Information Collection Request (the "AHA July ICR Comment").[12] That letter set out eight specific defects in HRSA's five-hour-per-week claims-submission estimate and asked the agency to explain, in numbers rather than adjectives, how it arrived at that figure—including which below-five-hour estimates in the record could possibly offset the many above-five-hour estimates submitted by hospitals, and why a "median" was the right measure. Ex. 1 at 24–29.

**<u>Issues Raised in the AHA's Comments</u>**

16. Because I adopt those letters in full, I summarize here only the principal issues the AHA's letters collectively raised.

---

[10] *See* AHA Letter at 1 n.1; HRSA-2025-0001-0052; HRSA-2025-0001-0005; Am. Hosp. Ass'n, AHA Letter to HRSA re: The 340B Rebate Model Pilot Program (Sept. 30, 2025), https://www.aha.org/lettercomment/2025-09-30-aha-letter-hrsa-re-340b-rebate-model-pilot-program.

[11] Letter from Chad Golder, Gen. Counsel & Sec'y, Am. Hosp. Ass'n, to HRSA Information Collection Clearance Officer (Apr. 27, 2026) (responding to 91 Fed. Reg. 9,632 (Feb. 26, 2026)), Ex. 1 at 31–32.

[12] Letter from Chad Golder, Gen. Counsel & Sec'y, Am. Hosp. Ass'n, to Thomas J. Engels, Adm'r, Health Res. & Servs. Admin. (July 15, 2026) (responding to 91 Fed. Reg. 35,989 (June 15, 2026)), Ex. 1 at 24–30.

17. **The legal standard for determining the appropriate payment mechanism.** HRSA's RFI sought input on how to "appropriately balance stakeholder concerns regarding implementation of a rebate model against the agency's goal of testing rebates in the 340B Program[.]"[13] The AHA's comment letter explained that this was the incorrect legal standard. Specifically, it told HRSA that "*it must give primacy to covered entities on this issue, see* H.R. Rep. 102-384, pt. 2, at 16 (1992)." AHA Letter at 3. As a result, the AHA explained, HRSA's balancing approach "fails from the start." *Id.*

18. **Administrative costs.** The AHA explained that a rebate program would impose far more cost on 340B hospitals than HRSA estimated. AHA Letter at 5–32. HRSA's own figure—$537 million annually—covers a single task, submitting claims data.[14] Applying HRSA's own labor inputs, the AHA showed that if a rebate program requires each 340B hospital to add even one full-time employee working forty hours per week—an estimate our members consider conservative—the labor cost will be roughly $750 million a year for 340B hospitals alone. Even that figure, the AHA told HRSA, understates the burden, because it omits the roughly 11,900 covered entities that are not hospitals. AHA Letter at 6–9.

19. **Excluded categories of costs.** The AHA also explained that HRSA's cost estimate excludes entire categories of operational costs, including the one that our members expect to be the largest: back-end reconciliation. Under a rebate mechanism, our members will need to match paid rebates to submitted claims, investigate shortfalls, and pursue missing and denied rebates—an entire workstream that does not exist under the upfront discount our members use today. The AHA explained, based on extensive input from our members, that this reconciliation work cannot be automated. It must be done manually. *Id.* at 14–15. HRSA's cost

---

[13] 91 Fed. Reg. at 7,289.

[14] Supporting Statement at 11.

estimate also excludes third-party administrator and vendor fees, information technology support, and financial audit costs, which our members reported at $150,000 to more than $750,000 per hospital each year. *Id.* at 9–11. It also omits training. And it omits one-time startup costs, which my conversations with members and review of the administrative record place at tens of thousands of dollars for the smallest facilities and three to four million dollars for large academic systems. If you take an extraordinarily conservative estimate of $150,000 per hospital for these ignored costs and extrapolate it across the 2,728 340B hospitals, the total comes to more than $400 million a year. Add the roughly $750 million a year in labor from just one additional full-time employee per hospital, and administrative costs exceed $1 billion annually for 340B hospitals alone—and several billion dollars a year across all covered entities. *Id.* at 11. Again, that estimate was based on conservative assessments of administrative costs.

