UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| THE AMERICAN HOSPITAL ASSOCIATION, THE MAINE HOSPITAL ASSOCIATION, EASTERN MAINE MEDICAL CENTER, NATHAN LITTAUER HOSPITAL & NURSING HOME, UNITY MEDICAL CENTER, and DALLAS COUNTY MEDICAL CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., Secretary of the U.S. Department of Health and Human Services, ET AL.,<br><br>Defendants. | DECLARATION OF MATTHEW J. MARSTON IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER |

I, Matthew J. Marston, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am the Vice President, Clinical Ancillary Services, and Chief Pharmacy Officer of Eastern Maine Healthcare Systems, dba Northern Light Health, the integrated health delivery system of which Plaintiff Eastern Maine Medical Center ("EMMC") is a member hospital. In that role, I am responsible for pharmacy operations across the Northern Light system, including administration of the 340B drug pricing program at each of Northern Light's covered entities.

2. I am familiar with Defendants' "340B Rebate Model Pilot Program" ("Rebate Program") and with the significant operational and financial harms that the Rebate Program will cause EMMC if implemented.

3. On April 17, 2026, Northern Light Health submitted a comment letter to Defendant Engels in response to HRSA's Request for Information regarding a revised Rebate Program. The letter explained why a rebate mechanism would impose substantial costs, burdens, and harms on our system that far outweigh any benefits that may come from such a fundamental switch. HRSA

nonetheless proceeded with its Rebate Program, announcing in an August 3, 2026 notice (the "Notice") that the Program would begin on January 1, 2027. On October 1, 2026, HRSA announced that it approved applications to participate in its Rebate Program from ten drug companies, covering eighteen drugs (the "Approved Plans"). Across Northern Light Health's eight 340B covered entities, we dispense all eighteen drugs in the Approved Plans (and all 25 drugs that HRSA referenced in the Notice).

4. I submit this declaration in support of Plaintiffs' motion for a temporary restraining order. The facts in this declaration are based on my personal knowledge and experience, my review of EMMC's and Northern Light Health's business records, and information provided to me by EMMC and Northern Light Health personnel with direct knowledge of those matters.

**Professional Background**

5. I have worked in hospital pharmacy and health system administration since 2012. I began at EMMC as a pharmacy practice resident in 2012, served as a clinical pharmacist on its inpatient oncology unit from 2013 to 2015, and served as its Clinical Oncology Specialist from 2015 to 2017, where I led compliance with United States Pharmacopeia Chapter 800 for the Eastern Maine Healthcare System and represented oncology on the hospital and health system pharmacy and therapeutics committees. From 2017 to 2018 I was Senior Manager of Clinical Pharmacy Services at Miller Drug, the system's retail pharmacy. I joined Northern Light Pharmacy in 2018 as Interim Director of Pharmacy, became Director of Pharmacy in 2019 and Associate Vice President in 2020. In 2021, I joined Northern Light Health as Vice President and Chief Pharmacy Officer. Since September 2025, I have served as Vice President, Clinical Ancillary Services and Chief Pharmacy Officer of Northern Light Health, with responsibility for laboratory,

imaging, medical transport, and pharmacy services across Northern Light Health, including the 340B program at each of its covered entities.

6. I earned my Doctor of Pharmacy from the Massachusetts College of Pharmacy and Health Sciences and my Master of Business Administration, with a focus on healthcare administration, from Husson University. I have been a Fellow of the American College of Healthcare Executives since 2024.

**Background on EMMC**

7. EMMC is a 411-bed tertiary medical center in Bangor, Maine, which is in Penobscot County. EMMC provides inpatient and outpatient infusion services, a broad range of specialty services, primary care,[1] a Level II trauma center,[2] a neonatal intensive care unit,[3] and pediatric services.

8. EMMC is the primary referral hospital for northern and eastern Maine. It cares for some of northern and eastern Maine's most underserved populations, including patients with complex chronic conditions and significant social and economic challenges. For many of our patients, especially those living in rural communities, EMMC is the closest facility where they can receive care.

9. EMMC is designated as a disproportionate share hospital because it treats a significant number of low-income patients. Approximately 18 percent of the Bangor population

[1] EMMC provides three-quarters of the primary-care services in the Bangor area.

