UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

THE AMERICAN HOSPITAL ASSOCIATION, THE MAINE HOSPITAL ASSOCIATION, EASTERN MAINE MEDICAL CENTER, NATHAN LITTAUER HOSPITAL & NURSING HOME, UNITY MEDICAL CENTER, and DALLAS COUNTY MEDICAL CENTER,

Plaintiffs,

v.

ROBERT F. KENNEDY, JR., Secretary of the U.S. Department of Health and Human Services, ET AL.,

Defendants.

DECLARATION OF ROBERT NAHOOPII IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

I, Robert Nahoopii, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am the Senior Vice President of Pharmacy Services at SpendMend LLC ("SpendMend"), a company that, among other things, provides independent 340B compliance audits, program advisory services, and operational support to 340B covered entities. I currently lead SpendMend's pharmacy division. I submit this declaration in support of Plaintiffs' motion for a temporary restraining order. The facts in this declaration are based on my personal knowledge and experience, my review of SpendMend's business records, and information provided to me by SpendMend personnel and clients with direct knowledge of those matters.

2. I have worked in hospital pharmacy and 340B program administration since 1999. I began my career at Intermountain Healthcare in Utah and held pharmacy management positions across that system, including pharmacy manager at Intermountain's corporate office, pharmacy operations coordinator at Intermountain Medical Center, pharmacy operations manager at Utah Valley Regional Medical Center, and, from 2010 to 2013, Director of Pharmacy for Utah Valley

Regional Medical Center and Intermountain's Urban South Region. In those roles I was directly responsible for Intermountain's largest 340B DSH hospital and regional support for a smaller DSH hospital, a non-340B hospital, and four critical access hospitals. In 2012, I co-founded Turnkey Pharmacy Solutions, which began by supporting critical access hospitals' ("CAHs") 340B programs and grew into a national 340B consulting and compliance firm. I served as Turnkey's Chief Executive Officer until SpendMend acquired it in August 2020, and I have led the pharmacy practice since the acquisition.

3. I earned my Doctor of Pharmacy from the University of Utah in 2006 and a Master of Science in Pharmacy Administration from the University of Utah in 2008. I completed two years of postgraduate residency training with Intermountain Healthcare, a first-year residency in hospital pharmacy and a second-year residency in hospital pharmacy administration. I am an Apexus Certified Expert in the 340B program ("340B ACE"), 2017. I served on the board of the Utah Society of Health-System Pharmacists from 2008 to 2010.

4. SpendMend serves more than 800 covered entities, spanning virtually every covered entity type recognized under the 340B statute, including disproportionate share hospitals, critical access hospitals, sole community hospitals, rural referral centers, children's and free-standing cancer hospitals, federally qualified health centers, and other federal grantees. Our clients are located in all fifty states. Apexus, the 340B Prime Vendor, has selected SpendMend five times as a Consultant Contributor to help educate the covered entity community.

5. Our work puts us inside the day-to-day operations of our clients' 340B programs. SpendMend has supported more than 200 HRSA 340B audits of its clients and has performed more than 4,000 mock audits over the past 13 years. In that work, we review purchasing records,

dispensing and administration records, patient eligibility determinations, contract pharmacy arrangements, third-party administrator ("TPA") configurations, and Medicaid billing practices. We also assist clients with manufacturers' claims-data submission requirements and with the refund process under the Medicare Drug Price Negotiation Program ("MDPNP").

6. On April 20, 2026, I submitted a comment letter on SpendMend's behalf to Defendant Engels in response to HRSA's Request for Information regarding a 340B rebate mechanism.[1] That letter explained, based on SpendMend's experience across hundreds of covered entities, why any rebate mechanism would impose costs and administrative burdens far greater than HRSA assumed, and it urged HRSA to retain the upfront discount structure that has governed the 340B program for more than thirty years. I adopt and incorporate that letter into this declaration. HRSA nonetheless announced the program in a notice published on August 3, 2026 (the "Notice"),[2] and on October 1, 2026, it published the rebate plans it had approved for ten manufacturers covering eighteen drugs (the "Approved Plans").[3] I have reviewed the Notice, the Approved Plans, HRSA's published guidance on the program, and the published materials of Second Sight Solutions, LLC ("Second Sight"), the operator of the Beacon platform that every Approved Plan uses.

