**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| THE AMERICAN HOSPITAL ASSOCIATION, THE MAINE HOSPITAL ASSOCIATION, EASTERN MAINE MEDICAL CENTER, NATHAN LITTAUER HOSPITAL & NURSING HOME, UNITY MEDICAL CENTER, and DALLAS COUNTY MEDICAL CENTER,<br><br>*Plaintiffs*,<br>v.<br><br>ROBERT F. KENNEDY, JR., SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, THOMAS J. ENGELS, ADMINISTRATOR, HEALTH RESOURCES AND SERVICES ADMINISTRATION, THE HEALTH RESOURCES AND SERVICES ADMINISTRATION, THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, AND THE UNITED STATES OF AMERICA,<br><br>*Defendants*. | Case No. 1:26-cv-00515-LEW |

**DECLARATION OF EDWARD SCHEIDLER**

I, Edward Scheidler, hereby make this declaration in lieu of an affidavit as permitted by 28 U.S.C. § 1746. I am aware that this declaration will be filed in the United States District Court for the District of Maine, and that it is the equivalent of a statement under oath. I declare as follows in support of AbbVie Inc.'s and Pharmacyclics LLC's (collectively "AbbVie") motion to intervene as defendants and memorandum in opposition to Plaintiffs' motion for a temporary restraining order in the above-captioned action:

**A. Background**

1. I am over the age of 21, under no disability, and competent to testify to the matters contained in this declaration.

2. I am the Head of the 340B Center of Excellence at AbbVie. I have worked at AbbVie since 2004 and have been responsible for AbbVie's 340B Program since 2017. My responsibilities include regularly engaging with the purchasers of AbbVie's pharmaceutical products concerning AbbVie's participation in the federal 340B Program, including with respect to AbbVie's relationships with commercial pharmacies (including so-called "contract pharmacies"). I am familiar with the conditions of AbbVie's participation in federal healthcare programs, such as Medicare and Medicaid.

**B. The 340B Program**

3. Manufacturers participating in the federal 340B Program, like AbbVie, must offer to sell their medications at a statutorily calculated discounted price to certain nonprofit healthcare providers, known as "covered entities." *See* 42 U.S.C. § 256b. The Health Resources and Services Administration ("HRSA") administers the 340B Program. The average 340B discount across AbbVie's drug portfolio is over 60% of the drug's commercial price. For some drugs, the price is as low as one penny per unit.

4. Historically, HRSA has insisted that manufacturers provide the 340B price via upfront discounts. Although the discounts are offered upfront—that is, when purchased from a wholesaler—a drug only qualifies for the 340B discount if it is dispensed to a qualifying patient. Covered entities thus could purchase drugs at the 340B price and then maintain them as distinct inventory, dispensable only to covered entities' 340B-eligible patients. But covered entities in the 340B Program typically choose another option: virtual "replenishment" inventory models.

5. Under the replenishment model, covered entities often rely on outside pharmacies (called "contract pharmacies") to acquire and dispense 340B-priced drugs, which are shipped directly from the wholesaler to the contract pharmacy to "replenish" the contract pharmacy's own drug stock. These "replenishment orders" replace drugs that the contract pharmacy previously sold to 340B-eligible patients. To operate a replenishment model, 340B participants rely on a "virtual" inventory system. Under these systems, contract pharmacies do not determine prior to or at the point of sale whether the patient is eligible for 340B-discounted drugs. Instead, claims data is used by pharmacies to make patient-eligibility determinations retroactively—that is, after the drugs have already been dispensed to a patient. The pharmacy tracks these determinations and orders additional drugs at the 340B ceiling price only after it has accumulated enough dispenses. Providers and pharmacies refuse to share their claims data with manufacturers, leaving them to rely on the pharmacy's assertion that 340B-eligible dispenses have occurred.

6. Under the replenishment model, while the 340B price is offered "prospectively," covered entities typically base their 340B orders on dispenses that happened in the past, making the 340B price "retrospective" with respect to the dispense that triggered the discount.

