# EXHIBIT D

April 20, 2026

**VIA ELECTRONIC FILING TO:**
**www.regulations.gov**

The Honorable Thomas J. Engels
Administrator
Health Resources and Services Administration
5600 Fishers Lane, Mail Stop 14W52
Rockville, MD 20857

**Re: Request for Information: 340B Rebate Model Pilot Program and Request for Public Comment; HHS Docket No. HRSA-2026-03042**

Dear Administrator Engels:

AbbVie Inc. (AbbVie) is pleased to provide comments in response to the Request for Information: 340B Rebate Model Pilot Program (HHS Docket No. HRSA-2026-03042) (RFI), which the Health Resources and Services Administration (HRSA) issued on February 17, 2026.[1]

AbbVie is a biopharmaceutical company committed to discovering and delivering innovative medicines and solutions that solve serious health issues today and address the medical challenges of tomorrow. We strive to have a remarkable impact on people's lives across several key therapeutic areas including immunology, oncology, and neuroscience. AbbVie focuses on these areas to accelerate the development of innovative approaches to treat disease and to respond to unmet patient needs. AbbVie has a robust pipeline of potential new medicines, with the goal of finding solutions to address complex health issues and enhance people's lives.

AbbVie provided comments in response to HRSA's initial announcement of an application process for a 340B Rebate Model Pilot Program (Pilot Program) in 2025,[2] and intended to participate in the Pilot Program until that program was terminated. Without the ability to offer the 340B price as a rebate, AbbVie has no effective means to deduplicate maximum fair price (MFP) and 340B claims, which poses what is anticipated to be a growing, significant harm to the Company. While AbbVie does not view the 340B statute as requiring HRSA preapproval of a manufacturer rebate model, AbbVie urges HRSA to move quickly toward approving manufacturer proposals to use a Rebate Model. A Rebate Model is the most appropriate and effective means of preventing the duplicate discounts required by both the 340B statute and Inflation Reduction Act (IRA) and curbing other widespread abuses that undermine the 340B Program's patient-focused objectives.

---

[1] Request for Information: 340B Rebate Model Pilot Program, 91 Fed. Reg. 7287 (Feb. 17, 2026).

[2] 340B Program Notice: Application Process for the 340B Rebate Model Pilot Program; Correction, 90 Fed. Reg. 38165 (Aug. 7, 2025).

**<u>Executive Summary</u>:**

AbbVie urges HRSA to approve a Rebate Model. Doing so will achieve:

- **Greater Program Integrity**: By tying 340B pricing to specific, verified patient dispenses, the Rebate Model is the most effective and efficient way to support statutory compliance by helping to prevent diversion and allowing manufacturers to deduplicate Medicaid and MFP claims.
- **Zero Harm to Covered Entities**: The data required is industry-standard (already collected and reported for Medicare/Medicaid/commercial payers). Rebates would be paid within 10 calendar days of a clean claim submission, which is faster than the current replenishment model and provides a way for covered entities to manage without impact to their cash flows.

**To be successful, the model should allow for:**

1. **Expeditious Action**: HRSA must act immediately to re-approve Rebate Models with an implementation date of no later than July 1, 2026, to support the statutory requirements of the 340B program and the IRA's nonduplication requirements.
2. **More Robust Data and Compliance**: HRSA should explicitly permit manufacturers to verify 340B rebates based on appropriate claims data fields, not just for MFP deduplication, but also to prevent Medicaid duplicate discounts and documented diversion.
3. **Federal Preemption**: At least 13 states have passed laws attempting to explicitly prohibit manufacturers from requiring claims data from covered entities. HRSA must clearly articulate that the federal 340B Rebate Model preempts these state laws, as they serve as a direct obstacle to federal program enforcement.

**<u>Overview:</u>**

**Section I** describes the 340B Program's integrity challenges—arising from the replenishment model, duplicate discounts, and diversion—and explains why the current system is not working. **Section II** outlines how a Rebate Model would help restore program integrity and have other potential benefits, at no cost to the federal government. **Section III** explains why a Rebate Model would not burden covered entities, which already collect and report similar data elements under other healthcare programs, and could benefit from faster access to 340B pricing than that available under the prevailing replenishment model. **Section IV** urges HRSA to clarify that a federal law preempts state laws that prohibit manufacturers from collecting necessary data and interfere with the administrative dispute resolution process. **Section V** urges HRSA to act expeditiously to balance the interests of all stakeholders, and to avoid significant delays in evaluating and announcing its decision on the new Rebate Model.

## I. <u>The 340B Program Faces Significant Program Integrity Challenges and Is Rife with Abuse (Questions 5 and 7)</u>

The 340B Program has been operating for years beyond statutory authority and serving as a profit-maximizing opportunity for covered entities, rather than as Congress intended: to help ensure that vulnerable patients have appropriate access to care and medicines.[3] At the root of many of the program integrity issues discussed below are a lack of transparency and covered entities' persistent efforts to maximize their financial benefit from the 340B Program.

Covered entities utilize models that perpetuate illegal duplicate discounting and diversion. A key example is the "replenishment model," an inventory system that many covered entities and for-profit pharmacies utilize to manage 340B drug purchases. Under a replenishment model, the 340B price is not provided at the point of sale, but rather requested after the fact through a process that shrouds program abuse. More specifically, a covered entity, through its contract pharmacy, uses a neutral inventory to dispense drugs to both 340B patients and non-340B patients alike. Drugs purchased at both the 340B price and at other prices are intermingled within this common inventory. After deciding to seek 340B pricing for an already-dispensed prescription—sometimes weeks or months later—the covered entity seeks to "replenish" its stock at the 340B ceiling price. That 340B-priced drug is then placed back in the common, neutral inventory, intermingled with and indistinguishable from drugs purchased at non-340B prices. When the pharmacy dispenses a drug to a patient, the drug comes out of that neutral inventory and neither the pharmacist, covered entity, nor patient know whether the unit dispensed is a unit for which the covered entity is permitted to receive the 340B price. Eligibility for 340B pricing is thus determined only when the replenishment order is placed, which often occurs weeks, months, or even a year after the prescription is dispensed. More recently, covered entities are adopting novel systems, such as credit-based replenishment models[4] and "alternative distribution" models[5] that further reduce transparency and obfuscate the "ship to, bill to" process established under HRSA's contract pharmacy guidance.[6] These distribution models frustrate efforts to identify duplicate discounts and present significant diversion risks.

This section describes persistent abuses of the 340B Program, including covered entities seeking statutorily-prohibited duplicate discounts and diverting 340B medicines to individuals

---

[3] H.R. Rep. 102-384(II) at 10–12 (1992). The purpose of the federal 340B Program is to "reduce pharmaceutical costs for safety-net medical providers and the indigent populations they serve" by creating "a low-cost source of pharmaceutical medication for the indigent patients themselves." Connor J. Baer, Drugs for the Indigent: A Proposal to Revise the 340B Drug Pricing Program, 57 Wm. & Mary L. Rev. 637, 638 (2015) (footnote omitted).

[4] AmeriSource Bergen, Looking for a Way to Remove 340B Inventory Management Burdens, https://www.amerisourcebergen.com/-/media/assets/amerisourcebergen/340b/isp-virtual-replenishment-program-slick.pdf ("Leveraging a credit-based approach, 340B drugs are purchased without the need for on-site storage").

[5] Verity, Alternative Distribution, https://verity-solutions.com/solution/alternative-distribution/ ("Our Alternative Distribution Model (ADM) restores 340B savings benefits by shipping replenished drugs directly to the covered entity, then transferring them to a contract pharmacy for dispensing.").

[6] 75 Fed. Reg. 10272, 10277 (March 5, 2010).

who are not their "patients." The current system does not adequately police abuses and creates strong financial incentives for covered entities to violate statutory requirements.

### A. Governmental and Manufacturer Efforts to Prevent 340B and Medicaid Duplicate Discounts Have Been Ineffective

The 340B and Medicaid statutes include a longstanding prohibition on Medicaid and 340B duplicate discounts: It is a violation of the 340B statute to cause a drug manufacturer to pay both a Medicaid rebate and provide a 340B discount on the same unit of drug.[7] Despite this clear statutory prohibition, duplicate discounting is pervasive, in part, due to a lack of proper regulatory oversight and adequate means for manufacturers to identify and prevent duplicate discounts.

#### 1. <u>HRSA's Mechanism to Prevent Illegal 340B and Medicaid Duplicate Discounts Is Insufficient</u>

HRSA's current approach to preventing 340B and Medicaid duplicate discounts, the Medicaid Exclusion File (MEF), has proven inadequate. Currently, when a covered entity enrolls in the 340B Program, it must inform HRSA whether it will use 340B drugs for its Medicaid fee-for-service patients (carve-in) or whether it will purchase drugs for its Medicaid fee-for-service patients through other mechanisms (carve-out).[8] If a covered entity carves-in, the covered entity's billing number will be reflected in the MEF, which notifies state Medicaid agencies that drugs purchased under that billing number are not eligible for a Medicaid rebate. The MEF is of limited utility because the "data on the HRSA MEF applies to Medicaid fee-for-service only, and does not apply to Medicaid managed care organizations (MCOs),"[9] which is the "dominant delivery system for people enrolled in Medicaid."[10] With approximately 78% of Medicaid beneficiaries—more than 66 million individuals—enrolled in risk-based, comprehensive MCOs,[11] the MEF captures only about 22% of beneficiaries in fee-for-service or other delivery arrangements.

Another significant gap is that the MEF does not list the billing number of a covered entity's contract pharmacy. Although HRSA guidance recommends that covered entities, contract pharmacies, and states develop arrangements to prevent duplicate discounts,[12] the Government Accountability Office (GAO) and the Health and Human Services Office of Inspector General (HHS OIG) have found that these policies often fail to prevent duplicate discounts. For example, in a 2020 report, the GAO stressed that HRSA's failure to "ensure that covered entities are

---

[7] Public Health Service Act (PHSA) § 340B(a)(5).
[8] HRSA, Duplicate Discount Prohibition, https://www.hrsa.gov/opa/program-requirements/medicaid-exclusion.
[9] HRSA, Duplicate Discount Prohibition, https://www.hrsa.gov/opa/ program-requirements/medicaid-exclusion.
[10] KFF, 10 Things to Know About Medicaid Managed Care (Feb. 27, 2025), https://www.kff.org/medicaid/10-things-to-know-about-medicaid-managed-care/ ("The latest national Medicaid managed care enrollment data (from 2022) show 75% of Medicaid beneficiaries were enrolled in comprehensive managed care organizations (MCOs).").
[11] KFF, 10 Things to Know About Medicaid Managed Care (Feb. 27, 2025), https://www.kff.org/medicaid/10-things-to-know-about-medicaid-managed-care/ ("The latest national Medicaid managed care enrollment data (from 2022) show 75% of Medicaid beneficiaries were enrolled in comprehensive managed care organizations (MCOs).").
[12] HRSA, Notice Regarding 340B Drug Pricing Program – Contract Pharmacy Services, 75 Fed. Reg. 10272, 10278 (March 5, 2010).

complying with 340B Program requirements, including the prohibition on duplicate discounts in managed care . . . not only puts drug manufacturers at risk of providing duplicate discounts, but also compromises the integrity of the 340B Program."[13] The HHS OIG has expressed similar concerns, emphasizing that "claim level" methods are needed to "identify 340B drug claims and correctly collect rebates for MCO drugs."[14]

GAO's and HHS OIG's concerns are supported by a Manatt survey, which reviewed states' differing approaches to preventing 340B and Medicaid duplicate discounts. [15] According to the survey, 12 states rely solely on the MEF to identify 340B drugs that are billed to Medicaid, with certain states having *no* policies or guidance for MCOs. The survey also found that there was "significant inconsistency" in how states identify duplicate discounts at contract pharmacies. The Manatt survey is consistent with AbbVie's experience, described further below. We have observed that states also vary in how each operationalizes carve-in and carve-out policies, further complicating efforts to identify Medicaid duplicate discounts. For example, a covered entity may be listed as carved-in on the MEF, but contract pharmacy claims may not be clearly distinguishable at the claim level. Without appropriate actions to enforce federal law requirements and clarify how states, MCOs, and contract pharmacies identify and report 340B claims, duplicate discounts will continue to go undetected at scale — imposing unlawful costs on manufacturers and undermining the integrity of both the 340B program and the Medicaid Drug Rebate Program.

