**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| THE AMERICAN HOSPITAL ASSOCIATION, THE MAINE HOSPITAL ASSOCIATION, EASTERN MAINE MEDICAL CENTER, NATHAN LITTAUER HOSPITAL & NURSING HOME, UNITY MEDICAL CENTER, and DALLAS COUNTY MEDICAL CENTER,<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., Secretary of the U.S. Department of Health and Human Services, THOMAS J. ENGELS, Administrator, Health Resources and Services Administration, THE HEALTH RESOURCES AND SERVICES ADMINISTRATION, THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, and THE UNITED STATES OF AMERICA,<br><br>*Defendants*. | Case No. 1:26-cv-515 |

**DECLARATION OF JUSTIN MCCARTHY**

I, Justin McCarthy, declare as follows:

1. I am over the age of 18. Except as expressly indicated, the facts stated below are based upon my personal knowledge, including my experience in the pharmaceutical industry, my work at Bristol-Myers Squibb Company (BMS), and my review of the business records of the company. If called to testify, I could truthfully and competently testify to these facts.

2. I am the Senior Vice President and Head of Market Access, Pricing, and Value Demonstration at BMS. In my current position, I lead our Market Access, Pricing, and Value Demonstration organization in its efforts to help ensure that patients in need of BMS's medicines

have access to them. I have over three decades of experience in the pharmaceutical industry, having served in a number of capacities related to health economics and outcomes research, real-world data and analytics, patient-centered outcomes assessment, market access, pricing, and contracting. I also have experience in public policy at the federal and state level, as well as experience serving as a pharmaceutical company's legal counsel advising on regulatory, licensing, clinical trial, and intellectual property issues.

3. BMS is a global biopharma company that is pursuing bold science to define what is possible for the future of medicine and the patients it serves. Its mission is to discover, develop, and deliver innovative medicines that help patients prevail over serious diseases. Consistent with that mission, BMS works to ensure that its products and treatments are available to as many patients as possible.

**BMS'S PARTICIPATION IN THE 340B PROGRAM**

4. BMS participates in the 340B Drug Pricing Program as a condition of having its drugs eligible for federal reimbursement under Medicaid and Medicare Part B. Under the 340B Program, a participating drug manufacturer must offer its covered outpatient drugs to certain hospitals and clinics—known as "covered entities"—at or below a price specified by a statutory formula. This 340B "ceiling price" results in significant price reductions on BMS's products for covered entities: The 340B price for some drugs can be as low as a penny per unit.

5. Manufacturers that participate in the 340B Program enter into an agreement with the Secretary of Health and Human Services known as a Pharmaceutical Pricing Agreement (PPA). A manufacturer's execution of the PPA indicates its commitment to participate in the 340B Program. If the Department of Health and Human Services (HHS) terminates a manufacturer's PPA, federal reimbursement under Medicaid and Medicare Part B is unavailable

for the manufacturer's drugs. BMS has participated in the 340B Program since its inception decades ago.

6. Throughout the 340B Program's history, covered entities have used various methods to purchase 340B-priced drugs. The simplest method is often called a physical inventory model. Under this model, covered entities physically segregate units purchased at the 340B price from units purchased at a commercial price on their shelves. Covered entities then determine whether a particular prescription is 340B-eligible—that is, whether it satisfies the statutory criteria to be filled with 340B-priced medicine—before the relevant drug is dispensed to a patient.

7. In the 340B Program today, covered entities typically use various virtual inventory models, most notably the "replenishment model," instead of a physical inventory model. Under the replenishment model, a covered entity first purchases a medicine at the commercial price, places it in a single, common inventory, and dispenses it to any individual with a prescription for the medicine, without regard to whether the prescription is 340B-eligible. After the medication is dispensed—often weeks or even months later—the covered entity or a third-party administrator acting on its behalf analyzes claims data from prior dispenses to identify prescriptions it thinks were 340B-eligible. Once the covered entity identifies a certain number of units it believes were 340B-eligible, it purchases "replenishment" units at the 340B price, reasoning that it is entitled to be made whole for the 340B price on the dispensed medicine initially purchased at the commercial price. The replenishment product is placed in the common inventory, and the cycle restarts. Thus, a defining characteristic of the product-replenishment model is that covered entities do not determine whether a prescription is 340B-eligible before it is dispensed. They instead do so after the fact.

