**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| THE AMERICAN HOSPITAL ASSOCIATION, THE MAINE HOSPITAL ASSOCIATION, EASTERN MAINE MEDICAL CENTER, NATHAN LITTAUER HOSPITAL & NURSING HOME, UNITY MEDICAL CENTER, and DALLAS COUNTY MEDICAL CENTER,<br><br>*Plaintiffs,*<br><br>v.<br><br>ROBERT F. KENNEDY, JR., Secretary of the U.S. Department of Health and Human Services, THOMAS J. ENGELS, Administrator, Health Resources and Services Administration, THE HEALTH RESOURCES AND SERVICES ADMINISTRATION, THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, and THE UNITED STATES OF AMERICA,<br><br>*Defendants.* | Case No. 26-cv-00515-LEW |

**DECLARATION OF CHRISTINE MARSH**

I, Christine Marsh, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am Senior Vice President, Value and Access for Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer"), and have held that position since July 2019. I submit this declaration in opposition to Plaintiffs' motion for a preliminary injunction.

2. As Senior Vice President, Value and Access, I am responsible for, among other things, collaborating with a broad range of Boehringer departments to ensure that Boehringer medicines are accessible to patients, including Medicare Part D and Medicaid enrollees. I have

direct oversight over the integrity and compliance of Boehringer's participation in the 340B program. Prior to my current position, I served as Senior Vice President, Market Access and Vice President, Managed Markets Sales at Boehringer, and in senior strategic leadership roles at Boehringer (where I have worked in various capacities since 1999), and Roxane Laboratories. In these roles, I have gained significant experience regarding pricing and government contracting for pharmaceutical products.

3. This declaration is based on my personal knowledge, including knowledge I have gained from others at Boehringer and company documents.

**Boehringer's Jardiance®, Ofev®, and Tradjenta® Products**

4. Boehringer has a long history of research and development of novel pharmaceutical products. In 2020 alone, the Boehringer family of companies (consisting of Boehringer Ingelheim Pharmaceuticals, Inc. and related entities globally) invested $4.2 billion in pharmaceutical research and development, covering work on approximately 100 projects across all phases of the research process, many of which addressed unmet medical needs. Those investments increased to $7.2 billion in 2025, a year in which more than 70 million people globally benefitted from therapies developed by the Boehringer family of companies.[1]

5. One of the medications that has resulted from Boehringer's investments is empagliflozin—a medication used to lower blood sugar in adults with type 2 diabetes and to reduce the risk of cardiovascular death in those adults and adults with heart failure—which Boehringer manufactures and sells under the trade name Jardiance®.

[1] *See* Boehringer Ingelheim, *Boehringer Ingelheim delivers on late-stage pipeline with two key launches, grows sales by 7.3% in a successful* 2025 (Mar. 25, 2026), https://www.boehringer-ingelheim.com/us/media/press-releases/boehringer-ingelheim-reports-2025-growth-and-pipeline-progress.

6. Boehringer markets Jardiance® in the United States under a license for the patents claiming empagliflozin and its uses. Boehringer owns title to its Jardiance® products (i.e., the physical, retail-packaged tablets) and exercises its rights to possess, sell, and otherwise dispose of those products, including by determining when and on what terms to make them available to others.

7. Another medication Boehringer has developed is nintedanib esylate, a groundbreaking treatment for idiopathic pulmonary fibrosis and other lung diseases. Boehringer manufactures and sells nintedanib esylate under the trade name Ofev®.

8. Boehringer markets Ofev® in the United States pursuant to patents owned by Boehringer-affiliated entities. Boehringer owns title to its Ofev® products (i.e., the physical, retail-packaged capsules) and exercises its rights to possess, sell, and otherwise dispose of those products, including by determining when and on what terms to make them available to others.

9. Boehringer also developed linagliptin tablets, which are used to lower blood sugar in adults with type 2 diabetes. Boehringer manufactures and sells the tablets under the name Tradjenta®.

10. Boehringer markets Tradjenta® in the United States pursuant to patents owned by Boehringer-affiliated entities. Boehringer owns title to its Tradjenta® products (i.e., the physical, retail-packaged tablets) and exercises its rights to possess, sell, and otherwise dispose of those products, including by determining when and on what terms to make them available to others.

**Boehringer's Participation in Medicare, Medicaid, and 340B**

11. Boehringer makes Jardiance®, Ofev®, Tradjenta®, and all its other drugs—numbering more than 20—available through Medicaid and Medicare.

12. Through the Medicaid program, Boehringer provides significant rebates, often above federally mandated amounts, on its products to states that provide health coverage to low-income individuals and families.

