United States District Court
District of Maine

| | | |
|---|---|---|
| American Hospital Association, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 1:26-cv-00515-LEW |
| | ) | |
| Robert F. Kennedy, Jr., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**National Association of Community Health Centers and National PCA Hub**
***Amicus Curiae* Brief in Support of Plaintiffs'**
**Motion for Preliminary Injunction**

Peter J. Brann
Stacy O. Stitham
Brann & Isaacson
113 Lisbon St., P.O. Box 3070
Lewiston, ME  04243-3070
207.786.3566
pbrann@brannlaw.com
sstitham@brannlaw.com

*Attorneys for Amici Curiae*
*National Association of Community Health Centers and National PCA Hub*

## Table of Contents


Interests of *Amici Curiae* .......... 1

Introduction .......... 2

Argument .......... 4

I. HRSA Failed to Apply the "Each Type of Covered Entity" Standard to Health Centers. .. 4

II. The Statute Does Not Authorize HRSA to Condition 340B Pricing on the Surrender of Valuable Claims Data That Was Not Counted as a Cost or Privacy Violation. .......... 7

A. Manufacturers' Statutory Access to Covered-Entity Information is Limited to Audits for Diversion and Medicaid Duplicate Discounts. .......... 7

B. Commercial Claims Data is Valuable Property, and the Notice Never Counted its Transfer as a Cost or a Federal Privacy Violation. .......... 9

III. The Pilot Transfers the Statutory Authority to Ascertain a 340B Patient from the Covered Entity to the Manufacturer. .......... 12

A. The Statute Vests Patient Determination in the Covered Entity, Subject Only to an After-the-Fact Audit. .......... 12

B. The 45-day Forfeiture and the Approved Manufacturer "Validations" Delegate First-Instance Patient Ascertainment to Private Drugmakers. .......... 13

C. Reading the Statute to Permit Private Eligibility Determinations Would Raise a Serious Constitutional Question the Court Should Avoid. .......... 15

IV. HRSA Ignored the Features of Section 330 that Make a Rebate Model Unworkable for Health Centers. .......... 16

V. Health Centers and their Patients Will Suffer Irreparable Harm and the Equities and Public Interest Strongly Favor Relief.. .......... 19

Conclusion .......... 20

## Interests of *Amici Curiae*

*Amici Curiae* have a substantial and direct financial interest in the operation of the 340B Program that lies at the heart of this litigation. The National Association of Community Health Centers (NACHC) is the national membership organization for community health centers, also known as Federally Qualified Health Centers, which receive grants or look-alike designations under Section 330 of the Public Health Service Act, 42 U.S.C. § 254b (Section 330). Every health center is eligible to participate under the 340B Program as a "covered entity." 42 U.S.C. § 256b(a)(4)(A). NACHC submitted detailed comments to the Health Resources and Services Administration (HRSA) on the request for information that preceded the challenged Notice and on the related information-collection request, and those comments are part of the administrative record. NACHC Comment, HRSA-2026-0001-1965 (Apr. 20, 2026) (NACHC Comment); NACHC ICR Comment (July 15, 2026) (NACHC ICR Comment); *see* ECF 1 (Compl. ¶ 218). In brief, health centers are the largest primary care network in the country: in 2025, more than 32.7 million people received care at HRSA-funded health centers, at more than 17,000 locations, and health centers are required by statute to serve every patient regardless of ability to pay. HRSA, Impact of the Health Center Program; NACHC Comment at 1; 42 U.S.C. § 254b(k)(3)(G)(iii).

The National PCA Hub LLC (the Hub) is the national collaborative of the 52 State and Regional Primary Care Associations (PCAs), the organizations HRSA funds under the technical-assistance authority of 42 U.S.C. § 254b(l) to help health centers in every State and territory meet the requirements of Section 330. National PCA Hub, About, https://www.nationalpcahub.org/about. Together, PCAs serve every health center funded under Section 330. The Hub and its member PCAs are the organizations health centers will call when

the 340B Rebate Model Pilot Program (the Pilot) takes effect, and they have a direct interest in whether health centers can continue to operate pharmacies at all under the Pilot.

*Amici* submit this brief because this case has been briefed principally from the perspective of hospitals. Health centers are a different type of covered entity, with a different statutory charter, a different payer mix, and far thinner margins. The Pilot's burdens fall on them differently and, in important respects, more heavily. *Amici* also write to bring to the Court's attention two features of the Pilot that deserve further development: the Pilot's conscription of health centers' commercially insured and self-pay claims data, and its transfer of the statutory authority to ascertain who is a 340B "patient" from the covered entity to the manufacturer.

