**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| THE AMERICAN HOSPITAL ASSOCIATION, THE MAINE HOSPITAL ASSOCIATION, EASTERN MAINE MEDICAL CENTER, NATHAN LITTAUER HOSPITAL & NURSING HOME, UNITY MEDICAL CENTER, and DALLAS COUNTY MEDICAL CENTER,<br><br>*Plaintiffs,*<br><br>v.<br><br>ROBERT F. KENNEDY, JR., Secretary of the U.S. Department of Health and Human Services, THOMAS J. ENGELS, Administrator, Health Resources and Services Administration, THE HEALTH RESOURCES AND SERVICES ADMINISTRATION, THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, and THE UNITED STATES OF AMERICA,<br><br>*Defendants.* | Case No. 1:26-cv-00515-LEW |

**BRIEF FOR INTERVENOR PHARMACEUTICAL RESEARCH & MANUFACTURERS OF AMERICA IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ........................................................ 1
BACKGROUND ........................................................ 3
LEGAL STANDARD ........................................................ 6
ARGUMENT ........................................................ 6
**I. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS. ........................ 6**
A. Plaintiffs' Legal Standards Arguments Fail. ........................ 6
B. Plaintiffs Identify No Serious Flaw In HRSA's Assessment Of The Pilot's Costs And Benefits. ........................ 8
C. HRSA Reasonably Considered Reliance Interests. ........................ 14
D. HRSA Did Not Ignore Important Problems Or Viable Alternatives. ........................ 15
**II. THE EQUITABLE FACTORS FAVOR DENIAL OF AN INJUNCTION. .......... 18**
CONCLUSION ........................................................ 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ....................20

*Am. Hosp. Ass'n v. Harris*,
625 F.2d 1328 (7th Cir. 1980) ....................19

*Am. Hosp. Ass'n v. Kennedy (AHA I)*,
820 F. Supp. 3d 30 (D. Me. 2025) ....................1, 3, 4, 17, 19

*Am. Hosp. Ass'n v. Kennedy*,
164 F.4th 28 (1st Cir. 2026) ....................18

*Associated Fisheries of Me., Inc. v. Daley*,
127 F.3d 104 (1st Cir. 1997) ....................9, 10

*Aviators for Safe & Fairer Regul., Inc. v. FAA*,
221 F.3d 222 (1st Cir. 2000) ....................9

*Biden v. Texas*,
597 U.S. 785 (2022) ....................17

*California v. Azar*,
950 F.3d 1067 (9th Cir. 2020) ....................10

*Cath. Legal Immigr. Network, Inc. v. EOIR*,
513 F. Supp. 3d 154 (D.D.C. 2021) ....................11

*Cent. Me. Power Co. v. FERC*,
252 F.3d 34 (1st Cir. 2001) ....................20

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
370 F.3d 151 (1st Cir. 2004) ....................18

*Charter Comm'ns, Inc. v. FCC*,
460 F.3d 31 (D.C. Cir. 2006) ....................9

*Consol Pa. Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*,
941 F.3d 95 (3d Cir. 2019) ....................15

*Ctr. for Biological Diversity v. EPA*,
141 F.4th 153 (D.C. Cir. 2025)....................10, 13

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)....................15

*Doe ex rel. Doe v. Portland Pub. Schs.*,
701 F. Supp. 3d 18 (D. Me. 2023)....................6

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)....................9

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)....................1, 8

*Fla. E. Coast Ry. LLC v. Fed. R.R. Admin.*,
186 F.4th 822 (11th Cir. 2026)....................10

*Freedom Holdings, Inc. v. Spitzer*,
408 F.3d 112 (2d Cir. 2005)....................19

*FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*,
146 S. Ct. 1546 (2026)....................7

*Housatonic River Initiative v. EPA*,
75 F.4th 248 (1st Cir. 2023)....................17

*Idaho Conservation League v. Wheeler*,
930 F.3d 494 (D.C. Cir. 2019)....................8

*Kyick Holdings, LLC v. Comm'r of Internal Revenue Serv.*,
188 F.4th 39 (1st Cir. 2026)....................7

*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
70 F.4th 582 (D.C. Cir. 2023)....................7

*Michigan v. EPA*,
576 U.S. 743 (2015)....................8

*NetCoalition v. SEC*,
615 F.3d 525 (D.C. Cir. 2010)....................11

*Novartis Pharms. Corp. v. Kennedy*,
182 F.4th 1027 (D.C. Cir. 2026)....................7

*NLRB v. Beverly Enters.-Mass., Inc.*,
174 F.3d 13 (1st Cir. 1999)........8

*Rosario-Urdaz v. Rivera-Hernandez*,
350 F.3d 219 (1st Cir. 2003)........19

*Smith v. Garland*,
103 F.4th 1244 (7th Cir. 2024)........9, 16

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024)........6

*Town of Weymouth v. Mass. Dep't of Env't Prot.*,
973 F.3d 143 (1st Cir. 2020)........20

*Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. Fed. R.R. Admin.*,
10 F.4th 869 (D.C. Cir. 2021)........16

*Village of Barrington v. Surface Transp. Bd.*,
636 F.3d 650 (D.C. Cir. 2011)........8

*Winter v. Nat'l Res. Def. Council, Inc.*,
555 U.S. 7 (2008)........18

*Woonasquatucket River Watershed Council v. USDA*,
186 F.4th 25 (1st Cir. 2026)........15

