**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

THE AMERICAN HOSPITAL ASSOCIATION, *et al.*,

Plaintiffs,

v.

ROBERT F. KENNEDY, JR. SECRETARY of the U.S. Department of Health and Human Services, *et al.*,

Defendants.

No. 1:26-cv-515-LEW

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**[1]

[1] Counsel for Defendants conferred with counsel for Plaintiffs, and the parties have agreed to litigate the Motion for a Temporary Restraining Order as a Preliminary Injunction Motion on the schedule the Court has entered. *See* Dkt. 14, 54.

## TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 2

I. Statutory and Regulatory Background ..... 2

A. The Section 340B Program ..... 2

B. The Medicare Drug Price Negotiation Program ..... 4

II. Factual Background ..... 5

STANDARD OF REVIEW ..... 6

ARGUMENT ..... 7

I. The Government is Likely to Succeed on the Merits Because HRSA's Approvals Do Not Violate the APA ..... 7

A. The Agency Applied The Correct Legal Standard ..... 8

B. The Agency Reasonably Considered Costs and Benefits of the Pilot ..... 10

1. HRSA Reasonably Considered Administrative Costs ..... 11

2. HRSA Reasonably Considered Float Costs ..... 14

3. HRSA Reasonably Considered Non-Economic Costs and Benefits of the Pilot ..... 16

C. The Agency Reasonably Considered Reliance Interests ..... 17

D. The Agency Reasonably Considered Alternatives and Did Not Act Arbitrarily to Reach a Predetermined Result ..... 19

II. Plaintiffs Have Failed to Show Irreparable Harm ..... 22

A. Compliance and Administrative Costs of the Program Are Not Irreparable Harm ..... 22

B. Plaintiffs Can Absorb Any "Float" Costs ..... 24

C. Any Setback to a Plaintiff's Mission Is Not Irreparable Harm ..... 25

III. The Balance of Equities and Public Interest Favor the Government ..... 25

CONCLUSION ..... 26

## TABLE OF AUTHORITIES

**Cases**

*Advocate Christ Med. Ctr. v. Kennedy*,
605 U.S. 1 (2025) .......... 9, 13

*Am. Hosp. Ass'n v.* Kennedy,
820 F. Supp. 3d 30 (D. Me. *2025), appeal dismissed*, No. 25-2236,
2026 WL 1854394 (1st Cir. Jan. 20, 2026) .......... 1, 5, 6, 18

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006) .......... 9

*Ass'n of Data Processing Serv. Orgs. v. Bd. of Gov. of Fed. Reserve Sys.*,
745 F.2d 677 (D.C. Cir. 1984) .......... 15, 17

*Astra USA, Inc. v. Santa Clara Cnty.*,
563 U.S. 110,at (2011) .......... 3, 4

*Bostock v. Clayton Cnty., Georgia*,
590 U.S. 644 (2020) .......... 9

*Bruno Project Rescue Inc. v. CDC*,
182 F.4th 1 (1st Cir. 2026) .......... 7

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962) .......... 7

*Charlesbank Equity Fund II v. Blinds to Go, Inc.*,
370 F.3d 151 (1st Cir. 2004) .......... 22

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .......... 22

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*,
48 F.3d 618 (1st Cir. 1995) .......... 25

*Consumer Elecs. Ass'n v. FCC*,
347 F.3d 291 (D.C. Cir. 2003) .......... 10

*Corewell Health William Beaumont Hosp. v. Kennedy*,
No. 1:26-cv-03111, 2026 WL 32575821 (D.D.C. Oct. 29, 2026) .......... 22

*Ctr. for Auto Safety v. Peck*,
751 F.2d 1336 (D.C. Cir. 1985) .......... 10

*Dep't of Com. v. New York*,
588 U.S. 752,at (2019) .......... 20

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
591 U.S. 1 (2020) ....................19

*Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*,
18 F.4th 38 (1st Cir. 2021) ....................26

*Eli Lilly & Co. v. Kennedy*,
No. 1:24-cv-03220-DLF, 2025 WL 1423630 (D.D.C. May 15, 2025) ....................8

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ....................7

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ....................7

*FCC v. Nat'lional Citizens Comm., for Broad.*,
436 U.S. 775,at (1978) ....................10

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .................... 10, 11

*Healthy Gulf v. Bureau of Ocean Energy Mgmt.*,
826 F. Supp. 3d 92 (D.D.C. 2026) ....................10

*Housatonic River Initiative v. United States Env't Prot. Agency*,
75 F.4th 248 (1st Cir. 2023) ....................7

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) ....................20

*Lucero v. Evangelidis*,
333 F. Supp. 3d 1 (D. Mass. 2018) ....................22

*Marasco & Nesselbush, LLP v. Collins*,
6 F. 4th 150 (1st Cir. 2021) ....................9

*Maryland v. King*,
567 U.S. 1301 (2012) ....................26

*Matos ex rel. Matos v. Clinton Sch. Dist.*,
367 F.3d 68 (1st Cir. 2004) ....................22

*Motor Vehicle Mfrs. Ass'n of the U.S. v State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ....................26

*Narragansett Indian Tribe v. Guilbert*,
934 F.2d 4 (1st Cir. 1991) ....................22

*Nken v. Holder*,
556 U.S. 418,at (2009) .......... 26

*Novartis Pharm. Corp. v. Kennedy*,
182 F.4th 1027 (D.C. Cir. 2026) .......... 9

*Perez v. Mortgage Bankers Assoc.*,
575 U.S. 92 (2015) .......... 6

*Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*,
58 F.4th 696 (3d Cir. 2023) .......... 3

*Sig Sauer, Inc. v. Brandon*,
826 F.3d 598 (1st Cir. 2016) .......... 7

*Sw. Airlines Co. v. Transp.ortation Sec. Admin.*,
650 F.3d 752 (D.C. Cir. 2011) .......... 8

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 6, 7, 25

**Statutes**

5 U.S.C. § 553 .......... 6, 15

5 U.S.C. § 706(2)(A) .......... 7

42 U.S.C. § 256b .......... *passim*

42 U.S.C. §§ 1320f-1 .......... *passim*

42 U.S.C. § 1396r-8(b)(4)(B)(i) .......... 4

42 U.S.C.§ 706(2)(A) .......... 2

Veterans Health Care Act of 1992,
Pub. L. No. 102-585, § 602, 106 Stat. 4943, 4967 .......... 2

Patient Protection and Affordable Care Act,
Pub. L. No. 111-148, tit. VII, subtitle B, § 7101, 124 Stat. 119, 821 .......... 2

Inflation Reduction Act of 2022,
Pub. L. No. 117-169, 136 Stat. 1818 .......... 4

**Rules**

Fed. R. Evid. 201 .......... 23

**Regulations**

42 C.F.R. § 10.20 (2025)....3

42 C.F.R. § 10.24 (2025)....3

*340B Program Notice: Application Process for the 340B Rebate Model Pilot Program,*
90 Fed. Reg. at 36163-01, (Aug. 01, 2025)....5

*Agency Information Collection Activities: Proposed Collection: Public Comment Request; Information Collection Request Title: 340B Rebate Model Pilot Program Application, Implementation, and Evaluation, OMB Number 0906-NEW,*
Fed. Reg. 35,989 (June 15, 2026) .... 11, 12, 13, 14

*Notice Regarding 340B Rebate Model Pilot Program,*
91 Fed. Reg. 48883-01 (Aug. 03, 2026) .... 1, 3

*Request for Information: 340B Rebate Model Pilot Program,*
91 Fed. Reg. at 7287-02, 7288 (Feb. 17, 2026)....5