20. **"Float" costs.** The AHA explained that a rebate mechanism forces our member hospitals to front the wholesale acquisition cost of every covered drug and then wait to be repaid—an arrangement the First Circuit described as "essentially functioning as an interest-free loan from the hospitals to the manufacturers."[15] The AHA told HRSA that its assumptions about the timing of this "float" were incorrect. For example, we explained that wholesaler payment terms are frequently five or seven days, not the ten HRSA assumed. We explained that drugs often are not dispensed before the wholesaler's invoice comes due. We explained that some wholesalers require multi-million-dollar prepaid escrow accounts regardless of when a rebate arrives. And we explained that facilities operating on a handful of days of cash-on-hand could breach bond and debt covenants before rebates arrived. AHA Letter at 18–29.

[15] *Am. Hosp. Ass'n*, 164 F.4th at 32.

21. **Covered entities' experience with other rebate mechanisms.** The AHA described problems that covered entities have had with other programs conducted by these same drug companies and vendor technologies, including the vendor (Second Sight Solutions) that was chosen to operate the Rebate Program. The record showed that, under the Maximum Fair Price refund process and the Medicare Drug Price Negotiation Program, payments are routinely late; that one academic health system identified at least 100 misclassified claims and approximately $178,000 in erroneously denied refunds in the first two months of that program; that one rural system saw twenty-three of forty-two qualifying dispenses processed incorrectly in a single month, twenty-two of which it proved were in fact 340B drugs; and that each contested claim takes up to thirty minutes of staff time to resolve through a multi-step process that requires submitting an inquiry in one system and uploading supporting data to another. *Id.* at 17–18. The AHA told HRSA that it should anticipate the same deficient performance from the same drug companies and third-party vendor.

22. **Permanent losses.** The AHA explained that many of these costs are not recoverable. Paying wholesale acquisition cost rather than the 340B price will result in forfeiture of valuable COGS, prompt-pay discounts, and sub-ceiling pricing that our members have access to today. *See* AHA Letter at 25.

23. **Non-economic harms.** The AHA's comment letter explained the many non-economic harms HRSA's rebate program would cause. The AHA wrote:

> Even if every rebate is paid on time and in full, that is, at a minimum, $200 or $500 million [in administrative costs] each year that cannot be spent on patient care. As a matter of basic logic, HRSA has to understand that these new administrative and related costs will have non-economic impacts by diverting resources away from caring for "more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384, pt. 2, at 12 (1992).

*Id.* at 29. Our letter further explained some of the specific types of patient harms that would result from a rebate program, often citing to comment letters submitted by covered entities: "It will jeopardize essential service lines—including oncology, labor and delivery, behavioral health, opioid treatment, and more. It will undermine patient assistance programs that subsidize 340B drugs for vulnerable patients. And in some cases, it will directly restrict access to needed medications." *Id.* at 32.

24. **Benefits.** The AHA explained that HRSA overstates the size of the duplicate-discount problem it claims the rebate program will solve. AHA Letter at 42 & n.47. The AHA explained that HRSA's own audit data demonstrate that duplicate discounts have declined sharply since 2018. Specifically, the AHA incorporated a prior comment letter from the 2025 Rebate Program's administrative process that explained:

> HRSA's own 340B audit data show that between fiscal years (FY) 2018 and 2022, audit findings across 340B hospitals for duplicate discount and diversion decreased by a combined 62%. Only 10.7% of 340B hospital audits had at least one finding of diversion; just 13.2% had a duplicate discount finding in FY 2022. As with any program as regulatorily and operationally complex as 340B, hospitals have adapted their 340B programs to better maintain compliance with all rules and regulations.[16]

I also am aware that several AHA members reported that HRSA's audits of their own facilities found no duplicate discounts at all.