[2] EMMC is an American College of Surgeons-verified Level II Trauma Center. Its trauma program works with more than 20 referring hospitals across a service area roughly the size of New Hampshire, Vermont, and Massachusetts combined, and approximately half of the seriously injured patients admitted to EMMC are transferred from community-hospital emergency departments. EMMC is also a base for LifeFlight of Maine, which provides critical-care air transportation for seriously ill and injured patients.

[3] As the only Level III Neonatal Intensive Care Unit (NICU) north of Portland, Eastern Maine Medical Center cares for more than 450 newborns each year, including about 150 who begin their fight for life in other hospitals.

lives below the federal poverty level and nearly 21 percent receive disability benefits.[4] Medicare or Medicaid pay for approximately 49 percent of EMMC's patient care. Defendant Health Resources and Services Administration has designated Penobscot County as containing medically underserved areas.[5]

10. In 2026, EMMC received CMS's five-star overall quality rating—the highest rating CMS awards—and was the only Maine hospital to receive it. Only about 10% of hospitals nationwide receive five stars.

**EMMC's Ongoing Financial Challenges**

11. Between 2019 and 2025, Northern Light Health as a whole lost $ 324 million from operations. EMMC's net losses accounted for 20 percent of that total. EMMC's operating margin in 2024 was negative 7.1percent.

12. Those financial challenges continue today. Through June of this year, Northern Light Health's operating loss for the fiscal year was $37,000,000.

13. In response to these ongoing financial challenges, EMMC has been forced to reduce its services and cut staff. In December 2022, we downsized our acute rehabilitation inpatient unit. We closed our audiology clinic in August 2024 after losing our providers to a private practice that opened in the area. We closed our pain clinic in June 2025 when the last remaining providers left to open a private practice of their own. We closed our walk-in clinic in September 2025 because we could not recruit and retain providers. And since September 2025, EMMC has reduced its workforce by 125.3 full-time equivalents.

[4] U.S. Census Bureau, *Bangor, ME*, https://data.census.gov/profile/Bangor_city,_Maine (September 25, 2026).
[5] Health Res. & Servs. Admin., *MUA Find*, https://data.hrsa.gov/topics/health-workforce/shortage-areas/mua-find (September 25, 2026).

14. EMMC anticipates further financial pressure in 2027 and is budgeting accordingly. Beginning in January 2027, the One Big Beautiful Bill Act ("OBBA") is expected to cause many patients to lose coverage under MaineCare, Maine's Medicaid program. Based on a Kaiser Family Foundation analysis of that lost coverage, EMMC has budgeted a $6.1 million increase in bad debt and free care for fiscal year 2027. Importantly, the Rebate Program is scheduled to take effect at precisely the same time that OBBA—and its resultant effects on bad debt and charity care—will take effect.

**EMMC's Participation in the 340B Program**

15. EMMC has participated in the 340B Program since October 1, 2003. Year-to-date through June, EMMC's 340B savings for 2026 are $79,000,000.

16. EMMC uses 340B savings to support its non-profit mission. For example, we use 340B savings to subsidize service lines that do not cover their own costs but remain vital to the communities we serve. EMMC also uses those savings to underwrite free and discounted medications for patients. We use 340B savings to support the charity care and community health programs EMMC provides to patients who cannot pay. EMMC relies on 340B savings to help fund the equipment and facility investments that keep these services available. And our 340B savings also help pay the nurses, physicians, pharmacists, and other staff who deliver this care. The costs imposed by the Rebate Program will directly impair our ability to fund these important services, projects, and positions.

17. During the entire time it has participated in the 340B Program, EMMC has always operated under an upfront-discount payment mechanism. It has designed its hiring, operations, third-party contractual relationships, information technology systems, and financial planning in reliance on an upfront-discount mechanism. A shift to a rebate mechanism would require EMMC

to revamp these features, requiring a substantial new investment of resources far above and beyond what we have budgeted for.

**<u>The Rebate Program Will Impose Massive Administrative Costs on EMMC</u>**

18. To even get up and running so we can participate in the Rebate Program, EMMC will incur substantial one-time costs to build infrastructure that does not exist today. Our initial estimate of the information technology effort for report development and integration alone is 140 hours, at an estimated cost of $150 per hour. There will be additional startup costs, including legal and compliance review; staff training; development of new policies, procedures, and compliance controls; changes to our accounting and Enterprise Resource Planning systems; and more.