**<u>Covered Entities Run Their 340B Programs in Many Different Ways, but Every One of Them Is Built Around an Upfront Discount</u>**

7. Across the covered entities SpendMend has served, there is great variability in how 340B programs are operationalized. Some entities maintain physical 340B inventory. Most hospitals use a virtual inventory with replenishment. Under that system, drugs are dispensed

[1] HRSA-2026-0001-2074.
[2] 91 Fed. Reg. 48,883 (Aug. 3, 2026).
[3] The Approved Plans are posted on HRSA's website. *See* Health Res. & Servs. Admin., *340B Rebate Model Pilot Program*, https://www.hrsa.gov/opa/340b-model-pilot-program (last visited Oct. 5, 2026).

from neutral stock, each dispense is evaluated by software to determine whether the patient qualifies, and once eligible dispenses reach a full package, the entity purchases a replacement quantity at the 340B price. Some entities qualify claims with TPA software; other, smaller systems track eligibility *manually, by hand*. Some participate in manufacturers' data-sharing programs through Second Sight's 340B ESP platform; others have declined.

8. Every one of those programs is built around receiving the 340B price at the time of purchase. Wholesaler account structures, split-billing and accumulator software, TPA contracts, contract pharmacy agreements, charity care and patient assistance policies, and annual budgets all assume the discount is received upfront. HRSA's statement that a rebate mechanism would have only a "minimal impact" on covered entities is, in my view, incorrect.

**<u>HRSA's Burden Estimate Does Not Resemble Real-World Implementation</u>**

9. HRSA estimates that claims submission will take a covered entity roughly five hours per week.[4] The Notice states that "any staffing impacts will generally be modest," that "in many cases, additional staffing will be unnecessary because they may be absorbed within existing operational structures or supported through existing third-party arrangements," and that only "[i]n limited cases, where operational structures are less sophisticated or TPAs are not utilized," will covered entities need more staff.[5] None of that matches my own experience working with our clients.

10. After HRSA approved the first rebate pilot in the fall of 2025, SpendMend developed an implementation playbook for its clients. At that time, we estimated most clients needed a minimum of six weeks to prepare, which would require coordination across legal,

---

[4] 91 Fed. Reg. 35,989, 35,990 (June 15, 2026); 91 Fed. Reg. at 48,893 & n.20.
[5] 91 Fed. Reg. at 48,893.

accounting and finance, pharmacy, information technology, and analytics. The legal work included assessment of the non-negotiable terms and conditions imposed by the rebate platform vendor. The information technology and analytics work included assessing, developing, and quality-testing the reports needed to assemble accurate claim-level submissions. The pharmacy and finance work included designing data-submission and reconciliation workflows that do not exist under the upfront discount mechanism, so that the entity could confirm it had actually been paid.

11. Nothing in this year's rebate program reduces that estimate. In fact, the drug list is approximately twice as large as last year's and covers even more manufacturers, so the complexity of preparation has only increased. All told, a covered entity can easily exceed 200 hours of project time simply to begin participating, depending on the complexity of its existing program and how readily its data can be reported. Those startup costs will be incurred before the recurring monthly work begins. Covered entities have already begun adding resources or requesting support from various 340B vendors, and nearly all of this additional support comes at an increased cost and burden to the 340B covered entities. This additional support can be $15,000 plus per covered entity on the low end.

12. In SpendMend's experience, many covered entities, particularly the smaller 340B programs, cannot complete the work necessary to implement the program on January 1, 2027, and even if the program never goes into effect, all money that covered entities spent preparing is unrecoverable.

**<u>Defendants' Rebate Program Will Create New and Burdensome Administrative Work</u>**

13. Submitting claims is itself a burdensome new work stream, in large part because the data the rebate mechanism requires is rarely contained in a single system. Contract pharmacy

claims are in each pharmacy's TPA, and large pharmacy chains often require covered entities to use the chain's own administrator or process, each of which has its own portal and file format. In-house pharmacy claims are in the covered entity's own TPA or pharmacy system. Medical claims for drugs administered in clinics and infusion centers are in the electronic health record and billing system, and in SpendMend's experience, most TPAs are either not receiving certain 340B administered drug data or not receiving all the required data elements. A covered entity that uses more than one of these systems must pull data separately from each one for every reporting cycle. Assembling the required fields can therefore mean building connections across disparate systems and compiling claims data by hand.