7. From my experience, hospital covered entities simply put their 340B profits into their general operating budgets. Some covered entities might, at their own discretion, occasionally choose to pass portions of their 340B discounts to certain patients. But such discounts are highly unusual: I would estimate that less than 5% of 340B transactions (perhaps less than 2 or 3%) involve any sort of direct patient discount. In fact, some major contract pharmacy chains refuse to cooperate with such patient discount programs. Patients at these pharmacies cannot receive discounts for drugs purchased at those pharmacies even if the covered entity *wanted* to pass those discounts along. As a general rule, patients pay full price.

### C. The Drug Price Negotiation Program

8. The Inflation Reduction Act ("IRA") created a federal drug-discount program called the Medicare Drug Price Negotiation Program ("DPNP"). I understand that in this program, the Secretary of the Department of Health and Human Services ("HHS") determines the price that Medicare plans will pay for certain drugs. The price set by HHS is typically called the maximum fair price ("MFP").

9. I understand that the process CMS has mandated that manufacturers use for providing MFP refunds is incompatible with the way drugs are sold at the 340B ceiling price. ***First***, there is a timing issue. Once a drug has been dispensed to a Medicare Part D enrollee, the plan sponsor has 7 days to submit that claim to CMS. Once manufacturers receive the claims data from CMS through the Medicare Transaction Facilitator ("MTF"), they have 14 days to transmit a refund to the dispensing pharmacy.[1] Manufacturers are often not asked to provide a 340B discount, however, for weeks, months, or even a year after a pharmacy dispenses a drug to a patient. That is because, as described, most 340B-eligible dispenses occur under the "replenishment model," by which covered entities (or the pharmacy acting on their behalf) wait until an entire package of medication has been dispensed to order a new "replenishment" package at the 340B price. So MFP refunds may already have been provided on earlier dispenses by the time a covered entity places a 340B replenishment order; the physical unit dispensed to a patient generally is not separately purchased at the 340B price before the dispensing transaction. ***Second***, there is a claims-data issue. Covered entities participating in the 340B Program generally refuse

[1] I understand that CMS created the MTF to facilitate the transmission of claims data from insurance plans to manufacturers. CMS, Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Sections 1191-1198 of the Social Security Act for Initial Price Applicability Year 2028 and Manufacturer Effectuation of the Maximum Fair Price in 2026, 2027, and 2028 at 215-17 (Sept. 30, 2025), https://tinyurl.com/uf86dc2f.

to provide manufacturers with the claims data that purportedly justifies a 340B replenishment order. This decision, combined with the timing issue, means that manufacturers are unable to determine whether they have already provided the MFP on the dispense that the covered entity is relying on for 340B replenishment. ***Third***, the MFP refund process involves different actors than the 340B discount model. With the MFP, manufacturers transmit refunds to dispensing entities (pharmacies), whereas I understand that with the 340B discount, covered entities place orders with drug wholesalers who later request chargebacks from manufacturers. In short, different entities seek different discounts from manufacturers at different times for the same dispensed prescription.

10. The overlap of the 340B Program and DPNP can result in negative pricing. As AbbVie has explained, "if the wholesale acquisition cost for a drug is $1,000, the MFP is $500, and the 340B ceiling price is $250; a manufacturer would be forced to provide $1,250 in discounts on a drug that cost only $1,000."[2]

11. Similar problems arise even if a covered entity does not use the replenishment model. In such a scenario, the 340B discount is due at the time of a covered entity's purchase—committing the covered entity to dispense the drug, eventually, to a 340B-eligible patient. At the same time, the MFP refund cannot be claimed until after a drug has been dispensed to an eligible Medicare patient and approved by their plan as an eligible claim. Under the current federal framework, then, a manufacturer would provide a front-end 340B discount to the covered entity (e.g., a hospital) on a unit of drug. If that unit is ultimately dispensed to an MFP-eligible patient, the manufacturer would be required to provide a back-end refund to effectuate the MFP. Yet the dispensing entity (e.g., a pharmacy) typically will not know at the time of dispense—and indeed may never know—whether the customer is a 340B-eligible patient. A rebate model avoids this

---

[2] AbbVie Comment Letter, at 8 (Apr. 20, 2026), https://tinyurl.com/ymf6uuck.

problem by waiting until the dispense occurs before obligating the manufacturer to identify and provide the correct discount.