2. AbbVie's Efforts to Prevent Illegal 340B and Medicaid Duplicate Discounts

AbbVie's own efforts to prevent illegal duplicate discounts reinforce the stark inadequacy of HRSA oversight of this issue. AbbVie's primary method of ensuring that it is not paying both 340B discounts and Medicaid rebates on the same unit of a drug is to review purchase data from covered entities and their contract pharmacies and to identify anomalies. AbbVie has committed substantial resources to this challenge, including employing a team of ten employees and engaging two vendors. The first vendor identifies potential duplicate discounts by comparing state-level Medicaid claim data against 340B chargeback data. However, 340B chargeback data may not contain sufficient identifiers to directly match against Medicaid rebate submissions without supplemental analytics because there is no universally applied 340B indicator that is consistently transmitted at the point of sale or in-state rebate invoicing. This creates particular issues with regard to contract pharmacy arrangements, where AbbVie must perform a secondary analysis with a different vendor to identify whether a claim is expected to be 340B-eligible. To that end, AbbVie has a policy of requiring covered entities to submit claims data for any contract pharmacy locations. This commitment to data transparency aligns with the broader national push for pricing accountability in healthcare — most recently reflected in President Trump's Executive Order,

[13] GAO, 340B Drug Discount Program: Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement, GAO-20-212, at 27 (Jan. 2020), https://www.gao.gov/assets/gao-20-212.pdf.
[14] OIG, State Efforts to Exclude 340B Drugs from Medicaid Managed Care Rebates, OEI-05-14-00430, at 2 (June 2016), https://oig.hhs.gov/oei/reports/oei-05-14-00430.pdf.
[15] Manatt, *State Medicaid Programs and 340B: 50-State Survey Results* (Oct. 21, 2019), https://www.manatt.com/insights/newsletters/health-highlights/state-medicaid-programs-and-340b-50-state-survey-r.

"Making America Healthy Again by Empowering Patients with Clear, Accurate, and Actionable Healthcare Pricing Information,"[16] which underscores that opaque arrangements in the healthcare system must be met with greater transparency and accountability. Despite this significant investment in resources, AbbVie has millions in disputed Medicaid duplicate discount claims activity that has remained unresolved for years, largely because covered entities refuse to work with AbbVie to comply with their statutory obligations.

Among our biggest challenges is access to data. AbbVie's efforts to collect the data necessary to identify and prevent duplicate discounts have faced considerable pushback from covered entities. Although covered entities are statutorily-required to maintain auditable records sufficient to demonstrate compliance with all 340B requirements[17], they have refused to provide basic data that would help manufacturers, like AbbVie, identify possible program abuse. Compliant covered entities have nothing to fear from transparency. If a hospital is not engaged in diversion or other 340B abuses, it should welcome the sharing of information necessary to ensure accurate Medicaid rebate payments. Opposition to that disclosure is itself evidence of a problem, and is flatly inconsistent with both the compliance assurances these entities made as a condition of 340B participation and the transparency priorities.

As discussed further in **Section IV**, our claims data policies have also been stymied by state laws prohibiting manufacturers from requiring covered entities to provide claims data—laws that are preempted by Section 340B. As one federal judge noted, when a manufacturer can only *request* the necessary data from covered entities, a covered entity can simply decline the request and

> there is not much recourse available to a manufacturer. Instead, covered entities—who may be engaging in the kind of fraud that the 340B Program's administrative dispute resolution [(ADR)] system is meant to prevent—will essentially be the ones determining whether or not they wish to give manufacturers the very data necessary to start such an audit. The 340B Program certainly did not establish a system where the fox guards the hen house.[18]

Yet such a system has emerged.

---

[16] Exec. Order No. 14221, Making America Healthy Again by Empowering Patients with Clear, Accurate, and Actionable Healthcare Pricing Information, 90 Fed. Reg. 11005 (Feb 28, 2025), https://www.federalregister.gov/documents/2025/02/28/2025-03440/making-america-healthy-again-by-empowering-patients-with-clear-accurate-and-actionable-healthcare.

[17] PHSA § 340B(a)(5)(C)

[18] *Pharma. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 453 (S.D. W. Va. 2024), *aff'd sub. nom.*, *Pharma Rsch. & Mfrs. of Am. v. McCuskey*, No. 25-1054, --- F.4th ----, 2026 WL 898259, 2026 U.S. App. LEXIS 9272 (4th Cir. Mar. 31, 2026).

AbbVie also experiences challenges accessing timely and complete Medicaid claim-level data from states, which have varying policies. In many states, AbbVie is limited in its ability to accurately match claims; certain states do not routinely provide full claim-level data, provide it in non-standardized formats, or limit key data elements (e.g., prescriber, NPI, contract pharmacy indicator, 340B indicator).

Even when AbbVie does identify duplicate 340B and Medicaid rebate claims and provides claim-level evidence, some states have taken the position that the burden of correction rests solely with the covered entity — even if the covered entity complied with the state's policies (e.g., covered entity is properly listed in the MEF). This can create a structural impasse for manufacturers, like AbbVie, who lack contractual privity with covered entities under the Medicaid Drug Rebate Program, leading to prolonged disputes and delays in repayment. In other circumstances, covered entities refuse to work directly with AbbVie to resolve validated duplicate discounts and direct AbbVie to individual states, each of which has its own process.

Of the Medicaid duplicate discounts that AbbVie has been able to identify approximately $250 million remain unresolved with roughly 60% pending for over two years with no sign of resolution. The current system is not working, and as explained below, a Rebate Model would provide an effective and efficient means to prevent illegal 340B/Medicaid duplicate discounts.

### B. The Inflation Reduction Act Compounds 340B Nonduplication Risks and Increases Financial Exposure

The IRA provides that the manufacturer of a selected drug is only required to provide access to the lower of the MFP or the 340B price, but is *not* required to provide both.[19] In guidance, CMS has asserted that responsibility rests on "manufacturers [to] ensure that the appropriate price concession is honored."[20] At the same time, the IRA guidance establishes a "14-day prompt MFP payment window," which requires Primary Manufacturers to transfer MFP refunds within 14 days of receiving limited claims data elements from the Medicare Transaction Facilitator.[21] Significantly, these data elements do not include a mandatory 340B claim identifier or any other information that would "constitute sufficient evidence that a claim was 340B-eligible."[22]

In failing to establish a mechanism to prevent duplication of the MFP and 340B ceiling price, CMS has ignored its obligation to comply with the statutorily-required pricing and nonduplication provisions of the IRA, leaving manufacturers in the untenable position of lacking access to the data necessary to provide such access. The statute's use of the term "shall not be required"[23] does more than delineate the responsibilities of manufacturers participating in both the Medicare Drug Price Negotiation Program ("MDPNP") and the 340B program; it also assigns to the agency, as the administrator of the MDPNP, a duty to ensure manufacturers are not subject to

---

[19] Social Security Act (SSA) § 1193(d).

[20] CMS, *Drug Price Negotiation Program: IPAY 2028 Final Guidance*, § 40.4.5, p. 253 (Sep. 30, 2025) ("IPAY 2028 Final Guidance"), https://edit.cms.gov/files/document/ipay-2028-final-guidance.pdf.

[21] *Id.* § 40.4.1.

[22] *Id.* at 72. *See id.*, tbl. 2 at 219.

[23] SSA § 1193(d).

duplicative discounts under the MDPNP and 340B. A recent article published on 340B Report states that of claims reviewed by a vendor, manufacturers paid duplicate MFP and 340B discounts on 30% of claims.[24] BRG has estimated that the cost of duplicative discounts to manufacturers of selected drugs, without mediation, in just 2026 alone, would be *over $4 billion*.[25] Not only are those duplicative discounts prohibited, but they also may result in confiscatory negative pricing for manufacturers. For example, if the wholesale acquisition cost for a drug is $1,000, the MFP is $500, and the 340B ceiling price is $250; a manufacturer would be forced to provide $1,250 in discounts on a drug that cost only $1,000.[26]

CMS's 14-day prompt pay window means manufacturers must be able to identify in real time whether a drug is eligible for MFP or 340B pricing, or both, and then effectuate that price. Manufacturers who fail to provide access to the MFP by CMS's deadline risk massive civil monetary penalties, equal to 10 times the difference between the amount charged and the MFP for each unit of drug sold.[27] The widespread use of "replenishment models," however, creates significant logistical challenges. Without timely access to claims information or a requirement for covered entities to identify 340B claims in real time, manufacturers have no way to determine whether a particular prescription was subject to a lower 340B price within the 14-day payment window.

Since the IRA passed, AbbVie has invested millions of dollars and countless hours preparing for MFP effectuation. AbbVie engaged in a two-year process, forming an expansive internal team that engaged a specialized vendor, and consistently worked with CMS to build a claims evaluation procedure through which AbbVie would provide the MFP on a unit of a selected drug. AbbVie also has spent years evaluating different options for 340B deduplication, including requiring covered entities to certify claims, a rebate model, and self-identification of 340B claims by covered entities. Without the Rebate Model pilot, manufacturers must resort to estimation methodologies derived from historical 340B purchasing patterns to reasonably determine if a claim may be subject to a 340B ceiling price that is duplicative of the MFP claim. Moreover, the available data is limited – it does not and cannot account for situations where more than one covered entity is replenishing the same specific claim at the 340B ceiling price.[28] In fact, the primary available

---

[24] 340B Report, *40% of Claims Miss the Mark* (Mar. 5, 2026), https://340breport.com/40-of-claims-miss-the-mark-sponcon-rxparadigm.

[25] BRG, *CMS October 2024 Final Guidance for MFP Effectuation in 2026-2027: Implications for Duplication with the 340B Channel* (2024), https://media.thinkbrg.com/wp-content/uploads/2024/10/23161214/BRG-Implications-for-Duplication-with-_the-340B-Channel-2024.pdf.

[26] In recent litigation, covered entities have suggested that duplicative discounts would only be at issue if manufacturers were to make an MFP available retrospectively, or through a rebate. *See* Compl. ¶ 88, *The Am. Hosp. Ass'n v. Kennedy*, No. 25-cv-600 (D. Me.). That is not true. Even if a manufacturer were to provide the purchase of a drug subject to an MFP prospectively that discount would still have to be validated through the MTF as going to an MFP-eligible individual and the manufacturer would still need to determine if that same claim was also the subject of a request for a 340B discount. Because the current status quo does not have a required time period in which covered entities must assert a claim is eligible for a 340B discount, there is no way to determine the duplicative discount within the 14-day period in which manufacturers must provide MFP, regardless of whether the MFP price is provided prospectively or retrospectively.

[27] SSA § 1197(a).

[28] BRG, *340B Patient Definition Implications for Duplicate Replenishment* at 2 (2026), https://media.thinkbrg.com/wp-content/uploads/2026/04/10141302/340B-Patient-Definition-and-Implications-for-Duplicate-Replenishment.pdf (A recent analysis of "Medicare Part D Prescription Drug Event (PDE) data for 2024

data field in MFP refund claims that will enable manufacturers to even attempt to predict potential duplicate discounts with 340B is the National Provider Identifier ("NPI"). But CMS specifically noted in its Final Guidance that NPI alone provides an insufficient basis through which to de-duplicate claims.[29]

The reality is that manufacturers are not able to identify 340B claims and are certainly paying duplicate discounts. As of April 1, 2026, BRG conservatively estimates that where a claim was eligible for both MFP and a 340B discount, manufacturers to date have paid both rebates in 40% of cases.[30] Without a means to identify 340B claims and 15 more drugs becoming subject to MFP next January, this issue will continue to expand. The complexity of deduplication will be further compounded beginning in 2028, when Medicare Part B claims become subject to MFP. This distinction is significant: while 80,000-plus pharmacies submit claims under Part D[31], there are over 1.5 million healthcare providers participating in Medicare Part B[32] The dramatic expansion in the number of entities to which MFP must be effectuated will substantially increase the logistical burden on manufacturers and further complicates deduplication efforts.

An appropriate 340B Rebate Model is the only reliable and effective option to address deduplication. HRSA approved AbbVie's application under the prior Pilot Program, which would have provided an effective solution if it had gone into effect. However, MFPs became effective starting on January 1, 2026, and, without the ability to use a Rebate Model, AbbVie has been left without an effective means to deduplicate MFP and 340B claims. AbbVie faces significant harms from this inability to deduplicate 340B/MFP claims, as required under the IRA.

Moreover, the lack of a clear and transparent process for nonduplication introduces significant inefficiencies, including the increased risk of disputes over the applicable price for a particular unit. Not only do these disputes delay payments to covered entities and pharmacies, but they also financially burden manufacturers, covered entities, dispensing entities and federal oversight and dispute resolution processes. To date, HHS has failed to establish any forum or mechanism through which disputes arising from MFP determinations can be resolved. Similarly, accurate deduplication would likely decrease the number of complaints regarding MFP availability submitted to the centralized intake system established by CMS by dispensing entities, reducing the burden on CMS to track and investigate such complaints.[33] By decreasing the need for these costly and burdensome dispute and complaint procedures, accurate deduplication of MFP and 340B ceiling price through a Rebate Model would increase overall efficiency across HHS. Not to mention that the increased transparency and integrity of the 340B program would likely reduce costs to the federal government across multiple programs—including Medicare, Medicaid and the 340B program, as discussed throughout this comment.