**BMS'S PARTICIPATION IN THE DRUG PRICE NEGOTIATION PROGRAM**

8. In 2022, Congress enacted the Medicare Drug Price Negotiation Program as part of the Inflation Reduction Act (IRA). The statute requires the Secretary of HHS to set a "Maximum Fair Price" on certain drugs that are selected each year as negotiation-eligible. HHS oversees the Drug Price Negotiation Program through its subagency, the Centers for Medicare & Medicaid Services (CMS).

9. BMS's product Eliquis® was selected for negotiation under the Drug Price Negotiation Program and became subject to a maximum fair price starting on January 1, 2026. The Maximum Fair Price for Eliquis is $231.00 for a 30-day supply, a 56% discount from the list price.[1] BMS's drug Pomalyst® was selected for negotiation and is scheduled to have a Maximum Fair Price of $8,650 for a 30-day supply (a 60% discount) take effect beginning in 2027.[2] BMS's drug Orencia® was selected for negotiation of a Maximum Fair Price for IPAY 2028.[3]

10. Once a Maximum Fair Price is in effect, manufacturers must make that price available on all sales of the selected drug to eligible Medicare beneficiaries enrolled in a prescription drug plan and to pharmacies, mail-order services, and other entities that dispense the drug to Medicare beneficiaries.

11. Under CMS guidance implementing the IRA, manufacturers like BMS may either offer dispensing entities the Maximum Fair Price for a selected drug at the time of purchase or

---

[1] CMS, *Medicare Drug Price Negotiation Program: Negotiated Prices for Initial Price Applicability Year 2026* (Aug. 15, 2024), https://tinyurl.com/5n6kj8ec.

[2] CMS, *Medicare Drug Price Negotiation Program: Negotiated Prices for Initial Price Applicability Year 2027* (Nov. 2025), https://tinyurl.com/de985fyb.

[3] CMS, *Medicare Drug Price Negotiation Program: Selected Drugs for Initial Price Applicability Year 2028* (Jan. 2026), https://tinyurl.com/yar6ev3t.

provide a post-purchase refund amounting to the difference between the entity's acquisition cost and the Maximum Fair Price. The latter practice is known as issuing an "MFP refund." BMS effectuates the Maximum Fair Price through refunds. For example, if the commercial price for Eliquis were $100 and the Maximum Fair Price were $40, BMS would initially charge its wholesaler $100 for the drug. The wholesaler would then sell the drug to a dispensing entity, such as a pharmacy. After the pharmacy dispenses the drug to an eligible Medicare beneficiary, the customer and her Medicare plan would be charged the Maximum Fair Price ($40), and BMS would issue a $60 refund to the dispensing entity.

12. BMS must provide the MFP refund to the dispensing entity within 14 days after receiving claims data verifying Maximum Fair Price eligibility through a data portal set up by CMS. If BMS does not pay the MFP refund within 14 days, it risks a significant civil monetary penalty—ten times the refund amount multiplied by the number of units sold above the Maximum Fair Price. 42 U.S.C. § 1320f-6(a).

13. The IRA protects manufacturers like BMS from having to offer both a 340B discount and the Maximum Fair Price on the same unit of a drug. Manufacturers instead must provide only the lower of the Maximum Fair Price and the 340B price. 42 U.S.C. § 1320f-2(d). For example, if a unit of Eliquis had a commercial price of $100, a 340B price of $50, and a Maximum Fair Price of $40, BMS would need to provide only a $10 refund—the difference between the 340B purchase price and the MFP—on drugs purchased by a covered entity at the 340B price and dispensed to eligible Medicare beneficiaries. If the 340B price were lower than the MFP, BMS would have no legal obligation to provide an MFP refund at all.

14. For those reasons, it is essential that BMS is able to identify which units of drugs may be subject to 340B pricing—and that this identification occur in a timely manner. As noted

above, manufacturers only have 14 days after receiving claims data for a drug dispense to verify eligibility for an MFP refund under CMS rules. Without the ability to determine within that short window that a unit of drug was also 340B-eligible—*i.e.*, that it was purchased by a 340B covered entity and dispensed to an eligible patient—BMS is unable to benefit from the above statutory protections. For instance, imagine that in the above example, BMS did not know the unit of Eliquis was subject to 340B pricing until after it was forced to pay the MFP refund. It would then provide a *$60* rather than $10 MFP refund—vastly exceeding its legal discounting obligations.