13. Through the Medicare program, Boehringer makes its drugs available to people aged 65 and older and certain individuals with disabilities. The Medicare program is divided into multiple parts that provide various benefits to beneficiaries. As relevant to Jardiance®, Ofev®, and Tradjenta®, under Medicare Part D, the Centers for Medicare and Medicaid Services ("CMS") partially reimburses private insurance plans that provide coverage for self-administered prescription drugs to Medicare beneficiaries. *See* 42 U.S.C. § 1395w-101 *et seq.*

14. Together, Medicare and Medicaid account for nearly half of the total U.S. prescription drug market.[2]

15. To receive coverage for drugs under the Medicare Part B and Medicaid programs, federal law requires that manufacturers participate in the 340B Program. *See* 42 U.S.C. § 1396r-8(a)(1). Boehringer thus participates in the 340B Program, and Jardiance®, Ofev®, and Tradjenta® are drugs that are subject to the 340B Program. The 340B Program is administered by the Health Resources and Services Administration ("HRSA").

16. Under the 340B Program, pharmaceutical manufacturers must offer drugs at a reduced price—referred to as the "340B ceiling price"—to a statutorily defined set of healthcare providers, known as "covered entities." In turn, covered entities dispense drugs acquired at a reduced cost to patients while often billing the patients' insurance for the full, non-discounted cost

[2] HHS Office of the Inspector General, *Drug Spending* (Dec. 16, 2024), https://oig.hhs.gov/reports/featured/drug-spending/.

of the product. Covered entities retain the difference between the reimbursement paid by the patient's insurer and the lower acquisition cost obtained through the 340B Program.

17. While the 340B statute requires that manufacturers offer discounts to covered entities, it permits manufacturers to effectuate their 340B "offers" in at least two ways: through a "discount" or a "rebate." 42 U.S.C. § 256b(a)(1).

18. The initial purpose of the 340B Program—as described in a report by the House Energy and Commerce Committee—was to enable covered entities "to stretch limited federal resources as far as possible, reaching more eligible patients and providing more comprehensive services."[3] But the 340B statute does not require covered entities to use the funds generated through the 340B Program to provide additional free or reduced-cost care to patients. In fact, there are virtually no limitations on how covered entities can use the resources obtained through the 340B Program. As a result, a 2023 study found that 69% of the disproportionate share hospitals that participate in the 340B Program provided less charity care than the national average for all hospitals.[4]

19. Since its creation, the 340B Program has evolved from a small program intended to help a limited number of safety net health providers into the second-largest prescription drug program in the country, now surpassed only by the prescription drug benefit in Medicare Part D. When the program first launched in 1992, fewer than 100 hospitals enrolled, and by 2009, the 340B Program accounted for $4 billion in total annual sales. Since then, however, the growth has

[3] House Energy and Commerce Committee. (1992). Report to Accompany H.R. 2980, The Medicaid Drug Rebate Amendments of 1992.

[4] Alliance for Integrity & Reform, *Charity Care at 340B Hospitals is on a Downward Trend* (Oct 2023), https://340breform.org/wp-content/uploads/2024/03/2023-Charity-Care-Report-Final-1.pdf.

exploded. In 2025, the 340B Program accounted for a staggering $100 billion in total sales.[5] 2025 marks the fourth consecutive year that total 340B purchases grew by at least 20% over the previous year.[6]

20. This massive growth has been driven in part by an increase in duplicate discounts (*i.e.*, seeking both a 340B discount and another discount) and diversion of 340B drugs (*i.e.*, transferring or selling a 340B-priced drug to individuals who are not patients of the covered entity). The scope of this problem is significant: for example, HRSA issued "a total of 1,536 findings to address covered entity noncompliance … from fiscal years 2012 through 2019."[7] IQVIA, an industry data provider, estimates that duplicate discounts accounted for one-quarter of total 340B drug sales in 2021, representing approximately $20-25 billion in total.[8] These duplicate discounts impose significant costs on pharmaceutical manufacturers. But these costs are not limited to manufacturers: a recent study found that 8% of the total increase in employer-based health insurance premiums can be attributed to increased 340B costs.[9]

---

[5] *2025 340B Covered Entity Purchases*, HRSA, https://www.hrsa.gov/opa/updates/2025-340b-covered-entity-purchases.

[6] William Newton, *Total 340B Purchases Reach $100 Billion in 2025*, 340B Report (July 14, 2026), https://340breport.com/total-340b-purchases-reach-100-billion-in-2025/.

[7] *See* U.S. Gov't Accountability Off., *GAO-21-107, Drug Pricing Program: HHS Uses Multiple Mechanisms to Help Ensure Compliance with 340B Requirements* 13 (Dec. 14, 2020)

[8] IQVIA, *Uncover the Invisible Impacts of 340B Discounts* (Dec. 20, 2021) https://www.iqvia.com/locations/united-states/blogs/2021/12/uncover-the-invisible-impacts-of-340b-discounts.

[9] Neal Masia et al., *The 340B Drug Purchasing Program and Commercial Insurance Premiums* (May 2025) available at https://www.npcnow.org/sites/default/files/2025-05/340B%20and%20Employer%20Costs%20White%20Paper.pdf.

**Boehringer's Need for the Rebate Model Pilot**

21. Under the Inflation Reduction Act ("IRA") Medicare Drug Price Negotiation Program (the "IRA Program"), CMS selects a certain number of drugs each year and imposes a "maximum fair price" ("MFP") for each selected product.