## Introduction

Congress created the 340B Program in 1992 so that safety-net providers could "stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384, pt. 2, at 12 (1992). For more than three decades the program has worked the same way for every covered entity: the manufacturer sells the drug at or below the ceiling price, up front. *Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 36–37 (1st Cir. 2026) (*AHA II*). The Pilot replaces that mechanism, effective January 1, 2027, for the drugs selected for Medicare price negotiation for 2026–27 with a system under which covered entities pay full wholesale acquisition cost (WAC), submit claim-level data on every dispensation of those drugs, which the Pilot covers "regardless of payer," to the manufacturer or its vendor, and then wait to see whether the manufacturer approves a rebate. *See* Notice Regarding 340B Rebate Model Pilot Program, 91 Fed. Reg. 48,883, 48,902–48,903 (Aug. 3, 2026) (Notice).

Plaintiffs have shown that the Notice is arbitrary and capricious for the reasons stated in their motion. *Amici* add four points specific to health centers and that further support interim relief.

*First*, HRSA concedes that in providing for 340B pricing through "any rebate or discount, as provided by the Secretary," it must use the mechanism that is "most effective and most efficient from the standpoint of each type of 'covered entity.'" 42 U.S.C. § 256b(a)(1); 91 Fed. Reg. at 48,884–85 (quoting H.R. Rep. No. 102-384, pt. 2, at 16). The Report's own illustration was that "[a] mechanism that is appropriate to one type of 'covered entity,' such as community health centers, may not be appropriate to another type." *Id.* at 48,885. HRSA never asked that question about health centers. The Notice's only type-specific discussion is a paragraph about interest costs that dismisses distinctions by covered-entity type as "potentially arbitrary," *id.* at 48,901, which is to say that HRSA rejected the standard it recited.

*Second*, the Pilot conditions 340B pricing on the covered entity's surrender, to drugmakers, valuable claims data for commercially insured, Medicare, and uninsured patients. Nothing in the statute gives manufacturers payer-level information; rather, they see only what a covered entity purchased. The 340B statute authorizes manufacturer audits only to police *diversion* and *Medicaid* duplicate discounts, 42 U.S.C. § 256b(a)(5)(A)–(C), and it "centralized enforcement in the government." *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 119 (2011) (quoting Brief for United States as Amicus Curiae 32). Commercial claims data are valuable assets in their own right, *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 558 (2011), and the Notice does not explain where HRSA found the authority to require their transfer, does not count their value as a Pilot cost, and does not consider the federal privacy violations of such transfers.

*Third*, the Pilot's 45-day submission deadline and the manufacturer "validations" that HRSA approved shift the statutory authority to ascertain who is a 340B patient from the covered entity from the statute to the drug manufacturer. 42 U.S.C. § 256b(a)(5)(B). The statute instead lets a manufacturer challenge a covered entity's patient determination only afterward through an

audit, and the statute imposes no time clock on the covered entity's exclusive determination authority in the first instance.

*Fourth*, the Pilot ignores the features of health centers that make a rebate model unworkable for them: the statutory sliding-fee obligation, Medicaid reimbursement at actual acquisition cost, physical inventory at thousands of small sites, and grant use rules that reserve health centers' non-grant funds for their statutorily authorized projects rather than for interest-free loans to drugmakers. The resulting harm is immediate, unrecoverable, and borne by the patients and communities for whom Section 330 makes health centers fiscally responsible.

Each of these arguments further supports Plaintiffs' allegations that HRSA relied on factors Congress did not authorize and ignored the factors Congress provided (Count I); failed to account for the Pilot's true costs (Count II); disregarded less burdensome alternatives that preserve the statutory structure (Count IV); and failed to consider important aspects of the problem that commenters placed squarely before it (Count VI); all in violation of 5 U.S.C. § 706(2)(A). In short, Plaintiffs have satisfied the four familiar requirements for obtaining a preliminary injunction. *See Doe v. Trump*, 157 F.4th 36, 46 (1st Cir. 2025).

## Argument

### I. HRSA Failed to Apply the "Each Type of Covered Entity" Standard to Health Centers.

The 340B statute requires each manufacturer to agree that the price it charges covered entities "does not exceed" the ceiling price, and it authorizes the Secretary to provide for that pricing through "rebate or discount." 42 U.S.C. § 256b(a)(1). The House Report explains that in choosing between those mechanisms "[t]he Committee expects that the Secretary of HHS, in developing these agreements, will use the mechanism that is the most effective and most efficient from the standpoint of each type of 'covered entity.'" H.R. Rep. No. 102-384, pt. 2, at 16. The