**Statutes and Regulations**

42 U.S.C. § 256b........1, 3, 4, 8

42 U.S.C. § 1320f. ........4, 8

90 Fed. Reg. 36,163 (Aug. 1, 2025)........4

91 Fed. Reg. 7,287 (Feb. 17, 2026) ........1, 4

91 Fed. Reg. 48,883 (Aug. 3, 2026)........ *passim*

**Legislative History**

H.R. Rep. No. 102-384, pt. 2 (1992)....................7

**Scholarly Authorities**

Sunita Desai and J. Michael McWilliams, *Consequences of the 340B Drug Pricing Program*, 378 NEJM 539 (2018), https://tinyurl.com/5bxazzw5 ....................20

**Other Authorities**

AHA, *Comments on 340B Rebate Model Pilot Program* (Apr. 20, 2026) ....................12, 14

HRSA, *340B Rebate Model Pilot Program*, https://tinyurl.com/3wt66tu3 ....................6

HRSA, Supporting Statement A: 340B Rebate Model Pilot Program Application, Implementation, and Evaluation Notice, OMB Control No. 0906-NEW (Aug. 4, 2026) ....................10

IQVIA, *How Large Are 340B/MFP Duplicate Discounts? 2: Findings* (Oct. 29, 2026), https://tinyurl.com/5hyftshp ....................18

PhRMA, Comment Letter on Request for Information: 340B Rebate Model Pilot Program and Request for Public Comment (April 20, 2026), https://tinyurl.com/mr34hjzk ....................5, 18

RORY MARTIN, CHUAN SUN & WILLIAM A. SARRAILLE, DO 340B REBATES CREATE A SIGNIFICANT FINANCIAL BURDEN FOR 340B PROVIDERS? (2026) ....................12

U.S. GOV'T ACCOUNTABILITY OFF., GAO-26-108784, 340B DRUG DISCOUNT PROGRAM (2026) ....................14

## INTRODUCTION

Plaintiffs' request for a preliminary injunction to block the launch of the Health Resources and Services Administration's (HRSA's) new 340B rebate pilot (the Pilot) should be denied. Now as before, HRSA's "authority to administer a rebate model program is not in question," *Am. Hosp. Ass'n v. Kennedy* (*AHA I*), 820 F. Supp. 3d 30, 46 (D. Me. 2025), because the 340B statute authorizes the delivery of discounted pricing through "any rebate or discount," 42 U.S.C. § 256b(a)(1). So the only question is whether HRSA has satisfied its obligation under the Administrative Procedure Act (APA) to "reasonably consider[] the relevant issues and reasonably explain[] the decision" to adopt a new rebate pilot. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). HRSA has done so. After this Court vacated its initial rebate pilot, HRSA started over. It solicited comments on whether to adopt a rebate model, as well as on costs, reliance interests, and alternatives. 91 Fed. Reg. 7,287 (Feb. 17, 2026). It reviewed 2,475 comments before issuing a detailed Notice explaining its decision. 91 Fed. Reg. 48,883, 48,888 (Aug. 3, 2026).

HRSA concluded that a limited rebate pilot would serve the goals of the 340B statute by using claims-level information to identify and prevent duplicate statutory discounts—including overlapping 340B and Medicare "Maximum Fair Price" (MFP) discounts—while also testing whether rebates would be effective program-wide. *Id.* at 48,889–90, 48,900–01. Despite manufacturers' calls for a program-wide rebate model, HRSA limited the Pilot to 340B-participating manufacturers with drugs subject to MFP obligations starting in 2026 or 2027—around 5% of 340B sales. *Id.* at 48,893, 48,902–03. Discounts remain in place for the rest. HRSA also rejected manufacturers' requests for additional data about 340B purchases and restricted their use of the data collected under the Pilot. *Id.* at 48,896, 48,903.

HRSA's Notice carefully examined covered entities' predictions that the Pilot would impose heavy administrative costs, as well as strain cash flow by requiring covered entities to "float" the full cost of drugs until rebates arrive. *Id.* at 48,894–95. HRSA determined that covered entities' administrative-cost projections rested on assumptions, such as manual data management, that were inconsistent with the Pilot's design. *Id.* at 48,891–94. And HRSA further determined based on comments and studies that the "expect[ed] … cash-flow impacts on covered entities" would "be minimal," *Id.* at 48,894–95. Even so, HRSA adopted safeguards to mitigate these cost impacts. *Id*. HRSA also weighed covered entities' reliance on discounts and explained why proposed alternatives would not achieve the Pilot's goals. *Id.* at 48,888–89, 48,899–901.

Plaintiffs' motion attacks a Notice HRSA did not publish, then tries to turn disagreements with HRSA's policy judgments into APA violations. Plaintiffs omit the Pilot's central purpose: avoiding 340B–MFP duplicate discounts. They assert that HRSA "excluded *entire categories*" of covered-entity costs from consideration, Mot. at 1, 6, only by conflating HRSA's estimate of *some* paperwork burdens with *all* of the costs HRSA considered, 91 Fed. Reg. at 48,893. They claim that HRSA "dismissed 'float' costs *entirely*," Mot. at 10, despite the Notice's extended discussion of this issue, 91 Fed. Reg. at 48,894–95. And they accuse HRSA of rejecting alternatives merely because they are not rebate models, Mot. at 17, when HRSA explained why it decided not to adopt each option, 91 Fed. Reg. at 48,899–901. In the end, Plaintiffs' challenge asks the Court to reject HRSA's decision to test a rebate mechanism Congress expressly authorized because Plaintiffs—who categorically oppose rebate models—would have weighed costs and benefits differently. But as this Court explained, the APA does not permit courts to "make a policy judgment in place of the Agency." *AHA I*, 820 F. Supp. 3d at 43. Plaintiffs thus are unlikely to succeed on the merits.