**<u>Other Authorities</u>**

Federal Audit Clearinghouse, Christian Unity Hospital Corporation D/B/A Unity Medical Center and SU, (Sept. 29, 2021)
https://app.fac.gov/dissemination/summary/2020-06-CENSUS-0000251222....24

Federal Audit Clearinghouse, Christian Unity Hospital Corporation D/B/A Unity Medical Center and Subsidiary, (Jan. 9, 2025),
https://app.fac.gov/dissemination/summary/2024-06-GSAFAC-0000348329 ....24

Federal Audit Clearinghouse, Dallas County Medical Center, (May 10, 2022)
https://app.fac.gov/dissemination/summary/2021-12-CENSUS-0000253181....24

Federal Audit Clearinghouse, Nathan Littauer Hospital Association, (Sept. 27, 2023),
https://app.fac.gov/dissemination/summary/2022-12-CENSUS-0000255363....24

Federal Audit Clearinghouse, Nathan Littauer Hospital Association, (Sept. 27, 2023),
https://app.fac.gov/dissemination/summary/2021-12-CENSUS-0000255363....24

Form 990, Unity Medical Center, 2023,
https://apps.irs.gov/pub/epostcard/cor/450310159_202406_990_2025122923822820.pdf ....25

Form 990, Eastern Maine Medical Center, 2024,
https://northernlighthealth.org/Legal/990-Financial-Statements/990/NL-Eastern-Maine-Medical-Center-Form-990.aspx....25

H.R. Rep. No. 102-384, pt. 2 (1992) ....3, 8, 9, 17

Maine Health Data Organization 2020-2024 Financial Data Report (B), (Dec. 1, 2025),
https://mhdo.maine.gov/_pdf/Report_B_FY24_All_Financial_Hosp_251231.pdf....25

Provide, Merriam-Webster,
https://www.merriam-webster.com/dictionary/ ........................................ 8

## INTRODUCTION

The 340B Program, which allows certain healthcare providers to access drugs at discounted prices, *see* Section 340B of the Public Health Service Act, 42 U.S.C. § 256b, has grown exponentially. Its operational complexity has grown with it. The Department of Health and Human Services (HHS), which administers the program, has found it harder in recent years to protect program integrity, including by preventing duplicate discounts. To address these concerns, HHS intends to test a rebate model on a small fraction of the market, beginning on January 1, 2027, as part of a new and improved 340B Rebate Model Pilot Program.

HHS first sought to implement a Rebate Model Pilot Program last year. But based on the contemporaneous record as it then existed, which largely consisted of a three-page Federal Register Notice, this Court concluded that the agency had likely failed to adequately explain its decision and consider costs and reliance interests. *Am. Hosp. Ass'n v. Kennedy* (*AHA I*), 820 F. Supp. 3d 30, 41 (D. Me. 2025), *appeal dismissed*, No. 25-2236, 2026 WL 1854394 (1st Cir. Jan. 20, 2026). This time around, guided by the Court's concerns with its previous attempt, the agency engaged in a robust comment period and carefully addressed every significant concern raised by covered entities in a twenty-page Federal Register Notice. Notice Regarding 340B Rebate Model Pilot Program, 91 Fed. Reg. 48883 (Aug. 3, 2026).

As a matter of policy, reasonable people may disagree about rebates. As a matter of law, the answer is straightforward. The statute plainly gives the agency the authority to choose between rebates and discounts. *See* 42 U.S.C. § 256b(a)(1) (providing that the amount to be paid for covered outpatient drugs may not exceed a statutory ceiling price, "taking into account any rebate or discount, as provided by the Secretary [of HHS]"). And the Notice, which is only part of an extensive administrative record totaling more than 34,965 pages, explains why the agency reasonably expects a rebate mechanism to promote program integrity and address deduplication and other concerns. The record also underscores the reasonableness of the agency's decision to test the rebate model on a small fraction of the market where rebates are likely to have the most benefit.

Yet Plaintiffs—covered entities and associations representing them—again seek emergency relief from this Court to thwart the implementation of the Pilot Program, alleging that the program is substantively unreasonable in violation of the Administrative Procedure Act (APA). That Plaintiffs disagree with the agency's outcome does not render the agency's well-reasoned decisions "arbitrary" or "capricious." *Id.* § 706(2)(A). At bottom, Plaintiffs ask this Court to substitute its policy judgment for that of the agency, but that is not the proper role of this Court. Plaintiffs have also failed to show irreparable harm. Their calamitous predictions ring hollow in light of evidence putting into appropriate context the relatively modest burden imposed by the Pilot, which implements a method expressly authorized by statute. The balance of equities and public interest weigh in the Government's favor as well. Plaintiffs' motion for a preliminary injunction should be denied.

## BACKGROUND

### I. Statutory and Regulatory Background

Medicare is a federal medical insurance program for people ages sixty-five and older and for younger people with certain disabilities. *See* 42 U.S.C. §§ 1395 *et seq.* Medicaid is a joint federal and state program that provides medical coverage for people with limited resources or certain disabilities. *See id.* §§ 1396 *et seq.*

#### A. The Section 340B Program

Congress created the 340B Program to govern the prices that drug manufacturers may charge certain healthcare providers, *see* Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 602, 106 Stat. 4943, 4967 (codified at 42 U.S.C. § 256b), and it later expanded the scope of that program, *see* Patient Protection and Affordable Care Act, Pub. L. No. 111-148, tit. VII, subtitle B, § 7101, 124 Stat. 119, 821 (2010). Within HHS, the Health Resources and Services Administration (HRSA) administers the 340B Program on behalf of the Secretary.

Under Section 340B, pharmaceutical manufacturers participating in Medicaid and in Medicare Part B (which covers certain outpatient drugs) must offer discounted drugs to "covered entities[.]" *See* 42 U.S.C. § 256b(a)(1), (3), (4). The discounts provided through the 340B Program help covered entities "stretch scarce Federal resources as far as possible, reaching more eligible patients and

providing more comprehensive services." H.R. Rep. No. 102-384(II), at 12 (1992). In particular, it gives them extra revenue from serving insured patients because covered entities "turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount." *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 699 (3d Cir. 2023). Participation in the 340B Program is not limited to small hospitals that traditionally serve low-income populations, however; "large academic medical centers and integrated health systems may also qualify if they meet certain criteria." 91 Fed. Reg. at 48884.

Section 340B implements these discounted-pricing requirements through "uniform agreements that recite the responsibilities [Section] 340B imposes, respectively, on drug manufacturers and the Secretary of HHS." *Astra USA, Inc. v. Santa Clara Cnty.* 563 U.S. 110, 113 (2011). Section 340B directs the Secretary to enter into agreements under which the amount covered entities must pay manufacturers for covered outpatient drugs "(taking into account any rebate or discount, as provided by the Secretary)" may not exceed a specified ceiling price. 42 U.S.C. § 256b(a)(1).

Section 340B also imposes substantive requirements on covered entities that choose to participate in the program, prohibiting 1) duplicate discounts and 2) the diversion of drugs purchased under the 340B Program. 42 U.S.C. § 256b(a)(5). To prevent duplicate discounts, the statute specifies that a covered entity shall not request a discount for a drug that is already subject to a separate Medicaid rebate requirement. *Id.* § 256b(a)(5)(A). And to prevent diversion, the statute specifies that "a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity." *Id.* § 256b(a)(5)(B).

To ensure compliance, Section 340B requires a covered entity to permit both the Secretary and the manufacturer to audit the entity's records. *Id.* § 256b(a)(5)(C). Congress authorized the Secretary to impose sanctions against covered entities for diversion, duplicate discounts, or other statutory violations. *Id.* § 256b(d)(2)(B)(v). If a manufacturer fails to comply with its 340B requirements, the Secretary may terminate the manufacturer's pharmaceutical pricing agreement and

impose civil penalties. *Astra USA*, 563 U.S. at 115–16; *see* 42 U.S.C. §§ 256b(d)(1)(B)(vi), 1396r-8(b)(4)(B)(i), (v).