25. **The rebate mechanism provides no remedy.** The AHA also explained that the 340B statute bars drug companies from denying discounts until they have completed the statutory audit and dispute resolution processes. AHA Letter at 43–44. It further noted HRSA has taken this position since 1994, when the agency issued a Final Notice stating: "A manufacturer

[16] Am. Hosp. Ass'n, Comment Letter on Application Process for the 340B Rebate Model Pilot Program at 9 (HRSA-2025-14998) (Aug. 27, 2025), https://www.aha.org/system/files/media/file/2025/08/aha-comments-to-hrsa-on-proposed-340b-rebate-model-pilot-program-letter-8-27-2025.pdf.

may not condition the offer of statutory discounts upon an entity's assurance of compliance with section 340B provisions." *Id.* at 44. On top of that, our letter explained that, since 1996, HRSA has taken the position that "[m]anufacturers must continue to sell at the statutory price during the audit process.… Not until the entity is found guilty of prohibited activity and a decision is made to remove the entity from the covered entity list, will the manufacturers no longer be required to extend the discount." *Id.* (quoting Manufacturer Audit Guidelines and Dispute Resolution Processes, 61 Fed. Reg. 65,406, 65,408 (Dec. 12, 1996)). Consequently, the AHA explained, "if drug companies must provide 340B discounts regardless of suspected program integrity concerns, it is unclear how a rebate model can advance any purported program integrity goals." *Id.* at 46.

26. **Reliance.** HRSA's RFI asked whether covered entities' "reliance interests are reasonable in light of the Secretary's express statutory authority to provide for discounts via 'rebate or discount[.]'"[17] The AHA explained that this incorrectly framed our members' reliance interests. AHA Letter at 38–39. We explained that AHA members built their pharmacy operations, their financial planning, and their patient programs around (1) a mechanism HRSA used consistently for thirty-three years; (2) HRSA's own pronouncements in 1994 and 1998 applying the appropriate legal standard when approving a rebate mechanism for one type of covered entity; and (3) HRSA's repeated public statements and court filings defending upfront discounts as recently as August 2025. In *American Hospital Association v. Kennedy*, Defendants "agree[d]" that those interests were "significant," 164 F.4th at 34, and the AHA explained why it

[17] 91 Fed. Reg. at 7,289.

was wrong to abandon that conclusion simply because the agency had discretion to adopt a different payment mechanism.[18]

27. **Less costly alternatives.** The AHA urged HRSA to adopt a less burdensome alternative—in particular, a single neutral third-party clearinghouse for claims data, building on the 340B claims repository for Medicare Part D that the Centers for Medicare & Medicaid Services was then developing, has implemented as of October 1, and has proposed to make mandatory for 2028. AHA Letter at 46–49. I am aware that numerous other commenters recommended the same alternative. The AHA also reminded HRSA that Defendants have told two federal courts of appeals that drug companies "have other options available to them" and "alternate means to deduplicate discounts." *Id.* at 40.

28. **The dispute resolution process.** The AHA explained that HRSA must create a dedicated process for resolving disputes between covered entities and manufacturers, *id.* at 51–52, and described what that process must contain to reduce costs and burdens on covered entities: a designated human point of contact to receive complaints and follow-ups, a clear, specified procedure for addressing them, and a fixed deadline—no longer than thirty days—for resolution.

29. **Additional comment period.** The AHA asked that if HRSA proceeded with a rebate program, it provide a further comment period on the program's actual specifics before any manufacturer application was approved. *Id.* at 53.

30. **Financial environment.** The AHA's comment letter described the severe financial headwinds that hospitals will face in 2027. It explained: "[A]s HRSA evaluates the financial impact of its program, it must do so in the context of the overall financial picture facing hospitals <u>*at this time*</u>. HRSA must provide a reasoned explanation for imposing the costs of the

---

[18] *Am. Hosp. Ass'n*, 820 F. Supp. 3d at 43.

Rebate Program *on top of* the costs of the OBBBA and other developments. Even if HRSA anticipates some benefits from conducting a test at some point, *now is not that time*[.]" *Id.* at 38.