19. The costs will increase once the Rebate Program is live on January 1, 2027. HRSA estimates that the Program will require only five hours of work per covered entity per week; it states that additional staffing will be unnecessary because the burden can be absorbed within existing operational structures or through existing third-party arrangements. Based on my firsthand experience, this is not accurate for EMMC.

20. Northern Light Health operates a centralized 340B program staffed by a program director and seven to eight analysts. To comply with Defendants' Rebate Program, we would need at least two additional analysts—pharmacy technicians or entry-level finance positions—at a recurring cost of approximately $123,000 per year in total compensation. Critically, however, experienced 340B professionals command total compensation well above that figure and are not in great supply, particularly in a rural state, meaning the cost for this labor could be even higher—especially as all of the covered entities in Maine are pursuing the same limited pool of labor. In addition, hiring a pharmacy technician takes us an average of fifty-two days from posting to start date, and a candidate with the pharmacy or compliance experience this work requires would take

considerably longer to find. New 340B staff also must complete Apexus 340B University, and in practice, it takes six months or more before a new analyst can work independently with a high degree of effectiveness.

21. I estimate the Rebate Program also will require approximately eighty additional hours each week just to oversee or correct what our third-party administrator ("TPA") reports. As such, HRSA is incorrect in the Notice when it states that existing TPA relationships "can be leveraged" without additional cost or burden. To make matters worse, EMMC has numerous 340B sites that do not feed their drug accumulations into the TPA, so those accumulations will have to be *manually* pulled and manipulated for submission. In similar contexts, TPAs frequently make mistakes when reporting this kind of data; therefore, I anticipate that I or others at EMMC will need to manually comb through claims to produce a file for submission for Defendants' Rebate Program. EMMC staff also will be forced to track the claims throughout the process to ensure the rebate came to our accounts payable, returned to the appropriate internal unit, dig into reasons why claims were denied, and then challenge each denial with the rebate platform or the manufacturer.

22. In addition, our vendors are raising their prices to accommodate the change to the rebate mechanism. Omnicell 340B, our TPA, has quoted an additional $1,000 per month, and that quote covers *only the submission of pharmacy claim data*. Omnicell does not collect claims data from our 340B sites, which include our infusion centers and many of our provider-based primary and specialty practices, and it cannot extract medical claims data from our electronic health records. Because Northern Light Health uses at least four different electronic health record systems, no vendor and no existing interface can assemble that data for us. Our own staff would have to locate each claim in the record, confirm patient eligibility, reformat the data to the manufacturer's specification, and submit it manually—on every submission cycle. This is an

entirely new manual process that would have to be designed and implemented. Assembling a compliant submission would require our TPA, outside compliance vendor, and our own personnel to coordinate *on every cycle*. For some required fields, such as Health Plan ID, we have not been able to determine where the data resides or even what the field refers to, because the definitions supplied by the platform vendor and the manufacturers are unclear.

23. Submitting the claim is only the beginning. Rebate reconciliation—which includes tracking the rebates that are paid and denied and challenging denials—will be the most burdensome work of all. We would have to analyze whether a rebate was actually received for each claim, involve our finance team to monitor bank accounts for sums matching those rebates, and build a tracking system that does not exist today. We are investigating additional software that is projected to cost an additional $200,000 to $500,000 per year in unbudgeted expense. None of this work is currently required under the upfront-discount mechanism. The Notice is incorrect to state that covered entities "already perform … reconciliation activities."

24. Claims submitted after the Rebate Program's 45-day deadline add yet another layer of work. Under the rules of the Program, any claim submitted more than 45 days after dispense will be denied. Given all of the new work required to submit claims data, this will be a difficult deadline to meet, meaning that EMMC may entirely lose 340B discounts it otherwise would have been entitled to. The only exception to this new 45-day deadline is for what the Notice calls "extenuating circumstances." But if EMMC were to seek such an exception, EMMC would be forced to manually describe the undefined "extenuating circumstances" and submit the requested exception for consideration "on a case-by-case basis." It is unclear what circumstances qualify, how long an exception request will take, or whether the 45-day clock pauses while a request is pending. That is additional work that has never existed before in the 340B Program.