14. To illustrate this burden, consider the numbers at a moderately sized covered entity with in-house retail pharmacies. The eighteen approved drugs comprise over 300 NDCs. A federally qualified health center with five clinics and five retail pharmacies has ten dispensing locations (*i.e.*, five retail environments and five administered drug environments) and would download roughly 40 reports per month if it decided to upload data weekly. It would then need to aggregate, analyze, and upload the data. This will likely take 30 minutes per report on average and result in 20 hours per month for just the upload portion. Then factor in time and resources needed to review denials and returned reports for missing data for each environment, and then the need to rerun or review data to respond to denials and missing data requests. Finally, a process is needed to reconcile all the output back to the original claims to ensure that rebates were paid appropriately and financial systems reconciled. On a similar note, a health system with ten covered entities, each with a mixed-use pharmacy, an in-house pharmacy, and ten contract pharmacies, would download roughly 48 reports per month per hospital or 480 reports total for

the health system, about 24 hours, or 0.6 of a full-time employee for just data submission per hospital or 6 FTEs for the health system.

15. Mixed-use hospital outpatient data is captured at the dose level, so even a small 340B program generates a significant volume of claims each month, and a large one generates hundreds of thousands of claims.

16. That only accounts for claims submission. Each claim must then be reconciled on the backend, which I estimate will be the most time-consuming aspect of the rebate program.

17. The Notice states that covered entities "already perform … reconciliation activities" and that technology can support rebate reconciliation "with minimal manual intervention." 91 Fed. Reg. at 48,892–94. Nothing in my experience supports that assumption.

18. Under a rebate mechanism, staff will have to track each submitted claim individually to determine whether a rebate was paid, whether the amount is correct, whether it was denied and on what ground, and whether it was reduced by a later credit. For each claim, staff will also have to look up which manufacturer's plan applies, because they set different rules for when the ten-day clock starts and what counts as a valid reason to deny a claim. Beacon reports this information one NDC and one dispensing location at a time, so the work cannot be done in bulk. Staff must collate the data by prescription number and fill number and confirm that the covered entity was made whole. I have also reviewed HRSA's FAQ, which states that "[c]overed entities should have access to the real-time rebate status of a claim, so they can easily reconcile claims submitted with rebates paid."[6] This is insufficient because it appears to be in reference to a single claim versus the ability to review all claims in aggregate against initial submissions and reconcile them with potential Medicare Part D MFP/MTF rebates.

[6] Health Res. & Servs. Admin., *340B Rebate Model Pilot Program*, https://www.hrsa.gov/opa/340b-model-pilot-program (last visited Oct. 5, 2026).

19. The MDPNP adds a second layer. Every approved drug for the rebate program is also a selected drug under the MDPNP, so for each Part D dispense, the manufacturer owes either a 340B rebate or a refund of the difference between the price paid and the Maximum Fair Price ("MFP"). The Approved Plans take varying approaches to that potential overlap. Some Plans reserve the right to reject the 340B rebate. Others pay the rebate and reduce the MFP refund through the Medicare Transaction Facilitator. Therefore, a covered entity that dispenses through its own pharmacy will receive the 340B rebate through Beacon and the MFP refund through the Medicare Transaction Facilitator. Because the two payments come through two separate systems, they arrive on different schedules, and either one might be denied or reduced by a subsequent credit. To confirm that it received the 340B price on a given dispense, then, the covered entity must trace both payments, and any later adjustments, back to that one claim. This is additional reconciliation complexity that was not anticipated during the comment period or in the Notice, which assumed no variation across drug companies.

20. Denied and delayed rebates add a third layer of cost and complexity, because each one must be disputed individually. HRSA's website directs covered entities to "[f]irst contact the manufacturer and IT platform vendor," then, after "good-faith efforts," to email HRSA using a form that calls for several data elements per claim, including the unit wholesale acquisition cost ("WAC") price, the unit 340B price, the rebate amount, the rejection date, and the rejection reason.[7] A covered entity dispensing all eighteen drugs will have ten dispute channels to learn and track.

21. SpendMend's experience with similar systems shows what covered entities can expect those disputes to cost. The data needed to contest a denial—the dispense record, the

[7] *Id.*

purchase record, the 340B ceiling price on the date of dispense, and the manufacturer's stated reason—are often in different systems. Assembling that data by hand takes up to 10–20 minutes per claim before evaluating whether the denial was appropriate, and there will be additional time required to submit the disputes. Under the approved Rebate Program, this process must play out while the 45-day submission window keeps running, because Beacon's rules do not reset the window when a claim is rejected. A covered entity with 20 denials in a month would likely spend an additional 3–7 hours disputing them. In SpendMend's experience, covered entities often do not have that time, and when the cost of a dispute exceeds the value of the rebate, they stop disputing. I saw this with the MFP rebates this year, where many covered entities simply lost rebates due to the resource burden of challenging the 340B status of a non-340B claim.