**D. Pilot Program History**

12. Because some drugs subject to the 340B price are also subject to the MFP, but manufacturers are not required to provide both price concessions on the same unit of drug, HRSA has twice attempted to test a rebate mechanism for delivering the 340B price.

13. First, in August 2025, HRSA promulgated a rebate model pilot program that would have applied to drugs for which MFP pricing would go into effect in 2026.[3] AbbVie was approved for that limited pilot. One month before AbbVie's rebate plan was to go into effect, the American Hospital Association ("AHA") and several other plaintiffs successfully requested that AbbVie's approval be enjoined. The plaintiffs in that litigation later entered into a settlement with HHS. To effectuate the settlement, the district court vacated AbbVie's and other manufacturers' approvals to participate in that pilot program. As a result, neither AbbVie nor any other manufacturer was approved to use a 340B rebate model in 2026.

14. AbbVie had only one drug subject to the DPNP in 2026, Imbruvica (a medicine used to treat certain blood cancers), for which it was required to determine whether the MFP or 340B price applied. In 2027, AbbVie will have three drugs subject to an MFP: Imbruvica, Linzess, and Vraylar. AbbVie sells Imbruvica, Linzess, and Vraylar to covered entities nationwide, including in Maine. AbbVie expects to process rebate requests for Imbruvica, Linzess, and Vraylar from Maine-based covered entities under the Pilot Program.

15. Second, on August 3, 2026, HRSA proposed a revised Rebate Model Pilot Program for 2027 ("Pilot Program"), in which manufacturers would deliver the 340B price for drugs subject

---

[3] 90 Fed. Reg. 38,165 (Aug. 7, 2025).

to both 340B and the DPNP using a rebate mechanism.[4] In its Pilot Program announcement, HRSA acknowledged the elimination of duplicate claim submissions under the 340B Program and the DPNP as one reason for collecting claims data and effectuating the 340B price through a rebate mechanism.[5]

16. Collecting claims data is the most efficient and accurate method of identifying when a rebate is warranted and ensuring compliance with the IRA because it enables manufacturers to quickly identify which dispenses are both MFP-eligible and subject to 340B pricing. In my experience, duplicate discounts are inevitable unless manufacturers can use a rebate model and obtain claims data. I thus understand that one goal of the Pilot Program is to avoid duplicate discounts so that a manufacturer does not pay both the MFP and the 340B price on the same prescription.

17. Based on my experience, rebate models (like the Pilot Program), which are based on actual patient dispenses, are more likely to enhance program integrity than upfront discount models (like the prevailing replenishment model).

18. I understand that data is submitted to the MTF for claims eligible for an MFP. However, without corresponding claims data from 340B dispenses, manufacturers cannot accurately match dispenses to ensure they do not provide duplicate discounts. Moreover, it is my understanding that the primary available data field in MFP refund claims that enables manufacturers to even attempt to predict potential duplicate discounts with 340B is the NPI. But CMS specifically noted in its Final Guidance that the NPI alone provides an insufficient basis

---

[4] 91 Fed. Reg. 48,883 (Aug. 3, 2026).

[5] *Id.* at 48,887.

through which to deduplicate claims.[6] I do not understand the physician NPI or pharmacy NPI, standing alone, to be sufficient to facilitate deduplication.

**E. The Revised Pilot Program**

19. The 2027 Pilot Program is a limited pilot for which only 25 specific drugs are eligible—those subject to the 340B discount as well as an MFP in 2027. It is my understanding that the selected drugs make up a very small portion of drug sales conducted under the 340B Program, estimated at less than 5.5% of total 340B sales.[7] Three of AbbVie's drugs are part of the Pilot Program: Imbruvica, Linzess, and Vraylar.