---

indicates that, if all covered entities used a three-year test to define "patient," *which many covered entities have now adopted*, 20 percent of brand drug PDEs could be replenished by more than one covered entity." (emphasis added)).

[29] IPAY 2028 Final Guidance at 254 § 40.4.5.

[30] *See supra* note 21.

[31] 90 Fed. Reg. 15792, 15837 (April 15, 2025) ("currently approximately 60,000-plus community pharmacies and 80,000-plus dispensing entities in total" dispense drugs to Medicare Part D beneficiaries).

[32] CMS, Fast Facts at 9 (April 2025), https://data.cms.gov/sites/default/files/2025-04/CMSFastFacts2025_508.pdf (lists 1,523,718 Total Providers)

[33] Final Guidance § 90.2.2 at 290.

We support HRSA's efforts to approve the use of a rebate model and urge the agency to move quickly. In the interim, AbbVie has invested significant time and research into evaluating alternative means by which it could identify duplicate discounts. The Beacon platform has implemented a self-identification option for claims submitted as MFP-eligible. But, BRG estimates that through the first quarter of 2026, only 1.5% of claims have been self-identified as 340B, confirming that such efforts do not work.

### C. Manufacturers and HRSA Lack Effective Means to Prevent Diversion to Individuals Who Are Not "Patients" of a Covered Entity

The 340B statute prohibits covered entities from selling or otherwise transferring drugs purchased under the 340B Program to a person who is not a "patient" of the covered entity (a practice known as "diversion").[34] Congress included that requirement to avoid the clear constitutional problems that would arise if other entities are permitted to participate in the program or benefit from the sale of manufacturers' drugs at steeply discounted prices. Unfortunately, HRSA has not enforced Congress's commands, and as a result, manufacturers' 340B-discounted drugs are frequently sold or transferred to non-patients—both individuals who are not eligible to receive drugs at the 340B price and third-party, for-profit entities that are not entitled to participate in the 340B Program.

The problem of diversion of 340B-priced drugs to individuals who cannot reasonably be considered "patients" of the covered entity is well-documented, but HRSA has failed to adequately address it.[35] Drug manufacturers are unable to combat diversion effectively because, as discussed above, covered entities do not provide them with the information they need to identify diversion. Manufacturers lack direct access to claims data that may enable them to identify that a drug was dispensed to an individual who is not a patient of the covered entity, and covered entities often intentionally thwart manufacturer efforts to obtain this information to resolve suspected diversion and duplicate discounting.[36] For example, manufacturers can investigate suspected diversion through the exercise of their statutory right to audit covered entities, but HRSA does not always approve a manufacturer's request to audit a covered entity. And, even in instances where HRSA found a manufacturer had reasonable cause to suspect diversion and approved the audit, covered entities have sued to prevent the manufacturer from exercising its rights.[37] Between the lack of

---

[34] PHSA § 340B(a)(5)(B).

[35] *See, e.g.*, GAO, *Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement*, GAO-11-836 (Sep. 2011) (recommends that HRSA "finalize new, more specific guidance on the definition of a 340B patient."); HHS OIG, *Memorandum Report, Contract Pharmacy Arrangements in the 340B Program*, OEI-05-00431 (Feb. 2014) ("Covered entities in our study reported different methods of identifying 340B-eligible prescriptions, and in some cases their determinations of 340B eligibility differ from one covered entity to another for similar types of prescriptions. This suggests a lack of clarity on how HRSA's patient definition should be applied in contract pharmacy arrangements.").

[36] *See Pharma Rsch. & Mfrs. of Am. v. McCuskey*, No. 25-1054, --- F.4th ----, 2026 WL 898259, 2026 U.S. App. LEXIS 9272, at *31-32 (4th Cir. Mar. 31, 2026) (explaining that a manufacturer will be unable to identify suspected diversion if it is unable to require covered entities to provide claims data).

[37] *See, e.g., Or. Health & Sci. Univ. v. Engels*, No. 24-cv-2184, 2025 WL 1707630 (D.D.C. June 17, 2025).

information and covered entity efforts to thwart manufacturers' attempts at identifying program abuse, the problem of diversion of 340B-priced drugs currently has no solution.

This problem is compounded by the fact that Section 340B does not expressly define the term "patient" leaving its meaning to be understood through statutory context and the application of tools of statutory construction. In 1996, HRSA issued non-binding guidance providing that an individual is a "patient" of a covered entity only if: (1) the covered entity has established a relationship with the individual, such that the covered entity maintains records of the individual's health care; (2) the individual receives health care services from a health care professional who is either employed by the covered entity or provides health care under contractual or other arrangements (*e.g.*, referral for consultation) such that responsibility for the care provided remains with the covered entity; and (3) the individual receives a health care service or range of services from the covered entity which is consistent with the service or range of services for which grant funding or Federally-Qualified Health Center (FQHC) look-alike status has been provided to the entity. Disproportionate share hospitals are exempt from this third requirement.[38] Under HRSA's 1996 guidance, an individual will not be considered a "patient" of the covered entity if the only health care service received by the individual from the covered entity is the dispensing of a drug or drugs for subsequent self-administration or administration in the home setting.[39]

HRSA's definition of the term patient has not changed since 1996, and it sweeps in individuals who cannot reasonably be considered "patients" of a covered entity consistent with the ordinary meaning of that term. In addition to being ambiguous, HRSA's "patient" guidance has failed to keep up with technology and changes in healthcare delivery (for example, the widespread use of telemedicine). Further, under the prevailing replenishment model, 340B-priced units inevitably end up in the hands of individuals who are not patients of the covered entity—despite Congress prohibiting covered entities from "transfer[ring] the drug to a person who is not a patient of the entity."[40] A recent analysis of "Medicare Part D Prescription Drug Event (PDE) data for 2024 indicates that, if all covered entities used a three-year test to define "patient," *which many covered entities have now adopted*, 20 percent of brand drug PDEs could be replenished by more than one covered entity.[41] From that statutory directive, AbbVie strongly believes that Congress did not contemplate the replenishment model when it created the 340B Program.

HRSA audit results confirm significant instances of product diversion among audited covered entities. These abuses demonstrate that covered entities are accruing deeply discounted prices on purchases that are not dispensed to eligible patients. Worse yet, as again recognized by a recent Senate Report, covered entities are not sharing the discounts with the patients they serve or even to accounting for the discounts they receive in any public or transparent way.[42] Because their diversion goes undetected and unpunished, covered entities have little incentive to

---

[38] 61 Fed. Reg. 55156, 55157–58 (Oct. 24, 1996).
[39] 61 Fed. Reg. at 55157–58.
[40] PHSA § 340B(a)(5)(B).
[41] BRG, *340B Patient Definition Implications for Duplicate Replenishment* at 2 (2026), https://media.thinkbrg.com/wp-content/uploads/2026/04/10141302/340B-Patient-Definition-and-Implications-for-Duplicate-Replenishment.pdf.
[42] Senate HELP Committee, *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program* (April 24, 2025) ("HELP Report"), https://www.help.senate.gov/imo/media/doc/final_340b_majority_staff_reportpdf.pdf.

(1) enact measures to ensure their 340B-priced drugs end up only in the hands of patients, as Congress intended, and (2) to share discounts with patients.

## II. A Rebate Model Would Address 340B Program Integrity Issues

HRSA must take action to address persistent abuses of the 340B Program. A critical first step would be for HRSA to allow manufacturers to use a Rebate Model. This section describes the structure of a potential Rebate Model, including its potential uses and benefits, the minimum data elements necessary to determine whether a drug is 340B-eligible, the bases for denying rebates, and evaluations to ensure that a Rebate Model is operating as intended and to its fullest potential.

### A. A Rebate Model is Needed Facilitate Compliance with Statutory Prohibitions Against Duplicate Discounting and Diversion (Question 7)

A Rebate Model would provide a mechanism to enforce statutory provisions that prohibit duplicate discounts and bring much-needed transparency to the 340B Program, in line with statutory requirements and HRSA's obligation as the agency charged with administering the 340B Program, at minimal cost to the federal government and covered entities. This section describes potential uses of a Rebate Model.

**A Rebate Model is needed to facilitate compliance with the 340B duplicate discount prohibitions under Medicaid and the IRA.** As discussed in **Section I**, currently, manufacturers have no reliable method to identify which discount to offer on a particular unit because the current system does not require covered entities to provide manufacturers with claims data. A Rebate Model is the only solution that can provide claims data and operate within the time constraints of the MDPNP to avoid duplicative payments. Under a Rebate Model, a manufacturer can evaluate whether a specific 340B rebate request is for a unit for which another drug discount was already paid. If that is the case, and a statutory duplicate discount prohibition applies (e.g., Medicaid, MFP), the manufacturer can avoid paying duplicate discounts. This is in stark contrast to the prevailing replenishment model, under which manufacturers lack this visibility and are reliant on covered entities to indicate whether a claim has already been subject to a different federal drug program discount. As the D.C. Circuit has noted, "[t]he covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate."[43] Accordingly, "[e]ach of these actors … has a financial incentive to catalog as many prescriptions as possible as eligible for the discount."[44] These financial incentives, combined with delays inherent under the replenishment model, fuel program abuses.

When it approved the Pilot Program last year, HRSA declined to permit manufacturers to use the Rebate Model to deny a 340B rebate when appropriate to prevent a Medicaid duplicate discount. Instead, HRSA stated that manufacturers could raise concerns regarding Medicaid

---

[43] *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 457 (D.C. Cir. 2024).
[44] *Id.* at 457–58.

duplicate discounts "directly with OPA [(the Office of Pharmacy Affairs)] or utilize the 340B statutory mechanisms, such as audits and administrative dispute resolution (ADR)[.]"[45] While AbbVie appreciates that these mechanisms have an appropriate place in 340B Program integrity, HRSA should not push for costly audits and ADR to resolve disputes when manufacturers can use the data available under a Rebate Model to identify and remedy clear instances of program abuse and statutory violations. Moreover, in a recent report, GAO found that despite repeated recommendations, "HRSA's audits do not fully assess compliance with the program requirement that prohibits covered entities from subjecting manufacturers to duplicate discounts, in which drugs are subject to 340B discounted prices and rebates under the Medicaid program."[46] Relying on the audit and ADR process to address duplicate discounts is not only inefficient, but also an ineffective use of governmental and stakeholder resources.

**A Rebate Model could prevent diversion of 340B drugs.** A Rebate Model could prevent diversion more effectively than under the prevailing replenishment model, because instead of the pharmacy dispensing from a neutral inventory where drugs purchased at 340B prices and other prices are intermingled and indistinguishable, with a Rebate Model, the drug for which the covered entity requests a rebate is tied to a dispensed claim. This would reduce the risk of diversion, ensuring that 340B-priced drugs go to the individuals whom Congress intended. Given the evidence of increasingly brazen diversion under the 340B statute, including multiple covered entities claiming the same dispense[47] and covered entities claiming dispenses for individuals who received care from unrelated providers in other states, it is essential that HRSA take action to address rampant diversion. AbbVie believes that it would be an inefficient and ineffective use of government and stakeholder resources if instances of diversion are adjudicated solely through the ADR process making a Rebate Model a more efficient and reliable means of identifying and resolving instances of diversion.

**Data from a Rebate Model could allow manufacturers (and HRSA) to identify instances when two covered entities have requested 340B pricing on the same unit of a drug.** This practice patently violates the 340B statute, which describes the 340B ceiling price for a unit of drug purchased by "a covered entity," not multiple covered entities.[48] However, without claims data from a Rebate Model, identifying this illegal and widespread practice would be impossible.

### B. A Rebate Model Could Provide Additional Benefits to the Government and Stakeholders (Question 7)

In addition to the potential uses of a Rebate Model described above, below we identify other potential benefits to the federal government and 340B program stakeholders. Any costs or

---

[45] 90 Fed. Reg. at 38166.

[46] GAO, 340B Drug Discount Program: Agency Oversight Has Improved, but Actions Needed to Address Weaknesses, GAO-26-108784, at 27 (Oct. 2025), https://www.gao.gov/assets/gao-26-108784.pdf.