15. This presents a sequencing problem. Under the replenishment model, BMS cannot know which dispenses were considered 340B-eligible until the covered entity retroactively analyzes data—usually well after the dispense has occurred—to determine whether the previously dispensed medication qualified for the 340B price. But the 14-day MFP-refund deadline begins to run within days of the dispense, as soon as BMS receives claims data through CMS's data portal verifying MFP eligibility. This means that in most cases, the covered entity itself may not have yet determined 340B eligibility by the time the MFP refund is due.

16. For its part, CMS has specifically disclaimed any responsibility for identifying when a unit is subject to both a 340B discount and a Maximum Fair Price, leaving manufacturers to fend for themselves. Although CMS has created a data portal to facilitate sharing claims data between dispensing entities and manufacturers to verify Maximum Fair Price transactions, no comparable mechanism exists for 340B discounts, which are currently overseen by a different subagency of HHS: the Health Resources and Services Administration (HRSA).

17. Covered entities collect claims data in the regular course of business and routinely share these data with public and private payors. Such claims data identify, for example, the date

of service, the dispensing pharmacy, the identity of the prescriber, the health insurer, and the prescription identification number assigned to each prescription.

18. BMS's current policy requires covered entities to submit claims data for 340B utilization within a 45-day post-dispense submission window, such that most data is submitted long after BMS can feasibly match it to MFP-refund claims in order to de-duplicate the discounts. BMS also exempts several states from its claims-data policy or limits the policy's scope to comply with restrictions set by state laws; in other states, noncompliance with BMS's policy is widespread. Less than half of all disproportionate share hospitals—which represent the highest 340B purchase volumes for Eliquis—are currently in compliance with BMS's policy.

19. For all these reasons, duplicate discounts not contemplated by Congress have become routine, undermining the legal protections built into the IRA. Manufacturers like BMS have been forced to pay both 340B and IRA price concessions to avoid the risk of failing to timely offer the lower of the two.

20. BMS has already lost more than $40 million because of its inability to detect duplicate claims for 340B and Maximum Fair Price pricing since Eliquis became subject to a Maximum Fair Price in January 2026. These losses will only mount as more of BMS's products are selected for negotiation under the Drug Price Negotiation Program. That includes BMS's Pomalyst, which was subject to negotiation and scheduled for a Maximum Fair Price beginning in January 2027.

**THE 340B REBATE MODEL PILOT PROGRAM**

21. On July 31, 2026, HRSA, the subagency of HHS responsible for overseeing the 340B Program, announced a limited rebate model pilot program. The rebate model pilot program is very narrow in scope: It applies only to drugs subject to a Maximum Fair Price for

2026 and 2027 and only during the effective dates for the negotiated prices. HRSA had previously approved a rebate plan that BMS submitted in 2025 for Eliquis, but that approval lapsed when HRSA withdrew its first pilot program.

22. The pilot program is premised on a rebate model that will work as follows: Covered entities will purchase a unit of drug at its wholesale acquisition cost (WAC) and provide routine claims data to the manufacturer within 45 days of dispensing the unit to identify its 340B eligibility. If the unit is eligible for 340B pricing, the manufacturer will then have 10 days to give the covered entity a rebate (equal to the difference between WAC and the 340B price).

23. The rebate model embraced by the pilot program is the only feasible method for allowing manufacturers to prevent duplication of 340B discounts and MFP refunds, as required by the IRA. BMS's claims-data policy alone is not sufficient to address 340B and IRA de-duplication. Under CMS guidelines, manufacturers may not condition or withhold a Maximum Fair Price refund while receipt of 340B claims data is pending. And any data submitted under BMS's policy generally identifies only where a duplicate discount has already been given, leaving BMS to attempt to recover the discount in a post-hoc dispute with the covered entity. The rebate model solves this problem by making a 340B eligibility determination *before* the price concession is paid, and on a nationwide basis. This is the only sequence where non-duplication may be achieved prospectively so that BMS can ensure it makes the lower of the IRA and 340B prices available without having to pay both discounts.

24. The pilot program also is a necessary (but notably insufficient) step forward in terms of HRSA's broader oversight responsibilities under the 340B statute itself. That statute prohibits covered entities from selling drugs purchased at the 340B-discounted price to non-patients (diversion) and provides that covered entities may not request the 340B price on a unit

of drug that will be subject to a Medicaid rebate (another form of unlawful duplicate discounts). But without advance access to claims data, manufacturers like BMS are often unable to identify 340B transactions that violate the prohibitions against diversion and duplicate Medicaid discounts.