22. Once a drug is selected for the IRA Program, the drug's manufacturer must sign a form agreement written by CMS and submit a data package to the Agency including information about the selected drug, such as costs related to research and development, production, and commercialization. 42 U.S.C. § 1320f-3(e). On the basis of this and other information, CMS develops and transmits an initial MFP offer to the manufacturer. *Id.* § 1320f-3(b)(2)(B). By statute, CMS's offer may not exceed a statutory ceiling.

23. On August 29, 2023, CMS selected Jardiance® for inclusion in the IRA Program, making Jardiance® subject to the CMS-dictated "maximum fair price" beginning on January 1, 2026.

24. On January 17, 2025, CMS selected Ofev® and Tradjenta® for inclusion in the IRA Program, making these drugs subject to CMS-dictated "maximum fair price[s]" beginning on January 1, 2027.

25. For Medicare Part D drugs like Jardiance®, Ofev®, and Tradjenta®, the MFP must be at least 25% to 60% below the drug's market-based price. *Id.* § 1320f-3(c). The statute additionally directs CMS to "aim[] to achieve the lowest [MFP] for each selected drug." *Id.* § 1320f-3(b)(1).

26. If a manufacturer fails to sign CMS's IRA Program agreement—or an addendum to the agreement memorializing the MFP established by CMS—the manufacturer is subject to a significant excise tax on all U.S. sales of the selected drug. *See* 26 U.S.C. § 5000D. The tax is initially calculated as 186% of the drug's sale price but increases to 1,900% after nine months. *See*

*id.* § 5000D(a), (b)(1), (d). A manufacturer's only other option for avoiding the tax in this scenario is to withdraw *all* of its products (not just the selected drug) from Medicare and Medicaid entirely. *Id.* § 5000D(c). Since Medicare and Medicaid combined account for such a significant portion of the prescription drug market, total withdrawal is not economically feasible for Boehringer.

27. In August 2024, roughly one year after CMS selected Jardiance® for inclusion in the IRA Program, CMS announced that the MFP for Jardiance® would be $197 for a 30-day supply.[10] That price reflects a 66% discount off Jardiance®'s list price.[11]

28. In November 2025, CMS announced that the MFP for Ofev® would be $6,350 for a 30-day supply, which reflects a 50% discount off Ofev®'s list price.[12]

29. In that same announcement, CMS set the MFP for Tradjenta® at $78 for a 30-day supply, which reflects an 84% discount off Tradjenta®'s list price.[13]

30. The MFP for Jardiance® (and all other drugs selected in August 2023 for the IRA Program's first year) took effect on January 1, 2026. *See* 42 U.S.C. § 1320f(b). Starting on that date, Boehringer was required by statute to "provide access" to Jardiance® to Medicare beneficiaries at the MFP. 42 U.S.C. § 1320f-2(a)(1). If Boehringer fails to comply with that access requirement, it is subject to a civil monetary penalty equal to ten times the difference between the MFP and the price actually charged, multiplied by the number of units sold at the higher price. *Id.* § 1320f-6(a).

---

[10] CMS, *Medicare Drug Price Negotiation Program: Negotiated Prices for Initial Price Applicability Year 2026* (Aug. 2024), https://www.cms.gov/files/document/fact-sheet-negotiated-prices-initial-price-applicability-year-2026.pdf.

[11] *Id.*

[12] CMS, *Medicare Drug Price Negotiation Program: Negotiated Prices for Initial Price Applicability Year 2027* (Nov. 2025), https://www.cms.gov/files/document/fact-sheet-negotiated-prices-ipay-2027.pdf.

[13] *Id.*

31. The MFPs for Ofev® and Tradjenta® will take effect on January 1, 2027.[14] Starting on that date, the same requirements and potential penalties that apply to Boehringer's sales of Jardiance® will also govern the sales of Ofev® and Tradjenta®.

32. Each of these three drugs is subject to both the 340B Program and the IRA Program. The IRA includes a special pricing provision that governs drugs subject to both of those programs. Under this provision, the manufacturer of a drug subject to both the 340B Program and the IRA Program must provide the drug at the lower of the 340B ceiling price or the MFP but cannot be required to provide the discount under the 340B Program and the discount under the IRA Program. *See* 42 U.S.C. § 1320f-2(d). Accordingly, as CMS has explained, the IRA requires manufacturers to "ensur[e] compliance with the statutory requirement to avoid duplication of the MFP and the 340B ceiling price for a selected drug."[15]

33. Moreover, the MFPs established under the IRA Program apply only to Medicare beneficiaries. Patients covered by Medicaid or private insurers, or who are uninsured, are not eligible to receive drugs at the highly discounted MFP. By contrast, covered entities can receive the 340B ceiling price for any patient regardless of the patient's health insurer. As a practical matter, that means that manufacturers must provide the lower of the MFP or 340B ceiling price only to the subset of patients of a 340B covered entity who are covered by Medicare. Manufacturers must also offer the 340B ceiling price to a covered entity for all its patients who are not Medicare beneficiaries.