D.C. Circuit relied on that instruction in holding that the statute places “the Secretary, not the manufacturers, in the driver’s seat” and that “manufacturers may not unilaterally impose rebate models without Secretarial approval.” *Novartis Pharms. Corp. v. Kennedy*, 182 F.4th 1027, 1030, 1035–36 (D.C. Cir. 2026). HRSA itself quoted the standard in the Notice. 91 Fed. Reg. at 48,884–85. Plaintiffs are therefore right that this standard provides the “relevant factors” against which the Notice must be measured. Compl. ¶¶ 217–21; *see Motor Vehicle Mfrs. Ass’n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The standard is covered entity type-specific for a reason. The 340B statute covers roughly a dozen distinct categories of covered entities, *see* 42 U.S.C. § 256b(a)(4), and the only time HRSA has ever approved a rebate it did so for a single type, State AIDS Drug Assistance Programs, after notice and comment, and after finding that “[c]overed entities generally preferred a discount system” and that “the discount system is functioning successfully for most covered entities.” Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Rebate Option, 62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997); Notice Regarding Section 602 of the Veterans Health Care Act of 1992—Rebate Option, 63 Fed. Reg. 35,239 (June 29, 1998); *see also Novartis*, 182 F.4th at 1037 (noting that HRSA’s notice addressed “the unique needs of the State ADAP programs”).Health centers are a different type of covered entity, and the differences, including those enacted by Section 330, go to the heart of why a rebate mechanism cannot work for them.

The Notice contains *no* analysis of applying that covered entity type standard to health centers. Its one type-specific passage concerns financing costs: HRSA acknowledged “differences between the average hospital and the average FQHC,” but “determined that these differences . . . do not justify carving up the Pilot” because “clean delineations along the lines of covered entity type may not be a particularly robust measure of disproportionality of impact (rendering such a

distinction potentially arbitrary).” 91 Fed. Reg. at 48,901 (ellipsis added). That passage is a confession, not an analysis. An agency that declares type-based distinctions “potentially arbitrary” has announced that it will not apply the standard Congress enacted. It has “relied on factors which Congress has not intended it to consider” and “entirely failed to consider an important aspect of the problem.” *State Farm*, 463 U.S. at 43. That is the failure Plaintiffs plead in Count I and Count VI. Compl. ¶¶ 217–21, 280–86.

HRSA’s explanation for making the Pilot mandatory for every covered entity confirms this. HRSA rejected a voluntary or narrowed Pilot because “[c]overed entities vary significantly” and limiting participation would introduce “selection bias” into the data HRSA hopes to collect. 91 Fed. Reg. at 48,901. That is the logic of a study design, not of the statutory standard. Congress did not direct the Secretary to assemble a representative sample of covered entities; it directed the Secretary to choose the mechanism that works best for *each* type of covered entity. An agency may not substitute its own research objectives for the factors Congress specified. *See State Farm*, 463 U.S. at 43.

Nor can HRSA rescue the Notice by labeling the program a “pilot.” The First Circuit rejected that argument, holding that the government had forfeited any contention that “experimental” programs are subject to a lesser standard, and finding that the administrative record the government submitted was “threadbare.” *AHA II*, 164 F.4th at 33, 36. NACHC told HRSA, with record support, that what works for ADAPs “may not be appropriate for CHCs,” that a rebate model would make the health-center sliding-fee program, which is founded in Section 330, “operationally impossible,” and that HRSA should exempt health centers. NACHC Comment at 3, 20–21, 35. HRSA did not answer those objections under the covered-entity-type standard it had invoked, which is alone sufficient for Count I, and also supports Count VI. Compl. ¶¶ 280–86.

## II. The Statute Does Not Authorize HRSA to Condition 340B Pricing on the Surrender of Valuable Claims Data That Was Not Counted as a Cost or Privacy Violation.

### A. Manufacturers' Statutory Access to Covered-Entity Information is Limited to Audits for Diversion and Medicaid Duplicate Discounts.

The Pilot applies to every 340B sale of a covered drug "regardless of payer," and it requires covered entities to submit, for each dispensation, a set of claim-level data fields that include the pharmacy benefit identifiers ("RX BIN," "RX PCN," "RX Group") and the "Health Plan Name and Health Plan ID," with "CASH" entered for uninsured patients. 91 Fed. Reg. at 48,902–03. In other words, the Pilot requires each health center to tell each manufacturer which commercial plan, which Medicare plan, or no plan paid for each prescription.

Nothing in the 340B statute authorizes that requirement. The statute identifies two things a health center must not do: (1) resell or transfer a 340B drug to someone who is not its patient (the "diversion prohibition") and (2) request payment *from Medicaid* for a 340B discounted drug if a drugmaker is to pay a rebate to Medicaid for the same drug (the "duplicate discount prohibition"). 42 U.S.C. § 256b(a)(5)(A)–(B). And it gives manufacturers a tool to police them: an audit, conducted "in accordance with procedures established by the Secretary relating to the number, duration, and scope of audits," directed to "the records of the entity *that directly pertain to the entity's compliance* with" those two prohibitions. *Id.* § 256b(a)(5)(C) (emphasis added).Stated differently, an after-the-fact statutory authorization is not the same as a statutory authorization to condition access to 340B pricing on the pre-payment submission of claims data.

The Supreme Court has described the 340B scheme as a program "superintended by" HRSA and in which Congress deliberately "centralized enforcement in the government." *Astra*, 563 U.S. at 113, 119 (quoting Brief for United States as Amicus Curiae 32). The Pilot inverts *Astra*: it hands manufacturers a continuous, claim-level window into covered entities' non-Medicaid business that the statute never gave them, on the theory that the Secretary's authority to

provide for pricing by "rebate" carries with it the authority to attach whatever conditions a manufacturer finds useful, no matter how valuable or costly to the covered entity.