The remaining factors confirm that a preliminary injunction is unwarranted. Plaintiffs' assertions of irreparable harm rest largely on predictions about compliance and float costs like those HRSA examined and found overstated. 91 Fed. Reg. at 48,891–94. An injunction, meanwhile, would expose participating manufacturers to billions of dollars in duplicative price concessions despite Congress's judgment that manufacturers need not provide both 340B and MFP pricing. It would also deny the government, the public, and all PhRMA members the prospect of a Pilot that improves compliance and transparency while testing rebate administration for broader use. Those interests should not yield to Plaintiffs' desire to avoid compliance burdens that HRSA deemed necessary to protect the integrity of the 340B Program. The motion should be denied.

## BACKGROUND

The 340B Program requires manufacturers participating in Medicaid and Medicare Part B to offer certain drugs to specified healthcare providers, known as "covered entities," at or below a statutory ceiling price. 42 U.S.C. § 256b(a)(1), (4). Section 340B expressly states that discounted pricing may be offered through "any rebate or discount, as provided by the Secretary [of Health and Human Services]." *Id.* § 256b(a)(1).

Since the 340B Program's inception, Congress has been attuned to the risk that participating manufacturers would be asked to provide duplicate price concessions. In the 340B statute, Congress expressly prohibited a manufacturer from providing both 340B pricing and a Medicaid rebate on the same drug unit. *Id.* § 256b(a)(5)(A). In 2022, Congress created the Medicare Drug Price Negotiation Program, requiring access to MFPs for selected drugs starting January 1, 2026. *Id.* § 1320f *et seq*. Congress required the lower of the MFP or the 340B price but stated that manufacturers "shall not be required to provide" both concessions. *Id.* § 1320f-2(d).

Failure to provide MFP access may trigger civil monetary penalties reaching millions of dollars daily. *Id.* §§ 1320f-6(c), 1320f-2(a)(5).

In part to address 340B–MFP duplicate discounts, HRSA proposed a rebate pilot in August 2025. *See* 90 Fed. Reg. 36,163 (Aug. 1, 2025). Covered entities would purchase selected drugs at wholesale acquisition cost (WAC), submit claims data for verification, and receive the difference between that cost and the 340B price as a rebate. *Id*. at 36,164–65. The pilot covered drugs with MFP obligations in 2026. The American Hospital Association (AHA), the Maine Hospital Association, and several of their members filed suit. *AHA I*, 820 F. Supp. 3d at 30. This Court preliminarily enjoined the pilot, stating that HRSA has authority to choose rebates over discounts but finding that HRSA had failed to address covered entities' "significant reliance interests" in those discounts and to "consider and reasonably explain" the pilot's administrative, cash-flow, and nonmonetary costs. *AHA I*, 820 F. Supp. 3d at 42, 44–45. At the parties' request, the Court vacated the pilot and remanded to HRSA. Order at 2, No. 25-cv-00600 (Feb. 10, 2026), Dkt. No. 115.

On remand, HRSA sought public comments on "whether HRSA should implement a rebate model," including costs, reliance interests, and alternatives. 91 Fed. Reg. 7,287. PhRMA's own comment letter urged that "[g]iven the strong promise of a 340B rebate model … to address some of the current program integrity challenges, a rebate model should be an option for all 340B drug purchases immediately, without first limiting implementation to a pilot." PhRMA, Comment Letter on Request for Information: 340B Rebate Model Pilot Program and Request for Public Comment (April 20, 2026), https://tinyurl.com/mr34hjzk.

Over the next six months, HRSA considered "a total of 2,475 comments," before announcing a revised Pilot on August 3, 2026. 91 Fed. Reg. at 48,888. The Pilot permits approved

manufacturers to use rebates for drugs subject to MFP obligations starting in 2026 or 2027. *Id.* at 48,902–03. HRSA estimated that the selected drugs would account for only around 5% of 340B sales. *Id.* at 48,893. Thus, the Pilot does not alter the 340B ceiling price or the rules governing 340B eligibility; it merely changes the "mechanism and timing" by which the price is provided. *Id.* at 48,899.

HRSA addressed the concerns previously identified by the Court. First, it acknowledged covered entities' longstanding reliance on discounts but weighed those interests against the Pilot's benefits. *Id.* at 48,888–89. Second, it examined covered entities' projected administrative costs, including staffing, technology, and reconciliation expenses. Many estimates, HRSA explained, "rest[ed] on assumptions that do not align with the design of the Pilot"—which standardizes reporting requirements, relies on existing infrastructure, and is limited to select drugs—or "do not accurately reflect what is needed administratively to implement a rebate approach." *Id.* at 48,893. Third, HRSA examined the cash-flow burdens of paying WAC rather than the 340B price while awaiting rebates, including potential disruptions to patient services. It adopted safeguards, including a ten-day rebate payment deadline for manufacturers and transitional inventory protections. *Id.* at 48,894–95. HRSA predicted that cash-flow impacts would be "minimal" and that the Pilot would not "materially impair covered entities' cash flow or their ability to furnish services to patients." *Id.* at 48,895, 48,899.

HRSA also identified benefits. It discussed longstanding difficulties in preventing duplicate discounts, made more pressing by the new MFP obligations. *Id.* at 48,886–87. A rebate model, HRSA explained, would help manufacturers identify 340B transactions and prevent duplicate discounts, as well as improve transparency and oversight. *Id.* at 48,889–90. The Pilot

would also allow evaluation of rebates for broader use. *Id.* at 48,890. It examined alternatives—including claims modifiers, clearinghouses, audits, and a narrower pilot—but found each inadequate to achieve these objectives. *Id.* at 48,899–901. Ultimately, HRSA found that "the anticipated benefits of the Pilot outweigh the costs." *Id.* at 48,894.