Since its inception, the 340B Program has experienced exponential growth. Between 2013 and 2023, the number of covered entities increased by 174%. 91 Fed. Reg. at 48886. From 2022 to 2023 alone, total 340B Program sales grew 23.4%, compared with a 10.1% growth in prescription drug spending in the U.S. in 2023. *Id.* And in 2025, the Program reached $100 billion in purchases at discounted 340B pricing. *Id.* at 48884. "As of April 1, 2026, the 340B Program includes 15,249 covered entities and 49,214 associated sites." *Id.* The 340B Program has therefore "evolved into a large and economically significant component of the pharmaceutical marketplace." *Id.* at 48886. The 340B Program has also grown harder to audit. Drugs now move through multi-step distribution channels, including contract pharmacies, and eligibility is often decided only after the fact. "This retrospective approach creates a gap between when a drug is dispensed and when eligibility is confirmed, making it difficult to ensure that discounted purchases are accurately matched to qualifying patients . . . and raising the risk that the same transaction could be counted toward both a 340B discount and a Medicaid rebate, a duplicate discount that the statute expressly prohibits." *Id.*

**B. The Medicare Drug Price Negotiation Program**

In the Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818, Congress gave the Secretary authority to negotiate the prices that Medicare pays for drugs that lack generic competition and that account for a disproportionate share of Medicare's expenses. 42 U.S.C. §§ 1320f(a), 1320f-1(b), (d), (e). The Medicare Drug Price Negotiation Program (MDPNP) applies only to manufacturers that choose to participate in Medicare and Medicaid and governs only the prices that Medicare pays for certain drugs. *See id.* § 1320f-1(b), (d). If negotiations for a selected drug are successful, the manufacturer memorializes its agreement to make the drug available to Medicare beneficiaries at the negotiated price, called the "Maximum Fair Price." *Id.* § 1320f-2(a). Under the Inflation Reduction Act's "nonduplication" provision, manufacturers must provide access to the lower of the Maximum Fair Price or the 340B ceiling price to covered entities—but not both. *Id.* § 1320f-2(d). Deduplication refers to the process of preventing such duplicate discounts.

## II. Factual Background

HRSA first attempted to roll out a 340B rebate Pilot program in August 2025, for reasons explained in a three-page Federal Register Notice. *See* 340B Program Notice: Application Process for the 340B Rebate Model Pilot Program, 90 Fed. Reg. 36163, 36163–65 (Aug. 01, 2025). That program would have gone into effect in January 2026. But largely the same plaintiffs as in this case obtained a preliminary injunction from this Court, which concluded that, based on the scarce contemporaneous record, the agency had likely failed to consider and reasonably explain important aspects of its decision. *See AHA I*, 820 F. Supp. 3d at 40. So the agency withdrew that program, and this Court vacated the agency's approvals of manufacturers' applications.

Then, in February 2026, the agency issued a Request for Information to "further evaluate the potential benefits and costs of a rebate model, among other topics." Request for Information: 340B Rebate Model Pilot Program, 91 Fed. Reg. 7287, 7288 (Feb. 17, 2026). By issuing the Request, it sought comments from stakeholders "across the continuum of the drug supply chain in order to gather information on how a rebate model would impact covered entities, manufacturers, wholesalers, State Medicaid Agencies, pharmacies, the Federal Government, and other stakeholder groups." *Id.* And it committed to "undertaking a methodical and deliberate approach to assess whether to implement a potential 340B Rebate Model Pilot Program[.]" *Id.*

In response, HRSA received a total of 2,475 comments, including 1,170 identical comments as part of a letter campaign and 26 non-public comments, "all of which HRSA considered in the design of the revised Pilot." *Id.* at 48888. In responding to those comments in a twenty-page Notice discussed further below,[2] HRSA explained that it designed the Pilot Program to balance "the burden on program stakeholders with the benefits to transparency and program integrity that a rebate model would provide." *Id.* at 48901. The drugs included in the Pilot are limited to the twenty-five drugs

---

[2] HHS voluntarily solicited comments, but the agency action here is not a rulemaking, so to the extent Plaintiffs imply that HHS was required to respond to comments directly, rather than just consider the scope of the problem and explain its decision, that argument is misplaced. *See AHA I*, 820 F. Supp. 3d at 45 (citing 5 U.S.C. § 553; *Perez v. Mortgage Bankers Assoc.*, 575 U.S. 92, 96 (2015)).

selected "for initial price applicability years 2026 and 2027 included on the CMS Medicare Drug Price Negotiation Selected Drug List," which represent less than 5.5% of total 340B sales. *Id.* at 48901–02.

Manufacturers then submitted plans to participate in the Pilot to HRSA, which evaluated the submissions and insisted on certain changes before approving plans in September of this year. *See* Partial Administrative Record (PAR) 33699–34941. For example, HRSA initially withheld approval of several drug manufacturers' proposed plans that would have permitted rejection or adjustment of 340B rebates on broader grounds than those permissible under the Pilot. *See, e.g.*, PAR 33747–49, 34613–14, 34680–81. HRSA also initially denied approval of proposed plans that allowed for expanded use of covered entity data beyond the purposes explicitly identified in the Pilot. *See., e.g.*, PAR 33747–49, 34253–54, 34300–01, 34413–14. And HRSA rejected one manufacturer's application because its proposal did not align with Program requirements to protect covered entities. PAR 34765–68. Ultimately, the agency approved ten manufacturers' plans for eighteen drugs to participate in the Pilot.[3] Approved plans are set to take effect January 1, 2027.

Plaintiffs have once again sued, claiming that the new Pilot Program is arbitrary and capricious under the APA. They seek to preliminarily enjoin "HRSA's approvals of the drug companies' plans" and enjoin HRSA "from implementing or giving effect to the Rebate Program in any way." Compl. at 140, Dkt. 1; *see also* Pls.' Mot. for TRO at 21 ("Pls.' Br."), Dkt. 2.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted). A "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

[3] 340B Rebate Model Pilot Program, HRSA, https://www.hrsa.gov/opa/340b-model-pilot-program.

relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

## ARGUMENT

### I. The Government is Likely to Succeed on the Merits Because HRSA's Approvals Do Not Violate the APA

Review under the arbitrary and capricious standard is "'highly deferential,' and [a court] will "uphold an agency determination if it is 'supported by any rational view of the record.'" *Bruno Project Rescue Inc. v. CDC*, 182 F.4th 1, 8 (1st Cir. 2026) (citation omitted); *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Moreover, an agency is free to change its position so long as it displays awareness that it is doing so, shows that there are good reasons for the new policy, and takes any serious reliance interests into account. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016); *see also Housatonic River Initiative v. United States Env't Prot. Agency* 75 F.4th 248, 270 (1st Cir. 2023) ("The agency 'need not demonstrate . . . that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible . . . , that there are good reasons for it, and that the agency believes it to be better.'" (citation omitted)). A court "may not substitute [its] judgment for that of the agency, even if [the court] disagree[s] with its conclusions." *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 601 (1st Cir. 2016). Review should be particularly circumscribed here because the statute expressly grants the Secretary the authority to effectuate 340B prices via rebates. *See* 42 U.S.C. § 256b(a)(1).