**Defendants Did Not Meaningfully Respond to the AHA's Comments**

31. I have reviewed the Notice in detail. In it, HRSA states that it "carefully reviewed and evaluated all comments," "conducted a systematic assessment of stakeholder input," and "considered both the substance and the evidentiary support of the comments received."[19] I respectfully disagree. HRSA failed to respond to many of the important problems identified in the AHA's comment letters, as well as those in the hundreds of comment letters submitted by our members and other covered entities.

32. On my reading, the Notice follows a consistent pattern: it acknowledges in general terms that covered entities submitted detailed cost and burden estimates, but it does not meaningfully engage with that information. In some instances, it entirely ignores comments about other important aspects of the problem. When it does address certain problems, it states without analysis that those estimates "rest on assumptions that do not align with the design of the Pilot."[20] Importantly, the Notice does not provide a second comment period, as the AHA and others requested, to submit comments based on the specific design of the Program. Nor did HRSA give covered entities any opportunity to comment on the manufacturers' plans before approving them on October 1, 2026. Instead of addressing the problems and data that the AHA and others describe, Defendants wave them away in conclusory fashion while adopting the assertions of drug companies and their technology vendors without scrutiny.

[19] 91 Fed. Reg. at 48,888.
[20] *Id.* at 48,893.

33. **The five-hour estimate.** A clear example is the number on which HRSA's entire cost figure rests. In 2025, HRSA estimated that a ten-drug rebate program would generate two hours per covered entity per week of paperwork burden. In its February 2026 ICR and RFI, HRSA contemplated a program two-and-a-half times larger—twenty-five drugs instead of ten—and estimated that it would take two-and-a-half times as long to comply, *i.e.*, five hours per week per covered entity.[21] The agency has never disclosed what data supports either figure. HRSA did state at one point that this five-hour number was the "median" amount of time required for data submission. The AHA asked HRSA, in plain and direct terms, to produce a chart of the below-five-hour estimates that would allow HRSA's estimate to sit at the median. Ex. 1 at 29. HRSA ignored that request and has never published a single piece of data in support of its labor-hour figure.

34. The closest HRSA has come to explaining its labor-hour figure was in its Supporting Statement. In that document, HRSA acknowledged (1) receiving 180 comments on the February request and 263 on the June request; (2) that they "primarily addressed the estimated paperwork burden"; and (3) that "[n]umerous commenters submitted organization-specific burden estimates that substantially exceeded HRSA's estimate."[22] It nevertheless disposed of all of these "organization-specific burden estimates" in a single paragraph, asserting that "many estimates assumed reporting requirements that will not be included in [the] Pilot[.]"[23] Again, HRSA did not respond to commenters' request to submit additional comments once HRSA settled on its program design. HRSA also stated, in conclusory fashion, that it "continues to believe that the estimated burden reasonably reflects the average paperwork burden associated

[21] HRSA has since approved plans covering eighteen drugs but has not changed its cost estimate.
[22] Supporting Statement at 6–7.
[23] *Id.* at 7.

with the information collection, across more than 15,000 covered entities, while recognizing that actual burden may vary among respondents."[24] Again, HRSA did not provide any data to support its "belie[f]" regarding the "average" estimated paperwork burden.

35. HRSA's Supporting Statement changed two things, however. It raised the pharmacist wage from $132 to $135.50 an hour, which moved HRSA's own total cost estimate for data submission from the $523,345,680 in the Notice to $537,222,270—roughly $14 million more. And it changed HRSA's description of the five-hour figure from a "median" burden to an "average" burden, without explanation or acknowledgment that those are different measures of a distribution.[25] As with its prior "median" figure, HRSA did not provide any supporting data for its "average" calculation.

36. **Reconciliation.** Reconciliation is the category of incremental administrative cost that our members identified as the single largest omission from HRSA's cost estimate. In the Notice, HRSA stated that covered entities "already perform extensive administrative functions under the 340B Program," including "reconciliation activities."[26] That answer is incorrect. Under the upfront discount mechanism, there is no rebate to reconcile because the discount is applied at the point of purchase. Therefore, it is inaccurate to say that covered entities "already perform … reconciliation activities." HRSA also asserted that "established technologies, including automated claims processing, batch data submission, and TPAs, can be leveraged to facilitate rebate submission and reconciliation with minimal manual intervention once implemented."[27] HRSA did not identify which technology products it was referring to, what that technology costs, or why the many covered entities who explained that manual reconciliation would be necessary

---

[24] *Id.*
[25] *Compare id.* at 11 ("average burden"), *with* 91 Fed. Reg. at 35,990 ("median burden"); *see also* Ex. 1 at 29.
[26] 91 Fed. Reg. at 48,892–93.
[27] *Id.* at 48,894.