25. Taking into account the time required to hire and train new analysts, build these processes, and stand up a reconciliation program, I do not believe EMMC can be prepared to implement Defendants' Rebate Program by January 1, 2027.

**The Rebate Program Will Impose a Range of Expensive "Float" Costs on EMMC**

26. Across Northern Light Health's eight covered entities, we estimate that the annual increased upfront drug spend under the Rebate Program for all twenty-five drugs would exceed $20 million; EMMC's share of that outlay is approximately $14 million. For the eighteen drugs currently approved, Northern Light Health's increased outlay would be $16 million, and EMMC's would be $12 million. Thus, of all the many costs that the Rebate Program will impose on EMMC, my most pressing concern is liquidity. EMMC does not have that cash available to lend to drug companies.

Commented [MM1]: Amy Gamble

27. Defendants believe that a 10-day rebate requirement will solve for this liquidity problem. I respectfully disagree. EMMC purchases drugs from our wholesaler on net fifteen-day payment terms. Because Defendants' ten-day rebate clock does not begin until a drug company receives a complete claim, that would leave us less than five days to assemble and submit the necessary claims data if we were to be reimbursed before our wholesaler invoice came due. Given the work required to assemble and submit that data—including, as noted, considerable manual labor—I am not confident EMMC can meet that schedule.

28. Because we will be forced to float the WAC of drugs to manufacturers, EMMC also may need to draw on a line of credit to pay our wholesaler in a timely manner, which will incur interest cost. I am not aware that Defendants have accounted for these interest costs in their cost-benefit analysis.

29. We also estimate that Defendants' Rebate Program will reduce our systemwide days of cash on hand by more than one day and reduce our debt service coverage ratio by approximately half a percent, putting us at risk of violating our bond covenant. I do not believe that Defendants have taken seriously this risk when conducting their cost-benefit analysis. Similarly, the Rebate Program would be damaging to EMMC's earnings and could result in a further downgrade to our ratings. Additional downgrading could cause us to lose access to capital for critical equipment replacements, such as imaging equipment, endoscopy equipment, cardiac catheter lab equipment, and network and server updates. It also would hinder our ability to repair equipment and delay payment to our vendor partners, ultimately forcing EMMC to make difficult choices about which services will remain available to our communities.

30. HRSA's analysis of "float costs" wrongly assumes accurate approvals of our claims and timely rebate payments. Based on my experience with drug companies and my understanding of how their third-party vendor operates, it is unrealistic to assume that drug companies will accurately rebate every claim—and pay every rebate on time. By my own conservative calculations, if manufacturers denied even 15 percent of EMMC's rebate claims, we would lose approximately $2.1 million each year.[6]

31. The Rebate Program also would cost us more than $250,000 per year in lost cost-of-goods-sold discounts. These are commonplace discounts that we will never be able to recover.

[6] Disputing claims would add additional costs. As an initial matter, Defendants do not intend to publish a full dispute resolution process until approximately thirty days after the rebate program takes effect, but we understand that covered entities will be required to challenge rebate denials with Beacon and the drug companies themselves. Filing a complete claim with these entities requires a forensic level of data reconciliation. For each disputed national drug code, we would have to produce evidence of the 340B ceiling price, the actual price paid, and proof of patient eligibility. We estimate that preparing a single administrative dispute resolution petition would take specialized staff approximately 10 hours. This incentivizes manufacturers to cycle through repeated requests for information and exhaust our administrative resources before any dispute process begins. And because Defendants' ability to take action against drug companies (and their chosen platform) when they fail to pay timely or inappropriately deny rebates is purely discretionary, drug companies could face no penalty for slow-walking this process.

This means that EMMC's price tag for the Rebate Program starts at $250,000 and increases with all the other administrative, "float," and other costs discussed herein.

32. Having worked in the 340B space for much of my career, I am aware that the purpose of the 340B Program is to allow providers like EMMC to "stretch scarce federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." The Rebate Program does the opposite. By imposing all of the costs and burdens discussed herein, EMMC will reach fewer patients and provide less comprehensive services to patients and communities in northern and eastern Maine.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this _8th__ day of October__________, 2026 at Brewer, Maine.

/s/Matthew Marston______________
Matthew J. Marston