22. To deal with the added administrative burden of a rebate mechanism, covered entities have told us that they will be forced to either hire up to two additional employees or engage an outside vendor. I understand that vendors are quoting approximately $60,000 to $100,000 per year for their services, even for the smallest covered entities. Many of our clients cannot afford that expense, and even those that can would still need their own staff to review and quality-check the vendor's work. SpendMend itself has been approached by clients to handle their claims submission and reconciliation work; to the extent we can offer this service at all, we will do so at little or no profit because our clients need the assistance and cannot bear the additional expense. We cannot, however, offer those services for free, thus adding costs for the covered entities themselves.

**<u>Second Sight's Existing Platform Shows the Added Costs that Covered Entities Should Expect</u>**

23. SpendMend has extensive, direct experience working on behalf of covered entities with two systems that resemble the rebate mechanism. The first is the Medicare

Transaction Facilitator, which processes MFP refunds. The second is the 340B ESP platform, which manufacturers use to administer their contract pharmacy restrictions. Drug companies participating in these programs rely on platforms produced by Second Sight, the same vendor that operates the Beacon platform approved for the Rebate Program.

24. SpendMend has been hired by covered entities to perform MFP reconciliation for them. In SpendMend's experience, we have seen error rates approaching forty percent in the system's identification of 340B claims. Compounding that issue, as noted above, the data required to dispute these errors is not readily available on the platform, so each dispute can take up to 15 minutes of staff time to analyze and assemble by hand. I believe the rebate program will require the same work on a larger scale, across more drugs, more manufacturers, and a second payment stream.

25. Claims submission through 340B ESP is similarly rife with inefficiency and error. The rules enforced in the vendor's software add conditions that HRSA has never adopted, and the result is a persistent gap between the claims a covered entity's TPA qualifies and the claims the manufacturer's software will accept. Reconciling that gap takes multiple hours per month per covered entity, and often the result is that the entity simply does not receive 340B pricing on a dispense to a 340B-eligible patient.

26. I believe these errors are the product of added complexity. Every condition a manufacturer adds to 340B pricing is another rule that must be encoded in a price file, transmitted to a wholesaler, and applied correctly to thousands of accounts, and each step is another place for the process to fail. SpendMend has already seen this with contract pharmacy restrictions. A client recently lost 340B pricing on multiple wholesaler accounts for five days because of errors in the price files the wholesaler received from the manufacturer. Defendants'

rebate mechanism multiplies the complexity. Manufacturers must now load WAC pricing into every covered entity's 340B account for the eighteen rebate drugs while leaving 340B pricing in place for all other 340B drugs. I expect that more rules, applied to more accounts, will produce more errors. Under a rebate mechanism, each error costs the covered entity the difference between WAC and the 340B price of a drug until it is manually located, disputed, and resolved.

<u>**The Rebate Program Will Deny 340B Pricing on Eligible Dispenses by Design**</u>

27. Independent of errors and denials, the design of the Rebate Program guarantees that some dispenses to 340B-eligible patients will never receive the 340B price. I describe three examples drawn from SpendMend's experience.

28. **The transition to the rebate mechanism.** Under the upfront discount mechanism, a covered entity dispenses prescriptions from its regular inventory and, once 340B-eligible dispenses add up to a full package, the entity buys a replacement package at the 340B price. On January 1, 2027, every covered entity will have eligible dispenses that have not yet added up to a full package and so have not been replenished. When the entity buys the replacement after that date, it will pay WAC, and it cannot claim a rebate on dispenses that occurred before the program began. HRSA recognized this problem and therefore allowed rebates on up to two unreplenished packages per drug dispensed in the fifteen days before January 1, 2027. 91 Fed. Reg. at 48,902. In SpendMend's experience, however, unreplenished balances for high-volume drugs such as Eliquis and Jardiance routinely exceed two packages at a single site. The entity will pay WAC for those additional packages with no rebate.

29. **Package purchases.** The Notice requires that rebates be "paid at the unit level," but drugs are purchased by the package. A critical access hospital that must order a non-formulary medication to meet a single patient's need will pay WAC for the entire package, but it

might only dispense one dose from the package and receive a rebate on that one dose. The hospital may never dispense the drug again, and it will wait months or years for the remaining product to expire before it can return it to a reverse distributor for a partial refund. The rebate on that single dose will rarely offset the WAC premium paid for the package. For example, if a bottle of 100 Januvia were purchased on WAC, and only 30 tablets were dispensed as 340B, the covered entity would only receive 30% of its WAC-to-340B savings back while it waited for the additional 70 tablets to be filled. This is a larger issue for closed-door 340B pharmacies only servicing 340B-qualified patients because they may end up carrying the cost on WAC for months, thereby further deteriorating their cash flow and exacerbating financial concerns.