20. AbbVie submitted its application for HRSA's new Pilot Program on Monday, August 24, 2026. HRSA formally approved AbbVie's proposal for participating in the Pilot Program on Thursday, September 24, 2026. Attached hereto as Exhibit A, Exhibit B, and Exhibit C are true and correct copies of HRSA's letters approving AbbVie for participation in the Pilot Program. AbbVie is set to start participating in the Pilot Program on January 1, 2027.

21. I understand that HRSA sought public comments about the Pilot Program before publishing the new Pilot Program framework. 91 Fed. Reg. 7,287 (Feb. 17, 2026). In response to that request, AbbVie submitted a comment, a true and correct copy of which is attached hereto as Exhibit D. AbbVie explained the substance of its investment of "millions of dollars and countless hours preparing for MFP effectuation." Ex. D at 8. It explained how, under related programs, "AbbVie has millions in disputed Medicaid duplicate discount claims activity that has remained unresolved for years, largely because covered entities refuse to work with AbbVie to comply with their statutory obligations." *Id.* at 6. And AbbVie provided specific information about how

---

6 IPAY 2026-28 Final Guidance § 40.4.5, at 254.

7 91 Fed. Reg. at 48,893.

"[m]anufacturers … would incur the bulk of the costs under a Rebate Model," in part because of their obligation to establish and maintain a platform for the Rebate Model. *Id.* at 26.

22. Under the Pilot Program, covered entities must submit claims data in order to obtain the 340B ceiling price in the form of a rebate. For submitted claims, AbbVie will offer the 340B ceiling price through a rebate mechanism in order to prevent both duplicate price concessions between the MFP and 340B ceiling price and other issues, such as the submission of duplicate Rx claims by separate covered entities. The Pilot Program—with its claims data submission requirements and rebate model—is the only effective method for manufacturers to deduplicate the discounts required under the 340B Program and the DPNP. As HRSA has recognized, requiring an upfront discount, which necessarily results in after-the-fact dispute resolution, is "inherently reactive" and leads to "resource-intensive 'pay-and-chase' processes."[8] By contrast, a rebate model also "by its very nature incentivizes covered entity compliance" because "the covered entity must affirmatively submit validated claims data to receive the discount, which may help to align the incentive structure with program integrity objectives."[9] Providing claims data while discount eligibility is being adjudicated ensures that eligibility and payment align.[10]

23. When covered entities submit timely, complete claims, the net price paid remains the same whether they receive a discount upfront or as a rebate.

24. HRSA has specified that under the Pilot Program, covered entities will be able to make purchases through their 340B wholesaler accounts. Manufacturers are to load commercial wholesale acquisition cost ("WAC") pricing in the 340B wholesaler account where purchases will

---

[8] 91 Fed. Reg. at 48,889, 48,890.

[9] *Id.* at 48,900.

[10] *See id.* at 48,899.

be made by covered entities. Once purchased, products will be dispensed or administered to individuals, and covered entities will use claims data to determine if a particular dispense or administration was eligible for the 340B price. Then, as part of requesting a rebate to the 340B ceiling price, covered entities must submit claims data to the manufacturer. Pilot Program rebates will be calculated as WAC minus the 340B ceiling price on the date of dispense (date of service). This framework allows covered entities to use existing 340B infrastructure, which I understand will lessen any administrative burden involved in seeking 340B discounts.

25. I understand that some commenters proposed that deduplication could be facilitated via a clearinghouse, administered by HRSA or a third party, which would coordinate the spread of information about 340B transactions among covered entities, manufacturers, and others. Such an approach is impractical in this context. ***First***, even if HRSA had authority to create a clearinghouse, it could not timely create a workable one.[11] Manufacturers have already been harmed by their effective inability to deduplicate transactions eligible for the MFP in 2026 and will soon also have to deduplicate transactions eligible for the MFP in 2027. ***Second***, the commenters' version of a clearinghouse would identify duplicate discounts after they have already occurred—that is, after a pharmacy and covered entity have already benefited from a duplicate discount. As manufacturers and HRSA explained, that design does not adequately encourage compliance with claims data sharing requirements. In fact, covered entities would be incentivized not to submit claims data, so that they can keep previously paid duplicate discounts. Moreover, because such a clearinghouse would not encourage compliance, its design is likely to involve

[11] 91 Fed. Reg. at 48,900 (acknowledging that "clearinghouses or similar intermediaries are not explicitly authorized under the 340B statute").

greater administrative cost than necessary, as the clearinghouse resolves duplicate discounts that could have been avoided in the first instance.