[47] BRG, *340B Patient Definition Implications for Duplicate Replenishment* at 2 (2026), https://media.thinkbrg.com/wp-content/uploads/2026/04/10141302/340B-Patient-Definition-and-Implications-for-Duplicate-Replenishment.pdf (A recent analysis of "Medicare Part D Prescription Drug Event (PDE) data for 2024 indicates that, if all covered entities used a three-year test to define "patient," *which many covered entities have now adopted*, 20 percent of brand drug PDEs could be replenished by more than one covered entity." (emphasis added)).

[48] PHSA § 340B(a)(1).

additional burdens under a Rebate Model—which would be minimal for the government and covered entities—are outweighed by the benefits of a Rebate Model.

**Transparency Can Reduce Cost.** A Rebate Model would increase transparency and the integrity of the 340B Program, ultimately reducing costs to the federal government across multiple programs—including Medicare, Medicaid and the 340B Program. Increased transparency into 340B claims can work hand-in-hand with existing statutory mechanisms to safeguard program compliance.

The 340B statute empowers manufacturers who suspect wrongdoing to conduct audits and seek resolution of disputes through a federal 340B ADR process.[49] Under current HRSA regulations, a manufacturer may audit a covered entity only when it can furnish "documentation which indicates that there is reasonable cause," defined to mean "that a reasonable person could believe that a covered entity may have violated" the prohibitions on diversion or Medicaid duplicate discounting.[50] Thus, a manufacturer must already possess such "documentation" in order to access the audit and ADR processes. Yet covered entities routinely decline to provide manufacturers, on a voluntary basis, with access to the type of information necessary to obtain HRSA's permission to initiate an audit. A Rebate Model would help address that informational gap, thereby facilitating the effective functioning of the audit and ADR processes.

A Rebate Model would increase program transparency, as claims data would be made available to manufacturers for review in a timely manner, reducing unnecessary disputes. The information that a manufacturer would request under a Rebate Model is comparable to the information that covered entities are already obligated to collect under the statute as a condition of receiving access to 340B pricing — including pharmacy, medical, and purchase data elements, such as the date of service, the prescriber number, and the account number. Covered entities are required to maintain this data for a set period of time—often between five to seven years.

When audits are needed, Rebate Model claims data will enable manufacturers to provide audit requests to HRSA with supporting claims documentation. A Rebate Model would facilitate more-detailed audit requests, which would allow HRSA to review audit requests with greater ease and reduce back-and-forth communications with manufacturers. Moreover, AbbVie is aware of federal budget constraints regarding 340B Program oversight; a Rebate Model will help streamline processes such that HRSA can do more on a limited budget.

**Provide a Mechanism for the Government to Exclude 340B Units from Part D Inflation Rebate Calculations.** A Rebate Model also could provide a mechanism for excluding 340B units from the Part D inflation rebate calculations, at no cost to the federal government. In the calendar year 2026 Physician Fee Schedule final rule, CMS states that it is "unable to *precisely* identify 340B units at the claim-level based on claims information reported to CMS by the covered entity."[51] Because of this, CMS adopted a "claims-based estimation methodology" to exclude

[49] PHSA § 340B(a)(5)(C).
[50] 61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996). https://www.hrsa.gov/sites/default/files/hrsa/opa/dispute-resolution-process-12-12-96.pdf.
[51] 90 Fed. Reg. 49266, 49740 (Nov. 5, 2025) (emphasis added).

340B units starting on January 1, 2026.[52] Acknowledging the limitations of an estimation methodology, CMS also established "a repository to receive *voluntary* submissions from covered entities of certain data elements from Part D 340B claims" to identify claims that should be excluded from the Part D inflation rebate calculation.[53] However, covered entities are unlikely to submit data to the repository voluntarily, and enforcement would require significant governmental resources. Furthermore, this data is unlikely to be available to manufacturers in a way that could enable timely 340B-MFP deduplication. But CMS need not establish complex systems to identify and exclude 340B units from the Part D inflation rebate calculation. A Rebate Model is the solution. Under a Rebate Model, the claims level data that CMS is hoping to collect under a 340B repository will already be available. AbbVie strongly recommends HRSA and CMS coordinate to structure a Rebate Model that supports Part D inflation rebate calculations.

**A Rebate Model Should be Structured to Benefit Patients.** Under the current system, most patients are unaware of the 340B Program[54] because the significant discounts that manufacturers provide are very rarely shared with any patient. Generally, the price an insured patient pays for a 340B drug is set by their insurance company, and the price uninsured patients pay for a 340B drug is determined by the pharmacy. If the patient is insured, covered entities and their business partners "turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount."[55] A study showed that in North Carolina, "[i]ndividual 340B hospitals collected as much as $6,026 in average profits *per claim* by charging up to 12.7 times their 340B acquisition costs for oncology drugs."[56] For instance, patients at one hospital paid "an average of $5,353 for the oncology drugs that [the hospital] acquired for an average $517 . . . [or] **paid 10.4 times the 340B acquisition costs**."[57] While some covered entities pass a portion of 340B savings to uninsured and underinsured patients, the reality is that most do not.[58] The result is arbitrage revenue. AbbVie believes that a Rebate Model should be structured to encourage covered entities to pass on 340B savings to low-income patients. AbbVie

[52] 90 Fed. Reg. at 49740.

[53] 90 Fed. Reg. at 49749.

[54] *See, e.g.*, *AbbVie Inc. v. Drummond*, 808 F. Supp. 3d 1266, 1270 (W.D. Okla. 2025) (referring to the 340B Program as "the most important drug pricing scheme virtually no one has heard of").

[55] *Sanofi-Aventis U.S. LLC v. Dep't of Health & Human Servs.*, 58 F.4th 696, 699 (3d Cir. 2023).

[56] North Carolina State Health Plan, *Overcharged: State Employees, Cancer Drugs, and the 340B Drug Pricing Program*, at 2, https://www.shpnc.gov/documents/overcharged-state-employees-cancer-drugs-and-340b-drug-price-program/download?attachment (last visited Apr. 2, 2026).

[57] North Carolina State Health Plan, *Overcharged: State Employees, Cancer Drugs, and the 340B Drug Pricing Program*, at 2, https://www.shpnc.gov/documents/overcharged-state-employees-cancer-drugs-and-340b-drug-price-program/download?attachment (last visited Apr. 2, 2026) (emphasis added).

[58] GAO, *Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement*, GAO-18-480, at 30 (June 2018), https://www.gao.gov/assets/gao-18-480.pdf ("Of the 55 covered entities responding to our questionnaire, 30 reported providing low-income, uninsured patients discounts on 340B drugs dispensed at some or all of their contract pharmacies, and 25 said they did not offer discounts at their contract pharmacies. All 30 covered entities providing patients with discounts reported providing discounts on the drug price for some or all 340B drugs dispensed at contract pharmacies. Federal grantees were more likely than hospitals to provide such discounts and to provide them at all contract pharmacies."); OIG, *Memorandum Report: Contract Pharmacy Arrangements in the 340B Program*, OEI-05-13-00431, at 14 (Feb. 4, 2014), https://oig.hhs.gov/oei/reports/oei-05-13-00431.pdf ("Eight of thirty covered entities reported that they do not offer the 340B price to uninsured patients in any of their contract pharmacy arrangements.").

recommends that HRSA develop a Rebate Model designed to support vulnerable patients, including through inclusion of a patient definition. A thoughtful rebate approach could bring the 340B Program back in line with the statutory text and intended purpose: to serve the most vulnerable patients.

### C. Certain Minimum Data Elements Are Necessary to Ensure the Rebate Model's Benefits Are Realized (Question 5)

AbbVie believes that three categories of data elements are needed to effectuate a successful Rebate Model: pharmacy, medical, and supporting order unit data elements.

AbbVie appreciates that the prior Pilot Program included pharmacy and medical claims data elements, and we encourage HRSA to maintain these elements in a future Rebate Model.[59] Regardless of the scope of drugs included in a Rebate Model (i.e., just IRA selected drugs or a broader swatch of drugs) it is important to include both pharmacy and medical claims data elements. While the MFP is limited to Part D in initial price applicability years 2026 and 2027, selected drugs may be administered under Medicare Part B or another payer's medical benefit, and pharmacy claims fields would not provide a manufacturer with the necessary information to determine whether a 340B rebate is owed in those instances. Moreover, the inclusion of pharmacy and medical claims data elements would facilitate the expansion of a Rebate Model to additional drugs, as discussed in **Section II.E.3** of this letter.

Further, we strongly encourage HRSA to require the submissions of supporting order unit data elements from the outset of the Rebate Model. In the prior Pilot Program, HRSA did not allow manufacturers to request such data,[60] but expressed openness to "evaluat[ing] potential incorporation of certain purchase data" "[a]s the pilot progresse[d]."[61] AbbVie maintains that data verifying the purchase of each individual unit is critical to a successful Rebate Model, both because proof of purchase is essential for validation of claims data and because of the importance of ensuring payment accuracy—that the amount paid in a rebate is tied appropriately to the price the covered entity paid for a drug. Consistent with how manufacturer systems operate under the chargeback model, manufacturers must know the original invoice date of the package sold to determine the appropriate credit (including insofar as Wholesale Acquisition Cost (WAC) may change from time to time or if the covered entity purchased the drug at below WAC pricing). In addition, manufacturers offer various contract prices, made available on covered entities Group Purchasing Organization (GPO) accounts, that can be used to purchase covered outpatient drugs not eligible for the ceiling price. Moreover, while supporting order unit data may be applicable to more than one claim (purchases are generally at the package level, and AbbVie understands that

---

[59] HRSA, 340B Rebate Model Pilot Program, http://web.archive.org/web/20251217112038/https://www.hrsa.gov/opa/340b-model-pilot-program (available on Dec. 17, 2025).

[60] AbbVie 340B Rebate Model Pilot Program Approval Letter, Ex. A to Decl. of E. Scheidler, *Am. Hosp. Ass'n v. Kennedy*, No. 2:25-cv-600 (D. Me. Dec. 10, 2025), ECF No. 36-2.

[61] HRSA, 340B Rebate Model Pilot Program, http://web.archive.org/web/20251217112038/https://www.hrsa.gov/opa/340b-model-pilot-program (available on Dec. 17, 2025).

claims under the rebate model will be processed at the unit level), existing commercially-standard and readily-available information allows manufacturers to cross-reference that data and validate that a claim is attached to a verified purchase of a product under a Rebate Model. The invoice number and account number will allow manufacturers to correlate the purchases with claims data in order to ensure each claim is attached to a purchase at -a non-340B price. These data elements are already standard, maintained by covered entities and their Third Party Administrators (TPA) under the replenishment model. For those covered entities that do not leverage a TPA and use a physical inventory model, wholesalers readily maintain the necessary information, on behalf of covered entities, that can be provided to manufacturers to ensure accurate rebate payments.

AbbVie also requests that HRSA add the following new data fields:

(1) **Part B Modifier.** HRSA should leverage the existing 340B modifier that CMS requires for Medicare Part B drugs. In its Medicare Part B Inflation Rebate Program regulations, CMS requires that covered entities utilize a 340B modifier to identify Medicare Part B drugs acquired at 340B pricing.[62] This identifier allows CMS to exclude those 340B units from manufacturer inflation rebate calculations under the IRA. This reporting mechanism operates today across covered entity types and is part of routine Part B medical claims billing. As covered entities already submit this 340B claims data under the Medicare program, it would be reasonable and impose no operational burden for covered entities to also submit this to manufacturers as part of a Rebate Model. This data would provide manufacturers with an existing field that provides pre-payment identification of 340B-discounted units for program integrity purposes.

(2) **Part D Modifier.** Likewise, HRSA should require a 340B modifier for Part D drugs. The National Council for Prescription Drug Programs (NCPDP) standard format includes a 340B modifier,[63] and its use is commonly required under Part D and commercial rebate agreements.

(3) **Any other 340B Modifier.** To the extent any additional 340B modifier is required in a federal program, HRSA should require such modifier as a required data field under the 340B Rebate Model.

(4) **Child Site Modifier.** A "child site" is an outpatient facility, such as an infusion center, located offsite from the main covered entity hospital. Historically, HRSA required child sites to satisfy two conditions before they could receive and dispense 340B-priced drugs: (1) they had to appear on the parent hospital's Medicare cost report, and (2) the

[62] 42 C.F.R. § 427.303(b)(1).