25. A broader 340B rebate model that extends beyond IRA-selected drugs would promote transparency and address many of these concerns. Although the pilot program is a welcome step forward in that regard, its limited scope leaves much work to be done by HRSA in fulfilling its statutory oversight obligations, particularly in the areas of improved transparency and correcting the rampant abuses in the 340B Program.

26. The burdens on covered entities imposed by the pilot program appear to be minimal, because the pilot program was designed to limit the administrative burden on covered entities. Among other things, the pilot program aligns with the 45-day submission window BMS has already built into its claims-data policy, standardizes the claims data elements that covered entities must report, and centralizes the reporting process. The pilot program also relies on routine pharmacy and medical claims data that covered entities already collect in the ordinary course of their billing and compliance activities. Additionally, manufacturers are required to bear the cost of the information technology platform used to implement the pilot program.

27. The pilot program also includes additional safeguards for covered entities. Manufacturers may deny 340B rebates only in limited circumstances to effectuate nonduplication of Maximum Fair Price and 340B discounts or when the 340B rebate has been provided to another covered entity on the same claim. In particular, HRSA prohibits manufacturers from denying 340B rebates based on eligibility or compliance concerns with diversion or Medicaid duplicate discounting. The agency has instead instructed manufacturers to

raise those concerns directly with HRSA or to use the 340B statutory auditing and alternative-dispute-resolution mechanisms. Manufacturers must also report denied claims, including the basis for denial, and they face termination from the pilot program if they do not provide acceptable justification for denials of rebate payments.

28. Manufacturers must report additional rebate data to HRSA to facilitate program oversight. HRSA plans to monitor the pilot program on an ongoing basis and to publish periodic summaries of its findings, as well as a comprehensive evaluation of the pilot program by April 30, 2028, following the first year of its operation. HRSA has explained that it will use data collected throughout the pilot program to more effectively prevent duplicate discounts and to inform future policy considerations related to 340B program integrity and compliance.
The rebate model that is central to the pilot program aligns with the primary commercial model that manufacturers use with their non-340B customers, where eligibility for a reduced price is not determined until after the product is purchased. It is standard commercial practice to provide price reductions through a rebate when a given unit's eligibility for the reduced price is not known at the time of sale.

29. BMS timely applied to participate in the pilot program for its products Eliquis and Pomalyst. As detailed in its application, BMS's pilot program model incorporates safeguards designed to protect the privacy and security of protected health information in compliance with HRSA's rebate model pilot.

**BMS WILL SUFFER HARM IF THE PILOT PROGRAM IS ENJOINED**

30. If the pilot program does not go into effect, BMS will suffer significant and irreparable harm.

31. HRSA approved BMS's application to participate in the pilot program for its products Eliquis and Pomalyst on September 24, 2026.

32. Between the previously announced pilot program and the most recent one, BMS committed more than $10 million and tens of thousands of hours to design, develop, test, and operationalize the infrastructure needed to implement and support its pilot program model. This work required significant planning, development, integration, and testing across internal revenue and financial systems, internal stakeholders, and external vendors. BMS also devoted significant time, money, and resources to ensure its platform will be able to process claims data and to issue rebates to covered entities within the 10-day window required by HRSA. For example, BMS has invested more than 10,000 hours in platform testing and related preparatory activities designed to support compliance with HRSA's requirements.

33. Without the ability to implement its pilot program, BMS will lack the information needed to identify in a timely manner units for which both a Maximum Fair Price rebate and a 340B price concession have been claimed, which will significantly increase the likelihood of duplicate price concessions. Such duplicate discounts are already rampant for Eliquis and will only increase as Maximum Fair Prices take effect for more of BMS's products. In addition, without the pilot program enabling BMS to review and de-duplicate claims data, BMS risks incurring significant civil monetary penalties for failure to provide the correct price required by federal law.

34. Each duplicate price concession costs BMS significant revenue that it would otherwise receive absent the unlawful duplicate price concession. BMS estimates that it has been forced to improperly pay more than $40 million in duplicate discounts for its product

Eliquis in the first half of 2026 alone. Without a pilot program in place for 2027, BMS estimates that figure will continue to climb significantly next year.

35. This lost revenue would otherwise be used by BMS to fund mission-critical programs like research and development into new drug therapies, and to offer critical patient support, education, and access programs.

36. In short, an injunction delaying implementation of the pilot program will cause widespread disruption to BMS's efforts to comply with its statutory obligations and cause significant and irreparable harm to BMS.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

*/s/ Justin McCarthy*
Justin McCarthy

Executed on October 14, 2026