---

[14] *Id.*

[15] CMS, *Medicare Drug Price Negotiation Program: Revised Guidance, Implementation of Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability Year 2026* (June 30, 2023) at 26, https://www.cms.gov/files/document/revised-medicare-drug-price-negotiation-program-guidance-june-2023.pdf.

34. Boehringer sells its drugs to wholesalers in bulk quantities. When Boehringer makes these sales, it is impossible to know which providers will dispense the drugs, which patients will receive them, and who will ultimately pay for the drug. Thus, Boehringer generally cannot know in advance which pricing rules will apply to each unit of product it sells.

35. Manufacturers generally comply with their pricing obligations under the IRA Program (and contracts in the private market) by following a two-step process. First, the manufacturer charges a uniform price—known as wholesale acquisition cost ("WAC") or list price—when it sells its drugs to wholesalers. Second, the manufacturer pays after-the-fact rebates to pharmacies and other dispensing entities that cause the final price, net of rebates, to equal the legally required price. For example, if the WAC for a drug subject to the IRA Program were $100, and the MFP for that drug were $40, the manufacturer would pay a $60 rebate to the dispensing pharmacy.[16] This two-step approach allows manufacturers to provide the correct price to a wide range of dispensing entities, despite not knowing who those entities will be when the drug products first enter the stream of commerce.

36. To provide access to MFPs set under the IRA Program, CMS has developed a "Medicare Transaction Facilitator" ("MTF") that will share data with manufacturers about claims for products subject to an MFP from dispensing entities (e.g., pharmacies). In return, the MTF can facilitate rebate payments from the manufacturers to the dispensing entities. In general, once a covered entity has dispensed a drug to a Medicare beneficiary, the MTF will send information

[16] In the context of the IRA Program, CMS describes the payments from manufacturers to dispensing entities as a "refund," but the payments are retrospective and functionally indistinguishable from a rebate. *See generally,* CMS, *Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability Year 2028 and Manufacturer Effectuation of the Maximum Fair Price in 2026, 2027, and 2028* (Sep. 30, 2025), https://www.cms.gov/files/document/ipay-2028-final-guidance.pdf.

about the claim to the manufacturer. Once the manufacturer ensures that the claim is valid, it is required to provide a rebate to the dispensing entity equal to the difference between the acquisition cost of the drug and the MFP.[17] In most cases, Boehringer will provide a rebate equal to the difference between the drug's WAC and the drug's MFP. Once the manufacturer has provided this rebate to the dispensing entity, it has met its statutory obligation to provide access to the MFP.

37. A key challenge for manufacturers providing access to the MFP is that neither manufacturers nor covered entities know which patient is a Medicare beneficiary eligible for the MFP until *after* a claim has been processed. While covered entities use various distribution models to obtain drugs at the 340B ceiling price, the acquisition cost of a covered entity is typically not WAC but rather the much lower 340B ceiling price. However, when a dispensing entity submits a claim to the MTF for a rebate, there is generally no way for either the dispensing entity or the manufacturer to know that the claim involves a drug initially purchased at the 340B ceiling price. But to meet its statutory obligation to provide access to the MFP, the manufacturer must still provide a rebate to the dispensing entity equal to the difference between WAC and MFP. Since the covered entity, working through the dispensing entity, acquired the drug at a price below WAC, it would benefit from a duplicate discount in this scenario.

38. For example, if a product's WAC is $100, its MFP is $40, and its 340B ceiling price is $30, the dispensing entity may submit a claim for an MFP refund and obtain $60 from the manufacturer. But since the manufacturer sold the dispensed drug through its wholesaler to the covered entity for $30 (the 340B ceiling price), the net result is that the manufacturer has *lost* $30 in the transaction (i.e., the $60 rebate paid to the dispensing entity minus the $30 acquisition cost

[17] *See id.* at 215.

of the covered entity). In other words, in this scenario, the manufacturer has received a *negative price* by paying a duplicate discount.

39. This duplicate discount would occur because determining which claims are subject to the 340B price is a process that the covered entity—which often contracts with an independent dispensing entity—determines after the drug has been dispensed. As a result, there is no way for manufacturers to prevent duplicate discounts between the 340B price and the MFP across all claims submitted to the MTF.

40. The most accurate way to avoid these duplicate discounts is to utilize the provision in the 340B statute authorizing manufacturers to offer the 340B ceiling price through a retrospective rebate (the same mechanism used to effectuate the MFP under the IRA Program). Accordingly, a rebate model is the only mechanism currently available to systematically prevent duplicate 340B and IRA discounts.

41. In the absence of a 340B rebate model, manufacturers do not have adequate data to identify those duplicate discounts. Accordingly, Boehringer has urged HRSA to authorize a 340B rebate model, which will allow covered entities to obtain the 340B ceiling price for covered drugs only if they provide manufacturers with sufficient information to identify and prevent duplicate discounts.

42. HRSA announced the first rebate model pilot program in the Federal Register on August 1, 2025, observing that manufacturers sought such a rebate model "primarily to address 340B and Maximum Fair Price (MFP) deduplication." 90 Fed. Reg. 36,163, 36,163 (Aug. 1, 2025). Boehringer timely submitted an application to participate in the pilot program, and HRSA, which administers the 340B Program, approved Boehringer's application on October 30, 2025.