The D.C. Circuit has already rejected the proposition that the 340B statute grants manufacturers the authority sought here. Manufacturers may not "unilaterally impose on covered entities any pricing mechanism of their own design" because the statute "places the Secretary, not the manufacturers, in the driver's seat of this important program." *Novartis*, 182 F.4th at 1035. To be sure, *Novartis* recognized that a Secretary-authorized rebate model may involve submission of some claim-level data, but it did not state that the statute authorizes HRSA to require the full range of non-Medicaid claims data demanded here or to permit manufacturers to use that data for other purposes. *Id.* at 1038. Similarly, this Court recently denied a preliminary injunction against Maine's contract-pharmacy statute, finding that the manufacturers had not "demonstrated that claims data are necessary to obtain an audit," and "there are apparently no cases where a manufacturer requested but was denied an audit due to a lack of relevant claims data." *Pharm. Rsch. & Mfrs. of Am. v. Frey*, 2026 WL 184504, *14 (D. Me. Jan. 23, 2026).

HRSA's own treatment of statutory authority in the Notice is asymmetrical. When commenters proposed a neutral clearinghouse that would preserve upfront discounts that would have been tenable to sliding fee discounts under Section 330, HRSA rejected it in part because clearinghouses "are not explicitly authorized under the 340B statute." 91 Fed. Reg. at 48,900; Compl. ¶ 176. Yet nothing in the statute explicitly authorizes HRSA to require covered entities to deliver commercial, Medicare, and cash claims data to manufacturers either. HRSA cannot arbitrarily demand explicit authorization for the alternative it disfavors while assuming authorization for the mandate it prefers. And HRSA has itself insisted, in letters a district court upheld, that a manufacturer may not implement a rebate model where "the Secretary has not

provided for such rebate" because the statute "require[s] the approval of a rebate model." *Eli Lilly & Co. v. Kennedy*, 2025 WL 1423630, *6 (D.D.C. May 15, 2025). The Notice contains no reasoned judgment concerning the data but instead adopts wholesale data terms written by the private manufacturers themselves. *Cf.* Compl. ¶¶ 176, 262–69 (Count IV failure to consider alternatives).

Whether Section 256b(a)(1)'s reference to a "rebate" authorizes a government-mandated transfer of valuable commercial claims data without any regulatory authority is a statutory interpretation question the Court reviews independently. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394, 412 (2024). The Notice asserts that the Pilot "exercises the Secretary's express statutory authority to provide for 340B pricing via rebate," 91 Fed. Reg. at 48,889, but it never explains how that authority extends to data about patients and payers that fall outside the only compliance concerns the statute lets manufacturers police. NACHC raised the point directly: "HRSA lacks statutory authority to require the submission of commercial claims data," and commercial data "cannot be included under the rebate pilot." NACHC Comment at 28, 30. An agency that fails to address a comment going to the limits of its own authority has failed to consider "an important aspect of the problem." *State Farm*, 463 U.S. at 43. Here, "[n]o explanation could justify or make lawful the agency's" interpretation, and a remand for further explanation would be a "useless formality." *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1237–38 (D.C. Cir. 2026). That failure is pleaded in Count I, Compl. ¶¶ 214–27, and Count VI, *id.* ¶¶ 280–86.

### B. Commercial Claims Data is Valuable Property, and the Notice Never Counted its Transfer as a Cost or a Federal Privacy Violation.

The Supreme Court has recognized that prescription claims data is a commercially valuable asset. In *Sorrell v. IMS Health Inc.*, 564 U.S. at 557–58, 580, the Court described the market in which pharmacies sell prescriber-identifying information from prescription records to data miners, who then sell it to drug manufacturers for marketing, and struck down a State law hindering that

market. In *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984), the Court held that confidential business information is property protected by the Fifth Amendment and that a "voluntary submission of data" in exchange for a government benefit "can hardly be called a taking" only "as long as [the submitter] is aware of the conditions under which the data are submitted, and the conditions are rationally related to a legitimate Government interest." *Id.* at 1002–04, 1007 (brackets added).

Those decisions matter here in two ways. *First*, they establish that the Pilot's data condition imposes a real cost that the Notice never counted. HRSA's cost analysis is limited to the labor of "reporting claims data." 91 Fed. Reg. at 48,893; Compl. ¶¶ 149, 172. It assigns *no* value to the data itself, even though NACHC told HRSA that the data is "extraordinarily valuable proprietary information" that is being transferred "away from covered entities and into manufacturers' possession without compensation." NACHC Comment at 28–29. An independent economic analysis estimates that the information manufacturers would obtain through claims-data platforms and a rebate model is worth roughly *$9.33 billion per year* to them, apart from any recovery of duplicate discounts, including through "selling licenses to data" and "targeting and influencing health care providers." Charles J. Courtemanche, *340B Data from the ESP and Beacon Platforms Hold Considerable Value for Drug Manufacturers* 1, 4 (Univ. of Ky. Inst. for the Study of Free Enter., Working Paper No. 66, Apr. 2026). An agency that counts the cost of the envelope but not the cost of what is inside it has not "adequately consider[ed]" costs. Compl. ¶¶ 228–48 (Count II).