On October 1, HRSA approved plans submitted by ten manufacturers covering 18 selected drugs, effective January 1, 2027. HRSA, https://tinyurl.com/3wt66tu3.

Plaintiffs sued, challenging the Notice as arbitrary and capricious under the APA and seeking vacatur of it and the manufacturer approvals. *See* Complaint, Dkt. No. 1. They moved for emergency injunctive relief to prevent the Pilot from taking effect on January 1, 2027. Mot. at 21. PhRMA and manufacturers approved to participate in the Pilot intervened. *See* Dkt. Nos. 15, 33.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy" available "sparingly and only in a clear and plain case." *Doe ex rel. Doe v. Portland Pub. Schs.*, 701 F. Supp. 3d 18, 32 (D. Me. 2023) (cleaned up). Plaintiffs must make a "clear showing" of likely success, irreparable harm, favorable equities, and a favorable public interest. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024); *Doe*, 701 F. Supp. 3d at 32.

## ARGUMENT

### I. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.

#### A. Plaintiffs' Legal Standards Arguments Fail.

Plaintiffs first contend that HRSA committed "clear-cut legal error" by failing to apply a "[l]egal [s]tandard[]" they divine from a House committee report. Mot. at 4–6 (discussing H.R. Rep. No. 102-384, pt. 2). But legislative history cannot impose a legal requirement that Congress

did not enact. *See Kyick Holdings, LLC v. Comm'r of Internal Revenue Serv.*, 188 F.4th 39, 56 (1st Cir. 2026) ("[T]he views of [congressional committees] are not the law" (quoting *FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*, 146 S. Ct. 1546, 1558 (2026)). Indeed, the D.C. Circuit has set aside agency action for doing what Plaintiffs urge—treating legislative history as a controlling standard. *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 597–98 (D.C. Cir. 2023) (agency violated APA by treating legislative history as directing it to resolve scientific uncertainty in favor of endangered species). Plaintiffs thus have the law backwards: Treating the committee report as binding would have been the error.[1]

Regardless, the argument fails on its own terms. The report does not "direct[]" HRSA to do anything. *Contra* Mot. at 6. The full quote—which Plaintiffs cut off—is that the Committee "expects" the Secretary to "use" the "most effective and most efficient" mechanism "from the standpoint of each type of 'covered entity.'" H.R. Rep. No. 102-384, pt. 2, at 16 (1992). While not required to do so, HRSA considered those standpoints. It quoted the report, acknowledged that "fixed compliance costs … may disproportionately burden small entities," and explained why differences among covered entities "do not justify carving up the Pilot." 91 Fed. Reg. at 48,884, 48,900–01. Plaintiffs do not confront that explanation.

HRSA also lawfully balanced covered entities' interests against its obligation to safeguard program integrity. 91 Fed. Reg. at 48,887. Plaintiffs are wrong to call program integrity a "non-statutory objective." Mot. at 5–6. Section 340B prohibits diversion and duplicate discounts, requires covered entities' full compliance with those prohibitions, and grants HRSA authority to

[1] *Novartis Pharms. Corp. v. Kennedy*, 182 F.4th 1027, 1035 (D.C. Cir. 2026) grounded HRSA's rebate authority in the statute, noting only that this interpretation "comport[ed] with" the report.

improve compliance under a subsection entitled "improvements in *program integrity*." 42 U.S.C. § 256b(a)(5), (d)(2)(A) (emphasis added). Congress separately provided that manufacturers "shall not be required to provide" overlapping MFP and 340B discounts. *Id.* § 1320f-2(d). The APA did not require HRSA to disregard these commands and consider only Plaintiffs' preferences.

### B. Plaintiffs Identify No Serious Flaw In HRSA's Assessment Of The Pilot's Costs And Benefits.

Plaintiffs' next attack rests on an equally mistaken view of the APA: that HRSA had to quantify every cost and benefit, then abandon the Pilot unless benefits exceeded costs. Mot. at 6–7, 13–14 & n.8. To the contrary, the APA imposes no freestanding duty to "engage in cost-benefit analysis," *Village of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 670–71 (D.C. Cir. 2011); *see NLRB v. Beverly Enters.-Mass., Inc.*, 174 F.3d 13, 23 n.2 (1st Cir. 1999) (looking to D.C. Circuit precedent for guidance on APA standards), or to obtain "perfect empirical or statistical data," *Prometheus*, 592 U.S. at 426–27.[2]

To be sure, "when an agency … rel[ies] on a cost-benefit analysis … a serious flaw … can render" the action arbitrary and capricious. *Idaho Conservation League v. Wheeler*, 930 F.3d 494, 507 (D.C. Cir. 2019). But "[a]dministrative decisionmaking is not an exact science." *Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 111 (1st Cir. 1997). "[A]gencies often make choices where no evidence can demonstrate a single right answer," and courts will "normally defer" when those choices are reasonably explained and fall within a "zone of reasonableness." *Aviators for Safe & Fairer Regul., Inc. v. FAA*, 221 F.3d 222, 230 (1st Cir. 2000); *see also Smith v. Garland*,

[2] *Michigan v. EPA*, 576 U.S. 743 (2015), involved a specific environmental statute that "require[d] at least some attention to cost." *Id.* at 751–52. Even then, EPA was not required "to conduct a formal cost-benefit analysis in which each advantage and disadvantage is assigned a monetary value;" rather, it was "up to the Agency to decide (as always, within the limits of reasonable interpretation) how to account for cost." *Id.* at 759.