Here, the agency's decisions to approve manufacturers' applications to participate in the Pilot Program readily satisfy the arbitrary and capricious standard, particularly in the context of informal agency adjudications.[4] As the record shows, the agency thoughtfully designed the Pilot Program in light of the exponential growth in the 340B Program, the growing complexity of the pharmaceutical supply chain, the difficulty of enforcing the prohibition on duplicate discounts, and concerns surrounding diversion. *See supra* at pp. 9–17. The agency recognized that the Program has operated

[4] *See, e.g.*, *Sw. Airlines Co. v. Transp. Sec. Admin.*, 650 F.3d 752, 757 (D.C. Cir. 2011) (Kavanaugh, J.) ("In 'informal adjudication[s]' like these, agencies must satisfy only 'minimal procedural requirements.'" (citation omitted)).

using upfront discounts for many years, but explained its view that "the size and complexity of the 340B Program and the pharmaceutical distribution chain, together with the [Medicare Drug Price Negotiation Program] framework and nonduplication requirements, warrant reconsideration of whether the upfront discount model remains the most effective means of carrying out statutory objectives." *Id.* at 48886–87.

**A. The Agency Applied the Correct Legal Standard**

Plaintiffs first argue that the agency applied an incorrect legal standard, but they are wrong. *See* Pls.' Br. at 5. The statutory text confers on HHS discretion to choose the mechanism for effectuating 340B pricing. *See* 42 U.S.C. § 256b(a)(1) (directing the Secretary of HHS to enter into agreements with drug manufacturers to effectuate the 340B ceiling price, "taking into account any rebate or discount, *as provided by the Secretary*" (emphasis added)). The relevant definition of the term "provide" is "to have as a condition" or to "stipulate." *Provide*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/provide. The statute therefore contemplates that the Secretary will set "as a condition" or "stipulate" whether the 340B price will be achieved through rebates or discounts. *See also Eli Lilly & Co. v. Kennedy*, 2025 WL 1423630, at *9 (D.D.C. May 15, 2025) (adopting this construction of the statute).

In opposition, Plaintiffs point to a committee report. But that report confirms this reading of the statutory text by acknowledging that 340B price reductions "would be implemented, *at the discretion of the Secretary*, either by a point-of-purchase discount, a rebate, or other mechanism." H.R. Rep. No. 102-384(II), at 8, 12, 16 (emphasis added). Even so, Plaintiffs argue that the committee report somehow divests HHS of this statutory discretion because it also indicated that the committee "expect[ed]" "the Secretary [to] use the mechanism that is the most effective and most efficient from the standpoint of each type of 'covered entity.'" *Id.* at 16. But a committee report is not positive law, so it cannot impose a standard that does not exist in the statute. *See Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 654 (2020) ("[O]nly the words on the page constitute the law adopted by Congress and approved by the President."); s*ee also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 304 (2006) (rejecting reliance on language in conference committee report that would impose an

obligation with no basis in statutory text). In any event, that the committee report flagged certain factors that it expected HHS to consider does not mean that those factors control over all others, for "no statute pursues a single policy at all costs." *Advocate Christ Med. Ctr. v. Kennedy*, 605 U.S. 1, 19 (2025).

Contrary to Plaintiffs' assertion, *Novartis* does not suggest otherwise. *See* Pls.' Br. at 6. There, the D.C. Circuit cited the same committee report to emphasize that Congress expected that "the *Secretary of HHS*"—rather than drug manufacturers themselves—would adopt the mechanism for effectuating 340B discounts. *Novartis Pharm. Corp. v. Kennedy*, 182 F.4th 1027, 1035 (D.C. Cir. 2026) (emphasis in original). The court did not suggest that the committee report could impose an obligation on the Secretary that does not exist in the statute. And in legal filings, Defendants never argued that the committee report could amend the statutory text. Rather, Defendants cited the committee report to support their view that the perspective of covered entities is a relevant consideration for the agency. Defendants also acknowledged that covered entities "generally preferred" a discount system. *Id.* But Defendants did not imply that the Secretary must choose a mechanism based *solely* on the preference of covered entities. To do so would itself be arbitrary and capricious by failing to account for the interests of other regulated entities and other relevant considerations, like program integrity.

Plaintiffs' reliance on *Marasco & Nesselbush, LLP v. Collins* is similarly misplaced. Pls.' Br. at 6 (citing *Marasco*, 6 F. 4th 150, 172–75 (1st Cir. 2021)). *Marasco* considered whether an agency disregarded a statutory mandate, whereas here, there is no statutory mandate, but an "expectation" in a committee report. In any event, as further explained below, HRSA *did* consider the costs and benefits of the rebate mechanism from the standpoint of different covered entity types, *see* 91 Fed. Reg. at 48900–01, and it reasonably concluded that the Pilot Program does not deviate from the statute's purpose of stretching scarce federal resources to reach more eligible patients and provide more comprehensive services. *See* 91 Fed. Reg. at 48899. The agency therefore applied the correct legal standard.

**B. The Agency Reasonably Considered Costs and Benefits of the Pilot**

Plaintiffs next argue that HRSA failed to reasonably consider the costs and benefits of the rebate pilot program, pointing to the following categories of costs: 1) administrative costs; 2) float costs; and 3) non-economic costs. *See* Pls.' Br. at 7–13. At the outset, arbitrary-and-capricious review is particularly deferential when it comes to matters implicating predictive judgments. *See FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775 813–14 (1978); *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021). Courts are "especially careful 'not to substitute [their] judgment for that of the agency . . . when the agency is called upon to weigh the costs and benefits of alternative policies.'" *Healthy Gulf v. Bureau of Ocean Energy Mgmt.*, 826 F. Supp. 3d 92, 109–10 (D.D.C. 2026) (quoting *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003) (Roberts, J.)); *see also Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985) (Scalia, J.) ("[C]ost-benefit analyses epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency . . . ." (citation omitted)).

In any event, Plaintiffs' argument is belied by the record. HRSA intends to "use data collected through the Pilot, including rebate submissions, denials, and dispute outcomes, to more effectively prevent duplicate discounts relative to existing mechanisms and to inform future policy considerations related to program integrity and compliance." 91 Fed. Reg. at 48890. It "believes that a rebate-based approach," "including the use of standardized claims-level data, will improve the identification and prevention of duplicate discounts" and further the goals of program integrity and overall transparency. *Id.* In particular, the agency expects "that the manufacturer data collection from covered entities under this Pilot will enable manufacturers to better identify 340B transactions both for purposes of their nonduplication efforts in MDPNP and deduplication in Medicaid Managed Care." *Id.* And the agency specifically cited "program integrity" as a "growing risk," noting that in 2019, when the Program was half its current size, manufacturer commenters stated that Medicaid/340B duplicate discounts amounted to as much as $1.5 billion annually. *Id.* at 48887.

Still, as discussed below, the agency recognized reliance interests on the upfront discount model and the new costs the Pilot will impose on covered entities. But it designed the Pilot to

minimize those costs, tailored the Pilot to include only those drugs for which overlapping federal pricing obligations create a heightened risk of duplicative price concessions, and reasonably concluded that the costs are outweighed by the benefits.