(and costly) were wrong. The Approved Plans, which HRSA did not publish until October 1, 2026, make reconciliation harder still. Instead of a single set of rules, covered entities must comply with ten separate manufacturer plans that do not all treat the same claim the same way. For drugs that also carry a Medicare maximum fair price, for example, some Approved Plans reserve the right to deny the 340B rebate, while others pay the rebate and instead reduce the maximum fair price refund—and manufacturers have reserved the right to change their approach after the Program begins. Covered entities therefore cannot build a single, automated reconciliation process. Instead, they must learn each manufacturer's rules, track every claim against the governing rules, monitor for ongoing changes, and evaluate each denial under a different standard.

37. **Staffing.** While I have not read every comment letter in the administrative record, I can estimate that hundreds of commenters told HRSA they would have to hire new employees to comply with a rebate mechanism. HRSA responded that "any staffing impacts will generally be modest," that additional staffing "may be absorbed within existing operational structures or supported through existing third-party arrangements," and that commenters "provided only estimates of anticipated staffing impacts."[28] On my reading of the Notice, HRSA cited no evidence for the proposition that existing third-party arrangements could absorb this work, and our members—who have on-the-ground knowledge of the implementation burden—told HRSA the opposite in the many comments that I have reviewed.

38. **Startup costs.** HRSA agreed that there would be "legitimate startup activities" and that such costs are "inherent to the adoption of a new operational approach." But it then

[28] *Id.* at 48,891, 48,893.

excluded the entire category of startup costs on the ground that they "will be transitional," without further evaluation.[29]

39. **Vendor, administrator, and audit costs.** HRSA assigned no value to increased third-party administrator and vendor fees, information technology support, and financial audits—costs that the AHA documented to range from $150,000 to more than $750,000 per hospital annually. HRSA's response was that covered entities "already perform extensive administrative functions,"[30] but it did not measure or further address these costs.

40. **Float.** HRSA did not quantify any of the float evidence in the record. HRSA wrote that it "expects the cash-flow impacts on covered entities to be minimal" because the ten-day rebate deadline "is intended to precede the payment deadlines associated with standard wholesaler payment terms,"[31] and it "believes that the Pilot is unlikely to result in unstable cash flow for covered entities, as certain commenters have predicted."[32] HRSA did not respond to the AHA's comments that wholesaler payment terms often require payment in fewer than ten days. Nor did it address the comments regarding other aspects of float costs, including escrow requirements, bond covenants, lost COGS and prompt-pay discounts, and the need to divert limited cash-on-hand away from critical services and payroll requirements.

41. **Delays and denials.** The AHA and other commenters explained why HRSA needed to factor in delays and denials in rebating covered entities. Drawing on experience with the Medicare refund processes that these same manufacturers operate through the same Second Sight Solutions technology, the AHA and covered entities explained that those payments are routinely late, misclassified, or wrongly denied, and that each contested claim takes staff time to

[29] *Id.* at 48,893–94.
[30] *Id.* at 48,892–93.
[31] *Id.* at 48,895.
[32] *Id.* at 48,894.

fix. HRSA did not dispute any of that, but it never attempted to put a dollar figure on the cost and cash flow consequences of delays and denials.

42. **Benefits and duplicate discounts.** The stated purpose of the Rebate Program is to prevent duplicate discounts. But HRSA never measured how many duplicate discounts exist in the 340B program, nor how many duplicate discounts this rebate mechanism could potentially avoid. The Notice conceded as much, acknowledging that "there is no federal estimate of the financial extent of duplicate discounts in 340B."[33] On my reading of the Notice, HRSA merely repeated two figures from drug industry comment letters. At the same time, the Notice was silent as to the evidence submitted by the AHA and others that undermines those figures, including HRSA's own audit data, which show duplicate discounts declining since 2018, and the many hospitals that reported clean audit records over as much as a decade.