30. **The 45-day deadline.** The Notice requires claims to be submitted within 45 days of dispense. In the ordinary course of operations, that window will routinely be missed through no fault of the covered entity. For example, when a patient receives a drug in the emergency department or an operating room and is then admitted to the hospital as an inpatient, the hospital does not bill for that drug until after the patient is discharged. In my experience, that process could take longer than 45 days. Drugs administered in some infusion centers present a second problem. Covered entities receive administration charge data for those drugs only every 30 days (*e.g.*, the infusion center opens up an encounter at the beginning of the month and closes it at the end of the month for billing multiple visits), and that data does not include every field the rebate mechanism requires. Staff must gather the missing fields by hand, which leaves them roughly two weeks to compile and submit each month's claims before the deadline passes. The practical reality is that some claims will be submitted late. While the Approved Plans allow manufacturers to grant exceptions case by case, a covered entity would have to prepare a written justification

for each late claim, and it often does not have the staff to do that. Therefore, the strict 45-day deadline—for every dispense type—will lead to 340B discounts that are lost entirely.

**The Problem the Rebate Program Targets Is Small, and Less Burdensome Alternatives Exist**

31. In the Notice, HRSA provides that "there is no federal estimate of the financial extent of duplicate discounts in 340B." 91 Fed. Reg. at 48,887. SpendMend's audit experience bears on that question directly. Of the more than 200 HRSA audits of covered entities that SpendMend has supported, very few have resulted in a duplicate discount finding. Of the more than 4,000 mock audits we have performed, duplicate discount risk was not a significant issue as many covered entities focus on ensuring that they are billing appropriately. Thus, even where a duplicate discount finding occurs, the claims at issue represent a small fraction of the 340B claims the covered entity processes. In my experience, moreover, covered entities' compliance has also improved substantially over the past decade.

32. To the extent there is even a duplicate discount problem worth addressing, less burdensome alternatives exist and are in use today. SpendMend has clients in all fifty states, and in my experience, Oregon's approach is the most efficient and effective means of preventing Medicaid duplicate discounts. Oregon's Medicaid program prevents duplicate discounts by collecting covered entity claims data retrospectively and excluding 340B claims from its rebate requests to manufacturers. One reason it works is because the data is shared with a neutral party affiliated with neither covered entities nor manufacturers. A similar process at the federal level, often called "a third-party clearinghouse approach," would address nonduplication without putting the financial burden on covered entities. In fact, CMS is proposing a similar model for the IRA inflation penalty component of Medicare Part D claims. It is concerning that CMS has

already implemented a clearinghouse data model approach for one part of the IRA and HRSA is using a rebate model for the MFP part.

**The Rebate Program Will Divert Resources from Patient Care**

33. The harm from Defendants' rebate mechanism will fall hardest on the covered entities with the fewest resources. Federally qualified health centers, in particular, do not have the resources for this program. SpendMend's smaller clients need the most help managing the differences among the manufacturer plans. Many small covered entities track eligibility manually—on paper—because the cost of TPA software would exceed the 340B savings their programs generate. Those entities will have to digitize their records to meet the data submission requirements, submit them within 45 days of each dispense, and perform manual uploads on a recurring basis, all with staff who perform several other jobs. Any delay costs them the WAC premium they have already paid. The alternative, implementing a TPA, diverts those same dollars from patient care. In my experience, the smallest covered entities will bear the largest burden.

34. It also will fall on patients. Many covered entities use 340B pricing to provide prescriptions to patients at no charge. Today, those entities are guaranteed 340B pricing on those prescriptions, subject to their own compliance. Under a rebate mechanism there is no such guarantee. A data error, a technical delay, a missed 45-day window, or an aberrant-quantity rejection means the entity has both given the drug away and paid the highest possible price for it. That is why SpendMend's playbook advised clients to revisit their charity care policies. I expect some safety-net providers to narrow or end those programs rather than accept the risk.

35. Every covered entity that SpendMend serves will be affected. The magnitude will vary, but all will imminently face new administrative burdens, new cash demands, and new ways

to lose 340B pricing on eligible dispenses. Those burdens divert resources from patient care. The costs of preparing for January 1, 2027, are being incurred now, and they will not be recovered if the program is later set aside. Based on more than twenty years in hospital pharmacy and 340B administration, on SpendMend's work with more than 800 covered entities, and conversations with SpendMend's clients, I believe the covered entity community and the providers and patients the program exists to serve will be immediately and substantially harmed by Defendants' Rebate Program.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 6th day of October, 2026 at Draper, Utah.

*/s/ Robert Nahoopii*
Robert Nahoopii