26. Manufacturers are best equipped to implement a rebate model. They have extensive operational experience with rebate programs and administer rebate programs across multiple federal and commercial markets—for example, the Medicaid Drug Rebate Program, historical Medicare Part D discount programs, and the wholesaler chargebacks that facilitate upfront 340B discounts. This existing infrastructure means that manufacturers can implement a rebate model that is predictable, scalable, and aligned with individual manufacturers' compliance requirements.

27. Moreover, as detailed below, manufacturers like AbbVie have already spent significant time and effort developing their Pilot Program plans in preparation for the 2027 DPNP, which will require them to ensure compliance with both the IRA and 340B for participating drugs.

28. The Pilot Program requires that participating manufacturers obtain claims data from covered entities to effectuate 340B rebates. In approving AbbVie's proposal for the Pilot Program, HRSA specified the data fields that AbbVie collects from covered entities in order to issue a 340B rebate. This claims data includes important information, such as date prescribed, Rx number, fill number, quantity dispensed, and the prescriber/rendering physician's National Provider Identifier, that allows manufacturers to prevent duplicate discounts. The Pilot Program does not work without claims data. Claims data is critical for AbbVie to determine the applicability of the MFP and fulfill AbbVie's duty under the IRA to provide the lower of the MFP and 340B price.

29. Without such claims data, manufacturers like AbbVie cannot accurately and exhaustively deduplicate the 340B price and MFP. One analysis concluded that, as of April 1, 2026, manufacturers have paid both discounts in at least 30% of cases where a claim was eligible

for both the MFP and 340B price, even though in such instances the claim should have received only the 340B price. Ex. D at 9.

30. Claims data also allows AbbVie to avoid duplicate claims more generally, including when multiple covered entities submit the same prescription for the same patient, a significant problem. For example, one analysis estimates that "[m]ore than 20 percent of [Medicare Part D dispenses] replenished at least once are at risk of replenishment by more than one covered entity," and that some of those dispenses "could be replenished by more than five" covered entities.[12]

31. Claims data is ubiquitous in the healthcare industry, and covered entities routinely collect and include it on everything from hospital bills to insurance to Medicare and Medicaid claims. Claims data is often required to substantiate non-340B healthcare transactions—such as insurance payment or Medicaid reimbursement. Even though claims data is readily available to covered entities, covered entities do not generally provide claims data voluntarily or upon request, which is one reason that HRSA included a claims-data requirement as a part of the Pilot Program. That requirement aligns the 340B Program with what I understand to be ordinary practices in the healthcare industry. A similar thing is true of rebates, which are standard in the healthcare industry and are commonly used to facilitate access to reduced pricing in federal and commercial healthcare programs alike. The Pilot Program's rebate model brings the 340B Program in line with industry norms. I am aware of and myself have had discussions with the health plan of a covered-entity hospital to discuss their formulary rebates. Many large health systems that qualify as 340B covered

---

[12] BRG, *340B Patient Definition and Implications for Duplicate Replenishment* (Apr. 10, 2026), https://media.thinkbrg.com/wp-content/uploads/2026/05/06130322/Patient-Def-Dupe-Replenishment-2026-4.5.26.pdf.

entities operate self-insured health plans and accept drug rebates as a way to effectuate their pharmacy-benefit-manager negotiated net drug prices for their employee prescriptions.