[63] NCPDP, 340B Information Exchange Reference Guide, v. 2.0, https://www.ncpdp.org/NCPDP/media/pdf/340B_Information_Exchange_Reference_Guide.pdf?ext=.pdf ("NCPDP has developed multiple identifiers that can be used in connection with the exchange of information related to Section 340B," including Submission Clarification Code 420-DK, which "[i]ndicates that prior to providing service, the pharmacy has determined the product being billed is purchased [under section 340B].").

child site had to be listed in HRSA's Office of Pharmacy Affairs Information System (OPAIS) database.[64] These requirements were put in place to prevent diversion of 340B drugs, which may include when a covered entity purchases a drug at the 340B-discounted price for use at a purported child site that, in fact, does not meet the eligibility criteria under HRSA's guidance.[65] Although HRSA temporarily waived the child site registration requirement in response to the global covid pandemic,[66] covered entities have challenged the agency's decision to reinstate the child site registration policy.[67] In light of this judicial decision limiting HRSA's authority to police 340B abuse by child sites, the burden of preventing diversion of 340B drugs through child sites now will fall largely on manufacturers. A child site modifier would provide manufacturers with a means to confirm whether a drug administered at a purported child site is eligible for 340B pricing.

Although each of the three categories of necessary data elements that AbbVie is requesting serves a distinct purpose, there is significant overlap among the elements in each category (thus limiting the burden on participating covered entities), as illustrated below, in **Table 1**.

**Table 1: Proposed Data Fields**

| ***2025 Pilot Program HRSA-Approved Field*** | **Field** | **Description** | **Pharmacy Claims** | **Medical Claims** | **Supporting Order Unit Data** | **Industry Standard[1]** |
|---|---|---|---|---|---|---|
| ✓ | Date of Service | Identifies date the prescription was filled at a pharmacy or professional services were rendered. Sometimes referred to as the Fill Date. | ✓ | ✓ | | ✓ |
| ✓ | Date Prescribed | Date the prescriber wrote the prescription. Always comes on or before the Date of Service. | ✓ | | | ✓ |
| ✓ | Rx Number | Identifier applied to the prescription by the pharmacy. | ✓ | | | ✓ |
| ✓ | Fill Number | Indicates the number of times the prescription has been filled as of the current fill. (E.g., a value of 2 indicates that the prescription has been filled twice and the current fill is the second one.) | ✓ | | | ✓ |
| ✓ | NDC-11 | 11-digit National Drug Code which is a unique identifier of the drug dispensed to the patient and sold. | ✓ | ✓ | ✓ | ✓ |
| ✓ | Quantity / Quantity Dispensed | Number of units (dispensed or sold). | ✓ | ✓ | ✓ | ✓ |

[64] *See* 59 Fed. Reg. 47884, 47886 (Sept. 19, 1994).
[65] 59 Fed. Reg. at 47886.
[66] *See* 88 Fed. Reg. 73859, 73859 (Oct. 27, 2023).
[67] *See Albany Med. Health Sys. v. HRSA*, No. 23-cv-03252, 2026 WL 592593, at *3–4 (D.D.C. Mar. 3, 2026).

| ***2025 Pilot Program HRSA-Approved Field*** | **Field** | **Description** | **Pharmacy Claims** | **Medical Claims** | **Supporting Order Unit Data** | **Industry Standard[1]** |
|---|---|---|---|---|---|---|
| ✓ | Prescriber ID / Physician ID | National provider identifier (NPI) of the prescriber that wrote the prescription or administered the drug. | ✓ | ✓ | | ✓ |
| ✓ | Service Provider ID / Ship-to-Pharmacy ID | ID assigned to a pharmacy or provider billing location/ Service facility location of encounter (e.g., NPI of the pharmacy that filled the prescription), also referred to as ship-to pharmacy (NPI). | ✓ | ✓ | ✓ | ✓ |
| ✓ | 340B ID | HRSA-assigned identifier of the 340B covered entity that purchased the product and designated the prescription as 340B. | ✓ | ✓ | ✓ | |
| ✓ | BIN Number | Prescription Drug Bank Identification Number. Enables pharmacies to electronically transmit data to the appropriate PBM for processing and reimbursement. | ✓ | | | ✓ |
| ✓ | PCN Number | Processor Control Number. Identifier used to determine which processor will handle a prescription drug claim. Might say "CASH". | ✓ | | | ✓ |
| ✓ | Group ID Number | A unique identifier assigned to a specific insurance plan that covers a group of people. | ✓ | ✓ | | ✓ |
| | Account Number | Account number on the invoice used to make the purchase | | | ✓ | |
| | Invoice Date | Date of sales invoice | | | ✓ | |
| | Invoice Number | Unique identifier for the invoice | | | ✓ | |
| | Child Site Modifier | An indication of whether the 340B drug was dispensed by a child site of a 340B covered entity. | ✓ | ✓ | | |
| | Medicare Part B 340B Claims Modifier | A claims-level modifier used by 340B covered entities to identify Part B drugs acquired at 340B prices. | | ✓ | | ✓ |
| | Part D 340B Modifier | A claims-level modifier used by 340B covered entities to identify Part D drugs acquired at 340B prices. | ✓ | | | ✓ |

AbbVie believes that the requested data elements are consistent with HRSA's expectation that under a Rebate Model, the "data submitted by covered entities to manufacturers will be comparable to data already being collected and maintained by covered entities."[68] Thus, "the burden associated with a potential 340B Rebate Model Pilot Program data request[] may not be

[68] 91 Fed. Reg. at 9632, 9633 (Feb. 26, 2026).

significant."[69] AbbVie further believes that the requested data elements are the minimum necessary to operate an efficient and successful Rebate Model.

### D. Rebate Denials Should Be Permitted in Accordance with the 340B Statute and Based on Industry Standard Data Elements (Questions 3 and 4)

AbbVie recommends that any rebate payment deadline be triggered only upon submission of complete and validated claims data, according to the HRSA-approved criteria, as verified by the manufacturer. In AbbVie's experience validating limited customer data submissions through 340B ESP, we have received incomplete, inaccurate, and encrypted data that required follow-ups with customers to rectify. Basing any timelines or requirements on the receipt of incomplete or inaccurate data would frustrate the intent of a Rebate Model. Further, our proposed approach would be consistent with requirements of other federal healthcare program payments to pay "clean claims," including the 30-day window for Medicare Administrative Contractor requiring receipt of "all basic information necessary to adjudicate the claim, and all required supporting documentation,"[70] Medicare Part D claims,[71] and Medicaid claims.[72] Additionally, under the MDPNP, CMS has made clear that the 14-day payment window does not begin until after validation of claims by the Drug Data Processing System (DDPS) has been completed.[73]Moreover, allowing a 24 to 48 hour verification period would be reasonable and should not significantly affect the timeliness of rebate payments. Given that claim verification periods are well-established features of other federal healthcare payment [74] there is no basis for subjecting 340B rebate claims to a more burdensome or truncated standard.

In the prior Pilot Program notice, HRSA limited 340B rebate denials to MFP deduplication and preventing duplicate covered entity rebate claims on the same 340B purchase.[75] AbbVie requests that HRSA also allow rebate denials to ensure compliance with other statutory requirements, including the prohibitions on Medicaid duplicate discounts and diversion.

---

[69] 91 Fed. Reg. at 9633.

[70] CMS, Medicare Claims Processing Manual, ch. 1 § 80.2.

[71] 42 C.F.R. § 423.520(b).

[72] 42 C.F.R. § 447.45.

[73] CMS, *Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability Year 2028 and Manufacturer Effectuation of the Maximum Fair Price in 2026, 2027, and 2028* (Sept. 30, 2025) ("Once the data has been verified by the Part D plan sponsor and DDPS, and the MTF DM has verified that a claim has no DDPS edits directly related to MFP-eligibility, the MTF DM will make the claim-level data elements . . . available to the Primary Manufacturer to notify them that the selected drug was dispensed to an MFP-eligible individual. . . . The MTF DM's transmission of the claim-level data elements to the Primary Manufacturer starts the 14-day prompt MFP payment window." *Id.* at 225.).

[74] *See, e.g.*, CMS, Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability Year 2028 and Manufacturer Effectuation of the Maximum Fair Price in 2026, 2027, and 2028, 223, (Sep. 30, 2025), https://www.cms.gov/files/document/ipay-2028-final-guidance.pdf ("After the Part D plan sponsor verifies Medicare eligibility and coverage of the selected drug, the plan pays the dispensing entity no more than the MFP plus any dispensing fees for the selected drug. . . . CMS, using DDPS, also performs verification steps to validate that the individual was an eligible Part D enrollee at the time of the claim.").

[75] 90 Fed. Reg. at 38166.

Specifically, AbbVie requests that HRSA permit rebate denials in the following instances: (1) a 340B rebate has already been paid on a particular unit and that same unit is submitted again but by a different covered entity; (2) deduplication for MFP; (3) providing the 340B price would generate an illegal Medicaid fee-for-service or MCO duplicate discount; and (4) instances where the manufacturer has identified diversion.

### E. AbbVie Supports Mandated Manufacturer Reporting to the Office of Pharmacy Affairs (Question 6)

The Pilot Program required drug manufacturers to report certain data regarding the claims they had received and rebates they had paid 21 days after the end of each monthly, reflecting data for the prior month. AbbVie supports a similar requirement with any new Rebate Model. We are confident that consistent reporting and evaluations will highlight the benefits of a Rebate Model, paving the way for its expansion to additional 340B drugs and uses.

#### 1. Manufacturers Should Report Data Directly to HRSA, Not Apexus

AbbVie believes that if manufacturers are required to submit data for HRSA's review, those submissions must be made directly to the Office of Pharmacy Affairs (OPA). During the development of the prior Pilot Program, HRSA's Federal Register notice stated that manufacturers would provide periodic reports to OPA, detailing data on purchases provided through rebates, information related to claim delays and denials, and other information that may evaluate the effectiveness of the rebate model.[76] But, when HRSA approved AbbVie's participation in the Pilot Program, HRSA then said that AbbVie had to submit data to the 340B Prime Vendor, Apexus.[77] AbbVie has significant concerns that the draft ICR that accompanies the RFI continues to propose that manufacturers would submit data to the 340B Prime Vendor.[78]

AbbVie believes such reporting to Apexus is inappropriate, creates conflicts of interest, and raises significant concerns about 340B Program integrity. Apexus is a wholly-owned subsidiary of Vizient, the largest GPO in the United States.[79] It is an "[i]ndependent[]" entity and "not . . . an agent of the Federal Government."[80] Moreover, Vizient counts many hospital covered entities as clients, stating on its website that its "clients make up 97% of academic medical centers in the U.S. [and] more than 69% of the acute care hospitals in the country."[81] The conflicts of interest flowing from Apexus' relation to Vizient have been scrutinized, including in litigation asserting that "Vizient appears to be utilizing its relationship with Apexus to . . . increase its GPO business in ways its competitors cannot."[82] Last year, the New York Times published an investigation

---

[76] *See* 90 Fed. Reg. at 38166.

[77] *See* AbbVie 340B Rebate Model Pilot Program Approval Letter, Ex. A to Decl. of E. Scheidler, *Am. Hosp. Ass'n v. Kennedy*, No. 2:25-cv-600 (D. Me. Dec. 10, 2025), ECF No. 36-2.

[78] 91 Fed. Reg. at 9632–33.

[79] Definitive Healthcare, *Top 10 GPOs by Staffed Beds* (Oct. 24, 2025), https://www.definitivehc.com/blog/top-10-gpos-by-staffed-beds; Vizient, *Frequently Asked Questions*, https://www.vizientinc.com/frequently-asked-questions.

[80] HRSA 340B Prime Vendor Agreement between HRSA and Apexus, at 1 (eff. Dec. 31, 2019) (Prime Vendor Agreement), available at https://www.hrsa.gov/sites/default/files/hrsa/foia/22f269-apexus-2019-contract.pdf.

[81] Vizient, *About Us*, https://www.vizientinc.com/about-us.

[82] Brief for Appellant at 14, *AIDS Healthcare Foundation v. Apexus, LLC*, (9th Cir. 2023) (No. 23-55425) (dismissed for failure to state a claim) ("Vizient leverages Apexus to gain an unfair advantage against its GPO competitors,

questioning Apexus's business practices. The article stated that "Apexus said its federal contract did not preclude it from developing other businesses, as long as they were not in conflict with the terms of the agreement."[83] The article also said that "[w]ith exclusive access to sales data, Apexus' 'purchasing optimization team' will analyze a hospital system's drug-buying habits and compare them with those of their competitors . . . . In some cases, Apexus will suggest that a hospital buy more 340B drugs or tweak its inventory in ways that can churn more cash."[84]

More recently, Senate Republicans on the Health, Education, Labor, and Pensions Committee have renewed concerns about Apexus's role in the 340B Program.[85] Congress is investigating Apexus out of concern about the "serious lack of transparency in the 340B Program."[86] Especially in light of this ongoing investigation, it would be inappropriate to further expand Apexus's role in the 340B Program by requiring drug manufacturers with a Rebate Model to report information to Apexus. Reporting directly to OPA will be more efficient, strengthen the federal government's oversight of the 340B Program, and facilitate HRSA's oversight of the Rebate Model.