43. Boehringer intended to implement the rebate model pilot program beginning on January 1, 2026, as authorized by HRSA. To prepare for implementation of the rebate model, Boehringer made significant organizational changes including changing IT infrastructure, contracting with additional vendors, developing new banking-payment processes, and adding additional headcount. These efforts cost Boehringer millions of dollars.

44. Boehringer also worked closely with HRSA and Beacon Channel Management to develop and implement a rebate model. In particular, Boehringer and Beacon Channel Management developed processes to simplify the data submission process for covered entities and to ensure prompt payment of any validated claims within 10 days—meaning that covered entities will promptly receive the full benefit of the 340B Program's discounts. Boehringer also worked closely with HRSA to make targeted adjustments to business rules to address concerns from covered entities, including solutions for unreplenished dispensed product during the initial transition period. To fully plan for these anticipated changes, Boehringer also developed a robust compliance framework to ensure compliance with all current HRSA and CMS requirements relating to the 340B rebate model and MFP effectuation.

45. Boehringer informed CMS of its intent to use the rebate model pilot program to de-duplicate the MFP and 340B discounts. Boehringer also shared information with covered entities about the functioning of its proposed rebate model pilot on October 31, 2025 by physical mailing and email notification when the covered entity's email address was available—well in advance of the January 1, 2026 effective date.

46. On December 1, 2025, several medical centers and hospital associations sued to stop the rebate model pilot program. On December 29, 2025, before the first MFPs took effect, the district court issued a preliminary injunction that blocked the rebate model from taking effect.

47. Following the district court's December 2025 injunction, Boehringer was forced to rush to implement new, less effective 340B/MFP deduplication strategies. In other words, Boehringer has been obligated to develop an alternative process to try to identify MFP refund claims that it "reasonably believes" involved drugs purchased subject to the 340B Program.[18] However, due to the structure of the 340B Program, Boehringer does not have sufficient information to identify whether many specific MFP claims overlap with 340B claims. Boehringer's current process is therefore nowhere near as effective as a 340B Rebate Model, and Boehringer is losing an average of $3.0 million *each week* to duplicate discounts as a result. Without access to a 340B Rebate Model, Boehringer stands to suffer even greater financial losses when the MFPs for Ofev® and Tradjenta® take effect on January 1, 2027.

48. In February 2026, HRSA issued a Request for Information ("RFI") to gather more information about the potential use of rebates to provide the 340B price. *See* 91 Fed. Reg. 7,287 (Feb. 17, 2026).

49. Boehringer submitted a comment in response to HRSA's RFI, explaining that, without a rebate model, it is often providing both the 340B ceiling price and an MFP refund, and may be required to sell drug products at a loss. *See* Boehringer Ingelheim Comment Letter, HRSA RFI 340B Rebate Model Pilot Program, No. HRSA-2026-0001-2323 (Apr. 20, 2026).

50. On August 3, 2026, HRSA issued a Notice Regarding 340B Rebate Model Pilot Program, 91 Fed. Reg. 48,883 (Aug. 3, 2026), announcing the availability of a rebate model qualifying manufacturers to provide the 340B price for drugs subject to IRA Program MFPs in 2027.

---

[18] *See* CMS, IPAY 2027 Final Guidance 284, https://www.cms.gov/files/document/medicare-drug-price-negotiation-final-guidance-ipay-2027-and-manufacturer-effectuation-mfp-2026-2027.pdf.

51. In the absence of a rebate model, Boehringer is not aware of a mechanism capable of accurately and systematically deduplicating the discounts provided under the IRA and 340B programs.[19] Thus, if Boehringer cannot proceed with the 340B Rebate Model Pilot Program, Boehringer will continue to have no viable alternative to implement the IRA's statutory prohibition on duplicate discounts. Although the Plaintiffs have proposed other approaches, those approaches would not solve the problem of duplicate discounts.

52. First, providing access to the MFP *prospectively* to every dispensing entity in the country, as the Plaintiffs have suggested, is administratively impossible and would expand the IRA Program well beyond its limits. Since only Medicare beneficiaries are eligible for the MFP, manufacturers would need to scrutinize every claim for every transaction in which their eligible products are dispensed to determine which claims do not involve Medicare beneficiaries. For those claims, manufacturers would then need to initiate after-the-fact chargebacks to recoup the difference between the MFP and WAC. This system would impose significant burdens on manufacturers, covered entities, and every other dispensing entity that does not participate in the 340B Program.