*Second*, *Monsanto*'s requirement that the conditions attached to a "voluntary" submission be "rationally related to a legitimate Government interest" means that the question of statutory authority discussed above is not academic. The only compliance interests the 340B statute expressly authorizes manufacturers to police are diversion and Medicaid duplicate discounts; a

demand for commercial, Medicare, and cash claims data serves neither, so the data condition cannot be brought within *Monsanto*'s safe harbor. Thus, the familiar canon that statutes should be read to avoid serious constitutional questions counsels against reading Section 256b(a)(1) to permit it. *Cf. Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013) (unconstitutional conditions doctrine "forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them"); *accord Horne v. Dep't of Agric.*, 576 U.S. 350, 366 (2015). HRSA's silence in the face of comments raising these concerns is itself a failure of reasoned decision-making under Plaintiffs' Count I and Count VI. Compl. ¶¶ 214–27, 280–86.

The data condition also raises serious federal privacy problems that the Notice assumed away. HRSA asserts that the required fields "do not include direct patient identifiers," 91 Fed. Reg. at 48,897, but its description of those fields omits the prescription and fill numbers the Pilot does require. *Id.* at 48,903. HSRA treats a prescription number as protected health information (PHI), 91 Fed. Reg. at 48,897, and it is information that must be removed under HIPAA's safe-harbor provision. *See* 45 C.F.R. § 164.514(b)(2)(i)(R). Similarly, Johnson and Johnson's comment equates the "Rx Number" field with a "Patient ID number," Compl. Ex. 1 (ECF No. 1-1) at 243, and the manufacturers' data vendor, Beacon, reportedly declines to ingest Rx numbers "because they do not want PHI in their system," *id.* at 13.

HRSA's premise that specific HIPAA comments "were not submitted in response to the RFI," 91 Fed. Reg. at 48,897, is also wrong and exposes HRSA's cursory consideration in violation of the APA: in its RFI comment, Plaintiff AHA warned that the Pilot's vendor refused the data-security questionnaires and vendor assessments hospitals complete "to comply with the HIPAA Security Rule," Compl. Ex. 1 at 82; another RFI commenter questioned whether manufacturers, which are not HIPAA covered entities, would need business associate agreements, *id.* at 9; and

Amici's review of the RFI docket identifies 112 comment letters that address HIPAA, 19 of them from health centers. An agency that overlooks comments on an issue it deemed important enough to address on its own has not "carefully consider[ed] all comments," 91 Fed. Reg. at 48,883, and has failed to consider "an important aspect of the problem." *State Farm*, 463 U.S. at 43; *see* Compl. ¶¶ 214–27, 280–86 (Counts I and VI).

## III. The Pilot Transfers the Statutory Authority to Ascertain a 340B Patient from the Covered Entity to the Manufacturer.

### A. The Statute Vests Patient Determination in the Covered Entity, Subject Only to an After-the-Fact Audit.

The diversion prohibition expressly provides that a "covered entity"—*not* HHS and *not* a drugmaker—"*shall* not resell or otherwise transfer the drug to a person who is not a patient of the entity." 42 U.S.C. § 256b(a)(5)(B). That is the singular place in the statute where "patient" is mentioned. And it reasonably grants the covered entity, not HHS, exclusive discretion to ascertain its patients in the first instance. The statute does not define "patient," does not set any time limit on a covered entity's determination that a person is its patient, and does not suggest that anyone other than the covered entity can make that determination in the first instance.

HRSA's longstanding guidance confirms that eligibility turns on the clinical relationship between the individual and the covered entity. *See* Notice Regarding Section 602 of the Veteran Health Care Act of 1992 Patient and Entity Eligibility, 61 Fed. Reg. 55,156, 55,157–58 (Oct. 24, 1996). As described above, the statute's only check on the covered entity's determination is an audit, which by definition occurs *after* the covered entity has acted in the first instance. 42 U.S.C. § 256b(a)(5)(C). Health centers rely on that structure and practical flexibility every day: contract pharmacies dispense, and compliance staff later match dispensations to eligible encounters and accurately replenish 340B inventory, sometimes weeks or months afterward. NACHC explained this to HRSA: "the statute exclusively grants the covered entity the authority to determine which

of its patients are eligible for 340B drugs," and it "allows HRSA and drugmakers to audit only after such a determination has been made." NACHC Comment at 31.