103 F.4th 1244, 1253 (7th Cir. 2024) ("Under the APA, the agency 'need only consider the evidence;' it need not mention every piece of evidence it considered." (emphasis omitted)). *Charter Comm'ns, Inc. v. FCC*, 460 F.3d 31 (D.C. Cir. 2006) is illustrative. There, the cable industry argued that an FCC rule would impose "enormous" costs with "absolutely no benefit." 460 F.3d at 41–42. The FCC acknowledged the cost concerns but ultimately credited other comments predicting that those costs would decline over time; adopted measures to mitigate costs; and identified offsetting benefits. *Id.* The court upheld this assessment as reasonable. *Id.*

HRSA provided a similarly reasoned assessment. It assessed covered entities' cost projections, explained why it discounted some estimates because they rested on assumptions that did not match the Pilot's design, and adopted safeguards to mitigate potential burdens. *See* 91 Fed. Reg. at 48,890–96. That predictive judgment both "merits deference" and "makes entire sense." *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 521 (2009). HRSA also weighed those costs against the benefits of preventing duplicate discounts, improving transparency, and strengthening oversight, ultimately finding that the Pilot's benefits outweighed its costs. 91 Fed. Reg. at 48,887–90, 48,894. Plaintiffs' arguments misrepresent the Notice and demand more than the APA requires.

**1. HRSA reasonably considered the Pilot's potential costs.**

**a. *Administrative costs***. Plaintiffs first try to manufacture an APA violation by conflating HRSA's Paperwork Reduction Act estimate with its broader assessment of the Pilot's administrative costs. *See* Mot. at 6. The $537 million figure represents estimated paperwork burdens across approximately 15,000 covered entities—not all the administrative costs HRSA considered. *See* Supporting Statement A: 340B Rebate Model Pilot Program Application, Implementation, and Evaluation Notice, OMB Control No. 0906-NEW, at 9 (Aug. 4, 2026). (And

Plaintiffs' characterization of that figure as "astonishing," Mot. at 1, ignores that it averages about $34,000 per covered entity, in a program of immense scale, involving approximately $100 billion in drug purchases annually. 91 Fed. Reg. at 48,893–94.) In fact, HRSA separately addressed each category of administrative costs Plaintiffs identify. *Id.* at 48,891–94. The APA did not require HRSA to monetize every cost. *See Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 171–72 (D.C. Cir. 2025) (agency need not "monetize or otherwise quantify all of the factors it must consider"). Nor did it require HRSA to credit covered entities' projections, which were premised on activities the Pilot would not require. *See Daley*, 127 F.3d at 110–11; *California v. Azar*, 950 F.3d 1067, 1101 (9th Cir. 2020).[3] These legal principles—and a fair reading of the Notice rather than Plaintiffs' mischaracterizations of it—dispose of Plaintiffs' arguments.

Reconciliation costs. HRSA did not "completely exclude[]" reconciliation costs or "misunderst[and] the new workflow." Mot. at 8. It acknowledged additional post-purchase reconciliation versus discounts but explained why existing systems could handle the Pilot's new tasks. 91 Fed. Reg. at 48,891–93.

Start-up costs. HRSA acknowledged "legitimate startup activities," including workflow redesign and IT configuration. Mot. at 9; 91 Fed. Reg. at 48,893. But many estimates assumed requirements "not contemplated under the Pilot's standardized reporting approach." *Id.* HRSA therefore reasonably expected implementation costs to be "substantially reduced" and that "these transitional costs will diminish." *Id.* at 48,893–94.

[3] Plaintiffs cite *Florida East Coast Railway LLC v. Federal Railroad Administration*, 186 F.4th 822, 866 (11th Cir. 2026), for the proposition that an agency "may not simply disregard an entire category of obvious costs." Mot. at 7. But that language comes from a dissent, not the court's opinion. *Id.* at 866 (Branch, J., dissenting). The majority rejected a challenge to the agency's treatment of labor costs, in part because the challengers' estimates assumed requirements the final rule did not impose. *Id.* at 846–48.

Vendor and training costs. HRSA did not "assign[] these costs no value at all." Mot. at 9. Manufacturers must pay for the rebate IT platform, which could integrate with existing systems and limit new infrastructure costs. 91 Fed. Reg. at 48,893–94. HRSA also considered existing 340B compliance obligations and the "significant financial benefit" of participation. *Id.* at 48,894. So, although the APA does not require agencies to quantify incremental costs against an existing baseline, *see supra* p. 8; *contra* Mot. at 8, HRSA did just that.

Staffing costs. HRSA explained that many staffing projections assumed tasks the Pilot would not require. 91 Fed. Reg. at 48,891–93. It expected modest impacts while acknowledging that some entities might need additional staff. *Id.* at 48,893. That reasoned explanation distinguishes Plaintiffs' cases. *See Cath. Legal Immigr. Network, Inc. v. EOIR*, 513 F. Supp. 3d 154, 173–74 (D.D.C. 2021) (agency declined to address concerns, labeling them simply as "speculative"); *NetCoalition v. SEC*, 615 F.3d 525, 539–42 (D.C. Cir. 2010) (agency lacked supporting evidence).

**b. *Float costs***. Last year, this Court faulted HRSA for a record "silent on the cost of floating the full price of covered drugs until 340B entities receive their rebate." *AHA I*, 820 F. Supp. 3d at 44–45. This time, a section of the Notice acknowledged concerns that paying WAC to acquire drugs could create "liquidity constraints, reliance on credit, and financial instability," particularly for rural and safety-net providers. 91 Fed. Reg. at 48,894. HRSA also considered other comments explaining that covered entities' projected burdens might be "inaccurate or overstated," given existing reimbursement arrangements and wholesaler payment terms, along with studies finding minimal financing costs relative to existing replenishment models. *Id.* at 48,894–95. Finally, HRSA adopted safeguards, including a ten-day deadline for rebates on complete claims, unit-level rebates, a transitional grace period, and appropriate enforcement for late payments. *Id.* at 48,895.