### *1. HRSA Reasonably Considered Administrative Costs*

HRSA estimated that the Pilot will impose total annual administrative costs of reporting claims of $537,262,052 across all covered entities, recognizing that due to the 340B Program's size and scale, "even modest operational changes produce large aggregate cost figures." *See* Ex. C, Supporting Statement A at 11 (Aug. 4, 2026). As compared with the previous day's Final Pilot Notice, that figure was updated to reflect more up-to-date Bureau of Labor Statistics data. *See id.* To arrive at that figure, HRSA explained that it estimated total burden hours "based on implementation of a potential Pilot compared to current data collection practices in the market." 91 Fed. Reg. 35989, 35991. In particular, the agency used "a task-based methodology that considers the discrete activities required to complete a reporting cycle." *Id.* at 35990. These activities include: 1) identifying and extracting eligible claims data; 2) formatting and validating data to meet manufacturer specifications; 3) submitting the data; 4) reconciling submissions and tracking rebate status; and 5) addressing errors, denials, or follow-up requests. *Id.*

HRSA carefully reviewed "the full range of comments while considering a range of policy options to best meet the commenters' varying perspectives." *Id.* at 48892. Several commenters asserted that implementation of a rebate model would impose significant costs on covered entities, including administrative burden, staffing needs, system modifications, and other costs. *Id.* at 48890. By contrast, manufacturers and technology companies argued that those estimates were "overstated or unsupported," pointing out that "covered entities are already required to collect and maintain the relevant claims-level data as part of routine billing, compliance, and audit activities." *Id.*

While HRSA acknowledged that the reporting process involves multiple steps beyond a simple transmission of data, it also determined that higher-end estimates reflected overall operational impacts rather than incremental time required to complete individual reporting responses under the Paperwork Reduction Act (PRA) framework. HRSA concluded, in light of the limited scope of the

Pilot and the limited claims-data involved, most of which are commonly available and already maintained by covered entities, that five hours per week represented a reasonable average[5] burden across a range of entities and was consistent with PRA guidance to estimate typical respondent effort. *See id.* at 35990–91. HRSA also recognized that the upfront discount model, under which most covered entities currently operate, reduces the need for post-purchase reconciliation and limits certain administrative steps. But the agency found that "many projections of administrative burden rest[ed] on assumptions that do not align with the design of the Pilot or . . . that do not accurately reflect what is needed administratively to implement a rebate approach." *Id.* at 48893.

For example, "several commenters assumed that covered entities would be required to develop and maintain manufacturer-specific data submissions, support multiple proprietary submission platforms, submit purchasing data, encounter-level information, patient-level clinical information, or real-time claims feeds, and manually reconcile claims across multiple systems." *Id.* "Other commenters projected substantial staffing increases . . . to support rebate administration, based on assumptions that data would require extensive manual collection, validation, and submission." *Id.* But "these projections generally assumed limited automation, manufacturer-specific reporting requirements, or ongoing parallel workflows that are not contemplated under the Pilot." *Id.* In reality, "the Pilot requires submission only for the limited universe of drugs included in the Pilot, utilizes standardized pharmacy and medical claims data elements, and relies primarily on information that covered entities already collect, maintain, and retain in the ordinary course of billing, dispensing, audit, and compliance activities." *Id.*

For these reasons, HRSA determined that in many cases, though not all, additional staffing will be unnecessary. *Id.* As for one-time implementation costs, HRSA emphasized that standardized data elements, centralized reporting processes, and reliance on information already maintained by covered entities will yield implementation costs far lower than estimates that assumed manufacturer-

[5] Page 35,990 of the June 15, 2026 Information Collection Request (ICR) incorrectly refers to the five-hour estimate as a "median" burden across covered entities; the table on the next page of that ICR correctly refers to it as the "average" burden, as does Supporting Statement A.

specific submission requirements, manual reconciliation across multiple proprietary platforms, and customized interfaces. The agency further predicted that these costs will be transitional, diminishing as processes become integrated into routine operations. *Id.*

Regarding systems and infrastructure, HRSA realized that implementation may require coordination with IT platforms to support the submission and validation of claims data. But the costs of the rebate IT platform must be paid by manufacturers as a condition of participation in the Pilot. And the record showed that rebate processing platforms have already been developed or are in the process of being operationalized and are designed to integrate with existing billing, pharmacy, and Third Party Administrator systems. HRSA anticipated that these platforms will leverage existing data flows and automation capabilities, thereby minimizing the need for covered entities to develop new systems. Finally, HRSA expects manufacturers and their platform vendors to "encourage platform designs that promote interoperability, minimize disruption to existing workflows, and reduce administrative burden on covered entities." *Id.* at 48894. Covered entity concerns that each manufacturer would use a different platform were not borne out in practice, as each manufacturer is using the same platform.[6]

As for other costs, including vendor fees and training, HRSA noted that participation in the 340B Program has always entailed some level of compliance and operational costs. Indeed, the record showed that "covered entities and their contract pharmacy partners already perform extensive administrative functions under the 340B Program, including inventory management, compliance oversight, audit preparation, collection and submission of claims-level data to manufacturers, [Third Party Administrators], and payers, and reconciliation activities." *Id.* at 48892–93. At the same time, covered entities derive significant financial benefit from participation in the Program. *Id.* at 48894. So while a rebate model may introduce incremental or transitional administrative and operational changes, HRSA concluded that the magnitude of the associated costs is likely to remain low as compared with the benefits of the Pilot program and the 340B Program more broadly. *See id.*

[6] 340B Rebate Model Pilot Program, HRSA, https://www.hrsa.gov/opa/340b-model-pilot-program.

Plaintiffs' claim that HHS failed to consider these costs, *see* Pls.' Br. at 7, is therefore belied by the extensive consideration HRSA gave them in the Notice. Coming to a different conclusion than Plaintiffs would have reached is not the same as failing to consider them. Ultimately, the agency reasonably concluded that the Pilot is structured to enable covered entities, manufacturers, and vendors to operationalize processes and identify implementation challenges on a limited, manageable scale. The twenty-five drugs that were eligible for the Pilot represent less than 5.5% of total 340B sales, with the remaining 94.5% continuing under the upfront discount model in 2027. The eighteen drugs that were ultimately approved to participate represent an even smaller percentage of 340B sales. This modest approach allows for the evaluation and adjustment of workflows and data exchange mechanisms based on actual experience prior to potential broader application, generating concrete, practice-based evidence on how the rebate model operates.

HRSA's cost assessment was thus neither irrational nor "pulled from thin air." Pls.' Br. at 7.

*2. HRSA Reasonably Considered Float Costs*

Plaintiffs further argue that HRSA failed to reasonably consider float costs, which is entirely inaccurate. *Id.* at 10. By float costs, Plaintiffs refer to the cost of floating the full price of covered drugs until covered entities receive their rebates—only ten days later, at maximum.

But HRSA acknowledged that many commenters expressed concern that covered entities would have to pay wholesale acquisition cost upfront and wait for rebate payments, which could create liquidity constraints and lead to financial instability. 91 Fed. Reg. at 48894. Other commenters indicated that the impact would be limited because rebates would be paid before drug purchase payments are due to wholesalers. Some commenters stated that the potential cash-flow impacts of a rebate model may be inaccurate or overstated, noting that "the numbers provided are only estimates and that healthcare providers already operate within reimbursement frameworks in which payment is received after the point of purchase, including under Medicare, Medicaid, and commercial payer systems." *Id.* In addition, "wholesalers commonly provide covered entities with payment windows or credit arrangements." *Id.* These commenters also indicated that "unit-based rebate models could reduce delays associated with current models that require accumulation of a full package size before

purchasing at the 340B discounted price and improve the predictability of reimbursement over time." *Id.*

After considering the comments, and available studies[7] of a rebate model, HRSA concluded that the Pilot was unlikely to result in unstable cash flow for covered entities. Plaintiffs claim that the studies are flawed and further claim that they do not support the agency's conclusions. Pls.' Br. at 10–12. But the Notice shows that HRSA consulted these studies to help it evaluate the competing narratives presented by commenters, and then, as explained below, incorporated design elements to mitigate any cashflow impacts on covered entities.