43. **Alternatives.** The AHA and other commenters suggested numerous alternatives that would not shift additional costs onto hospitals. HRSA cast them all aside. Its principal reason for rejecting the alternatives was that they "would not inform whether rebates are an efficient means of effectuating the 340B ceiling price ... and therefore would fail to advance the central purpose of the Pilot."[34] On my reading, that is self-justifying, circular logic. HRSA rejected each alternative to a rebate mechanism because it was not a rebate mechanism. The AHA's comment letter directly criticized "[s]uch circular reasoning," but HRSA again never responded. AHA Letter at 34.

44. Where HRSA did engage with a specific alternative, its analysis was no better. For example, the AHA and other commenters proposed a neutral clearinghouse for claims data, modeled on a repository the Centers for Medicare & Medicaid Services was building at the time

---

[33] *Id.* at 48,887.
[34] *Id.* at 48,890.

and has now implemented. HRSA rejected this option, stating it is "not explicitly authorized under the 340B statute."[35] The AHA's comment letter specifically called upon HRSA to explain its legal reasoning, but the Notice did not do so.[36] Its other stated reason for denial was that, "unlike a clearinghouse, a rebate model by its very nature incentivizes covered entity compliance as a prerequisite to receiving 340B discounts."[37] On my reading of the Notice, HRSA provided no evidentiary support for this conclusion, and it is materially identical to a sentence in a comment letter submitted by a pharmaceutical trade organization.[38] Thus, HRSA answered the commenters who proposed the clearinghouse by adopting, nearly word for word, *a drug industry* trade association's speculation about *covered entities*' intentions. In addition, the drug companies' own choices also demonstrate that they—not covered entities—lack the incentive to participate in a Rebate Program. Because participation is voluntary for drug companies, each manufacturer may choose which of its eligible drugs to include in the Rebate Program and which to withhold. Multiple manufacturers chose not to include a particular eligible drug in the Rebate Program (even though one of those manufacturers included a different eligible drug). I understand that these drugs were withheld because the manufacturers feared losing market share to competing products outside the Rebate Program. Defendants never addressed these incentives when rejecting less burdensome alternatives. What's more, if duplicate discounts imposed the costs that drug companies claim, those manufacturers would have every reason to subject *all* of their eligible drugs to a rebate mechanism. Instead, they concluded that protecting market share

---

[35] *Id.* at 48,900.

[36] AHA Letter at 48 (explaining that HHS has not "publicly presented its legal reasoning, and there is serious reason to question it," and stating that "HRSA must subject its legal analysis to public scrutiny").

[37] 91 Fed. Reg. at 48,900.

[38] *Compare id.* ("As manufacturer commenters have observed, unlike a clearinghouse, a rebate model by its very nature incentivizes covered entity compliance as a prerequisite to receiving 340B discounts."), *with* Pharm. Rsch. & Mfrs. of Am., Comment Letter, HRSA-2026-0001-1895, at 14 ("Unlike a clearinghouse, a rebate model, by its very nature, incentivizes covered entity compliance as a precursor to receiving the 340B discount.").

for certain drugs mattered more. In my view, those choices confirm that the duplicate-discount problem the Pilot purports to solve is overstated, and that drug companies are using the Rebate Program only where it serves their competitive interests. Their own choices prove why the AHA's proposed alternatives were the better course.

45. **Patients, communities, and timing.** The Notice recites several of the patient harms commenters described but then concludes, without analysis, that HRSA "does not anticipate that the Pilot will materially impair covered entities' … ability to furnish services to patients."[39] It acknowledges comments warning that patients may have to "go elsewhere and potentially travel far distances to obtain necessary medications—a problem that is particularly acute for rural communities,"[40] but then says nothing further about them. Nor does the Notice acknowledge this Court's finding last year that hundreds of millions of dollars spent on administrative costs is hundreds of millions of dollars that cannot be spent on patient care.