32. HRSA is preparing manufacturers, covered entities, and other stakeholders for the Pilot Program's effective date.

33. As part of the Pilot Program, HRSA requires manufacturers to pay for the costs of data collection software through which covered entities will submit claims data to manufacturers.[13] AbbVie has worked with Berkeley Research Group ("BRG") and Second Sight Solutions ("Second Sight") to develop a platform for covered entities to submit claims data to AbbVie. Second Sight's technology platform called "Beacon" will compare 340B data submitted through the Pilot Program and MFP refund claims data received through the "Medicare Transaction Facilitator" on a daily basis to identify claims subject to both MFP and 340B pricing for AbbVie. AbbVie will use those comparisons to appropriately price and fulfill refund requests.[14]

34. It is my understanding that many covered entities already use "340B ESP," a Second Sight product, to submit claims data in the context of 340B replenishment orders.[15] 340B ESP is similar to Second Sight's "Beacon" platform. It is my understanding that all 10 manufacturers, including AbbVie, that are participating in the Pilot Program intend to use Second Sight's "Beacon" platform to support their participation.[16] In my experience, most covered entities

---

[13] 91 Fed. Reg. at 48,893.

[14] Beacon MFP Support Center, *Beacon MFP Frequently Asked Questions*, https://tinyurl.com/4btsetnx.

[15] 340B ESP Help Center, *Frequently Asked Questions (FAQs)*, https://help.340besp.com/en/articles/14482537-frequently-asked-questions-faqs.

[16] HRSA, *Approved manufacturer 340B Rebate Model plans*, https://www.hrsa.gov/opa/340b-model-pilot-program.

have personnel who handle claims data for eligibility determinations—or use vendors that can easily and rapidly interface with Beacon just as they do with other parties, like payers.

35. In accordance with the Pilot Program, AbbVie provides covered entities with free access to Beacon's Pilot Program platform to support claims data submissions, as well as technical support, customer service, and educational resources at no cost to covered entities. Many covered entities work with "third-party administrators" to identify claims for discounts under the 340B Program from past dispenses, as well as discounts available through other programs. Based on my experience, these third-party administrators may be willing and able to offset covered entities' administrative burdens by uploading necessary claims data directly to Beacon on the entities' behalf.

36. The Pilot Program is not only small in scale—affecting perhaps 5.5% of all 340B sales—it is also structured to prevent delays and to not affect covered entities' cash flow.[17] I understand that covered entities commonly use payment windows or credit arrangements when purchasing from wholesalers, arrangements that allow covered entities to receive and dispense medications before they need to pay the wholesaler. The Pilot Program makes manufacturer rebates due within 10 days of claim submission, but covered entities typically enjoy standard wholesaler terms under which payment is due 30 days after purchase, so that covered entities can receive rebates before payment is due. HRSA has clarified that a manufacturer's failure to pay a rebate within 10 days of submission of a complete Pilot Program claim may jeopardize a manufacturer's participation in the Pilot Program. 91 Fed. Reg. at 48,895. Thus, even if covered entities must place orders at the WAC, they will receive rebates under the Pilot Program before they are required to remit payment for those WAC-priced orders.

---

[17] 91 Fed. Reg. at 48,893.

37. It is my understanding that currently, under the replenishment model, a covered entity will not purchase additional drug units at the discounted 340B price until the dispenses for a drug reach a full package size. Moreover, a covered entity's payment from an external contract pharmacy usually is delayed 30 to 45 days, or more, based on the covered entity's contractual agreement with the pharmacy. As a result, it is possible that the Pilot Program will actually reduce the time that covered entities spend waiting to realize a drug discount.

38. Similarly, it is my understanding that covered entities have experience managing far greater administrative burdens and delays than those that covered entities fear will result from HRSA's Pilot Program. Many hospital pharmacies engage with outpatient Medicaid patients. For such patients, a hospital pharmacy dispenses a drug that it has already purchased, submits claim-level data, then waits for the State to adjudicate the request and pay the pharmacy. It is my understanding that this process affects all drugs dispensed to Medicaid patients, whereas only 18 drugs have currently been approved for the Pilot Program. I also understand that many covered entities use the so-called "Alternate Distribution Model" or "ADM" as a workaround to manufacturers' contract-pharmacy policies.[18] The ADM requires covered entities to spend significantly, obtain a wholesaler license, and undertake the burden of redistributing drugs to contract pharmacies.