2. <u>HRSA Should Collect Data on How the Rebate Model is Functioning And its Impact on Patients, At least on a Monthly Basis</u>

Substantively, AbbVie supports the manufacturer reports and associated timing that HRSA adopted as part of the prior Pilot Program. This included two reports, both of which were required to be delivered to OPA within 21 days after the end of each monthly, reflecting data for the prior month:

- **Report 1**: Data extracts of all previous month's 340B Rebate claims to include the following data fields:
    - Claim submission date
    - 340B ID
    - NDC-11 purchased
    - Quantity
    - Unit WAC price
    - Unit 340B Ceiling Price
    - Unit MFP price
    - Rebate Amount

---

because certain 340B-eligible hospital covered entities are statutorily prohibited from using GPOs to purchase 340B drugs. Apexus, however, can do so because it is the Prime Vendor and claims it is not a GPO. And, upon information and belief, Apexus has been granted the authority to purchase non-340B drugs at sub-wholesale costs. This allows Apexus/Vizient to unfairly compete with other GPOs, because hospitals will prefer to deal with a single GPO or—in some cases—be required to by their drug wholesaler.").

[83] Ellen Gabler, *How a Company Makes Millions Off a Hospital Program Meant to Help the Poor*, N.Y. Times (Jan. 15, 2025), https://www.nytimes.com/2025/01/15/us/340b-apexus-drugs-middleman.html.

[84] Ellen Gabler, *How a Company Makes Millions Off a Hospital Program Meant to Help the Poor*, N.Y. Times (Jan. 15, 2025), https://www.nytimes.com/2025/01/15/us/340b-apexus-drugs-middleman.html.

[85] Letter from Sen. B. Cassidy to C. Hatwig, President, Apexus, LLC (Feb. 1, 2026), available at https://www.help.senate.gov/imo/media/doc/26-02-01_chairman_cassidy_letter_to_apexus_finalpdf.pdf.

[86] *Id.* at 3.

- **Report 2**: Set of five data aggregations with the following information:
    - Aggregated sales by Covered Entity as defined in Section 340B(a)(4) of the Public Health Service Act
    - Average days from claim submission to rebate payment for all rebates paid
    - Number of rebates paid after 10 calendar days
    - Number of rebates denied with denial reasons
    - Number of selected drug claims determined to be eligible for MFP instead of 340B price as a result of rebate model pilot program
    - The number of rebates paid out in the reporting period, broken down by 340B drug for which the rebate was paid.

AbbVie believes these same reports, at the same reporting frequency, should be required for the Rebate Model.

AbbVie further recommends that manufacturers supply HRSA with any suspected diversion, duplicate discounting, or other 340B Program violations identified during the reporting period. This will enable HRSA to evaluate the need for expanded duplicate discount prevention and diversion monitoring. AbbVie also recommends that HRSA take enforcement action—including through audits—against covered entities who engage in such behavior.

Finally, AbbVie supports making public certain information from HRSA's Rebate Model evaluations. Specifically, AbbVie believes HRSA should make public the timeliness of a manufacturer's rebate payments; dispute resolution timelines; statistics regarding how many manufacturer rebate denials were due to suspected diversion, evidence of duplicate discounting, or any other reason; a breakdown of whether disputes concerned the administration of the rebate model or eligibility of claims for a 340B rebate; and information related to program integrity, such as the number of times more than one covered entity requested a rebate on the same claim. However, AbbVie requests that HRSA confirm that it will not make public any confidential or proprietary information from drug manufacturers or other 340B Program stakeholders, including but not limited to the 340B ceiling price. AbbVie would be happy to work with HRSA to identify what information falls into those categories.

3. <u>AbbVie Supports Frequent Manufacturer Reporting to OPA Regarding the Rebate Model to Facilitate Expansion of a Rebate Model to More Drugs</u>

AbbVie agrees with HRSA's intent to require monthly reporting from manufacturers.[87] We further encourage HRSA to regularly and frequently assess the benefits of the Rebate Model, starting as early as the end of the first quarter of its implementation, with regular reevaluations quarterly thereafter.

In the accompanying ICR, HRSA suggests that the Rebate Model may be limited to "manufacturers with MDPNP Agreements with the Centers for Medicare & Medicaid Services' for

[87] 91 Fed. Reg. at 9633.

the initial price applicability years 2026 and 2027."[88] Given the benefits of a Rebate Model outside of the IRA—including preventing Medicaid duplicate discounts and diversion—AbbVie believes that a Rebate Model should not be limited to manufacturers with IRA selected drugs. At the very least, if the Rebate Model is initially limited to these manufacturers, it should include both drugs selected and not selected under the IRA. In particular, HRSA should consider including drugs within a class so as not to inadvertently impact prescribing choices based on 340B pricing. Further, once the data shows the Rebate Model is effective and beneficial—which we are confident that the data will demonstrate—HRSA should move quickly to expand the program to include all 340B drugs. A robust data collection with frequent evaluations would allow HRSA to build on the Rebate Model, test improvements to an existing Rebate Model in real time, and support such an expansion of a Rebate Model to additional drugs as soon as possible. More infrequent evaluations would cause all interested parties to miss out on the benefits of a potentially expanded Rebate Model, hurting 340B Program integrity.

## III. <u>The 340B Rebate Model Would Not Be Burdensome for Covered Entities</u>

AbbVie supports a Rebate Model as an effective and efficient means to offer 340B pricing to covered entities. As explained below, we are skeptical of covered entities' assertions that a Rebate Model would be costly, given that a Rebate Model would involve covered entities submitting claims-level data that they already collect and report under other healthcare programs. We are equally doubtful that a Rebate Model would create cash flow concerns, and believe that in reality, covered entities likely will access 340B pricing faster after dispenses to patients than under the prevailing replenishment model (which also functions as a retrospective discount). In the rare cases where a Rebate Model is not feasible for a particular covered entity, AbbVie would encourage the affected covered entity to contact our 340B Center of Excellence. AbbVie understands that sometimes there are extenuating circumstances and evaluates each request on a case-by-case basis. AbbVie plans to work with covered entities to understand their hardship request and will determine if a hardship exception is warranted in accordance with AbbVie's standard business practices.

### A. A 340B Rebate Model Would Not Impose Significant Additional Costs on Covered Entities (Questions 1 and 4)

Rebates are explicitly authorized under the 340B statute,[89] and covered entities already are required to collect and maintain claims data and establish 340B patient eligibility determinations in the normal course. Rebates have been a longstanding mechanism for manufacturers to offer the 340B ceiling price to AIDS Drug Assistance Program (ADAPs),[90] which view a Rebate Model as

---

[88] 91 Fed. Reg. at 9632.

[89] Under Section 340B, a pharmaceutical manufacturer must "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." PHSA § 340B(a)(1). To implement this provision, Section 340B directs the Secretary of Health and Human Services to "enter into an agreement with each manufacturer of covered outpatient drugs under which the amount required to be paid (taking into account *any rebate* or discount, as provided by the Secretary) to the manufacturer for covered outpatient drugs . . . does not exceed" the applicable ceiling price. *Id.* (emphasis added).

[90] 63 Fed. Reg. 35239 (June 29, 1998).

the "gold standard."[91] Rebates also are commonly used to facilitate access to reduced pricing to other federal and commercial healthcare programs, such as the Medicaid Drug Rebate Program, the IRA, and TRICARE.[92]

AbbVie agrees with HRSA's statement in the accompanying ICR that under a Rebate Model, the "data submitted by covered entities to manufacturers will be comparable to data already being collected and maintained by covered entities," and therefore "the burden associated with a potential 340B Rebate Model Pilot Program data requests may not be significant."[93] Covered entities already transmit similar claims data to various third-parties, such as state Medicaid agencies, health plans, and even provide limited claims data to manufacturers (e.g., on some contract pharmacy claims ) to facilitate reimbursement and certain discount or rebate payment. Federal courts also have recognized that under longstanding HRSA guidance, manufacturers "may require" information from covered entities and "the burden of providing the claims data is 'minimal.'"[94] The only change under a Rebate Model would be that covered entities would also submit this data to another entity (the 340B Rebate Model vendor). Submitting existing data to a different entity should not require additional full-time employees (FTEs) or significantly change the responsibilities of existing FTEs. Please see Appendix A for more information on industry standard data fields.

Moreover, in accordance with 340B statutory requirements, covered entities should already be reviewing 340B transactions for compliance with statutory duplicate discount prohibitions[95] and ensuring that there is no "diversion" of 340B-priced medicines to an individual who is not a "patient" of the covered entity.[96] HRSA guidance also requires covered entities to maintain auditable records[97] in anticipation of a potential audit initiated by HRSA or a manufacturer.[98] The information that a manufacturer would request under a Rebate Model is comparable to the information that HRSA would request when auditing a covered entity.[99] For example, HRSA's sample data request list for covered entity audits includes pharmacy, medical, and purchase data elements, such as the date of service, the prescriber number, and the account number. Put simply

---

[91] Letter from Brandon M. Macsata, CEO, ADAP Advocacy Association, to Chantelle Britton, Director, Office of Pharmacy Affairs, HRSA, Sept. 8, 2025, https://www.regulations.gov/comment/HRSA-2025-0001-0715.

[92] *See, e.g.*, 42 U.S. Code § 1396r-8 (Medicaid); CMS, *Drug Price Negotiation Program: IPAY 2028 Final Guidance* (Sep. 30, 2025) ("IPAY 2028 Final Guidance"), https://edit.cms.gov/files/document/ipay-2028-final- guidance.pdf; TRICARE Retail Refund Program, Manufacturer Policy and Procedures Guide (Apr. 2025) https://health.mil/Reference-Center/Publications/2025/04/25/Manufacturer-Policy-and-Procedure-Guide.

[93] 91 Fed. Reg. at 9633.

[94] *Novartis Pharms. Corp.* 102 F.4th at 463.

[95] PHSA § 340B(a)(5)(A); SSA § 1903(m)(2)(A)(xiii); SSA § 1927(j)(1); SSA § 1193(d).

[96] PHSA § 340B(a)(5)(B).

[97] Health Resources & Services Administration, Program Integrity. https://www.hrsa.gov/opa/program-integrity ("Covered entities participating in the 340B Drug Pricing Program must maintain accurate records to ensure compliance.").

[98] PHSA § 340B(a)(5)(C).

[99] *See* 340B Prime Vendor Program, *Sample HRSA 340B Audit Data Request List (DRL) for Covered Entities*, https://www.340bpvp.com/Documents/Public/340B%20Tools/sample-hrsa-340b-audit-data-request-for-covered-entities.pdf.

arguments from covered entities that they will incur significant additional costs to collect and process claims data under a Rebate Model are suspect as the collection and processing of such data by covered entities and their vendors is already *required* for covered entities to ensure they are compliant with 340B program requirements.

Covered entities currently engage TPAs to assist with 340B operations and could use TPAs for Rebate Model needs as well. TPAs have broad capabilities and familiarity with Rebate Model claims submissions, so covered entities likely would not need to onboard new vendors and likely would not incur significant additional costs. Multiple TPAs and vendors have already operationalized the infrastructure necessary to support Rebate Model submissions. Covered entities have historically been able to adapt in response to changes in the 340B Program, including by setting up alternative distribution models and engaging third party administrators to assist with 340B operations. For those covered entities that do not leverage a TPA and use a physical inventory model, wholesalers readily maintain the necessary information, on behalf of covered entities, that can be provided to manufacturers to ensure accurate rebate payments.

Manufacturers also would incur the bulk of the costs under a Rebate Model, including establishing and maintaining the Rebate Model platform. For example, in the lead-up to the prior Pilot Program, AbbVie engaged Second Sight Solutions, which operates the Beacon platform, to collect the HRSA-approved data elements, apply 340B rebate eligibility criteria, provide transparent reporting, and facilitate 340B rebate payments to covered entities. If HRSA moves forward with a Rebate Model, AbbVie would incur all costs associated with operating Beacon, as well as providing initial set-up and ongoing support and resources at no cost to the covered entity. Through Beacon, AbbVie would offer ongoing technical assistance, customer service, and educational resources to covered entities at no cost, including: detailed technical assistance on the Beacon website that addresses file setup for data element submissions and data templates; training and technical support to covered entities regarding Beacon and to address any questions or concerns regarding the Beacon platform; and a variety of online resources, including pre-recorded and live training sessions, available on their website. Beacon also would provide administrative functionality that would reduce covered entity administrative costs, such as status and reconciliation reporting at no cost to covered entities. The user interface provides the covered entities (and their invited partners) access to 340B rebate model data at no cost that can be customized by the entity and allows for the viewing of multiple organizations' data, (if authorized).