53. Second, there is no mandatory claims clearinghouse that contains the information necessary to avoid duplicate discounts between the 340B ceiling price and the MFP. While CMS did create a clearinghouse for Medicare Part D 340B claims, it did so for voluntary submissions

[19] In a similar vein, a 340B rebate model could help address other 340B Program integrity issues including duplicate discounts with the Medicaid program and drug diversion. Current methods for addressing duplicate discounts between the Medicaid and 340B Program, including covered entity audits and administrative dispute resolution, are insufficient to fully address the scope of the duplicate discount problem. Despite a 340B rebate model's potential to address this concern, HRSA's notice announcing the 340B rebate model pilot expressly prohibited participating manufacturers from denying claims based on "compliance concerns with diversion or Medicaid duplicate discounts." 91 Fed. Reg. 48883, 48903 (Aug. 3, 2026). While Boehringer will comply with this requirement, we have urged HRSA to reconsider this policy.

only. 90 Fed. Reg. 49,266, 49,932 (Nov. 5, 2025). Here again, manufacturers would not have sufficient information to prevent duplicate discounts for *all* Medicare claims. Moreover, HRSA itself has determined that a claims clearinghouse would not be sufficient to fully address the nonduplication of the MFP and 340B price. In the Federal Register notice announcing the revised 340B Rebate Model, HRSA remarked that a claims clearinghouse "would preserve the current dynamic in which the discount is provided upfront and compliance verification occurs only after the fact." 91 Fed. Reg. 48,883, 48,900 (Aug. 3, 2026). By contrast, HRSA concluded that a 340B Rebate Model "incentivizes covered entity compliance as a prerequisite to receiving 340B discounts," directly addressing the nonduplication of the MFP and 340B price. *Id.*

54. Boehringer has suffered significant economic harm due to duplicate discounts in the absence of a rebate model and will suffer significant additional harm if the new rebate model pilot program is enjoined, as two additional drugs, Ofev® and Tradjenta®, are subject to both the 340B and MFP discounts. Berkeley Research Group ("BRG") estimated that manufacturers will lose $4 billion in duplicate 340B and MFP discounts in 2026 alone absent the rebate pilot program.[20]

55. Many covered entities and their contract pharmacies are not required to provide (and in fact do not provide) Boehringer the relevant claims data. Indeed, Boehringer receives claims data for only a small fraction of 340B transactions. When Boehringer does receive claims data, it can directly match and deduplicate MFP claims and 340B claims.

[20] BRG, *Implications for Duplication with the 340B Channel* (Oct. 2024) at 2, https://media.thinkbrg.com/wpcontent/uploads/2024/10/23161214/BRG-Implications-for-Duplication-with-_the-340B-Channel-2024.pdf.

56. Only 1% of all MFP refund claims include 340B claims data submitted by covered entities. With respect to voluntary claims modifiers (a notation that dispensing entities can voluntarily include on a claim denoting that the product was dispensed to a 340B patient), an analysis from BRG concluded that modifiers were included in less than 0.5% of all MFP refund claims.

57. The claims data that Boehringer does receive comes from contract pharmacies and certain in-house pharmacies in states that do not prohibit claims-data collection and from the rare covered entities that voluntarily submit data to Boehringer (e.g., through voluntary claims modifiers). Although manufacturers of drugs covered by the 340B program are authorized by federal law to establish claims data requirements, *see Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023), several state laws have purported to restrict those federal rights, and many of those state laws remain in effect.

58. For claims submitted by covered entities who do not supply claims data, Boehringer employs a second approach: a "chargeback-to-sales" ("CSR") ratio. Under this approach, Boehringer calculates a ratio equivalent to the proportion of the covered entity's total purchases made at the 340B price over the covered entity's total purchases for the preceding 12 months. Boehringer then pays MFP refunds to dispensing entities at least proportionate to their unique ratio. For example, if 90% of a covered entity's drug purchases were made at the 340B price over the preceding 12-month period, Boehringer would assign a CSR ratio of 9:1. Once the dispensing entity associated with the covered entity submits MFP refund claims, Boehringer will provide the MFP refund for the first claim and not provide the MFP refund for the subsequent nine claims, repeating this process to maintain the 9:1 ratio.

59. Although these methods help address duplicate 340B/MFP discounts, they are no replacement for direct identification of specific 340B claims. In particular, Boehringer has no way of identifying whether a drug dispensed by a covered entity that does *not* share claims data was dispensed to a 340B patient. Due to these discrepancies, Boehringer is paying many duplicate discounts. According to BRG, across all drugs selected for the first year of the IRA Program, manufacturers have identified roughly 6.6% of MFP refund claims as duplicative with 340B discounts compared to roughly 10.6% of sales that are made at the 340B price for these products. And even though these imperfect screening measures result in the payment of vast duplicate discounts, covered entities have nevertheless complained about them: Boehringer has received 18,793 inquiries and 243 complaints from dispensing entities alleging that Boehringer has failed to pay the MFP refund due to the company's deduplication methodologies.

60. Because Boehringer's deduplication methodologies cannot accurately identify all duplicate discount requests, the company is effectively required to provide duplicate MFP and 340B discounts. Boehringer faces a massive, and growing, set of financial losses that is actively harming Boehringer's business.