Courts agree: a pharmacy may dispense "pending review of the covered entity's medical records to determine whether the individual is a patient of the covered entity," and a manufacturer that suspects ineligible dispensing has a remedy because "the 340B statute entitles it to audit the covered entity." *AstraZeneca Pharms. LP v. Harris*, 2026 WL 3182328, *3 (E.D. Ark. Sept. 29, 2026). The Notice pays lip service to this principle when it instructs that each plan "must ensure that 340B rebates are not denied based on eligibility or compliance concerns with diversion or Medicaid duplicate discounts," and that a manufacturer with such concerns "must raise those concerns directly with HRSA/OPA or utilize the 340B statutory mechanisms, such as audits and administrative dispute resolution." 91 Fed. Reg. at 48,903. That is the statutory structure. But the Pilot's other terms contradict it.

### B. The 45-day Forfeiture and the Approved Manufacturer "Validations" Delegate First-Instance Patient Ascertainment to Private Drugmakers.

The Notice sets a floor, not a ceiling, on the time a covered entity has to identify a 340B claim: each plan must allow submission "at a minimum, up to 45 calendar days from date of dispense, with allowances for extenuating circumstances and other exceptions." 91 Fed. Reg. at 48,902. The approved plans instead adopt that minimum as their *deadline*. *See, e.g.*, Amgen 340B Rebate Model Pilot Program Policy at 3. Such a deadline undoubtedly limits the volume of drugs bought at the 340B price, a power Congress withheld from the Secretary. *See* H.R. Rep. No. 102-384, pt. 2, at 16 (the 340B statute "does not authorize the Secretary to limit in any way the volume of purchases that can be made at the price reduction"). The approved plans then implement forfeiture rules and eligibility screens that the statute nowhere contemplates. Amgen's plan, for example, lists an "Aberrant Quantity" validation that rejects claims inconsistent with

"*manufacturer* commercial business practices," a "Pharmacy Eligibility" validation that rejects claims "according to the *manufacturer's* contract pharmacy policy," and a "Claim Expired" validation under which the "[c]laim submission date must be within 45 days after the Date of Service." Amgen 340B Rebate Model Pilot Program Policy at 13 (emphasis added). AbbVie's plan announces that it will "monitor instances where non-WAC purchases were used for 340B rebate submission" and "deny any such rebate requests," AbbVie Imbruvica Rebate Model Pilot Program Policy at 4, notwithstanding the Notice's instruction that "[r]ebates may not be denied for perceived lack of WAC purchases," 91 Fed. Reg. at 48,903.

HRSA has been candid that this inversion is its goal. In rejecting the clearinghouse alternative, HRSA adopted the manufacturers' own framing ("[a]s manufacturer commenters have observed") and explained that "a rebate model by its very nature incentivizes covered entity compliance as a prerequisite to receiving 340B discounts," because "the covered entity must affirmatively submit validated claims data to receive the discount," whereas a clearinghouse "would preserve the current dynamic in which the discount is provided upfront and compliance verification occurs only after the fact." 91 Fed. Reg. at 48,900. However, that "current dynamic" that HRSA describes *is the 340B statute*. Section 256b(a)(5) provides the discount up front and verifies compliance afterward through audits conducted under procedures the Secretary establishes. Perhaps fatally to Defendants, HRSA has announced that the Pilot's virtue is that it replaces that structure with one in which *the manufacturer* validates each claim before the price concession is paid. It essentially delegates to the private manufacturer authority to ascertain 340B patients in the first instance through pre-audit audits and strict claim eligibility windows. But the agency cannot delegate authority to private industry that the agency itself lacks. HRSA's refusal to consider the alternative that would have preserved the statutory structure is the failure pleaded

in Count IV, Compl. ¶¶ 262–69, and its reliance on manufacturer convenience rather than the language of the 340B statute is the serious failure pleaded in Count I, *id.* ¶¶ 214–27.

The effect of HRSA's failure is that a 340B-eligible dispensation to a 340B-eligible patient becomes, by manufacturer rule, a non-340B dispensation if the health center does not identify it within the manufacturer-set temporal window, or if the manufacturer's screen rejects it. That is a patient determination made by the manufacturer, before any audit, on criteria the manufacturer wrote. NACHC said exactly this to HRSA: the Pilot "shifts the authority to ascertain a patient away from the CHC-provider to a non-provider – the drugmaker," and does so "prior to any audit, and in clear contravention of the plain text of the diversion prohibition." NACHC Comment at 31; *see also id.* at 16–17 ("Systems or methodologies that effectively transfer this determination to manufacturers . . . exceed statutory authority."). Boston Medical Center Health System likewise told HRSA that "the rebate model effectively shifts claim eligibility determination from HRSA to manufacturers" and that the Pilot "potentially violates the Constitutional principle of non-delegation, making manufacturers the arbiters of claim eligibility." Compl. Ex. 1 at 128-132. The Notice does not respond to these critical problems, which fall under Plaintiffs' Counts I, IV, and VI. Compl. ¶¶ 214–27, 262–69, 280–86.

### C. Reading the Statute to Permit Private Eligibility Determinations Would Raise a Serious Constitutional Question the Court Should Avoid.