Ultimately, HRSA "expect[ed] the cash-flow impacts on covered entities to be minimal" and concluded that the Pilot was "unlikely to result in unstable cash flow." *Id.* at 48,894–95. That is not "dismiss[ing] 'float' costs" at all, let alone "*entirely*." Mot. at 10.

Plaintiffs primarily attack two studies cited in the Notice, but those studies were only part of HRSA's analysis.[4] They impugn them as "drug-company-commissioned," Mot. at 10, although HRSA appropriately considered comments and evidence from all sides. Plaintiffs criticize the studies' focus on interest costs, ignoring HRSA's broader discussion of liquidity risks. 91 Fed. Reg. at 48,894–95. And they claim that IQVIA's later study "undermin[es]" its earlier one, Mot. at 9, although the new study describes its findings as "[c]onsistent with, and extending, our earlier study," RORY MARTIN, CHUAN SUN & WILLIAM A. SARRAILLE, DO 340B REBATES CREATE A SIGNIFICANT FINANCIAL BURDEN FOR 340B PROVIDERS? 1, 5–6 (2026).

Plaintiffs also complain that the ten-day deadline will not *eliminate* float costs. Mot. at 10–11. HRSA never promised that: it expected rebates to precede wholesaler payments "in most cases." 91 Fed. Reg. at 48,894–95. The APA did not require HRSA to eliminate every cost or select the lowest-cost option. *See Ctr. for Biological Diversity*, 141 F.4th at 171–72.

**c. *Impacts on patient care*.** Finally, HRSA acknowledged commenters' concerns about "reduced service capacity, limitations on access to medications, or delays in care," 91 Fed. Reg. at 48,898, but found that the Pilot's limited scope and continued availability of 340B discounted pricing would prevent it from "materially impair[ing] covered entities' cash flow or their ability to furnish services to patients," *id.* at 48,899. HRSA thus considered covered entities' concerns

[4] Plaintiffs also fault HRSA for not citing the studies in its request for comments, Mot. at 9 n.6, but both studies were publicly available—and AHA's own RFI comments twice invoke the IQVIA study. *See* AHA, Comments on 340B Rebate Model Pilot Program 20 n. 23, 25 (Apr. 20, 2026), https://tinyurl.com/438kn89w.

and explained why it reached a different conclusion. Plaintiffs' disagreement with that judgment does not establish an APA violation.

### 2. HRSA reasonably considered the Pilot's likely benefits.

Plaintiffs' benefits-related challenge fares no better. They portray the Pilot as imposing enormous costs for little benefit, *see* Mot. at 14, but they omit discussion of essentially all of the benefits that HRSA anticipated. Most glaringly, they never mention one of the principal problems HRSA designed the Pilot to address: 340B–MFP deduplication. *See* 91 Fed. Reg. at 48,889–90. Nor do Plaintiffs address the Pilot's other anticipated benefits of "ensuring that stakeholders have transparency into 340B transaction information;" "enhanc[ing] HRSA's oversight of the 340B Program and improv[ing] program integrity;" "assist[ing] HRSA's evaluation of retrospective, claims-based reconciliation;" and providing information for HHS to "support compliance with statutory requirements across federal drug pricing programs." *Id.* at 48,890.

Rather than engage with the justifications and explanations HRSA actually provided, Plaintiffs seize on two industry estimates HRSA cited in passing concerning the prevalence of duplicate discounts: $1.5 billion in annual Medicaid duplicate discounts and a projection that duplicate discounts could affect up to 25% of 340B transactions. Mot. at 13–14. Plaintiffs accuse HRSA of uncritically "adopt[ing]" these figures. *Id.* at 14. But HRSA attributed both to industry sources, 91 Fed. Reg. at 48,887, 48,898, and it "adopted" neither as a projection of the Pilot's benefits, Mot. at 14. Instead, HRSA cited these points alongside a discussion of reports from

Congress, the Government Accountability Office (GAO), and others documenting persistent difficulties preventing duplicate discounts.[5] *Id.* at 48,887 & nn.11–13, 48,899–900.

Plaintiffs also assert that the Pilot cannot prevent Medicaid duplicate discounts because manufacturers cannot deny rebates under the Pilot solely on suspicion of such duplication. Mot. at 14. But Plaintiffs themselves contended that HRSA *had* to do what it did, *see* AHA, Comments on 340B Rebate Model Pilot Program 24, which is require manufacturers to raise suspected duplicate discount violations through HRSA, 91 Fed. Reg. at 48,903. And HRSA explained that claims-level data would help manufacturers "better identify 340B transactions" that may involve duplicate discounts, which they could address through HRSA or statutory procedures, while helping HRSA "more effectively prevent duplicate discounts relative to existing mechanisms." *Id.* at 48,890, 48,903.

**C. HRSA Reasonably Considered Reliance Interests.**

Plaintiffs also mistake HRSA's rejection of their position on reliance interests for a failure to consider it. Mot. at 14–15. HRSA acknowledged that it had "initially administered the Program as primarily an upfront discount" model and that covered entities had structured their operations around that model since 1992. 91 Fed. Reg. at 48,886, 48,888. But HRSA gave numerous reasons why that history did not require preserving discounts indefinitely for all 340B drugs. *Id.* at 48,886–89. HRSA also adopted safeguards to reduce any disruption. *Id.* at 48,889, 48,893–96. Having thus accounted for covered entities' reliance interests, HRSA concluded that, "on balance," they did

[5] Plaintiffs also point to supposedly declining duplicate discounts in HRSA audits, Mot. at 14, but, as GAO explained in a report HRSA cited, those audits "do not fully assess compliance" with the prohibition on Medicaid duplicate discounts because they exclude Medicaid managed care—which accounts for most Medicaid prescriptions and drug spending. U.S. GOV'T ACCOUNTABILITY OFF., GAO-26-108784, 340B DRUG DISCOUNT PROGRAM 13–14 (2026); 91 Fed. Reg. at 48,887 n.17.