First, "the Pilot requires prompt rebate payments, within ten calendar days of submission of a complete claim." 91 Fed. Reg. at 48895. "This accelerated payment timeline is intended to precede the payment deadlines associated with standard wholesaler payment terms, thereby reducing or eliminating the need for covered entities to 'float' the [wholesale acquisition cost] price or finance drug purchases for extended periods." *Id.* Therefore, "while many covered entities would need to place an order at the higher [wholesale acquisition cost] price for the drugs included in the Pilot, payment to wholesalers for those orders, in most cases, would occur after the rebate from the manufacturer is received." *Id.* Even assuming that some wholesalers require payment within shorter timeframes, *see* Golder Decl. ¶ 20; Denton Decl. ¶ 21, Plaintiffs never identify the wholesalers in question or quantify how many of the eighteen drugs they acquire from such wholesalers, nor do

---

[7] Plaintiffs fault HRSA for not citing these studies in the RFIs or ICRs. But "the most critical factual material" test applies to rulemaking, not informal agency adjudication, and in any event does not extend to all data. *See Ass'n of Data Processing Serv. Orgs. v. Bd. of Gov. of Fed. Reserve Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984) (Scalia, J.) ("It is true that, in informal rulemaking, at least the most critical factual material that is used to support the agency's position on review must have been made public in the proceeding and exposed to refutation. That requirement, however, does not extend to all data, . . . and it only applies in rulemaking and not in other informal agency action, since it derives not from the arbitrary or capricious test but from the command of 5 U.S.C. § 553(c) that 'the agency . . . give interested persons an opportunity to participate in the rule making.'"); *see also Sw. Airlines Co.*, 650 F.3d at 757 ("An agency conducting an informal adjudication has no statutory obligation to prematurely disclose the materials on which it relies so that affected parties may pre-rebut the agency's ultimate decision." (internal citations omitted)).

they explain why covered entities have no duty to act as prudent buyers by working with those wholesalers that provide more favorable payment terms.

Second, "the Pilot requires unit-level rebate processing, which allows covered entities to receive rebates based on individual dispenses . . . rather than waiting for full package utilization, as occurs under the current replenishment model." 91 Fed. Reg. at 48895. This approach is expected to accelerate the timing and frequency of rebate payments, resulting in more predictable and continuous cash flow. *Id.* Third, "the Pilot accounts for starting inventory considerations to facilitate the transition from upfront discounts to rebates for a limited set of drugs." *Id.* "HRSA has incorporated operational flexibilities, such as a 15-day implementation grace period for unreplenished accumulations, to address commenter concerns regarding inventory timing, cash flow, and potential gaps between drug purchase and rebate eligibility during the transition to a rebate-based model." *Id.*

Taken together, "these design features are intended to ensure that covered entities can access 340B pricing in a timely manner while minimizing short-term liquidity pressures." *Id.* HRSA also stressed that "timely rebate payment is a core requirement of manufacturer participation in the Pilot and is critical to maintaining operational stability for covered entities." *Id.* HRSA intends to monitor and enforce manufacturer compliance with payment deadlines, including by removing manufacturers from participation in the Pilot for noncompliance. *Id. Contra* Pls.' Br. at 11–12.

### *3. HRSA Reasonably Considered Non-Economic Costs and Benefits of the Pilot*

With respect to non-economic costs, including patient care, HRSA indicated that covered entities, "provider organizations, and some patient advocacy groups generally" asserted that a shift to a rebate model could affect the timing and availability of financial resources used to support patient care. 91 Fed. Reg. at 48898. In particular, commenters were concerned that patients will lose access to "discounted drugs and needed services because covered entities" will have to divert resources away from patient care and toward complying with the Pilot. *Id.* By contrast, manufacturers stated that a rebate model could maintain or enhance patient access by improving program integrity and ensuring that discounts accrue to the patients that the 340B Program was intended to benefit." *Id.* Further, "[s]ome commenters cite[d] industry analyses suggesting that duplicate discounts may affect up to

approximately 25% of 340B drug transactions, representing tens of billions of dollars annually, and asserted that reducing such inefficiencies could improve the overall availability of resources within the healthcare system." *Id.* These commenters indicated that improved claims-level transparency and coordination across programs, including with the MDPNP, could support more accurate pricing and reduce the need for post hoc reconciliation, which may contribute to more predictable financial flows over time. *Id.*

After reviewing both perspectives, HRSA stated that "Congress created the 340B Program so that covered entities could 'stretch scarce federal resources as far as possible, reaching more eligible patients and providing more comprehensive services.'" *Id.* at 48899 (citing H.R. Rep. No. 102–384(II), at 12). HRSA concluded that "the Pilot does not deviate from that statutory purpose." *Id.* It explained that implementation of a rebate model does not "modify the statutory 340B ceiling price, covered entity eligibility requirements, or the legal framework governing patient eligibility under the 340B Program." *Id.* "Rather, the Pilot changes the mechanism and timing by which the 340B price is effectuated, shifting from an upfront discount to a post-dispense rebate that is expressly authorized by the 340B statute." *Id.* And the Pilot is designed to "mitigate any potential operational or financial disruption to covered entities," so "HRSA does not anticipate that the Pilot will materially impair covered entities' cash flow or their ability to furnish services to patients." *Id.* Contrary to Plaintiffs' predictions about the impacts of the Pilot, at the end of the day, Plaintiffs will spend the same amount of money on these drugs after the Pilot is implemented as they do now, as that price is set by statute. Their arguments are premised on overstating costs, but HRSA reasonably concluded that the true costs of the Pilot are much lower than their predictions. The agency is not obligated to respond to consequences based on fanciful worst-case scenario estimates of costs.

### C. The Agency Reasonably Considered Reliance Interests

Plaintiffs also argue that HRSA did not reasonably consider reliance interests. *See* Pls.' Br. at 15–16. As this Court noted last year, "agencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position,

and consider serious reliance interests." *AHA I*, 820 F. Supp. 3d at 42. As the below illustrates, that is what HRSA has done this time around.

Some commenters raised concerns about reliance interests. 91 Fed. Reg. at 48888. They asserted that an upfront discount model has been used in the Program for more than thirty years, and covered entities have reasonably relied on this consistency when designing their internal operations. *Id.* These commenters argued that there was no reason to shift to what they viewed as a costly rebate mechanism given this history. *Id.* By contrast, other commenters claimed that the costs of implementing a rebate mechanism were overstated and the benefits far outweighed any additional costs. *Id.* They stressed that a rebate mechanism "is not a novel concept as it has been used in a limited capacity in the 340B Program for decades, is widely employed across the drug industry, and the current replenishment system functions in several respects like a rebate mechanism." *Id.*

In response, HRSA agreed that rebates are common across the pharmaceutical sector, are used extensively in Medicare Part D, and have been recognized as a valid mechanism in the 340B context for AIDS drug assistance programs since 1988. *Id.* In the agency's view, any reliance on a single delivery mechanism must be understood in light of the 340B statute's plain language, which clearly contemplates rebates, "the 340B Program's evolving administrative framework, and the evolution of the pharmaceutical distribution chain over the past 20 years." *Id.* Plaintiffs argue that HRSA dismissed their reliance as unreasonable, Pls.' Br. at 15–16. Although HRSA doubted that covered entities could reasonably expect an upfront discount model to continue unchanged forever in light of the discretion the statute confers on the agency, 91 Fed. Reg. at 48888, in the alternative, HRSA expressly considered covered entities' reliance interests and concluded that those interests were outweighed by other policy concerns, like ensuring program integrity. *Id.* at 48889. Moreover, the "significant growth in size and complexity of the 340B Program has introduced oversight challenges that were less pronounced when the Program was smaller and less complicated." 91 Fed. Reg. at 48888. "While covered entities have relied on the upfront discount model for three decades, HRSA in its stewardship role must balance these interests against the rapidly changing 340B landscape that requires HRSA to weigh competing policy concerns, including program accessibility,

administrative feasibility, statutory compliance, and the prevention of duplicate discounts and diversion." *Id.*

Under Plaintiffs' view, in which the costs of a rebate model will always outweigh its benefits from Plaintiffs' perspective, HRSA could *never* implement a rebate mechanism, in contravention of the express terms of the statute. Plaintiffs' position notwithstanding, reliance interests cannot amend statutory language. *See Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 32 (2020) ("[E]ven if [an agency] ultimately concludes that the reliance interests rank as serious, they are but one factor to consider. [The agency] may determine, in the particular context before it, that other interests and policy concerns outweigh any reliance interests.").