46. **Financial environment.** HRSA does not address the financial environment facing hospitals in 2027. It provided no answer to the many commenters that raised this issue, nor did it explain why it must implement a Rebate Program *at this time*.

47. **Dispute resolution.** Despite the AHA asking HRSA to create a dedicated process for resolving disputes, HRSA has not done so. Instead, HRSA has stated that it will publish a dispute resolution process within thirty days of the Program taking effect.[41] Until that day comes, however, covered entities must challenge rebate denials through the Beacon platform and with the drug companies themselves. For many covered entities—particularly small and rural hospitals—this leaves dispute resolution unavailable as a practical matter. These covered entities

[39] 91 Fed. Reg. at 48,899.
[40] *Id.* at 48,898.
[41] *Id.* at 48,895–96.

do not have the staff, systems, or financial resources to track each denial, assemble the supporting documentation, and pursue challenges with each manufacturer. For them, a denied rebate will often simply go unpaid.

**The Rebate Program Is Harming—and Will Continue to Harm—the AHA's Members and Their Patients**

48. Our members have informed the AHA that even temporary outlays of the cash required to purchase drugs at wholesale acquisition cost can have severe consequences. For example, it is common for 340B hospitals to use bond financing for projects that expand patient care, and those bonds typically carry covenants requiring the hospital to maintain a minimum number of days of cash-on-hand. Forced expenditures under this program threaten to push some members below those thresholds. And as the AHA has explained to HRSA, a covenant breach carries consequences that range from a credit rating downgrade to a higher cost of borrowing to closure of the facility.

49. Members also have told the AHA that the uncertainty and liquidity risks this program creates have already changed what they are able to plan for—deferring expansions of patient services, facility improvements, and new service lines that would have expanded access to care. Those harms are happening now, before the program takes effect.

50. Members also have told the AHA that the program jeopardizes the patient programs they fund with 340B savings, including free and discounted medication programs, community health screenings and vaccine clinics, other vital service lines, and free or reduced-cost care for uninsured patients. With so many members operating on very thin or negative margins, they inform the AHA that they have no excess funds to sustain current service levels if they must absorb the many costs associated with the Rebate Program.

51. Some members have informed the AHA that the Rebate Program's compliance costs would approach or exceed their 340B savings, forcing them to withdraw from the 340B Program altogether. That consequence, in the AHA's view, is antithetical to the purpose of the 340B Program. We do not believe that Congress would create a program that is so costly that expected participants could not, in fact, participate.

52. Our members have informed the AHA that they have operated in reliance on the upfront discount mechanism for more than three decades and have built their operations, pharmacy workflows, and compliance practices around it. Our members expect to need at least one, and in many cases more than one, additional full-time employee to comply—employees who must be paid for with funds that otherwise serve the hospital's mission. Submitting claims-level data to drug companies, tracking rebates owed, reconciling paid and denied claims, and challenging denials will require resources that would otherwise go to patient care.

53. The costs imposed under the Rebate Program are not recoverable. Because Plaintiffs bring a challenge under the Administrative Procedure Act, our members cannot recover the money they spend complying with this Program even if it is set aside, and our members have already begun incurring those costs. The AHA and other commenters, including many of our own members, brought each of these harms to Defendants' attention during a process designed to collect exactly this information. Defendants have not addressed them. They have instead approved ten manufacturers' plans and raced ahead toward a January 1, 2027 effective date.

54. The 340B program exists so that safety-net providers can stretch scarce federal resources as far as possible, reaching more eligible patients and providing more comprehensive services. Defendants' rebate program would require those same providers to spend more than a billion dollars a year, thereby forcing them to do the opposite. Likewise, in exercising its

discretion to choose a payment mechanism, the Secretary must select the one that is most effective and most efficient from the standpoint of covered entities. As the administrative record amply demonstrates, a rebate mechanism does not satisfy this legal standard.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 7th day of October, 2026 at Washington, D.C.

/s/Chad Golder
Chad Golder