**F. Duplicate Discounts and Program Costs**

39. I understand that Plaintiffs' lawsuit, if successful, will prevent the revised Pilot Program from going into effect as planned on January 1, 2027. A temporary delay or permanent cancellation of the Pilot Program would adversely affect AbbVie, because—among other

[18] Generally, under AbbVie's current contract-pharmacy policy, covered entities may claim the 340B price only at their in-house pharmacy or at a single, designated commercial pharmacy.

reasons—AbbVie will be forced to pay duplicate MFP and 340B discounts or risk violating federal law.

40. In 2027, AbbVie will have three drugs subject to an MFP: Imbruvica, Linzess, and Vraylar. If AbbVie cannot determine and provide the applicable price for those drugs, it will face significant risk from federal enforcement actions and steep civil penalties. Alternatively, AbbVie will be forced to provide excess price concessions, by offering 340B pricing and MFP rebates on many covered entity purchases. This risk of excess price concessions is severe: IQVIA has estimated the overlap between 340B and Medicare to be up to 40% of claims.[19] A separate review concluded that manufacturers paid duplicate MFP and 340B discounts on at least "30% of total claims."[20]

41. For example, to consider the impact with respect to just one of AbbVie's products, U.S. net revenue for Vraylar through Q2 2026 was approximately $1.97 billion.[21] Relying on these figures projected forward, adjusted for overlapping 340B and MFP eligibility, and based on the assumption that AbbVie would pay duplicate MFP and 340B discounts on at least 30% of claims without the Pilot Program, I estimate that AbbVie would lose $265,000 each week, $1.1 million each month, and $13.8 million unnecessarily over the course of 2027 to improper duplicate Vraylar discounts.

---

19 IQVIA, *Can 340B Modifiers Avoid Duplicate Discounts in the IRA?* (Feb. 28, 2023), https://www.iqvia.com/-/media/iqvia/pdfs/us/white-paper/2023/can-340b-modifiers-avoid-duplicate-discounts-in-the-ira.pdf.

20 340B Report, 40% of Claims Miss the Mark (Mar. 5, 2026), https://340breport.com/40-of-claims-miss-the-mark-sponcon-rxparadigm.

21 AbbVie, AbbVie Reports First-Quarter 2026 Financial Results at 6 (Mar. 31, 2026), https://investors.abbvie.com/news-releases/news-release-details/abbvie-reports-first-quarter-2026-financial-results ("First Quarter Results"); AbbVie, AbbVie Reports Second-Quarter 2026 Financial Results at 7 (July 31, 2026), https://investors.abbvie.com/news-releases/news-release-details/abbvie-reports-second-quarter-2026-financial-results ("Second Quarter Results").

42. I understand that it has been estimated that without the Pilot Program, manufacturers would lose approximately $5 billion in duplicate 340B and DPNP discounts in 2027 alone.[22] Overall, I estimate that AbbVie would lose $689,000 each week, $3.0 million each month, and $35.8 million unnecessarily over the course of 2027 to improper duplicate discounts.

43. AbbVie has also invested substantial time and money preparing for the Pilot Program, expending countless hours and millions of dollars to ensure that it is able to effectuate the MFP and accurately deduplicate 340B and MFP pricing.

44. AbbVie does not require covered entities to engage with the Pilot Program. If a covered entity does not wish to participate in the pilot, it may still send prescriptions to one of the pharmacies or specialty pharmacies capable of dispensing Imbruvica, Linzess, and Vraylar without disrupting patient care; the patient will pay the same price, but the covered entity will simply not receive the benefit of the 340B discount.

45. AbbVie's Pilot Program plan must operate uniformly across all jurisdictions.

**G. Inaccurate Estimates**

46. I understand that several plaintiffs contend that the Pilot Program's rebate model will require covered entities to "float" large amounts of money to manufacturers. For example, I have reviewed the declaration of Chad Golder, prepared on October 7, 2026, in support of Plaintiffs' motion for a temporary restraining order, which states that "wholesaler payment terms are frequently five or seven days." Dkt. 2-5 ¶ 20. And the declaration of Matthew Marston states that Eastern Maine Medical Center has a 15-day payment window. Dkt. 2-6 ¶ 27. I do not believe those to be accurate representations of industry-standard wholesaler practices; based on my