Ultimately, a Rebate Model could *reduce* costs for covered entities because it would increase transparency into 340B claims and thus reduce the need for manufacturer-initiated audits. The 340B statute empowers manufacturers who suspect wrongdoing to conduct audits and seek resolution of disputes through a federal 340B ADR system.[100] Implementation of a Rebate Model likely would reduce the need for manufacturer audits of covered entities, as claims data would be readily available to manufacturers in close to real-time to identify and resolve disputed claims. As discussed above, when audits are needed, Rebate Model claims data will enable manufacturers to

[100] PHSA § 340B(a)(5)(C).

provide clearer, more robust audit requests to HRSA. Under current HRSA guidance, in order to obtain the agency's approval to conduct an audit, manufacturers must demonstrate that there is "reasonable cause" to believe that the covered entity is engaged in wrongdoing.[101] A Rebate Model would facilitate more detailed audit requests, which would allow HRSA to review audit requests with greater ease and reduce back-and-forth communications with manufacturers. The reduction in the number of audits, claims reversals, and other dispute-related issues could offset any administrative costs to covered entities under the Rebate Model. With respect to deduplication of MFP and 340B claims, without a rebate model, when a claim is reasonably identified as 340B by a manufacturer but has not received a 340B discount, covered entities need to wait for resolution of a good faith inquiry into a dispute over MFP payment and potentially bring the issue to HRSA for resolution—all the while waiting for reimbursement.

Regardless, any administrative costs associated with the 340B Program for covered entities—if any actually existed—would be far outweighed by the program's benefits. While the list price value of 340B purchases in 2024 was $148 billion, the discounted price to covered entities was significantly lower ($81.4 billion).[102] This is because manufacturers provide massive discounts to covered entities under the 340B Program. These discounted prices are significantly lower than the prices at which manufacturers sell their products to other purchasers. For the vast majority of drugs, manufacturers participating in the 340B Program must sell their products to covered entities at discounts ranging from at least 23.1% to more than 99.9% of the average market price.[103] On average, 340B covered entities receive 59% off of wholesale acquisition cost (WAC).[104] Many mandatory 340B ceiling prices are as little as one penny per unit of drug. Covered entities thus reap significant revenue from their participation in the program. It is more than fair for covered entities to assume minimal compliance costs associated with ensuring 340B program integrity—again, assuming there are any—in return for the ability to generate massive amounts of revenue under the program.

### B. Covered Entities' Concerns about Payment Timing and Potential Cash Flow Concerns Are Unfounded (Question 2)

#### 1. Under the Rebate Model, Covered Entities Are Likely to Receive 340B Pricing Faster Than Under the Existing Framework

AbbVie believes that requiring rebates to be paid (or if appropriate, denied) within 10 calendar days of a manufacturer receiving complete claims data would be reasonable and would not lead to cash flow concerns for covered entities. The prior Pilot Program would have had a 10-calendar-day deadline, and the current RFI states that "[a] potential 340B Rebate Model Pilot

[101] 61 Fed. Reg. at 65406.

[102] Drug Channels Institute, *340B Hit $81 Billion in 2024 (+23%): Why CMS and the IRA Are Poised to Cool the Program's Runaway Growth* (Dec. 15, 2025), https://www.drugchannels.net/2025/12/340b-hit-81-billion-in-2024-23-why-cms.html.

[103] SSA § 1927(c); PHSA § 340B(a)(1).

[104] BRG, *340B Program at a Glance: 2025*, at 1 (2025), https://media.thinkbrg.com/wp-content/uploads/2025/02/19075246/340B-Program-at-a-Glance-2025_F.pdf.

Program could require that all rebates be paid to the covered entity (or denied, with documentation in support) within 10 calendar days of data submission."[105]

A 10-day rebate payment period would be faster than most 340B discounts are delivered today, particularly because most covered entities and the pharmacies with whom they contract use a "replenishment" model, which has inherent delays. Eligibility for 340B pricing only is determined when the replenishment order is placed, which often occurs weeks, months, or even a year after the prescription is dispensed, in part because the replenishment order is only placed after the medication is dispensed and sufficient accumulators exist to order (e.g., full package size).[106] This is not true under a Rebate Model. Under a Rebate Model, a covered entity would be able to submit requests for 340B pricing in near real-time, shortly after the drug is dispensed to a patient of the covered entity. Access to the 340B price would not depend on use of the entire package and could occur much faster than today (e.g., under the prior Pilot Program, no more than 10 days after submission of a claim).[107] Moreover, rebate payments would be sent via electronic funds transfer, directly to the covered entities registered bank account, which provides prompt payment and avoids delays (e.g., due to checks).

The transition from a wholesaler chargeback discount model to a Rebate Model framework likely should not affect covered entities' cash flow because our understanding is that with a 10-calendar-day deadline, the rebate payment generally would be paid by the time covered entities are required to pay wholesalers.[108] Moreover, a 10-calendar-day deadline is far shorter than when rebate payments are due under other programs. For example, Medicaid drug rebate payments are assessed on a quarterly basis and due 37 days after receipt of the invoice,[109] and as discussed above, manufacturers of selected drugs have 14 days to pay MFP rebates.[110] We understand that payment terms may vary by contract, but urge HRSA to validate timing under the chargeback discount model with wholesalers as we expect the impact to a covered entity's cash flow is hyperbole.

A 2025 IQVIA study considered the impact of a Rebate Model on covered entities' cash flow and concluded that "financing costs under the 340B rebate model are small and unlikely to be a barrier to its use by covered entities."[111] The study compared interest rates under different

---

[105] 91 Fed. Reg. at 7290.

[106] Adam J. Fein, *Challenges for Managed Care from 340B Contract Pharmacies*, 22 J. of Managed Care & Spec. Pharm. 197 (Mar. 2016), https://pmc.ncbi.nlm.nih.gov/articles/PMC10398234/.

[107] Beacon Support Center, *Rebate Model Frequently Asked Questions*, https://support.beaconchannelmanagement.com/en/articles/9589827-rebate-model-frequently-asked-questions (*How long does it take for a 340B rebate payment to be processed and paid?*).

[108] *See* SmartSourceRx, *Credit and Payment Details*, https://www.smartsourcerx.com/credit-and-payment-details.

[109] HHS, *Medicaid Drug Rebate Program Release No. 7: 50% Rebate Cap – Technical Amendment Passed* (Apr. 29, 1993), https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/downloads/rx-releases/mfr-releases/mfr-rel-007.pdf.

[110] CMS, *Drug Price Negotiation Program: IPAY 2028 Final Guidance*, § 40.4.1 (Sep. 30, 2025) ("IPAY 2028 Final Guidance"), https://edit.cms.gov/files/document/ipay-2028-final-guidance.pdf.

[111] Chuan Sun, MS, MA, et al, IQVIA, *How Will a Rebate Model Impact Cash Flow in the 340B Drug Pricing Program?*, at 1, 13 (2025), https://www.iqvia.com/-/media/iqvia/pdfs/us/white-paper/2025/iqvia-cash-flow-impact-in-340b-white-paper-2025.pdf.

inventory models and found that rebate model interest costs (0.19%) were no larger than under physical inventory models (0.19%).[112] For contract pharmacies, rebate model interest costs (0.03%) were lower than physical and credit-based replenishment models.[113] IQVIA found that "[e]ven under unfavorable assumptions, rebate interest costs remained under 1.2%."[114]

**Figure 4. Interest costs for the eight 340B drug inventory and rebate models**




Last week, IQVIA released an updated version of their study that include all 10 drugs subject to MFP and allowed for shorter wholesaler payment terms, reconfirming the marginal nature of any potential interest costs. The study found that, "For all covered entity types, combined annual interest costs are estimated to be $53.7 million, representing 0.40% of the $13.4 billion in combined 340B purchases at WAC for these drugs."[115]

2. <u>The Beacon Rebate Model Platform Permits Covered Entities to Reconcile 340B Rebate Payments and Ensure Timely Payments</u>

The Beacon platform, which AbbVie would use to operationalize a Rebate Model, would allow covered entities to reconcile 340B rebate payments to the submitted 340B eligible claims data, which the Beacon platform makes available for free through a downloadable data report.[116]

---

[112] Chuan Sun, MS, MA, et al, IQVIA, *How Will a Rebate Model Impact Cash Flow in the 340B Drug Pricing Program?*, at 1, 13 (2025), https://www.iqvia.com/-/media/iqvia/pdfs/us/white-paper/2025/iqvia-cash-flow-impact-in-340b-white-paper-2025.pdf.
[113] Chuan Sun, MS, MA, et al, IQVIA, *How Will a Rebate Model Impact Cash Flow in the 340B Drug Pricing Program?*, at 1, 13 (2025), https://www.iqvia.com/-/media/iqvia/pdfs/us/white-paper/2025/iqvia-cash-flow-impact-in-340b-white-paper-2025.pdf.
[114] Chuan Sun, MS, MA, et al, IQVIA, *How Will a Rebate Model Impact Cash Flow in the 340B Drug Pricing Program?*, at 1 (2025), https://www.iqvia.com/-/media/iqvia/pdfs/us/white-paper/2025/iqvia-cash-flow-impact-in-340b-white-paper-2025.pdf.
[115] Rory Martin, Chuan Sun & William A. Sarraille, *Do 340B Rebates Create a Significant Financial Burden for 340B Providers?*, IQVIA White Paper (2026).
[116] Beacon Support Center, *Rebate Model Frequently Asked Questions*, https://support.beaconchannelmanagement.com/en/articles/9589827-rebate-model-frequently-asked-questions (*Can my covered entity reconcile 340B rebate payments back to claims submissions?*).

Beacon also includes a functionality for covered entities to research the 340B rebate status of a particular claim and to initiate a good faith inquiry in the event that a covered entity has not received a 340B rebate that it believes is due.[117]

Moreover, there are existing pathways under the 340B statute to ensure timely payments under a Rebate Model. For instance, if a manufacturer persistently does not provide timely 340B rebates, HRSA could also consider revoking approval of its Rebate Model or consider other enforcement mechanisms. In guidance on the prior Pilot Program, HRSA stated that "[a] manufacturer that is consistently unable to timely resolve rebate reimbursement issues may have its participation in the pilot program revoked."[118] Further, disputes over whether a manufacturer provided the 340B price on appropriate claims could be subject to the ADR process.

## IV. <u>HRSA Must Make Clear that a Rebate Model Preempts State Laws that Restrict Claims Data Collection and Interfere with ADR.</u>

When developing a Rebate Model, HRSA must make clear that the federal program preempts any state law that restricts the success of the Program, including by restricting a manufacturer's ability to collect claims data. State laws purporting to restrict the use of rebate models or the collection of claims data in connection with the 340B Program unconstitutionally intrude on the objectives of the federal Rebate Model, a program that specifically contemplates that manufacturers will request—and covered entities will submit—claims data.[119] To the extent States attempt to apply their state laws to limit or obstruct the Rebate Model, such interference undermines the federal Rebate Model and stands as a direct obstacle to a manufacture's ability to participate in the program.[120] At least two federal district courts and one federal Court of Appeals have found this to be true, ruling that such restrictions are unconstitutional because they "interfere[] with manufacturers' ability to conduct audits, which are necessary to launch the HHS-administrated dispute resolution process," and, thereby, "frustrate[] the operation of the audit mechanism and thus the enforcement of § 340B."[121]

---

[117] Beacon Support Center, *Rebate Model Frequently Asked Questions*, https://support.beaconchannelmanagement.com/en/articles/9589827-rebate-model-frequently-asked-questions.

[118] HRSA, 340B Rebate Model Pilot Program, http://web.archive.org/web/20251217112038/https://www.hrsa.gov/opa/340b-model-pilot-program (available on Dec. 17, 2025).

[119] The doctrine of federal preemption requires that "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Felder v. Casey*, 487 U.S. 131, 138 (1988); *see also McCulloch v. Maryland*, 17 U.S. 316 (1819).

[120] *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (unanimously concluding federal law preempted a Massachusetts state law "[b]ecause [although] a variety of state laws and regulations may conflict with a federal statute, whether because a private party cannot comply with both sets of provisions or because the objectives of the federal statute are frustrated, 'field preemption may be understood as a species of conflict preemption, . . . where 'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.").

[121] *Pharm. Rsch. & Mfrs. of Am. v. Morrisey v. McCuskey*, No. 25-1054, --- F.4th ----, 2026 WL 898259, 2026 U.S. App. LEXIS 9272, at *31-32 (4th Cir. Mar. 31, 2026); *see also Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 453 (S.D. W. Va. 2024); *AbbVie v. Drummond*, 808 F. Supp. 3d 1266, 1278 (W.D. Okla. 2025).