61. Every day, thousands of Medicare beneficiaries are dispensed Jardiance®. Among the ten drugs selected for the IRA Program for MFPs beginning in 2026, Jardiance® had the second highest utilization among Medicare beneficiaries.[21] With this utilization comes a commensurate amount of MFP refund claims, further increasing the potential for duplicate 340B and MFP discounts. As a result, since the MFP for Jardiance® took effect on January 1 and until a 340B

---

[21] *See* CMS, *Fact Sheet: Medicare Drug Price Negotiation Program: Selected Drugs for Initial Price Applicability Year 2026* (Aug. 2023) (noting that 1,573,000 Medicare Part D enrollees used the drug from June 2022-May 2023).

Rebate Model is implemented, Boehringer is losing an average of $3.0 million every week to duplicate discounts.

62. There is no reasonable method for Boehringer to retrospectively address the duplicate discounts that are currently accruing. For certain MFP refund claims, Boehringer will never receive the 340B claims data necessary to confirm whether an MFP refund should indeed have been provided. Even if the new 340B Rebate Model takes effect on January 1, 2027 as intended, covered entities will not be required to retrospectively submit 340B claims data for the vast majority of dispensing transactions that have occurred since January 1, 2026. As a result, Boehringer will have no way to retroactively remedy the duplicate discounts that the company has paid to date. Thus, as a direct result of the lack of a 340B Rebate Model for 2026, Boehringer has had to incur staggering (and growing) financial losses.

63. Because Ofev® and Tradjenta® will be subject to MFPs as of January 1, 2027, the harm to Boehringer will only continue to grow if the new 340B Rebate Model cannot take effect on January 1, 2027 as planned. That current and future harm to Boehringer is particularly acute because Boehringer will have three IRA drugs as of 2027.

**<u>The Rebate Model Pilot Will Not Harm 340B Covered Entities</u>**

64. The rebate model pilot program has been carefully designed to ensure that covered entities will not be harmed.

65. First, the pilot program is limited to a small subset of drug products, for the purpose of assessing the benefits and drawbacks of the rebate model. Out of thousands of drug products and dozens of drug manufacturers covered by the 340B Program, only the 25 products subject to IRA Program MFPs in 2027 are eligible for the rebate model pilot program. Of these 25 products, CMS has announced that four selected drugs—Entresto, Stelara, Xarelto, and the insulin aspart

products (NovoLog/Fiasp)—are exiting the IRA Program on January 1, 2027, rendering these products ineligible for the rebate model pilot program.

66. Second, I understand that the narrow set of data that is required to be submitted by covered entities is limited, industry-standard data that covered entities maintain in the ordinary course of business. HRSA approved limited data fields for covered entity submissions, including information about the distribution of the drug product (date of service, prescription number, quantity, etc.), the provider (identifying the physician and service provider), and insurance information.[22] I understand that HRSA already required covered entities to maintain accurate records of this information and that HRSA or drug manufacturers could audit those records.[23] Furthermore, HRSA has required that drug manufacturers provide technical support and customer service to covered entities regarding the rebate platform, and manufacturers must bear the administrative costs of "the IT platform used for data submission."[24]

67. Moreover, the program provides robust protections for any claims data that is submitted. The pilot program requires that the software platform used to gather this limited data incorporate controls to ensure that the data are handled and stored appropriately.[25] In particular, the software platform must have "mechanisms in place to protect patient identifying information," and must also maintain the data in a manner that complies with all applicable privacy and data security laws.[26] I understand that the software operator that will process rebates received an Expert Determination confirming that it is compliant with HIPAA and does not collect or maintain

---

[22] 91 Fed. Reg. 48,903 (Aug. 3, 2026).

[23] HRSA, *Program Integrity* (Sept. 2025), https://www.hrsa.gov/opa/program-integrity.

[24] *See* 91 Fed. Reg. 48,902 (Aug. 3, 2026).

[25] *See id.*

[26] *Id.* at 48,897.

identifiable protected health information.[27] Boehringer's policy is compliant with these requirements and implements HRSA's guardrails.

68. Third, rebates must be paid promptly under the pilot: Boehringer has committed to paying rebates within 10 days of submission of a complete rebate request. Thus, covered entities that promptly submit rebate requests will not be required to "float" any funds. Under standard wholesaler payment terms, covered entities must generally pay for drug purchases within 30 days of purchase. As a result, covered entities that submit rebate claims promptly will obtain a rebate that allows them to net the 340B price on the sale well before the date on which their invoice is due to the wholesaler on the original purchase. In other words, although a covered entity will initially place an order at a standard commercial price under the 340B rebate model, the covered entity will not actually have to pay the non-340B price if it promptly submits a rebate claim, because it will receive the rebate before it needs to pay the invoice.

69. Fourth, the pilot program includes further safeguards to minimize the disruption to covered entities. For instance, manufacturers must provide 60 days' notice for covered entities before implementation of a rebate model. Boehringer issued this notice to covered entities on October 2, 2026. Furthermore, Boehringer, like other drug manufacturers, will allow covered entities to continue ordering the drugs through their existing distribution mechanisms, which will prevent delays or disruptions in the flow of drugs to covered entities and patients.[28]

70. Fifth, HRSA has stated that it will closely monitor the pilot program to understand how a rebate model system functions in practice and to ensure that participants comply with the

---

[27] Beacon Channel Management, *Rebate Model Frequently Asked Questions*, https://support.beaconchannelmanagement.com/en/articles/9589827-rebate-model-frequently-asked-questions.