A law "violates the private nondelegation doctrine when it allows non-governmental entities to govern." *FCC v. Consumers' Research*, 606 U.S. 656, 697 (2025). The Supreme Court has described the delegation of regulatory power to private parties with an interest adverse to those regulated as "legislative delegation in its most obnoxious form." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). The Pilot gives manufacturers, the parties whose financial interest is directly adverse to covered entities, the power to write and apply the rules for when a person is a "patient"

of the entity eligible to receive 340B-priced drugs. HRSA's stated oversight consists of plan approval and the admonition that denials based on eligibility concerns should be routed to HRSA, but the deadlines and validations HRSA approved operate automatically and by their terms, with no HRSA decision in the individual case. Much worse, they are directly contrary to Section 256b(a)(5)(B), which says that only the covered entity is authorized to make such patient eligibility and 340B-drug classification decision in the first instance, subject to an after-the-fact audit.

*Amici* do not ask the Court to hold that the Pilot violates the Constitution. The point is interpretive. When one reading of Section 256b would permit private drugmakers to decide patient eligibility in the first instance and another would leave that decision with the covered entity subject to governmental audit, the latter reading is compelled both by the statutory text and by the canon of constitutional avoidance. *Loper Bright*, 603 U.S. at 400, 412. HRSA never considered this fatal defect. That omission is pleaded in Counts I, IV, and VI. *See* Compl. ¶¶ 214–27, 262–69, 280–86.

## IV. HRSA Ignored the Features of Section 330 that Make a Rebate Model Unworkable for Health Centers.

Four health-center-specific problems were placed before HRSA and received no answer. *First*, every health center must maintain "a schedule of discounts" adjusted to the patient's ability to pay, with full discounts for patients at or below the poverty line, and they must make "every reasonable effort" to collect reimbursement from third-party payers. 42 U.S.C. § 254b(k)(3)(F), (G)(i)–(ii); 42 C.F.R. § 51c.303(f)-(g). Health centers set pharmacy prices for low-income patients off their actual 340B acquisition cost. Under the Pilot, the acquisition cost in the health center's wholesaler price file will be WAC, and the rebate, if it arrives, will arrive weeks later and only for claims the manufacturer approves. NACHC explained that this makes the sliding-fee program "operationally impossible" for the covered drugs dispensed at in-house pharmacies, for example, because a health center cannot know at the point of sale whether a dispensation will ever be priced

at 340B. NACHC Comment at 5, 20, 35. HRSA's only response is a requirement that manufacturers publish a quarterly price file that covered entities "may use . . . to assist with sliding fee scales." 91 Fed. Reg. at 48,902 (ellipsis added). That response assumes the rebate will in fact be paid on every eligible claim, and it does not address the problem, which is timing and certainty at the point of sale, not the eventual use of funds. It doesn't address the health center's responsibility to submit accurate claims.

*Second*, federal regulations cap State Medicaid payment for drugs at the lower of the pharmacy's actual acquisition cost plus a professional dispensing fee or its usual and customary charge, 42 C.F.R. § 447.512(b), and many States reimburse 340B drugs at the 340B acquisition cost. Health centers serve a heavily Medicaid population. Under the Pilot, a health center that purchases at WAC and awaits a rebate must either bill Medicaid at a 340B cost it has not yet achieved, or bill at WAC and later reconcile, exposing itself to recoupment and claim inaccuracy. Medicaid managed-care rules compound the problem: plans must "exclude utilization data for covered outpatient drugs that are subject to discounts under the 340B drug pricing program" from the utilization reports used for Medicaid drug rebates, 42 C.F.R. § 438.3(s)(3), a determination that must be made at the time of the claim, not 45 days later. NACHC and State Medicaid agencies raised these issues in detail. NACHC Comment at 24–27. The Notice does not address them. That silence is the failure to respond to significant comments pleaded in Count I and the failure to consider important aspects of the problem pleaded in Count VI. Compl. ¶¶ 214–27, 280–86.

*Third*, health centers operate thousands of small sites, and many manage 340B inventory physically rather than through virtual replenishment. NACHC told HRSA that the 45-day window becomes 55 days once the Pilot's processing periods are added and 70 to 85 days where physical inventory is used, which exceeds the window entirely. NACHC Comment at 10. Problematically,

HRSA estimated only *five hours* per week of covered-entity burden, Agency Information Collection Activities: Proposed Collection: Public Comment Request; Information Collection Request Title: 340B Rebate Model Pilot Program Application, Implementation, and Evaluation, 91 Fed. Reg. 35,989, 35,990 (June 15, 2026); contrastingly, health centers estimated *15 to nearly 40 hours* per week per entity. And NACHC calculated an annual cost between $103,552 and $272,518 per health center and between $150 million and $395 million across all health centers, each of which must report separately for each grantee site. NACHC ICR Comment at 1–3, 7. The Notice's burden discussion does not engage with any of these critical figures, which bear directly on health centers' statutory duty to serve patients regardless of their ability to pay. 42 U.S.C. § 254b(k)(3)(G)(iii)(I); *see id.* § 254b(k)(3)(G)(i)–(ii).