"not outweigh the significant benefits of proceeding." *Id.* at 48,889. So unlike the agencies in *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020) and *Woonasquatucket River Watershed Council v. U.S. Department of Agriculture*, 186 F.4th 25 (1st Cir. 2026), HRSA actually weighed reliance interests. The APA did not require HRSA to give them controlling weight. *See Regents*, 591 U.S. at 32.

### D. HRSA Did Not Ignore Important Problems Or Viable Alternatives.

**1.** None of the three problems HRSA supposedly "ignored," Mot. at 15, renders the Pilot arbitrary and capricious. First, Plaintiffs fault HRSA for failing to discuss the One Big Beautiful Bill Act, which they predict will impose billions of dollars in additional costs on certain hospitals beginning in 2027. Mot. at 16. But the One Big Beautiful Bill Act does not even mention the 340B Program, much less impose obligations on covered entities in their capacity as 340B participants. Plaintiffs nonetheless claim that the Notice ignored that the Pilot was particularly inconvenient "*at this time*." *Id.* But HRSA thoroughly evaluated the Pilot's anticipated costs and benefits within the "landscape governing 340B pricing obligations." 91 Fed. Reg. at 48,884. It was not obligated to identify and consider governmental decisionmaking disconnected from the 340B Program. In any event, agencies are presumed to be aware of existing law when they regulate, *Consol Pa. Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 941 F.3d 95, 112 (3d Cir. 2019) (presuming rulemaking authorities are aware of existing law when they promulgate regulations), and an agency "need not mention every piece of evidence it considered," *Smith*, 103 F.4th at 1253.

Second, Plaintiffs contend that HRSA failed to establish procedures for resolving delayed or denied rebates. Mot. at 16–17. But HRSA adopted several safeguards, including the ten-day payment deadline, in response to these concerns. 91 Fed. Reg. at 48,895, 48,903. Covered entities

may also report improper denials to HRSA, which can investigate and remove manufacturers from the Pilot for repeated violations, while the existing ADR process provides an additional avenue for unresolved disputes. *Id.* Plaintiffs thus are wrong to imply that the Pilot leaves covered entities without recourse. *See* Mot. at 17. Nor does HRSA's decision to establish an *additional* review pathway, with some implementation details for later publication, make the Pilot arbitrary. *Cf. Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. Fed. R.R. Admin.*, 10 F.4th 869, 876 (D.C. Cir. 2021) ("no reason to send" agency "back to the drawing board" because one aspect of regulatory plan "will be articulated in a subsequent rulemaking").

Third, Plaintiffs critique Second Sight Solutions, the vendor operating the rebate-processing platform selected by participating manufacturers. Mot. at 17. But the Notice addressed the concerns underlying such complaints through the technical requirements for manufacturer rebate plans. 91 Fed. Reg. at 48,902.

**2.** Plaintiffs next accuse HRSA of "unlawfully cast[ing] aside several less burdensome alternatives" simply because they were not rebate mechanisms. Mot. at 17. But the Notice addressed four categories of alternative proposals: enhanced claims modifiers, a centralized clearinghouse, more intensive audits, and a narrower Pilot. 91 Fed. Reg. at 48,899–901. HRSA explained, one-by-one, why each would be less effective at achieving the Pilot's program-integrity and evaluation objectives, including by reference to specific findings made by federal oversight bodies. *Id.* at 48,899–901. As for the narrower Pilot proposal, HRSA explained this would risk producing an unrepresentative sample, limiting the Pilot's ability to assess how a rebate mechanism operates across the diverse 340B Program. *Id*. at 48,901. HRSA also explained why it chose to limit the Pilot by drug rather than by covered entity type: The risk of duplicative price

concessions arises from overlapping pricing obligations for particular drugs, regardless of which covered entity dispenses them. *Id*. In addition, excluding certain covered entities would reduce the ability of manufacturers to detect overlapping rebate claims. *Id*. at 48,903.

Nor was HRSA's reasoning "circular." Mot. at 17. It explained that alternatives would be less effective at preventing duplicate discounts and improving claims accuracy, because a rebate mechanism creates a distinct incentive: "the covered entity must submit validated claims data as a precondition to receiving the discount, creating an inherent incentive for accurate reporting." 91 Fed. Reg. at 48,901. That incentive is weaker when "the 340B discount is provided upfront." *Id*.

Finally, Plaintiffs contend that HRSA was committed to a "predetermined result" because it again pursued a rebate model. Mot. at 18. But this Court's prior ruling faulted HRSA for inadequately considering costs and reliance interests; the Court did not conclude that the model was unlawful or inherently unreasonable. *AHA I*, 820 F. Supp. 3d at 47. And it is "black-letter law" that an agency may "reexamine[] the problem, recast its rationale and reach[] the same result." *Biden v. Texas*, 597 U.S. 785, 813 (2022) (alteration in original); *cf. Housatonic River Initiative v. EPA*, 75 F.4th 248, 268 (1st Cir. 2023) (rejecting accusation of predetermination where agency retained principal features of proposal after public comment). HRSA considered comments, addressed objections, and designed the Pilot to mitigate burdens. Indeed, HRSA rejected PhRMA's requests to make rebates available immediately for all 340B purchases and to require additional purchasing and invoice data, finding that the latter could increase covered entities' administrative burdens. *See* PhRMA, Comment Letter on 340B Rebate Model Pilot Program 3, 16 (Apr. 20, 2026); 91 Fed. Reg. at 48,896, 48,902–03. HRSA also restricted manufacturers' use of Pilot data. *Id.* Plaintiffs' disagreement with HRSA's decision does not establish unlawful prejudgment.