Here, "HRSA has taken into consideration covered entities' reliance interests and found that, on balance, they do not outweigh the significant benefits of proceeding with the Pilot as described in this Notice." 91 Fed. Reg. at 48889. It is not for Plaintiffs or this Court to second-guess that determination.

**D. The Agency Reasonably Considered Alternatives and Did Not Act Arbitrarily to Reach a Predetermined Result**

Finally, Plaintiffs argue that HRSA ignored important problems and rejected less burdensome alternatives on arbitrary grounds so it could reach a predetermined result. *See* Pls.' Br. at 16–18. Plaintiffs' characterization is not only factually wrong, it is also insufficient, as a matter of law, to set aside an agency action. Legally, there is no "open-mindedness test" under the APA. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 685 (2020). "It is hardly improper for an agency head to come into office with policy preferences and ideas, discuss them with affected parties, sound out other agencies for support, and work with staff attorneys to substantiate the legal basis for a preferred policy." *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019).

In any event, the record refutes Plaintiffs' claim that HRSA rejected alternatives on arbitrary grounds. HRSA acknowledged that commenters identified alternative approaches to address program integrity concerns within the existing upfront discount framework, including enhanced use of claims modifiers; a centralized clearinghouse or similar data-sharing mechanism; more intensive audits and

oversight; and narrower pilot structures. 91 Fed. Reg. at 48899. After carefully considering each of these proposals, HRSA concluded that none of them, either individually or in combination, would achieve the program integrity and evaluation objectives that the Pilot is designed to advance. *Id.* at 48899.

As for claims modifiers, that approach entails covered entities and pharmacies applying standardized identifiers to claims at the point of adjudication to flag 340B transactions. *Id.* HRSA acknowledged that claims modifiers are a component of the current framework for identifying 340B transactions, but HRSA did "not believe that reliance on claims modifiers alone would adequately address the program integrity deficiencies that the Pilot is designed to mitigate and prevent." *Id.*; *see also supra* at p. 10 (noting that in 2019, when the 340B Program was half its current size, manufacturer commenters estimated that Medicaid/340B duplicate discounts amounted to $1.5 billion annually). HRSA noted that the Medicaid Exclusion File, which assists covered entities with preventing duplicate discounts for drugs subject to Medicaid rebates, also "relies on claims modifiers as its central mechanism." 91 Fed. Reg. at 48899. "Yet multiple governmental oversight bodies have found this approach may be insufficient." *Id.* These findings indicate that claims modifiers "may not be the best method to ensure compliance with the statutory duplicate discount prohibition." *Id.* Moreover, "claims modifiers can be applied inconsistently, may be incomplete or unavailable at the time of adjudication, and depend on voluntary compliance by covered entities and dispensing pharmacies without an enforcement mechanism that ties the receipt of the 340B discount to verified claims data." *Id.*

Other commenters proposed a centralized or third-party clearinghouse as an alternative to a rebate model, under which an intermediary would serve as a central data hub to coordinate 340B transaction information. But HRSA "considered this proposal and conclude[d]" that it was in substance "an enhanced claims modifier system operating under a different name" and therefore subject to the same limitation of the current model, which fails to incentivize covered entity compliance as a *prerequisite* to receiving 340B discounts. *Id.* at 48900. As HRSA explained, all of the proposed retrospective enforcement mechanisms are inherently reactive and identify a potential

duplicate discount only after it occurs, whereas a rebate model shifts the compliance framework to a prospective approach in which verification occurs before the discount is provided. *Id.* at 48901.

Finally, commenters proposed significantly narrowing the Pilot itself, including "limiting participation to voluntary participants, restricting participation to entities with sufficient operational capacity, limiting the Pilot to fewer drugs or dispensing settings, or excluding physician-administered drugs or contract pharmacy arrangements." *Id.* at 48900.

HRSA carefully considered these alternatives, but it determined that differences between covered entities do not justify carving up the Pilot. *Id.* at 48901. "HRSA specifically determined that limiting participation to non-hospital entities, voluntary covered entities, or only operationally sophisticated entities could introduce substantial selection bias and reduce the reliability and generalizability of Pilot findings." *Id.* Similarly, further limiting the number of drugs in the Pilot would "reduce the agency's ability to evaluate rebate administration and duplicate discount prevention in the context of the MDPNP and other overlapping pricing programs." *Id.* And "[t]he nonduplication and duplicate discount issues that the Pilot is designed to address are inherently drug-specific and apply to all covered entities." *Id.* For that reason, "the program integrity risk, along with the nonduplication risk, that the Pilot is designed to mitigate . . . attaches to particular drugs, namely, those drugs for which overlapping federal pricing obligations create a heightened risk of duplicative price concessions, rather than to particular categories of covered entities." *Id.* "Scoping the Pilot by the drugs that generate the specific compliance challenge is therefore a rational and direct means of targeting the identified problem." *Id.*

Thus, HRSA concluded that "none of the proposed alternatives would adequately serve the program integrity and evaluation objectives that the Pilot is designed to advance, and that a limited rebate pilot provides the most appropriate mechanism to evaluate operational feasibility, duplicate discount prevention, transparency, and coordination across federal pricing programs in the current programmatic environment." *Id.*

That conclusion was both reasonable and reasonably explained. It is not arbitrary and capricious merely because Plaintiffs disagree.

## II. Plaintiffs Have Failed to Show Irreparable Harm

Plaintiffs must also show that a preliminary injunction is needed "to prevent a real threat of [irreparable] harm." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). In other words, a "speculative injury" is not enough. *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6–8 (1st Cir. 1991) (citation modified). And as Judge Nichols recently explained in the 340B context, a plaintiff does not "automatically" meet the irreparable harm standard when funds are unrecoverable. *Corewell Health William Beaumont Hosp. v. Kennedy*, 2026 WL 3257581, at *6 (D.D.C. Oct. 29, 2026). This harm must also be "significant," *id.*, or "substantial." *Lucero v. Evangelidis*, 333 F. Supp. 3d 1, 4 (D. Mass. 2018) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).

Importantly, Plaintiffs do not claim that the rebate model reduces the amount of their 340B discounts. That amount is set by the statute, and the challenged agency action here merely changes how those discounts are disbursed in a way that the 340B statute clearly authorizes. Rather, Plaintiffs principally focus on three theories of harm: 1) compliance and administrative costs; 2) "float" costs; and 3) setbacks to their mission. None of these asserted injuries rise to the level of irreparable harm.

### A. Compliance and Administrative Costs of the Program Are Not Irreparable Harm

First, Plaintiffs claim that moving to a rebate model will impose large compliance and administrative costs, alleging that "$537 million in data-submission costs alone" will force them to "cut or eliminate important patient services," hire new analysts, and postpone projects. Pls.' Br. at 19–20. But these cost estimates are speculative and are far higher than HRSA's estimates; the actual costs are likely to be far lower and relatively insubstantial.