---

[22] BRG, *Update on Effectuation of the Maximum Fair Price in 2026 and Outlook for 2027* at 2 (Apr. 2026), https://media.thinkbrg.com/wp-content/uploads/2026/05/06130328/Effectuation-of-the-Maximum-Fair-Price-in-2026-and-Outlook-to-2027_5.6.26.pdf.

experience, they are likely to represent unusual circumstances or unsuccessful negotiation. It is my understanding that payment to a wholesaler typically comes due in 30 days, which is more than sufficient time to compile and submit the data necessary to receive a rebate before payment to a wholesaler comes due.

47. I further understand that under virtual inventory replenishment, covered entities dispense from neutral stock and order replacement drugs only after accumulating a full package of 340B-eligible dispenses. The 340B dispenses and supporting data therefore exist before the covered entity places a replenishment order. In my experience, under the virtual inventory replenishment model, covered entities can submit claims before or around the time of the replenishment WAC purchase, allowing rebates to arrive before wholesaler invoices become due.

48. I understand that one analysis has explained that "[u]nder both pre-MFP and MFP conditions, dispensing entities experience a negative cash-flow period between day 15, when the pharmacy pays its wholesaler for the drug, and day 30, when the payer reimburses the pharmacy for the drug."[23] Accordingly, the cash-on-hand devoted to unrebated drug purchases will merely be the rolling balance awaiting a rebate. Negative cash flow is thus far more limited than is implied by Plaintiffs' cash-outlay estimates.

49. I have reviewed the declaration of Trapper Denton, prepared on October 8, 2026, in support of Plaintiffs' motion for a temporary restraining order. It states that before the prior iteration of the Pilot Program was to take effect, Dallas County Medical Center's "wholesalers were not prepared to extend the credit limits DCMC needed on its 340B accounts to operationalize even the partial rebate program," and that "[w]hen credit limits are exceeded, wholesalers stop

[23] IQVIA, *How will a Rebate Model Impact Cash Flow for Price Negotiated Drugs in Medicare Part D?* (Dec. 9, 2025), https://www.iqvia.com/locations/united-states/library/white-papers/how-will-a-rebate-model-impact-cash-flow.

fulfilling drug orders . . . for every 340B product DCMC purchases." Dkt. 2-3 ¶ 23. It also asserts "[t]he cumulative working capital DCMC would be required to float throughout 2027 to drug manufacturers is therefore approximately $1.5 million" and that "$1.5 million diverted to manufacturers for rebate processing is simply not possible without borrowing" or reducing services. Dkt. 2-3 ¶¶ 19-20. As explained, however, the cash-on-hand devoted to unrebated drug purchases is the rolling balance awaiting a rebate. *See supra* ¶ 45. A figure stated in annual terms is likely to overestimate an entity's financing burden.

50. In addition, the declaration of Robert Nahoopii hypothesizes that, because drugs are purchased at the package level but rebates are issued per unit, "[a] critical access hospital that must order a non-formulary medication to meet a single patient's need will pay WAC for the entire package, but it might only dispense one dose from the package and receive a rebate on that one dose." Dkt. 2-8 ¶ 29. Under the current replenishment model, however, a hospital buys a package of drugs at commercial prices and receives no subsidy until a full package of eligible dispenses has accumulated. To the extent the medication was not normally dispensed by the hospital, it may never accumulate enough dispenses to obtain the 340B price. In that hypothetical case, the Pilot Program's per-unit rebates are likely to improve a covered entity's position.

51. The declaration of Mark Bertilrud further states that "[s]ome manufacturers reserve the right to reject a 340B rebate claim when the drug is also subject to the MFP" while "[o]thers will pay the 340B rebate in full and instead reduce the maximum fair price." Dkt. 2-2 ¶ 25. AbbVie's approach is consistent with its statutory obligation to offer the 340B ceiling price when it is lower than the MFP, and to provide the MFP when it is lower than the 340B ceiling price. *See* Ex. B at 4.

* * *

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 14th day of October 2026.

/s/ Edward Scheidler
Edward Scheidler
Declarant