Moreover, States are increasingly passing laws that interfere with the federal program by attempting to regulate the sale and transfer of products at the federal 340B price, changing the terms of participation in the federal program, and prohibiting manufacturers from conditioning the sale of drugs at the federal 340B price on the receipt of covered-entity claims data. To date, at least thirteen States have passed laws containing such restrictions.[122] These state laws commonly include exceptions for where such data is required under federal law. Some States have accordingly recognized that their laws do not or cannot prohibit data collection in connection with participation in a federal Rebate Model.[123] However, other States have claimed that the exception for federally required data does not apply because the Rebate Model does not explicitly require drug manufacturers to request such information.[124] It is thus critical that HRSA make clear that such state-law restrictions are preempted.

The U.S. Department of Justice (DOJ) recently filed several amicus briefs on behalf of the United States, urging U.S. Courts of Appeals around the country to strike down state laws that prohibit drug manufacturers from, among other things, requiring covered entities to provide claims data as a condition of the manufacturer offering 340B prices.[125] As the brief explains, such state laws improperly interfere with the proper functioning of the federal administrative enforcement scheme.[126] Clarification about the Rebate Model's preemptive effect will prevent future erroneous interpretations of these state laws, preserving the centrality of federal enforcement and saving the judicial system the effort of having to resolve such disputes.

Congress created the 340B Program as an exclusively federal program, overseen by HRSA.[127] Such state-law data-collection restrictions also interfere with the 340B Program's ADR process in two distinct ways.

***First***, manufacturers cannot access the ADR process without covered-entity claims data. Such data is crucial to initiate the audit process, a necessary prerequisite to filing an ADR claim.[128] Manufacturers must establish "reasonable cause" that the covered entity is engaging in prohibited activity before HRSA will approve the audit.[129] "In practice," claims data is the *only* way that manufacturers are able to establish reasonable cause and manufacturers "likely need to 'require'

---

[122] Colo. Rev. Stat. § 6-29-105 (Colorado); Me. Rev. Stat. Ann. tit. 24-A, § 7753 (Maine); N.D. Cent. Code § 43-15.3-08 (North Dakota); Neb. Rev. Stat. § 44-4620 (Nebraska); N.M. Stat. Ann. § 26-1-27 (New Mexico); Or. H.B. 2385 (Oregon); R.I. Gen. Laws §§ 5-19.3-3, -5 (Rhode Island); S.D. Codified Laws § 58-29G-3 (South Dakota); Tenn. Code Ann. § 47-18-136 (Tennessee); Utah Code Ann. § 31A-46-311; Vt. Stat. Ann. tit. 18 (Vermont), § 4682; W. Va. Code § 60A-8-6a (West Virginia).

[123] *See, e.g.*, Defs. Mem. of Law at 13-14, *Pharma. Research & Mfrs. of Am. v. Arel*, No. 25-cv-600 (D. Vt. Sept. 2, 2025) (Attorney General did "not oppose entry of a preliminary injunction temporarily blocking" claims-data provision of Vermont law, in light of Pilot Program).

[124] *See, e.g.*, Br. in Support of Mot. for Prelim. Injunction at 2, *AbbVie v. Hilgers*, No. 4:25-cv-3089 (D. Neb. Nov. 11, 2025).

[125] *See, e.g.*, Br. of the United States as Amicus Curiae, *AbbVie v. Weiser*, No. 25-1439 (10th Cir. Feb. 25, 2026).

[126] *Id.* at 15.

[127] *See* PHSA § 340B(d)(1)(B)(v), (d)(3); *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110 (2011).

[128] *See* PHSA § 340B(d)(3)(A).

[129] 61 Fed. Reg. at65407.

submission of claims or utilization data as a condition of delivery to contract pharmacies."[130] As one federal judge noted, in determining that Oklahoma's law prohibiting drug manufacturers from collecting claims data was preempted by Section 340B, "without suspicion-raising claims data, how would a manufacturer know to ever ask for an audit? The claims data . . . would be *the* way to detect possible diversion or double-dipping on discounts. The barrier to access that data created by [the Oklahoma law] thus stands in direct conflict with the 340B Program's dispute resolution mechanism."[131] Or, as another federal judge noted in finding West Virginia's analogous statute conflicted with Section 340B, if manufacturers cannot require the provision of claims data, "there is not much recourse available to the manufacturer. Instead, covered entities—who may be engaging in the kind of fraud that the 340B Program's ADR system is meant to prevent—will essentially be the ones determining whether or not they wish to give manufacturers the very data necessary to start such an audit."[132]

***Second***, Congress specifically vested HHS and HRSA exclusive authority to enforce and administer the 340B Program through audits and a federal ADR program.[133] In 2024, HRSA recently issued a final rule setting forth additional details of the congressionally prescribed 340B ADR process.[134] The final rule established a comprehensive scheme to resolve disputes between manufacturers and covered entities arising under the 340B statute. Under the rule, a "340B ADR Panel" within HRSA is tasked with resolving not only disputes about drug prices but also claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price—the exact issue States are passing laws to purportedly address.[135] By vesting enforcement authority solely in HHS, Congress withheld from States the ability to enforce the 340B Program's requirements against manufacturers.[136] Auxiliary enforcement mechanisms beyond those contemplated in the federal statute would "undermine the agency's efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis."[137] As the DOJ noted in its recent amicus brief, such state laws "supplant[]" the uniform scheme Congress created "by arrogating to the State enforcement authority that properly belongs to the federal government alone. That act of self-aggrandizement conflicts with the scheme Congress designed."[138] In sum, as the Fourth Circuit recently noted, such restrictions on the

---

[130] *Pharm. Rsch. & Mfrs. of Am. v. Morrisey v. McCuskey*, No. 25-1054, --- F.4th ----, 2026 WL 898259, 2026 U.S. App. LEXIS 9272, at *31 (4th Cir. Mar. 31, 2026).
[131] *AbbVie v. Drummond*, 808 F. Supp. 3d 1266, 1278 (W.D. Okla. 2025).
[132] *Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 453 (S.D. W. Va. 2024).
[133] *Astra USA*, 563 U.S. at 120–21.
[134] *See* 89 Fed. Reg. 28643 (Apr. 19, 2024).
[135] *See* 42 C.F.R. §§ 10.3, 10.21; *accord id.* § 10.22(c)(1) ("A manufacturer is responsible for obtaining relevant information and documents from any wholesaler or other third party that facilitate the sale or distribution of its drugs to covered entities.").
[136] *See Astra*, 563 U.S. at 120–21.
[137] *Id.*
[138] Br. of United States, *AbbVie v. Weiser*, No. 25-1439 at 15 (10th Cir. Feb. 25, 2026).

collection of claims data "interfere … at an operational level with HHS's enforcement authority and specific enforcement activity."[139]

AbbVie believes that some States will continue to enforce restrictions on the collection of claims data even in light of a Rebate Model. Thus, AbbVie requests HRSA issue a statement making clear that the Rebate Model preempts all state laws that attempt to impose different or additional requirements or limitations on manufacturers, such as claims data prohibitions. Such interference with an exclusively federal program violates the Supremacy Clause and will disrupt the integrity of the Rebate Model.[140]

## V. HRSA Must Act Expeditiously to Balance the Interests of All Stakeholders and Announce Its Decision on the New Rebate Model.

AbbVie appreciates HRSA's recent efforts following litigation over the Pilot Program. AbbVie respectfully submits that re-approving a Rebate Model should not require a heavy lift. Even the district court in Maine recognized that approval of a Rebate Model would not require extensive additional explanation; HRSA simply needs to provide a well-reasoned explanation of the basis for its decision that responds to objections raised by covered entities and shows that HRSA has balanced the interests at stake. HRSA does not need more process or significant further delays; rather, HRSA needs to act expeditiously and decisively, while supporting its decision with evidence in a written record—much of which the agency already possesses. Indeed, given the ongoing nature of manufacturers' obligations under the IRA, any significant delays will cause substantial prejudice to manufacturers and other stakeholders.

Without delay, therefore, HRSA should issue a decision that (1) re-approves manufacturers' Rebate Models, (2) authorizes manufacturers to implement those models by a date certain (i.e., July 1, 2026), and (3) responds to all of the major objections that have been raised by covered entities, whether in comments submitted to HRSA or in litigation. In its decision moreover, HRSA should assemble and cite to specific materials, communications, or other submissions that the agency considered and upon which it relies in reaching its conclusions. The record should include all pertinent material from the initial application-and-approval process.

***

AbbVie appreciates the opportunity to provide comments on the Rebate Model. We strongly support the 340B Program's original intent and we thank you for consideration of our comments in an attempt to preserve patient access to lifesaving and life-sustaining medicines. We

---

[139] *Pharm. Rsch. & Mfrs. of Am. v. Morrisey v. McCuskey*, No. 25-1054, --- F.4th ----, 2026 WL 898259, 2026 U.S. App. LEXIS 9272, at *32 (4th Cir. Mar. 31, 2026).

[140] U.S. Const. art. VI, cl. 2. State regulation of the 340B Program violates the Supremacy Clause by impermissibly changing the terms of a federal drug-pricing regime—the federal 340B Program—and significantly increasing the cost of participation in that regime.

would be pleased to discuss at your convenience. If you have questions, please contact me at hillary.cavanagh@abbvie.com.

Sincerely,

*Hillary Cavanagh*

Hillary Cavanagh
Vice President, US Policy and Analytics
On behalf of AbbVie Inc.

cc (via Electronic Mail): Chris Klomp
Director, Center for Medicare
Deputy Administrator
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244

## Appendix A: Industry Standard Forms

**Table 2: Standard Pharmacy Claim Forms**

| Form | Also Known As | Description |
|---|---|---|
| NCPDP D.0 | National Council for Prescription Drug Programs standard | NCPDP D.0 serves as the universal format used to communicate prescription drug claim data consistently and in real-time by retail, mail-order, hospital outpatient, and specialty pharmacies whenever a prescription is dispensed (e.g. pharmacy packages patient, drug, and cost data into a standardized e-message, transmits it to the payer, and receives an instant approval/denial). Covered entities also rely on it to properly flag and bill drugs purchased under the 340B Drug Program. |
| CMS-1500 | HCFA-1500 | CMS-1500 is the standard claim form used by healthcare providers in the U.S. to bill insurance companies for medical services. It is used if providers administer drugs in an office setting or by a specialty pharmacy if a drug is billed under a medical benefit. |
| UB-04 / 837I | CMS-1450 | UB-04 is the standard claim form used by hospitals and facility-based outpatient pharmacies when billing for services as part of a facility claim. It is used if a covered entity administers a drug as part of its services at the facility. |
| Prescription Drug Event | PDE | PDE is a summary record submitted to CMS for every prescription filled under a Part D plan by the Medicare Prescription Drug Plan. It is not a payment request, but a post-claim data record used to administer Part D and reconcile plan payments. |

**Table 3: AbbVie Rebate Model Data Fields provided for reimbursement to others**

| Data Field | Provided for reimbursement | NCPDP D.0 | CMS-1500 | UB-04 | PDE |
|---|---|---|---|---|---|
| Date of Service | Yes | Field 401-D1 | Box 24A | FL 45 | Yes |
| Date Prescribed | Yes | Field 414-DE | - | - | - |
| Rx Number | Yes | Field 402-D2 | - | - | Yes |
| Fill Number | Yes | Field 403-D3 | - | - | Yes |
| NDC-11 | Yes | Field 407-D7 | Box 24A, shaded area | FL43* | Yes |
| Quantity / Quantity Dispensed | Yes | Field 442-E7 | Box 24G | FL 46 | Yes |
| Prescriber ID / Physician ID | Yes | Field 411-DB | Box 17b or Box 24J | FL 76 or FL 78–79 | Yes |
| Service Provider ID / Ship-to-Pharmacy ID | Yes | Field 201-B1 | Box 32a or Box 33a | FL 56 or FL 57 | Yes |
| 340B ID | No | - | - | - | - |
| BIN Number | Yes | Field 101-A1 | - | - | - |
| PCN Number | Yes | Field 104-A4 | - | - | - |
| Group Number | Yes | Field 301-C1 | Box 11 & 9a | FL62 A-C | - |
| Child Site Modifier | No | - | - | - | - |
| Medicare Part B 340B Claims Modifier | Yes | N/A | Box 24D | FL 44 | - |
| Part D 340B Modifier | Yes | Field 420-DK, value "20" | - | - | - |

*NDC for Medicaid Drug Rebate Reporting