[28] *See* 91 Fed. Reg. 48,891 (Aug. 3, 2026).

340B Program's requirements.[29] HRSA's Office of Pharmacy Affairs ("OPA") has selected manufacturers to participate in the pilot and will monitor its execution—for example by requiring these manufacturers, including Boehringer, to submit regular data to OPA. OPA will also solicit feedback from covered entities, provide a mechanism for stakeholders to submit comments, and facilitate the provision of "real-time reconciliation reports" for covered entities to stay apprised of the rebate status of submitted claims in real time.[30] OPA has reserved the right to terminate any drug manufacturer from the pilot program if it fails to meet the program's requirements, such as by failing to provide rebates in a timely manner.[31]

71. Further, many covered entities already voluntarily use a model similar to the rebate model in the 340B context. That model is commonly referred to as a "virtual credit model." Under this model, covered entities (or their contract pharmacies) purchase all medications at commercial prices (such as WAC) and maintain a single inventory, without differentiating between 340B and non-340B products. The covered entity dispenses medications in the ordinary course and then identifies (after the fact) transactions that it maintains are eligible for 340B pricing. The covered entity sends that data—usually through a third-party administrator—to its distributor, which attempts to match the drug transactions identified as 340B eligible with prior purchases of the same NDC and quantity. When the distributor successfully makes a match, it (i) "credit[s] the [covered entity's] non-340B commercial account for the difference" between the commercial and 340B price, and (ii) generates "a non-inventory purchase on the 340B covered entity bill-to/ship-to

---

[29] *See* 91 Fed. Reg. 48,895 (Aug. 3, 2026) ("HRSA intends to use this information to monitor denial patterns and assess whether rebate determinations are applied in a consistent and appropriate manner across participating manufacturers and will remove manufacturers from the Pilot where appropriate.").

[30] *See Id.* at 48,902.

[31] *Id.* at 48,895.

account."[32] Thus, rather than replenishing their inventories by having the distributor "physically shi[p]" drugs earmarked for 340B use, covered entities and contract pharmacies buy replacement drugs at the commercial price and then obtain the 340B price through a "financial credit" applied after the fact.[33] For example, when a covered entity enrolled in a virtual credit model program purchases a drug initially for $100 and later dispenses the drug to a 340B-eligible patient, "$100 will be credited to" the covered entity's "non-340B account" by the distributor "and then the entity will be invoiced for the 340B ceiling price … in [its] 340B account."[34]

72. The net effect of this virtual credit model is the same as a 340B rebate model: the covered entity orders drugs at commercial prices up front, then later receives the 340B price through a rebate after a third party validates the transaction. Court records and commercial literature show that covered entities have voluntarily participated in these virtual credit model programs for nearly a decade.[35] Indeed, PharmaForce stated in 2024 that "a lot" of its "customers . . . are using" the virtual credit model "successfully" and that many pharmacies now "require a

---

[32] AmerisourceBergen (now Cencora), Inventory Synchronization Program Guide, Doc. No. HS-110567, at 3, available at https://web.archive.org/web/20240426164057/https://www.amerisourcebergen.com/-/media/assets/amerisourcebergen/pdf/hgs-230633-isp-guide-12dec23-v2.pdf. PharmaForce, which offers a variety of 340B services for covered entities and pharmacies, has similarly identified the "adoption of credit-based replenishment models" as "a recent trend in 340B program" that "eliminates the need for physical inventory deliveries" and instead "us[es] a credit system within the pharmacy's retail account." PharmaForce, Credit-Based Replenishment: The Future of 340B? (accessed May 20, 2025), https://www.thepharmaforce.com/340b-credit-based-replenishment.aspx

[33] PharmaForce, Credit-Based Replenishment: The Future of 340B, at 5:52-6:12 (May 23, 2024), https://www.youtube.com/watch?v=T7yz-ZgjW2w ("PharmaForce Webinar").

[34] *Id.* at 5:25-5:38.

[35] See, e.g., Memorandum of Law in Support of Defendant's Motion to Dismiss, *Fruth, inc. v. Cardinal Health, Inc.*, No. 3:23-cv-801, ECF No. 15, at *3 (S.D.W. Va. filed Mar. 18, 2024) (describing a similar "virtual replenishment" program operated by Cardinal Health and referring to allegation that plaintiff "began using" -it "in March 2016"); PharmaForce Webinar, supra, at 24:20-24:32 (referring to Cardinal Health virtual credit model program).

credit-based replenishment model."[36] Likewise, Boehringer recently identified one covered entity that has shifted to making significant purchases at WAC and stated that it is doing so under a virtual credit model.

---

[36] *See* PharmaForce Webinar, supra, at 24:05-24:23.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14 day of October, 2026.

Christine G. Marsh
Christine G. Marsh
Senior Vice President, Value and Access
Boehringer Ingelheim Pharmaceuticals, Inc.