*Fourth*, the Pilot's float is financed with dollars Congress reserved for the health center project. Section 330 grant funds must not exceed the gap in costs of operation and its other revenue, including the "fees, premiums, and third-party reimbursements" it expects, and those non-grant funds must be "used as permitted under this section" or to "further[] the objectives of the project." 42 U.S.C. § 254b(e)(5)(A), (D). HRSA accordingly treats the spread between third-party reimbursement and the 340B purchase price as program income that "must further the objectives of the project by benefiting the patient population." HRSA, *Program Income and Your Grant* 9, 21 (July 15, 2026); *see* 2 C.F.R. § 200.307(b)(2). The Pilot turns that income into a receivable that exists only if the manufacturer approves the claim; it makes the center carry the WAC-to-340B difference in the meantime, *i.e.*, an "interest-free loan from the hospitals to the manufacturers," *AHA II*, 164 F.4th at 32, at a financing cost the federal cost principles make unallowable. 2 C.F.R. §§ 200.449(a), 300.106. Rules that forbid a grantee to hold federal cash beyond its "actual, immediate cash requirements," *id.* § 200.305(b)(1), cannot be squared with a mandate to extend

55 to 85 days of credit to drugmakers. NACHC Comment at 10, 14. HRSA conceded that financing costs "may be disproportionately larger for smaller entities that would need to obtain small business loans at higher interest rates," 91 Fed. Reg. at 48,900–01, but it never considered the effect on the grant program it administers. That is an uncounted cost (Count II) and an unconsidered "important aspect of the problem" (Count VI). Compl. ¶¶ 228–48, 280–86; *State Farm*, 463 U.S. at 43.

## V. Health Centers and their Patients Will Suffer Irreparable Harm and the Equities and Public Interest Strongly Favor Relief.

The record already contains the declaration of a Maine health center that illustrates the harm. DFD Russell Medical Centers, a federally qualified health center serving Central and Western Maine, operates on roughly 40 days of cash, ECF No. 2-7 (Kane-Lewis Decl. ¶ 7), and prescribes 11 of the 18 Pilot drugs to its patients, *id.* ¶ 16 & n.3. Its net 340B revenue fell from $1,072,712 in 2022 to $230,337 in 2025, *id.* ¶ 13; it has no staff to absorb the Pilot's data submission and reconciliation work, *id.* ¶¶ 19–22; and because the cost of administering the rebate mechanism "would exceed the entire remaining benefit of the program," it "would have to leave the program altogether," cutting the behavioral health, patient assistance, and nurse care management services its 340B savings support, *id.* ¶¶ 23–24.

Nationally, NACHC's member assessments reported that more than half of health centers would deplete reserves and more than a quarter would draw on lines of credit; health-center operating margins average negative two percent, and a quarter of health centers operate below negative five percent. NACHC Comment at 2; NACHC ICR Comment at 1. These harms are irreparable because, as this Court held last year, covered entities have no damages remedy against the government for the costs of an unlawful rebate program, and the "downstream effect[s]" of diverting funds from patient services cannot be undone. *Am. Hosp. Ass'n v. Kennedy*, 820 F. Supp.

3d 30, 46 (D. Me. 2025) (*AHA I*). The First Circuit agreed. *AHA II*, 164 F.4th at 37. These are the uncounted costs pleaded in Count II and the disregarded reliance interests pleaded in Count V. Compl. ¶¶ 228–48, 270–79.

The balance of equities and the public interest point the same way. The status quo that an injunction would preserve is the upfront-discount model that has governed the program for "more than three decades," and "the primary cost of any delay appears to run to the drug manufacturers," who would continue to receive what Congress required of them all along. *AHA II*, 164 F.4th at 37. HRSA's first attempt at this Pilot was enjoined by this Court, and the injunction was affirmed and the program vacated. *AHA I*, 820 F. Supp. 3d at 30; *AHA II*, 164 F.4th at 28; Compl. ¶ 63. HRSA has not shown that the second attempt cures the defects this Court identified. Meanwhile, the public interest in the continued operation of health-center pharmacies in medically underserved communities, in Maine and nationwide, is exactly the interest Congress enacted the 340B Program to serve.

## Conclusion

The Court should grant Plaintiffs' motion for a preliminary injunction and enjoin Defendants from implementing the 340B Rebate Model Pilot Program, including the approved manufacturer plans, pending final judgment.

Dated: October 29, 2026

Respectfully submitted,

/s/ Peter J. Brann
Peter J. Brann
Stacy O. Stitham
Brann & Isaacson
113 Lisbon St., P.O. Box 3070
Lewiston, ME 04243-3070
207.786.3566
pbrann@brannlaw.com
sstitham@brannlaw.com

*Attorneys for Amici Curiae*
*National Association of Community Health Centers and National PCA Hub*