## II. THE EQUITABLE FACTORS FAVOR DENIAL OF AN INJUNCTION.

"The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). The Court must also weigh the harm an injunction would impose on manufacturers and the public. *See Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

**A.** An injunction would substantially harm PhRMA's members. *See Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 37 (1st Cir. 2026) ("[T]he primary cost of any delay appears to run to the drug manufacturers."). Halting the Pilot would deprive participating manufacturers of a rebate mechanism to prevent duplicate 340B–MFP discounts—potentially costing them billions of dollars collectively. *See* Stansel Decl. ¶ 18, Dkt. No. 33-1; *see also* IQVIA, *How Large Are 340B/MFP Duplicate Discounts? 2: Findings* (Oct. 29, 2026), https://tinyurl.com/5hyftshp ("MFP/340B duplicate discounts for the first 10 drugs were estimated to be $4.1 billion for 2026, the next 15 drugs were $3.5 billion for 2027, and the combined impact was $7.6 billion."). Manufacturers would also lose the Pilot's benefits for transparency and oversight. 91 Fed. Reg. at 48,899. And an injunction would harm manufacturers excluded from the Pilot by threatening to delay broader use of rebate models to prevent duplicate discounts. *Id.* at 48,901; Stansel Decl. ¶¶ 19–23.

**B.** Plaintiffs' asserted injuries do not justify extraordinary relief. The Pilot preserves 340B discounted pricing, changing only the "mechanism and timing" for drugs representing roughly 5% of 340B sales. 91 Fed. Reg. at 48,893, 48,899. As HRSA emphasized, 340B drug purchases totaled approximately $100 billion in 2025, "underscoring the scale of discounted drug purchasing available to covered entities and the resulting financial resources and savings available to support

care for underserved populations." *Id*. at 48,894. Plaintiffs' predictions that the many thousands of "Plaintiffs and Maine safety–net providers" *collectively* "face tens of millions of dollars" in costs must be assessed against this backdrop. Mot. at 18.

Plaintiffs principally invoke compliance costs. Mot. at 19–20. But ordinary compliance costs generally do not establish irreparable harm,[6] and the First Circuit requires "substantial" injury. *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 222 (1st Cir. 2003). Plaintiffs predict that the Pilot will "immediately threaten operations" and "force 340B hospitals to cut or eliminate important patient services." Mot. at 18–19. Although the Court credited similar predictions in the prior litigation, *AHA I*, 820 F. Supp. 3d at 46, HRSA has now reasonably explained why the Pilot as designed should impose substantially lower burdens than Plaintiffs allege, 91 Fed. Reg. at 48,892–95.

**C.** The public interest favors allowing the Pilot to proceed. The public has a significant interest allowing HRSA to test whether a congressionally authorized rebate model can improve 340B compliance and program integrity. Plaintiffs' response—that the public has no interest in allowing unlawful government action to proceed—assumes the (wrong) answer to the merits question. And it ignores the public's strong interest in allowing agencies to respond to changing conditions—including the growth of the 340B Program and new MFP obligations—by choosing among congressionally authorized policy options.

Moreover, to the extent the Court concludes that the agency should provide more explanation, Plaintiffs are wrong to suggest that the public interest favors an injunction. An

[6] *See, e.g.*, *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) ("[I]njury resulting from attempted compliance with government regulation ordinarily is not irreparable harm."); *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) (same).

inadequately explained agency action need not automatically be vacated; it may be remanded without vacatur for the agency to explain further while the policy takes effect. *Central Me. Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001); *see also Town of Weymouth v. Mass. Dep't of Env't Prot.*, 973 F.3d 143 (1st Cir. 2020). That remedy is appropriate where, as here, any deficiency is in explanation only (again, AHA does not challenge the agency's authority to adopt a rebate model) and vacatur would dramatically disrupt the agency's approach to implementing Congress's goals (such as its determination that MFP and 340B discounts should not be duplicated). *See Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993).

Finally, because covered entities typically do not use windfalls from federal statutory discounts to pass savings on to patients, *see* Sunita Desai & J. Michael McWilliams, *Consequences of the 340B Drug Pricing Program*, 378 NEJM 539, 546 (2018), https://tinyurl.com/5bxazzw5, Plaintiffs' invocation of "patient care or access to medications" is misplaced. Mot. at 21. Consistent with HRSA's judgment, the public is best served by a Pilot that will support the long-term sustainability and integrity of the 340B Program.

## CONCLUSION

The Court should deny the motion for a preliminary injunction.

Dated: November 3, 2026

Respectfully submitted,

*/s/ Daniel L. Rosenthal*
Daniel L. Rosenthal, Bar #8618
MARCUS | CLEGG
16 Middle Street, Unit 501
Portland, ME 04101
(207) 828-8000
dlr@marcusclegg.com

Kwaku A. Akowuah (*pro hac vice*)
Madeleine Joseph (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Email: kakowuah@sidley.com

*Counsel for PhRMA*

## CERTIFICATE OF SERVICE

I, Daniel L. Rosenthal, hereby certify that I am over eighteen years old and caused a true and correct copy of the foregoing document to be served electronically on the parties receiving service in this case through the Court's CM/ECF electronic filing system on November 3, 2026

Dated: November 3, 2026

/s/ Daniel L. Rosenthal
Daniel L. Rosenthal, Bar #8618