The Pilot Program has a very limited scope—currently covering only 18 drugs that together constitute less than 5.5% of total 340B sales—and the program requires covered entities to submit claims only for this small set of drugs. 91 Fed. Reg. at 48893. The program "utilizes standardized

pharmacy and medical claims data elements," and "relies primarily on information that covered entities already collect, maintain, and retain in the ordinary course of billing, dispensing, audit, and compliance activities." *Id.* For this reason, HRSA projected an average administrative cost of only $34,320 per covered entity. *Id.* While allowing that some costs are "inherent to the adoption of a new operational approach," HRSA expected that costs will diminish over time. *Id.*

Moreover, evidence suggests that Plaintiffs already have the practical and financial resources to comply with the rebate program.[8] Eastern Maine Medical Center's corporate parent—Northern Light Health—has a long-term contract with OptumInsight, Inc., a subsidiary of UnitedHealth Group, which appears to include 340B-related consulting services. Nathan Littauer Hospital's declaration refers to a "third-party administrator" and "third-party compliance vendor" that it already uses. Fadale Decl. ¶ 18, Dkt. 2-4; s*ee also* Denton Decl. ¶ 27, Dkt. 2-3 (acknowledging that county-owned Dallas County Medical Center (DCMC) already collects contract pharmacy claims "in the ordinary course of business," but asserting, without explanation, that "medical claims are not as readily available"). Covered entities' existing practices confirm HRSA's view that additional staffing will often be unnecessary.

Finally, covered entities' 340B revenues have fluctuated significantly, which suggests they can continue to provide services even where these revenues vary over time.[9]

---

[8] Pursuant to Fed. R. Evid. 201(b)(2), Defendants request the Court take judicial notice of the facts cited in footnotes 9 through 12.

[9] Nathan Littauer Hospital Association, Independent Auditors' Reports, year ended December 31, 2022, at 22, https://app.fac.gov/dissemination/summary/2022-12-CENSUS-0000255363; Nathan Littauer Hospital Association, Independent Auditors' Reports, year ended December 31, 2021, at 19, https://app.fac.gov/dissemination/summary/2021-12-CENSUS-0000255363 (showing Nathan Littauer Hospital's 340B revenue fluctuated between $1.2 and $3.9 million in 2020 and 2022); Christian Unity Hospital Consolidated Financial Statements, years ended June 30, 2021 and 2020, at 30, https://app.fac.gov/dissemination/summary/2021-06-CENSUS-0000251222, Christian Unity Hospital Consolidated Financial Statements, years ended June 30, 2024 and 2023, at 31, https://app.fac.gov/dissemination/summary/2024-06-GSAFAC-0000348329 (fluctuated from $824,761 to $639,183 in 2020 and 2024 for Unity Medical Center); Dallas County Medical Center Auditor's Report, Dec 31, 2021 and 2020, at 7, 29, https://app.fac.gov/dissemination/summary/2021-12-CENSUS-0000253181 (between approximately $290,000 and $1,111,910 from 2019 to 2021 for DCMC).

### B. Plaintiffs Can Absorb Any "Float" Costs

Second, Plaintiffs suggest the "float" costs will "threaten bond-covenant defaults, insolvency, diversion of limited cash-on-hand away from payroll and other critical needs, and even participation in the 340B Program itself." Pls.' Br. at 20. Plaintiffs are entitled to rebates within 10 days of submitting their claims and have made no allegation that they will not be reimbursed; Plaintiffs acknowledge the *entire* process will not likely take more than a month. Austin Decl. ¶ 16, Dkt. 2-1. And the reimbursement burden lies with the manufacturers—HRSA intends to monitor compliance with payment deadlines and may take enforcement action in the event of delays. 91 Fed. Reg. at 48895.

When evaluating Plaintiffs' claims about their liquidity, the Court should look at the covered entities and their associated entities together. Eastern Maine Medical Center (on its own) has 69.9 days cash on hand without taking into consideration board-designated and other investments, which jumps to 84.5 days if one includes such investments.[10] Eastern Maine Medical Center also has its own pharmacy subsidiary: M Drug, which had over $104 million in total revenue and end-of-year assets of over $39 million according to Eastern Maine Medical Center's most recent 990 Form.[11] Similarly, other Plaintiffs disregard resources of their affiliated foundations and reserves when expressing concerns about liquidity.[12]

### C. Any Setback to a Plaintiff's Mission Is Not Irreparable Harm

---

[10] *See* Maine Health Data Organization (MHDO) 2020-2024 Financial Data Report (B), Dec. 1, 2025, https://mhdo.maine.gov/_pdf/Report_B_FY24_All_Financial_Hosp_251231.pdf, at 84, *contra* Austin Decl. ¶ 8 (Me. Hosp. Ass'n), Dkt. 2-1 (asserting that a recent MHDO report "shows that the median operating margin for Maine hospitals was 0.35 percent and the median number of days of cash on hand was 9.3") (underlining in original); *see also* Denton Decl. ¶ 10 (DCMC presently has 111 days cash on hand).

[11] Form 990, Eastern Maine Medical Center, 2024, at 101, https://northernlighthealth.org/Legal/990-Financial-Statements/990/NL-Eastern-Maine-Medical-Center-Form-990.aspx.

[12] Form 990, 2023, Unity Medical Center, at 1, https://apps.irs.gov/pub/epostcard/cor/450310159_202406_990_2025122923822820.pdf (showing Unity Medical Center has total assets over $42 million).

Finally, Plaintiffs assert that the Pilot will cause irreparable harm to their missions, as they face financial uncertainty and may have to delay maintenance on hospital facilities and cut back on health-promoting services. To the extent Plaintiffs rely on injuries to patients, they may not rely on alleged harms to third parties to demonstrate irreparable harm, *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 622 (1st Cir. 1995); *see also Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish . . . that *he* is likely to suffer irreparable harm in the absence of preliminary relief." (emphasis added)). In any event, these claims are too speculative to support Plaintiffs' claims. *See* 91 Fed. Reg. at 48899 (projecting that the Pilot Program will not harm patient care). Thus, Plaintiffs have failed to establish irreparable harm.

**III. The Balance of Equities and Public Interest Favor the Government**

Even if Plaintiffs could establish irreparable harm, they have not shown that "the balance of equities and consideration of the public interest" favor a preliminary injunction. *Winter*, 555 U.S. at 32. Where, as here, the government is the defendant, these factors "merge." *Nken v. Holder*, 556 U.S. 418 435 (2009). As the First Circuit has recognized, "[a]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)). That is particularly true here, where Congress has explicitly granted the Secretary of HHS the authority to choose between rebates or discounts in administering the 340B Program, and the agency has reasonably chosen to exercise that authority in light of vast recent changes in the regulatory landscape. Regulatory agencies "must be given ample latitude to 'adapt their rules and policies to the demands of changing circumstances.'" *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (citation omitted). And while Plaintiffs claim that the balance of the equities and the public interest favor them because there is no public interest in the perpetuation of unlawful agency action, Pls.' Br. at 21, that argument only presupposes the success of their incorrect view of the merits.

## CONCLUSION

For these reasons, this Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: November 3, 2026

Respectfully submitted,

BRENNA JENNY
Deputy Assistant Attorney General
Civil Division

MICHELLE R. BENNETT
Assistant Director
Federal Programs Branch

*/s/ Elisabeth Neylan*
ELISABETH J. NEYLAN (N.Y. Bar Reg. No. 6125736)
MICHAEL S. POLITO (D.C. Bar No. 90041172)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel: (202) 616-3519; Fax: (202) 616-8460
E-mail: Elisabeth.J.Neylan@usdoj.gov

*Attorneys for Defendants*